## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 18-31080 (DRJ)** |
| | § | |
| **HGIM HOLDINGS, LLC,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

## DECLARATION OF SHANE J. GUIDRY IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Shane J. Guidry, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am the Chairman of the board of directors and the Chief Executive Officer of HGIM Holdings, LLC, a limited liability company organized under Delaware law ("***HGIM Holdings***," and, together with its 90 Debtor affiliates, the "***Debtors***," "***Harvey Gulf***," or the "***Company***").

2. I have more than 29 years of experience in the offshore supply vessel and marine support services industry. I joined Harvey Gulf in 1988, and have served continuously as Chief Executive Officer since my appointment in 1997. As a result, I am familiar with the Company's day-to-day operations, business and financial affairs, books and records, and employees.

3. On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Court***").

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Gladiator Marine, Inc. (3298), Golden Lane Marine, Inc. (4167), Guidry Brothers, Inc. (6568), Harvey America LNG, LLC (8857), Harvey Badger, LLC (2525), Harvey Bear, LLC (6355), Harvey Beaver, LLC (2298), Harvey Blue-Sea, LLC (0837), Harvey Bobcat, LLC (0099), Harvey Bronco, LLC (6441), Harvey Buffalo, LLC (8949), Harvey Bull, LLC (2896), Harvey Carrier, LLC (8502), Harvey Challenger, LLC (0334), Harvey Champion, LLC (9246), Harvey Charger, LLC (6139), Harvey Clipper, LLC (1593), Harvey Colt, LLC (6038), Harvey Condor, LLC (8252), Harvey Cougar, LLC (5816), Harvey Cowboy, LLC (0864), Harvey Deep-Sea, LLC (8407), Harvey Eagle, LLC (1135), Harvey Energy, LLC (8717), Harvey Explorer 242, L.L.C. (5016), Harvey Express 225, LLC (0818), Harvey Falcon, LLC (0858), Harvey

4.     All facts and opinions set forth in this declaration (this "***Declaration***") are based upon:  (i) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (ii) information learned from my review of relevant documents; (iii) information supplied to me or verified by other members of the Company's management and its third-party advisors; and/or (iv) my experience and knowledge concerning the offshore supply vessels and marine support services industry generally.  Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but it is accurate to the best of my knowledge.  Such financial information is presented on a consolidated basis for the Debtors, except where specifically noted.

5.     The Debtors have filed certain contemporaneous motions seeking "first day" relief (collectively, the "***First Day Pleadings***") to minimize possible adverse effects of the chapter 11 filings on the Debtors' businesses.  I have reviewed the First Day Pleadings, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders resulting from the filing of these chapter 11 cases (the "***Chapter 11***

---

Freedom, LLC (5429), Harvey Gator, LLC (7401), Harvey Giant, LLC (1757), Harvey Gladiator, LLC (0222), Harvey Grizzly, LLC (1887), Harvey Gulf International Marine, LLC (4472), Harvey Hauler, LLC (9654), Harvey Hawk, LLC (5055), Harvey Hawkeye, LLC (3208), Harvey Heat, LLC (0384), Harvey Herd, LLC (3095), Harvey Hurricane, LLC (1196), Harvey Husky, LLC (3647), Harvey Hustler, LLC (5552), Harvey Indian, LLC (0709), Harvey Intruder, L.L.C. (1512), Harvey Jaguar, LLC (8702), Harvey Leader, LLC (7641), Harvey Legend, LLC (3187), Harvey Liberty, LLC (0308), Harvey Lightning, L.L.C. (3787), Harvey Lion, LLC (6760), Harvey Mariner, LLC (3917), Harvey Mustang, LLC (9266), Harvey Otter, LLC (4295), Harvey Pacer, LLC (5543), Harvey Panther, LLC (8839), Harvey Patriot, LLC (4297), Harvey Pioneer, LLC (7920), Harvey Pirate, LLC (9649), Harvey Power, LLC (8862), Harvey Provider 240, L.L.C. (5017), Harvey Raider, LLC (9905), Harvey Rain, LLC (2933), Harvey Ram, LLC (7523), Harvey Raven, LLC (1432), Harvey Razorback, LLC (3556), Harvey Rebel, LLC (3584), Harvey Redhawk, LLC (8299), Harvey Rover, LLC (0651), Harvey Runner, LLC (1882), Harvey Sailor, LLC (2032), Harvey Saint, LLC (1609), Harvey Sea Lion, LLC (2325), Harvey Sea-Hawk, LLC (1664), Harvey Seas, LLC (0471), Harvey Spirit, L.L.C. (6777), Harvey Spur, LLC (5474), Harvey Steeler, LLC (5881), Harvey Storm, LLC (7078), Harvey Subsea, LLC (6477), Harvey Supporter, LLC (9141), Harvey Thunder, L.L.C. (5020), Harvey Tiger, LLC (4232), Harvey Tugs, LLC (8947), Harvey War Horse, L.L.C. (5019), Harvey War Horse III, L.L.C. (3785), Harvey Wave, LLC (2246), Harvey Wind, LLC (0974), Harvey Wolf, LLC (7836), Harvey Worker, LLC (2503), HGIM Corp. (0829), HGIM Holdings, LLC (0448), and N.J. Guidry & Sons Towing Co., Inc. (9524).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  One Shell Square, 701 Poydras Street, Suite 3700, New Orleans, Louisiana 70139.

*Cases*").   As set forth herein and described in greater detail in the First Day Pleadings, I also believe that without immediate access to cash collateral and authority to make certain essential prepetition payments and otherwise continue conducting ordinary course business operations, the Debtors would suffer immediate and irreparable harm to the detriment of their businesses, estates, and stakeholders.

6.      I am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I would testify competently to the facts and opinions set forth herein.

## PRELIMINARY STATEMENT

7.      Harvey Gulf is a premier operator of offshore supply vessels and marine support services in the Gulf of Mexico, and commenced the Chapter 11 Cases to effectuate a balance sheet restructuring that will ensure the Company remains the market leader for years to come.  Harvey Gulf operates its top-end fleet of vessels qualified under the Jones Act[2] to support offshore oil and gas exploration and production.   The Company obtained its best-in-class status by providing innovative, technologically advanced, safe, and energy efficient support vessels to meet the evolving production and drilling support needs of the deepwater and ultra-deepwater energy industry.   Harvey Gulf's success is buoyed by the hard work of its management team and employees, and its critical relationships and contracts with its key customers.  Above all, Harvey Gulf prides itself on its industry-wide reputation for safety.

8.      Beginning in 2014, as a result of severely depressed oil prices, exploration and production companies drastically cut the number of offshore exploration and drilling projects in the Gulf of Mexico, causing substantial drops in both vessel utilization and day rates.  These cuts

---

[2]      Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them in the remainder of this Declaration or in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated February 26, 2018 (the "***Plan***").

US 5515025

impacted the offshore supply boat and service sector by, among other things, contributing to a considerable vessel oversupply in the marketplace.  Industry-wide oversupply granted substantial pricing power to exploration and production companies and deeply impacted all offshore supply boat and service market participants—including Harvey Gulf.

9.      Company management quickly recognized the early signs of the market downturn and took action to combat its impact.  Commencing in January 2014, and continuing through the first quarter of 2017, Harvey Gulf initiated a series of operational and financial actions with the goal of weathering the market downturn.  These steps included implementing approximately $87 million in cost reductions, stacking unprofitable vessels, conducting non-core asset sales, and negotiating amendments to its Credit Facility to provide financial covenant relief.  Contemporaneously, Harvey Gulf made the strategic decision to execute long-term vessel use contracts with its key customers to position itself to endure a potential downturn in the vessel spot market.  This unique approach successfully enabled Harvey Gulf to maintain positive EBITDA and substantially outperform other market participants during the now 3.5-year-long, industry-wide market downturn.  As the downturn persisted into 2017, however, the Company recognized the need for a balance-sheet restructuring to ensure it could continue to lead the pack in its industry, particularly as other market participants effectuated restructurings to substantially deleverage their balance sheets.

10.     As an initial step in 2017, the Debtors initiated negotiations with the Agent with the goal of amending the Credit Agreement and obtaining relief from certain financial covenants and debt servicing obligations.  When it became apparent that a more comprehensive transaction would be necessary to deleverage the Debtors' balance sheet, the Debtors engaged with the Agent,

4

a broad base of Lenders under the Credit Agreement, and other stakeholders to negotiate a consensual deleveraging of the Debtors' balance sheet.

11.     After months of hard-fought, arm's-length negotiations, the Debtors, these Lenders, and the Debtors' equity sponsor, The Jordan Company, L.P. ("***TJC***") and certain of its affiliates (together with TJC, the "***TJC Parties***"), successfully reached agreement on the terms of a comprehensive restructuring transaction (the "***Restructuring***").  These parties memorialized this agreement in a restructuring support agreement (the "***RSA***"), which formed the foundation for the Plan which will substantially deleverage the Debtors by converting nearly **$1.0 billion** in secured debt into equity.  This significant deleveraging will right-size the Debtors' balance sheet, eliminate burdensome covenants and amortization payments, and reduce interest expense on an annual basis by approximately $47 million.  Improved cashflow will enable the Debtors to offer more attractive pricing to their customers and to maintain and expand their state-of-the-art fleet.  Moreover, the Plan does not impair general unsecured creditors, with the goal of preserving the Debtors' relationships with valued trade and contract counterparties.  Lastly, the transactions contemplated by the Plan ensure that the Debtors remain compliant with the Jones Act, an essential requirement for the Debtors' business operations.

12.     The Debtors completed solicitation of votes on the Plan before filing the Chapter 11 Cases.  Only the holders of allowed claims on account of the Credit Agreement were entitled to vote on the Plan.  Holders of approximately 94% in number and 75.5% in dollar amount,[3] voted to accept the Plan, excluding the votes of insiders.

13.     I believe that it is in the Debtors' best interests to commence the Chapter 11 Cases to effect the above-described deleveraging on an accelerated basis.  Following consummation of

---

[3]     The percentage in dollar amount voting to accept is based upon the principal amount of claims.

US 5515025

the Restructuring included in the Plan, I believe the Debtors' technologically advanced vessels, key business relationships, superior operational capabilities, and elite management team will enable them to continue to succeed in the offshore supply boat and service market despite the depressed oil market. Moreover, I believe that the Plan and the deleveraging transactions embodied therein will best position the Debtors to maintain their already strong position in the industry, and will propel the Debtors to long-term success.

14. The remainder of this Declaration is organized as follows. Part I provides background information on the Company and detailed information on the Company's operations and prepetition capital structure. Part II describes the significant distress presently affecting the offshore supply vessel and marine support services industry and its effects on the Debtors, the Debtors' prepetition restructuring efforts, and the negotiations that led to the RSA and solicitation of the Plan. Part III and **Exhibit A** summarize the relief requested in and the factual bases supporting the First Day Pleadings.

## I.   THE DEBTORS BUSINESS

### A.   Company History

#### 1.   Founding and Early History

15. My grandfather, Numa Guidry, started Harvey Gulf as a fishing company in 1946. In 1955, he assembled a fleet of inland towing vessels to service the Gulf Coast transportation market and named his company Harvey Canal Towing Company. In 1965, Numa Guidry's sons— Robert Guidry and Richard Guidry—joined the family enterprise and helped expand it into the offshore ocean towing and rig moving industry. The company adopted a new name to reflect its new direction: Harvey Gulf International Marine, Inc.[4]

---

[4]   Harvey Gulf International Marine, Inc. originally was a corporation, but in 2009 was converted to Harvey Gulf International Marine, LLC, a Louisiana limited liability company.

US 5515025

16.     In 1972, my father, Robert Guidry, was elected as the President and Chief Executive Officer of what now is Harvey Gulf.  I began working at the Company in 1988 and spent the next ten years working closely alongside my father in many roles, including overseeing Harvey Gulf's vessel safety inspections, vessel maintenance and repair, and sales and marketing division. In 1994, I became the President of Harvey Gulf, and in 1997, when my father stepped down as Chief Executive Officer, I was elected Chief Executive Officer and became the third-generation family member to serve as President and Chief Executive Officer of Harvey Gulf.

### 2.     Harvey Gulf's Expansion into the OSV and MPSV Sector

17.     In 2003, Harvey Gulf entered a new age with its foray into the offshore supply vessel ("*OSV*") and multi-purpose support vessel ("*MPSV*") market.  Management saw an opportunity in the deepwater market, and determined that it was best to divest the Company's tugboat business and invest in OSVs and MPSVs.  Accordingly, Harvey Gulf built and began operating a number of new OSVs and MPSVs in the Gulf of Mexico (the "*GoM*") between 2003 and 2006.  In 2014, as part of the continued evolution from a tugboat company into an OSV company, Harvey Gulf sold its entire towing division, including all eight vessels, and it no longer operates in the tugboat or towing sector.

18.     In 2008, I partnered with The Resolute Fund II, L.P., an investment fund managed by TJC, to acquire Harvey Gulf.  The acquisition was designed to pair Harvey Gulf with a sophisticated sponsor with strong access to the debt and capital markets.  Working with a well-capitalized and respected financial entity enabled Harvey Gulf to complete a series of strategic acquisitions that positioned Harvey Gulf to compete with the biggest OSV companies operating in the GoM and created opportunities to enter new geographic markets.  Between 2012 and 2014, Harvey Gulf acquired approximately 62 vessels through a series of acquisitions of three different competitors.  Each time, the Company hired primarily the crews necessary to staff the newly

US 5515025

acquired vessels, maintaining a lean corporate staffing structure in line with a strong culture of efficiency and accountability that continues today.

### B.    Assets and Operations

#### 1.    Vessels

19.    Harvey Gulf primarily operates and maintains one of the most technologically advanced fleets operating in the GoM out of a full-services facility in Port Fourchon, Louisiana. Harvey Gulf's recent achievements include:

- becoming the first company in North America to own and operate a marine service vessel that uses liquefied natural gas ("**LNG**") as its primary fuel source;

- completing construction and commencing operations of the first LNG marine fueling facility in the United States;

- accepting delivery of the *Harvey Stone*, a highly specialized, technologically advanced multi-purpose field support vessel ("**MPFSV**"); and

- accepting delivery of the *Harvey Sub-Sea* and sister vessel the *Harvey Blue-Sea*, each a large capacity "best in class" multi-purpose heavy construction vessel ("**MPHCV**") with the technical capabilities to efficiently, effectively, and safely perform high-quality field development activities.

20.    In addition, Harvey Gulf is recognized across the industry for its safety-focused culture.  The Company consistently outperforms industry benchmarks for safety standards, and there has never been a loss of life caused by the Company's operations in its over 60 years of existence.

21.    Harvey Gulf's fleet is also one of the most environmentally friendly in the GoM. All of Harvey Gulf's extra-large OSVs, MPSVs, and MPHCVs are designated as American Bureau of Shipping ENVIRO+[5] and Green Passport class.[6]

---

[5]    ENVIRO+ class vessels are "green" vessels that comply with many international environmental protection requirements.

[6]    Green Passport notation certifies that a vessel was not built with environmentally unfriendly materials.

22.     The fleet currently consists of 60 vessels, divided among five categories as set forth in the chart below.

| Vessels by Category | |
| --- | --- |
| Offshore Supply Vessels (OSVs) | 50 |
| Multi-Purpose Support Vessels (MPSVs) | 2 |
| Multi-Purpose Heavy Construction Vessels (MPHCVs) | 2 |
| Multi-Purpose Field Support Vessel (MPFSV) | 1 |
| Fast Supply Vessels (FSVs) | 5 |
| **Total** | **60** |

### i.      Offshore Supply Vessels



*Harvey Spirit, a large OSV*

23.     Harvey Gulf is a premier provider of high-spec new generation vessels operating in the GoM.  OSVs are differentiated from other types of marine support vessels by their cargo-handling flexibility, longer range, and large capacity.  Specifically, OSVs use space on and below deck to transport equipment and supplies such as fuel, water, drilling fluids, drill pipe, deck equipment, provisions, and other cargo.  The Company's fleet includes 50 OSVs that provide support to rigs, production facilities and offshore construction, maintenance, and salvage projects in all water depths of the GoM.

US 5515025

ii.       **Multi-Purpose Support Vessels and Multi-Purpose Heavy Construction Vessels**



*Harvey Sub-Sea, an MPHCV*

24.      The Company's fleet includes two MPSVs and two MPHCVs.  These vessels are distinguished from OSVs in that they are larger and more specialized vessels that are principally used to support complex deepwater subsea construction, installation, repair, and maintenance. MPSVs and MPHCVs also support remotely operated underwater vehicle operations, diving activities, well intervention, platform decommissioning, and other offshore topside and subsea construction applications.

iii.      **Multi-Purpose Field Support Vessel**



*Harvey Stone, an MPFSV*

10

25.     The Company's fleet includes one MPFSV, the *Harvey Stone,* a highly specialized, technologically advanced vessel with the capability to operate as the dedicated pull-back tug in support of large tankers.

### iv.          Fast Supply Vessels



*Harvey Express, an FSV*

26.     The Company's fleet includes five fast supply vessels ("**FSV**").  FSVs are distinguished from OSVs in that they are smaller vessels that are primarily used for quick transportation of equipment and personnel to drilling rigs, production facilities, and other offshore assets.  While traditional OSVs travel at an average speed of approximately 10 knots, FSVs are capable of reaching speeds of up to 30 knots and are used to transport deck cargo, fuel, and water for offshore installations.  FSVs are also capable of transporting personnel to and from offshore assets when helicopters cannot be used due to adverse weather conditions or other unforeseen events.

US 5515025

### 2.   LNG Vessels and Investments





*Harvey Energy, an extra-large LNG-powered OSV*

*Harvey Freedom, an extra-large LNG-powered OSV*

27.    After discussions with its key customers, Harvey Gulf concluded that LNG-powered vessels are the future of the offshore supply boat and service sector.  LNG-powered vessels have distinct advantages over those powered by traditional fuels, including: (i) lower cost; (ii) virtually no sulfur oxide emission; (iii) significantly reduced nitrogen oxide emission; (iv) significantly reduced hazardous particulate matter; (v) greater reliability; (vi) increased safety; and (vii) their ability to withstand increasingly stringent environmental regulatory requirements.

28.    As a result, Harvey Gulf invested in developing and building LNG-powered vessels in order to ensure its place at the forefront of LNG technology.  In 2015, the Company completed construction and commenced operations of an LNG marine fueling facility in Port Fourchon, Louisiana, the first such LNG marine fueling facility in the United States.  This LNG fueling facility supports critical operations of the oil and gas industry's OSV fleet operating on alternative, cleaner burning fuel.

29.    That same year, Harvey Gulf accepted delivery of the *Harvey Energy* OSV, becoming the first company in North America to own and operate a marine service vessel that uses LNG as its primary fuel source.  Harvey Gulf has since accepted delivery of three additional LNG-

powered OSVs: the *Harvey Liberty*, the *Harvey Power*, and the *Harvey Freedom*, and expects to take delivery of the *Harvey America* during the Chapter 11 Cases.

30.     These investments were well-received by customers, created significant opportunities for the Company, and are a key part of the Debtors' long-term strategy to maintain their position as market leaders.



*LNG Marine Fueling Facility in Port Fourchon, LA*

### 3.     Operations

#### i.     The Debtors' Management

31.     The Company's success is buoyed by an experienced management team.  Harvey Gulf's management team is currently comprised of the following:

| Name | Years with Harvey Gulf | Title |
|------|------------------------|-------|
| Shane J. Guidry | 29 | Chairman and Chief Executive Officer |
| Robert L. Gwinn, III | 39 | President |
| Jeffrey M. Henderson | 8 | Executive Vice President and Chief Financial Officer |
| Robert A. Vosbein, Jr. | 11 | Executive Vice President and General Counsel |
| Chad J. Verret | 8 | Executive Vice President of LNG Operations |
| Lance A. Reynolds | 6 | Executive Vice President of Vessel Operations |
| Corby Autin | 10 | Executive Vice President HSSE and Personnel |

#### ii.     Key Customer Relationships

32.     Harvey Gulf's customer relationships are crucial to its success.  The customer base includes oil majors, independent exploration and production ("*E&P*") companies, and drilling

contractors, some of which have been customers for over 50 years.  The Company's top 10 customers accounted for 93%, 96%, and 95% of its revenues on a consolidated basis in 2015, 2016, and 2017, respectively.

### iii.      Employees

33.     The Debtors currently employ approximately 580 employees, comprised of 504 crew members, nine hourly employees, and 67 land-based and corporate employees.  None of the Debtors' employees is represented by a labor union.  The Debtors provide employees with a defined-contribution savings plan qualified pursuant to section 401(k) of the Internal Revenue Code of 1986, as amended.

34.     Harvey Gulf is headquartered in New Orleans, Louisiana and maintains two corporate leases in Houston, Texas.

### iv.      Regulation of the Debtors' Business

35.     The Debtors' business operations are subject to extensive government regulations in the form of United States federal, state, and local statutes, and regulations governing the operation and maintenance of vessels.  The Company's vessels are subject to the jurisdiction of the United States Coast Guard, the National Transportation Safety Board, United States Customs and Border Protection, and the United States Maritime Administration.

36.     Notably, the Debtors and certain Non-Debtor Affiliates are subject to the restrictions of the U.S. cabotage laws known as the Shipping Act of 1916 and the Merchant Marine Act of 1920 (as amended, the "*Jones Act*"), under which the transporting of merchandise or passengers for hire in the coastwise trade of the United States is generally restricted to vessels built in the United States, registered under the U.S. flag, and owned and operated by "U.S. Citizens" within the meaning of the Jones Act.  Generally, a business entity must satisfy two requirements in order to qualify as a U.S. Citizen under the Jones Act, and, thereby, be eligible to own and

14

operate a vessel in the U.S. coastwise trade.  First, the entity must be eligible to document a vessel in the United States with the U.S. Coast Guard.[7]  Second, the entity must be at least 75% owned by U.S. citizens eligible to own and operate a vessel in the coastwise trade.[8]

37.     For the avoidance of doubt, I anticipate that before, during, and upon completion of the Restructuring contemplated by the Plan, the Debtors will continue to take all necessary steps to remain Jones Act compliant.

### C.     Corporate Organizational Structure

38.     The Debtors are comprised of 91 entities, each organized under Delaware or Louisiana law.  HGIM Holdings, a Delaware limited liability company, is the ultimate parent company of each of the Debtors.  Harvey Gulf also has 11 affiliates that are not Debtors in the Chapter 11 Cases (the "***Non-Debtor Affiliates***").  A chart illustrating the full organizational structure is attached as **Exhibit B**, and a simplified chart is depicted below.

---

[7]     46 U.S.C. § 55102(b)(2).  For a corporation to document a vessel in the United States: (1) it must be incorporated under the laws of the United States or a state; (2) its chief executive officer, and the chairman of the board of directors, must be U.S. citizens; and (3) no more than a minority of the number of directors necessary to constitute a quorum can be noncitizens.  *Id.*; § 12103(b)(4); 46 C.F.R. §§ 67.39(a), 221.3(c)(2).  For a general partnership: (1) each general partner must be a citizen; and (2) U.S. citizens must own at least 50% of the "equity interest in the partnership."  46 C.F.R. § 67.35; *see also* 46 U.S.C. § 12103(b)(3); 46 C.F.R. § 221.3(c)(3).  For a limited liability company, it is either subject to the corporation or general partnership requirements depending on how it is organized; it is generally considered to be organized like a corporation if it is managed by a board of managers rather than directly by the members.

[8]     46 U.S.C. § 50501(a); 55 Fed. Reg. 51,244 (Dec. 12, 1990).  A 75 percent interest exists only if: (1) title to at least 75 percent of the stock in the corporation is vested in citizens of the United States free from any trust or fiduciary obligation in favor of a person not a citizen of the United States; (2) at least 75 percent of the voting power in the corporation is vested in citizens of the United States;  (3) there is no contract or understanding by which more than 25 percent of the voting power in the corporation may be exercised, directly or indirectly, in behalf of a person not a citizen of the United States; and (4) there is no other means by which control of more than 25 percent of any interest in the corporation is given to or permitted to be exercised by a person not a citizen of the United States.  46 U.S.C. § 50501(d).

The regulations clarify that the 75% requirement is only met if: (1) "[a]t least 75 percent of the stock interest in the corporation . . . is owned by citizens . . ."  46 C.F.R. § 67.39(b)(2); (2) "stock or equity interest requirements for citizenship . . . encompass title to all classes of stock, title to voting stock, and ownership of equity."  *Id.* § 67.31(a); and (3) where title to a vessel is held by an entity comprised, in whole or in part, of other entities which are not individuals, each entity contributing to the stock or equity interest qualifications of the entity holding title must be a citizen eligible to document vessels in its own right . . . ."  46 C.F.R. § 67.31(d).



1. Includes wholly-owned subsidiaries thereof
2. Harvey Thunder, LLC is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc.,
   a wholly-owned direct subsidiary of HGIM Corp.

### 1. The Debtors

39.    HGIM Holdings and HGIM Corp., a corporation organized under Delaware law and a wholly-owned direct subsidiary of HGIM Holdings, were each formed on May 20, 2008, in connection with my and TJC's acquisition of the Company. HGIM Holdings has no investments or ownership interests other than its ownership of the equity in HGIM Corp.

40.    Except as otherwise noted herein, HGIM Corp. holds 100% of the equity of all other Debtor subsidiaries,[9] each of which is a limited liability company or corporation organized under Louisiana law. All of HGIM Corp.'s Debtor subsidiaries are single-asset (vessel) entities, except: (i) Harvey Gulf International Marine, LLC ("***Harvey Gulf International Marine***"), which holds no assets, but is the manager of each of HGIM Corp.'s other wholly-owned direct Debtor subsidiaries and of Harvey Thunder, LLC; (ii) Harvey America LNG, LLC, which owns the *Harvey America* and approximately 49.9% of the outstanding common units in GCSG Holdings, LLC, which, together with its subsidiaries, own and operate a shipyard in Gulfport, Mississippi (as

---

[9]    Harvey Thunder, LLC is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc., a wholly-owned direct subsidiary of HGIM Corp.

further described below); (iii) Guidry Brothers, Inc., which leases the facility in Port Fourchon, Louisiana; and (iv) certain entities that no longer hold any assets or liabilities except for being guarantors under the Senior Secured Term and Revolving Credit Agreement, dated June 18, 2013 (as amended, the "***Credit Agreement***") among HGIM Corp., as borrower, HGIM Holdings and its Debtor subsidiaries (other than HGIM Corp.), as guarantors, a syndicate of financial institutions as lenders (the "***Lenders***"), and Bank of America, N.A., as administrative agent (the "***Agent***").[10]

41.     One of the single-asset, wholly-owned Debtor subsidiaries of HGIM Corp. is Harvey Gladiator, LLC, a company organized under Louisiana law.  Harvey Gladiator, LLC's single asset is the *Harvey Gladiator*, an OSV which services a customer off the coast of Galveston, Texas in the ordinary course of business, and has returned to port in Galveston for substantially all of the 180 days immediately prior to filing the Chapter 11 Cases.

### 2.     Non-Debtor Affiliates

42.     The Debtors have 11 affiliates that are not Debtors in the Chapter 11 Cases.  Of these entities, the Non-Debtor Affiliates with significant assets or liabilities are:  (i) Harvey Stone Holdings, LLC and its subsidiary Harvey Stone, LLC; (ii) Q-LNG Transport LLC ("***Q-LNG***") and Q-LNG Operating I, LLC; and (iii) GCSG Holdings, LLC and its subsidiaries.  Importantly, these entities are not borrowers or guarantors under any of the Debtors' debt obligations and such entities and their operations are not expected to be affected by the Chapter 11 Cases except as otherwise described herein.  The remaining Non-Debtor Affiliates have no assets or liabilities.

### a.     Harvey Stone Holdings, LLC and Harvey Stone, LLC

43.     HGIM Corp. owns a 100% interest in Harvey Stone Holdings, LLC (a Non-Debtor Affiliate), which in turn owns a 100% interest in Harvey Stone, LLC (a Non-Debtor Affiliate).

---

[10]     The Debtors anticipate dissolving such entities in connection with the Plan.

Both entities are limited liability companies organized under Louisiana law; neither is a borrower or guarantor under the Credit Agreement.  Harvey Stone, LLC's primary assets are the *Harvey Stone*, a highly specialized MPFSV, and a 10-year contract for use of the *Harvey Stone* vessel. Harvey Stone, LLC is a borrower under approximately $41 million in secured notes (the "***Harvey Stone Notes***"), entered into in conjunction with the construction of the *Harvey Stone* and secured by a first-priority mortgage on the *Harvey Stone*.

44.     Like certain other subsidiaries, Harvey Stone, LLC is party to a management agreement with Debtor Harvey Gulf International Marine.  Under the terms of the management agreement, Harvey Gulf International Marine pays Harvey Stone, LLC's operating expenses in the ordinary course of business and invoices Harvey Stone, LLC for such expenses.  Harvey Stone, LLC periodically reimburses Harvey Gulf International Marine for these expenses.  Harvey Stone, LLC is permitted under its financing with its lenders to, under certain circumstances, make distributions to the Debtors on account of Harvey Stone, LLC's equity interests.  As of the Petition Date, no such distributions have ever been made.

### b.     Q-LNG

45.     Q-LNG is a limited liability company organized under Louisiana law.  In 2016, one of the Company's key customers contacted Harvey Gulf's management about providing articulated tug and barge ("***ATB***") and integrated tug-barge ("***ITB***") vessels for the purpose of transporting LNG fuel.  Harvey Gulf invested in an exclusivity and engineering services agreement, an intellectual property license agreement, and certain related rights (collectively, the "***IP Materials***") as an initial step toward evaluating whether to pursue this opportunity, which was outside the scope of the Company's existing business.  HGIM Holdings' Board of Directors, including each of its disinterested directors, ultimately decided not to invest additional capital to pursue the ATB and ITB business and authorized me to explore alternatives for this business.

US 5515025

46.     Accordingly, in January 2017, Q-LNG was formed to pursue the ATB and ITB business opportunity.  In connection with the creation of Q-LNG, Harvey Gulf International Marine contributed the IP Materials to Q-LNG.  In return, HGIM Corp. received 30% of the common units outstanding and all 2,071,346 preferred units of Q-LNG.  My affiliate, AGIII, LLC, owns the remaining 70% of the common units outstanding.[11]    Additionally, the Q-LNG Agreements (as defined below) provide that Q-LNG will pay a management fee to Harvey Gulf International Marine with respect to each barge vessel owned or operated by Q-LNG.

47.     As part of the Restructuring, Q-LNG's operating agreement (the "***Q-LNG Operating Agreement***") and the Amended and Restated Vessel Management Agreement dated October 27, 2017 (the "***Q-LNG Management Agreement***" and, together with the Q-LNG Operating Agreement, the "***Q-LNG Agreements***") may be amended to reflect certain terms that are currently being negotiated among the Debtors, the Agent, the Steering Committee, and Q-LNG.

48.     Q-LNG has its first vessel under construction and currently estimates that such vessel will be delivered in January 2020.

### c.     The Shipyard Entities

49.     GCSG Holdings, LLC ("***GCSG Holdings***," and together with its direct and indirect wholly-owned subsidiaries,[12] the "***Shipyard Entities***"), a limited liability company organized

---

[11]     In November 2017, AGIII, LLC made a $10 million capital contribution to Q-LNG in connection with the financing of the first ATB vessel to be constructed by Q-LNG.  Q-LNG and AGIII, LLC have elected to delay the issuance of additional equity interests in Q-LNG for such capital contribution until the resolution of any modifications to the Q-LNG Agreements (as defined below).

[12]     GCSG Holdings owns 100% of the equity in GCSR Holdings, Inc., a corporation organized under Delaware law, which in turn owns 100% of the equity in Gulf Coast Shipyard Group, Inc. and GCS Realty, Inc., each of which are corporations organized under Delaware law.  Equity in Gulf Coast Shipyard Realty, LLC, a limited liability company organized under Delaware law, is 90% held by GCSR Holdings, Inc., and 10% held by GCS Realty, Inc.

under Delaware law, owns and operates a shipyard (the "***Shipyard***") located in Gulfport, Mississippi that is currently used exclusively by the Debtors to store, maintain, and construct their vessels.  The Shipyard contains, among other things:  (i) a total operating area of over 60 acres; (ii) production and outfitting buildings with over 700,000 square feet of under-cover manufacturing space; and (iii) a large construction bay that is suitable to simultaneously build and/or service multiple large vessels.

50.     Debtor Harvey America LNG, LLC owns 49.9% of the common units[13] of GCSG Holdings; TJC, through HGIM Group, LLC, owns approximately 41.3% of the common units; I own approximately 6.7% of the common units; and members of the executive management team own the remaining common units.  Certain Shipyard Entities are borrowers under a first lien credit facility with Hancock Bank as lender, dated as of June 23, 2015.  As of February 2018, there was approximately $5.5 million outstanding under such facility.  None of the Debtors are borrowers or guarantors of this debt.

51.     The Debtors have entered into certain key contracts with the Shipyard Entities including:  (i) a vessel construction contract which governs the building of certain LNG-powered vessels; (ii) a shipyard management agreement by which Debtor Harvey Gulf International Marine manages the operations of the Shipyard; and (iii) a master storage contract which governs the terms by which Harvey Gulf can dock and store vessels at the Shipyard.

---

[13]     In connection with entry into GCSG Holdings' Second Amended and Restated Limited Liability Company Agreement, dated May 11, 2017, GCSG Holdings:  (i)  issued $24 million in preferred units (98% of which are held by HGIM Group, LLC and 2% of which are held by me) corresponding to the $24 million capital contribution to GCSG Holdings; and (ii)  agreed to issue up to $20 million of additional preferred units to Harvey America LNG, LLC in connection with certain expenditures by Harvey America LNG, LLC associated with the building of the *Harvey America* vessel at the Shipyard.  The Debtors will disclose the number of preferred units issued to Harvey America LNG, LLC in connection with the filing of the Plan Supplement.

52.     The Plan provides that, as part of a settlement under Bankruptcy Rule 9019, HGIM Group, LLC will contribute its membership interests in GCSG Holdings, including all of its common and preferred units, to Debtor Harvey America LNG, LLC (the "**Shipyard Contribution**").  This Shipyard is important to the Debtors' operations because, among other things, it allows the Debtors to construct new vessels and service their existing vessels without relying on a third-party shipyard.  As a result of the Shipyard Contribution, Debtor Harvey America LNG, LLC will own approximately 91.2% of the common units in GCSG Holdings.

### D.     The Debtors' Prepetition Capital Structure

#### 1.     Prepetition Indebtedness

53.     As described in detail below, as of the Petition Date, the Debtors' significant outstanding funded debt obligations total approximately $1.22 billion.  The Debtors' long-term debt obligations are owed under a Senior Secured Term and Revolving Credit Agreement, dated June 18, 2013, among HGIM Corp. as borrower, HGIM Holdings as guarantor, a syndicate of financial institutions as lenders, and Bank of America, N.A. as Agent.  In addition to HGIM Holdings, each of HGIM Corp.'s Debtor subsidiaries is a guarantor under the Credit Agreement. The Credit Agreement has been amended four times, most recently on March 16, 2016.

54.     The Credit Agreement consists of three credit facilities:  (i) a $270 million revolving credit facility (the "**Revolver**"); (ii) a $225 million Senior Secured Term A Facility (the "**Senior Secured Term A Facility**"); and (iii) an $875 million Senior Secured Term B Facility (the "**Senior Secured Term B Facility**," and together with the Revolver and the Senior Secured Term A Facility, the "**Credit Facility**").  The Revolver and the Senior Secured Term A Facility mature in June 2018 and the Senior Secured Term B Facility matures in June 2020.

55.     Borrowings under all three tranches of the Credit Facility are secured on a *pari passu* basis by first lien mortgages on each of the Debtors' vessels and substantially all of the

Debtors' personal property.  There is no subordination or intercreditor agreement between or among the Lenders.  The Agent generally acts at the direction of lenders holding a majority of the aggregate outstanding principal amount of the borrowings under the Credit Facility.

56.     The Revolver has total commitments of $270 million, which are fully drawn as of the Petition Date.  All outstanding borrowings under the fully-drawn Revolver bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 3.75%, payable at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

57.     The Senior Secured Term A Facility has an outstanding principal balance of $114,351,563 as of the Petition Date, as well as accrued and unpaid interest.  Principal outstanding under the Senior Secured Term A Facility is payable quarterly, at a rate of 6.25% of the original principal borrowed (approximately $13.9 million) for the quarters ending September 30, 2017 through March 31, 2018, with the remaining balance outstanding (approximately $72.5 million) due on June 18, 2018.  All outstanding borrowings under the Senior Secured Term A Facility bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 4.25%, at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

58.     The Senior Secured Term B Facility has an outstanding principal balance of $842,187,500 as of the Petition Date, as well as accrued and unpaid interest.  Principal outstanding under the Senior Secured Term B Facility is payable quarterly, at a rate of 0.25% of the original principal borrowed (approximately $2.2 million) through the quarter ending March 31, 2020, with the remaining balance outstanding (approximately $818.1 million) due June 18, 2020.   All

US 5515025

outstanding borrowings under the Senior Secured Term B Facility bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 4.50% at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

59.     Subsequent to completing solicitation of votes on the Plan but prior to the Petition Date, the Agent informed the Company that because of the defaults under the Credit Agreement, each of the tranches of the Credit Facility were converted from the LIBO rate (described above) to a base rate upon end of each applicable LIBO interest period, as set forth in and permitted by the Credit Agreement.   Accordingly, the Agent asserts that: (i) beginning in December 2017 through January 2018, borrowings under the Revolver converted to the base rate and bear interest at the applicable base rate (subject to a 1.00% floor) plus a margin of 2.75%; (ii) beginning in September 2017, borrowings under the Senior Secured Term A Facility bear interest at the applicable base rate plus a margin of 3.25%, and (iii) beginning in September 2017, borrowings under the Senior Secured Term B Facility bear interest at the applicable base rate plus a margin of 3.50%, each payable at the end of the quarter.

US 5515025

### 2.    Equity Ownership

60.    As of the Petition Date, common units in HGIM Holdings are held by its members as set forth below:

| Member | Common Units |
|---|---|
| HGIM Group, LLC | 77,000 |
| Shane J. Guidry | 20,000 |
| Robert A. Vosbein, Jr. | 1,000 |
| Robert L. Gwinn, III | 1,000 |
| Jeffrey M. Henderson | 1,000 |
| **Total** | **100,000** |

61.    HGIM Holdings also has a single Class B unit outstanding and issued to Shawn J. Guidry.  HGIM Group, LLC is owned by investment funds managed by TJC.

62.    HGIM Corp. is a wholly-owned direct subsidiary of HGIM Holdings, and holds 100% of the equity of all other Debtor subsidiaries except for Harvey Thunder, LLC, which is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc., a wholly-owned subsidiary of HGIM Corp.

## II.    EVENTS LEADING TO THE RESTRUCTURING

### A.    Commodities Downturn and Industry Distress

63.    OSVs, which support offshore drilling, production, and decommissioning activities, form a maritime industry subsector that generated more than $25 billion in global annual revenues at its peak in 2013.  As a result of severely depressed oil prices, E&P companies, an important source of this revenue, have drastically cut the number of exploration and drilling projects in the GoM since 2014.

64.    Rig demand, a highly relevant driver of OSV demand, also decreased substantially since the downturn began in 2014.  Diminishing rig counts are a negative bellwether for the offshore supply boat and service sector, and a trend that is unlikely to reverse itself if oil prices do not experience a significant and sustained recovery.  Oil companies are not utilizing their existing

US 5515025

contracted capacity, as evidenced by numerous contract cancellations and the recent chapter 11 filings of certain other offshore supply boat and service market participants ("**OSSM Participants**"). Among other things, E&P companies will require a sustained price increase over a period of several months in order to justify expenditures in the area, and thus increase rig count.

65.     Due to decreased GoM activity, oil production, decommissioning, and offshore drilling—especially deepwater drilling, the key driver for OSV demand—the OSV market suffered substantial drops in utilization and day rates. Lower levels of utilization and day rates affected the offshore supply boat and service sector, contributing to considerable oversupply in the marketplace and granting E&P companies substantial pricing power. OSV companies were forced to do more for less in this depressed price environment, resulting in decreased margins.

**B.      Aggressive Steps at the Outset of the Market Downturn**

66.     Company management quickly recognized the early signs of the market downturn and took action to combat its impact. Commencing in June 2014, Harvey Gulf initiated a series of operational and financial actions with the goal of weathering the market downturn, including:

- reducing crew member headcount by approximately 45%;

- reducing general and administrative headcount by approximately 50%;

- negotiating reduced insurance premium payments;

- eliminating the Company's 401(k) contribution matching program; and

- reducing employee bonuses and executive compensation.

67.     These initiatives, along with certain others, succeeded in realizing an annualized $87 million in cost reductions, notwithstanding the Company's historically lean operating budget.

US 5515025

68.     The Company also began stacking unprofitable vessels and conducting non-core asset sales in the ordinary course of its business, including selling certain vessels which the Company believes will no longer be profitable.[14]

69.     Contemporaneously, the Company made the strategic decision to execute long-term vessel use contracts with its key customers in order to prepare the Company to weather a potential downturn in the vessel spot market.  This approach successfully enabled Harvey Gulf to maintain positive EBITDA and significantly outperform other OSSM Participants during the now 3.5-year-long, industry-wide market downturn.  Indeed, in each of the past three years, Harvey Gulf increased its market share and EBITDA margin, and significantly outperformed many other OSSM Participants.  Over the past three years, Harvey Gulf:  (i) added more than 40 new customers to its existing customer base; (ii) increased its EBITDA margin by 27%; and (iii) realized a 10% return on assets.

### C.     The Prolonged Market Downturn Hits the Debtors

70.     The market downturn, however, lasted far longer than anticipated and could no longer be weathered without taking additional steps.  As the downturn extended into late 2015, the Debtors determined that they would need relief from certain covenants under the Credit Agreement and successfully negotiated such amendments in 2016.  When the downturn persisted into 2017 with no signs of imminent recovery, Company management realized that their efforts to date could no longer adequately shield Harvey Gulf from the pressures facing the rest of the OSSM Participants.

---

[14]     Harvey Gulf is in the process of selling the *Harvey Herd*, an OSV, in the ordinary court of its business and consistent with its prepetition practices.  Such sale is expected to be consummated during the Chapter 11 Cases.

US 5515025

71.     A portion of Harvey Gulf's long-term vessel use contracts began to roll off in 2017 and will continue to do so into 2019 and beyond.  As these long-term contracts roll off, the Debtors must choose to either: (i) attempt to replace them with new contracts; (ii) stack the previously contracted-for vessels; or (iii) take their chances in the increasingly unstable vessel spot market. As a result, the Company's EBITDA and EBITDA margin declined in 2017 and, without significant deleveraging, are projected to decline precipitously in 2018.

72.     Furthermore, the Debtors' liquidity strain is exacerbated by approximately $34 million in Senior Secured Term A Facility and Senior Secured Term B Facility amortization and interest payments due quarterly, and the impending maturity of the Revolver and the Senior Secured Term A Facility on June 18, 2018.

### D.     Hiring Restructuring Advisors and Commencing Negotiations with the Steering Committee

73.     As the downturn persisted into 2017, the Debtors recognized the need for a balance-sheet restructuring to ensure they could continue to lead the industry, particularly as other market participants effectuated restructurings to substantially deleverage their balance sheets. Accordingly, the Company hired Stephens Inc.[15] and Vinson & Elkins LLP to advise on strategic alternatives, including potential deleveraging transactions.

74.     As an initial step in 2017, the Debtors initiated negotiations with the Agent with the goal of amending the Credit Agreement and obtaining relief from certain financial covenants and debt servicing obligations.  When it became apparent that a more comprehensive transaction would be necessary to deleverage the Debtors' balance sheet, the Debtors engaged with certain Lenders under the Credit Agreement to negotiate a consensual deleveraging of the Debtors'

---

[15]     Blackhill Partners, LLC was acquired by Stephens Inc. in February 2018.

US 5515025

balance sheet.  The Debtors initially attempted to negotiate an out-of-court transaction with the Lenders to effectuate such deleveraging, but it became evident through the course of those discussions that the transactions necessary to maximize value for the Debtors and their stakeholders while positioning the Debtors for long-term success could only practicably be implemented through an in-court process.

75.     Over the next few months, the Debtors and their advisors engaged with the Agent and a steering committee of lenders holding approximately 49%[16] of the debt outstanding under the Credit Agreement (the "***Steering Committee***") and their advisors (including PJT Partners LP, as financial advisor, and Davis Polk & Wardwell LLP, as counsel to the Agent) to negotiate a restructuring of the Debtors' funded indebtedness under the Credit Agreement.  The parties met frequently, exchanged proposals, and engaged in hard fought, arm's-length negotiations on the terms of a comprehensive restructuring transaction to be achieved through a consensual prepackaged plan.  During this time period, the Debtors and the Steering Committee negotiated and ultimately agreed on the framework for the Restructuring by which the Lenders would, subject to the Restructuring Toggle (as later defined), consensually equitize approximately 70% of their secured debt claims in exchange for equity in the Reorganized Debtors (as defined in the Plan) while ensuring that the Debtors and Reorganized Debtors remain compliant with the Jones Act.

76.     While negotiating the Restructuring in September 2017, the Debtors sought to avoid making certain interest and amortization payments due under the Credit Agreement in order to preserve much-needed liquidity.  On September 20, 2017, the Debtors entered into an agreement with certain lenders under the Credit Agreement (as amended, the "***Forbearance Agreement***") under which the Lenders agreed to forbear from exercising, through October 31, 2017 (the

---

[16]     As of the Petition Date.

"***Forbearance Termination Date***"), any remedies otherwise available to them as a result of the Debtors' decision to not make approximately $30 million in interest and principal payments due under the Credit Agreement in September 2017.  The Forbearance Agreement was amended seven times to extend the Forbearance Termination Date as restructuring negotiations continued, most recently through February 20, 2018.

77.     On September 30, 2017, in connection with entry into the Forbearance Agreement, the Boards of Directors of HGIM Holdings and HGIM Corp. appointed Richard Nevins to such boards as an independent director.  The HGIM Holdings' Board of Directors also created a special committee, consisting of Mr. Nevins and Cornelius Dupré II to:  (i) consider, review, and evaluate, in connection with any proposed transaction, any matters on which an actual or potential conflict exists between HGIM Holdings and its direct or indirect subsidiaries, on the one hand, and the members of HGIM Holdings and/or their respective affiliates (other than HGIM Holdings and its subsidiaries), on the other hand, and such other matters as the Board of Directors of HGIM Holdings may from time to time delegate; (ii) make recommendations to the full Board of Directors of HGIM Holdings with respect to any such matter; and (iii) determine whether any such matter is fair and reasonable to, and in the best interests of, HGIM Holdings and its members.

78.     As negotiations continued into 2018, the parties turned their attention to, among other things, the terms of the Exit Facility (as later defined), certain warrants, a management incentive plan (the "***Management Incentive Plan***"), and the Shipyard Settlement (as defined below).  In early February 2018, when negotiations gained momentum with agreement on all other key terms, the Debtors and the Restructuring Support Parties agreed that it was in the best interests of all stakeholders to execute the RSA with the built-in Restructuring Toggle to allow the Debtors to proceed with the Restructuring as set forth in the Plan, but also allow the Debtors and

Restructuring Support Lenders (as defined in the RSA) to pivot to an alternative transaction(s) and/or process to implement the Restructuring if the Management Document Milestone (as later defined) is not achieved.

### E.   The Restructuring Support Agreement

79.   After extensive negotiations, the Restructuring Support Parties succeeded in reaching agreement on the terms of a comprehensive restructuring transaction that deleverages the Debtors' balance sheet by equitizing more than 70% of their prepetition funded indebtedness. The key terms of this transaction are set forth in the RSA.[17]  The RSA is critical to the Debtors' successful Restructuring because the Restructuring Support Parties, holding in excess of 64% in principal amount outstanding under the Credit Agreement, have committed to convert their secured debt claims into equity in the Reorganized Debtors, subject to certain requirements and milestones set forth in the RSA.  Without the support of the Restructuring Support Lenders, the Debtors could not effectuate the Restructuring or equitize the Restructuring Support Lenders' secured claims.

80.   The RSA establishes certain milestones for the Chapter 11 Cases:

- no later than five days after the Petition Date, the Court shall have entered: (i) an interim order authorizing the Debtors' use of cash collateral and other prepetition collateral (the "***Cash Collateral Order***"); and (ii) a scheduling order, each in forms and substance as set out in the RSA;

- no later than 35 days after the Petition Date, the Court shall have entered a final Cash Collateral Order, in form and substance as set out in the RSA;

- no later than 60 days after the Petition Date, the Court shall have entered an order approving a Disclosure Statement and a confirmation order (the "***Confirmation Order***"), each in forms and substance as set out in the RSA; and

- no later than 15 days after entry of the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan.

---

[17]   The RSA was entered into on February 8, 2018, made effective on February 16, 2018, and subsequently amended and restated on February 21, 2018.

81.     The RSA also includes a milestone associated with finalizing my employment agreement (the "***CEO Employment Agreement***") and the Q-LNG Agreements.  If such agreements are not reached within 30 days after the Petition Date the (the "***Management Document Milestone***"), the Agent (on behalf of the Restructuring Support Lenders) may send notice to the Debtors of a failure to reach the Management Document Milestone (the "***Restructuring Toggle***"). Upon occurrence of the Restructuring Toggle:  (i) the Required Restructuring Support Lenders (as defined in the RSA) may request that a chief restructuring officer (the "***CRO***") be appointed (the identity of any CRO and the scope of any CRO's duties must be mutually agreed upon by the Debtors and the Required Restructuring Support Lenders); and/or (ii) the Required Restructuring Support Lenders and the Debtors may agree to seek confirmation of the Plan, as modified, or pursue an alternative transaction(s) and/or process to implement the Restructuring other than that which is contemplated by the Plan.

82.     It is also important to note that the Debtors maintain a "fiduciary out" under the RSA.  Specifically, Section 10(d) of the RSA provides that each Debtor may terminate its obligations thereunder if its board of directors, board of managers, or such similar governing body determines, based on advice of counsel, that proceeding with the contemplated restructuring transactions would be inconsistent with the exercise of its fiduciary duties or under applicable law.

**F.      The Plan**

**1.   Key Terms of the Plan**

83.     Most significantly, the Debtors will convert a substantial part of their approximately $1.22 billion in secured debt outstanding under the Credit Agreement into a new $350 million first lien term loan facility (the "***Exit Facility***").  The secured lenders under the Credit Agreement shall receive their pro rata share of: (i) the Exit Facility; and (ii) 100.0% of the

31

US 5515025

Reorganized HGIM Equity[18] subject to dilution by the Management Incentive Plan and the Shipyard Warrants, all as further described in the Plan and disclosure statement related thereto.

84.     Under the Management Incentive Plan, the Reorganized Debtors' management will receive 3.00% of the equity of the Reorganized Debtors and three series of warrants in an aggregate amount equal to 11.00% of the equity of the Reorganized Debtors on a fully-diluted basis.

85.     Importantly, trade creditors/general unsecured creditors are unimpaired under the Plan and will receive payment in full on account of valid claims in the ordinary course of business. I believe this treatment is vital to maximize value for all stakeholders given the Company's vital relationship with vendors and service providers.

86.     The Plan also includes a settlement (the "*Shipyard Settlement*") under Bankruptcy Rule 9019, which will settle all claims between the TJC Parties (and certain affiliates) and the Debtors.  Under the Shipyard Settlement, among other things, the TJC Parties (through HGIM Group, LLC) will contribute their equity interests in the Shipyard Entities to the Debtors, and will receive two series of warrants (the "*Shipyard Warrants*") in an aggregate amount equal to 4.00% of the Reorganized HGIM Equity, subject to dilution by the Management Incentive Plan.  The Shipyard Settlement ensures the Company unfettered access to and use of its Gulfport, Mississippi shipyard that is, and will be, important to our operations.

87.     The Restructuring to be implemented through the Plan deleverages the Debtors' balance sheet by equitizing 70% of their prepetition funded indebtedness, thereby putting the Debtors on a level playing field with other OSSM Participants that have already restructured and will continue to position the Debtors ahead of other OSSM Participants that have not deleveraged.

---

[18]     In the form of common stock, to the extent permitted under the Jones Act, and warrants (as described in the Plan).

On a level playing field, the reorganized Debtors are positioned to maintain their position as a market leader because they have:

- one of the most technologically advanced fleets in the GoM;

- key long-standing and profitable contracts and business relationships;

- an industry-wide reputation for operational safety;

- strong operational capabilities maintained by a historically lean operating budget;

- positioned themselves at the forefront of LNG technology; and

- an elite and experienced management team.

### 2.  Solicitation of Votes on the Plan

88.     The Debtors completed solicitation of votes on the Plan before filing the Chapter 11 Cases.  Only the holders of allowed claims on account of the Credit Agreement were entitled to vote on the Plan.  Holders of approximately 70% in principal amount of the debt outstanding under the Credit Agreement have voted in favor of the Plan.  Of such holders who submitted ballots, approximately 94% in number and 75.5% in dollar amount, voted to accept the Plan, excluding the votes of insiders.

## III.   FIRST DAY PLEADINGS

89.     Contemporaneously with this Declaration, the Debtors have filed several First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of the Chapter 11 Cases, and effect a swift and smooth restructuring of the Debtors' balance sheet.  I have reviewed each of the First Day Pleadings and I believe that the relief requested in the First Day Pleadings is necessary to allow the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases. The Debtors intend to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure,

and the Bankruptcy Local Rules for the Southern District of Texas.  Absent the Court granting the relief requested by the Debtors in their First Day Pleadings on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

90.     A description of the relief requested and the facts and opinions supporting each of the First Day Motions is detailed in **<u>Exhibit A</u>**.

34

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 8, 2018
Houston, Texas

/s/ *Shane J. Guidry*
Shane J. Guidry
Chairman & Chief Executive Officer
HGIM Holdings, LLC

**Exhibit A**

## Exhibit A

## Evidentiary Support for First Day Pleadings[1]

### A.   Emergency Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")

1.      In the Joint Administration Motion, the Debtors request entry of an order consolidating the administration of these chapter 11 cases for procedural purposes only as follows: (i) the Office of the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*") shall conduct joint informal meetings with the Debtors, as required, and unless otherwise directed by the Court, a joint first meeting of creditors; (ii) one plan and disclosure statement may be filed for all of the Debtors by any plan proponent; however, substantive consolidation of the Debtors' estates is not being requested at this time; (iii) unless otherwise required by the Court, each Debtor will file separate schedules of assets and liabilities and statements of financial affairs, and, as applicable, lists of equity security holders; (iv) proofs of claim filed by creditors of any Debtor shall reflect the caption and case number of the Debtor to which the claim relates and in which chapter 11 case such claim is to be filed; and (v) a separate claims register shall be maintained for each Debtor.

2.      The Debtors also seek authority to file their monthly operating reports required by the U.S. Trustee by consolidating the information required for each Debtor in one report that tracks and breaks out all of the specific information on a Debtor-by-Debtor basis in each monthly operating report.  Finally, the Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case of HGIM Holdings, LLC.

---

[1]      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Declaration and applicable First Day Pleadings.

US 5246684

3.      I expect that notices, applications, motions, other pleadings, hearings, and orders in these chapter 11 cases may affect all of the Debtors.  If each Debtor's case were administered independently, there would be a number of duplicative pleadings and overlapping service.  I believe that this unnecessary duplication of identical documents would be wasteful of the resources of the Debtors' estates, as well as the resources of this Court and of other parties in interest.

4.      I understand that joint administration will permit the Clerk of the Court to use a single general docket for all of the Debtors' chapter 11 cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding all of the Debtors' chapter 11 cases.  Moreover, I understand that supervision of the administrative aspects of the Debtors' chapter 11 cases by the U.S. Trustee will be simplified.  Therefore, I believe joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

5.      I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates.  The rights of the Debtors' respective creditors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities, will continue to maintain separate books and records, and will provide information as required in the consolidated monthly operating reports on a Debtor-by-Debtor basis. Each creditor will be required to file a proof of claim against the applicable estate in which it allegedly has a claim or interest and will retain whatever claims or interests it has against the particular estate.  The recoveries of all creditors will be enhanced by the reduction in costs resulting from joint administration of the Debtors' chapter 11 cases.  Additionally, the Court will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining

2

redundant files.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

  **B.**    **Emergency Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (V) Granting Related Relief (the "*Scheduling Motion*").**

  6.    Through the Scheduling Motion, the Debtors seek entry of an order: (i) scheduling a combined hearing to (a) approve the Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "***Disclosure Statement***") and (b) consider confirmation of the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "***Plan***"); (ii) establishing the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "***Objection Deadline***"); (iii) establishing a deadline to file a brief in support of the Disclosure Statement or confirmation of the Plan and to reply to any objections (the "***Reply Deadline***"); (iv) approving the solicitation procedures with respect to the Plan, including the forms of ballots (the "***Solicitation Procedures***"); (v)  approving the form and manner of the notice of commencement of the Debtors' chapter 11 cases, the Combined Hearing and the Objection Deadline (the "***Combined Notice***"); (vi) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "***Schedules and SOFAs***") through and including May 9, 2018 (the "***Schedules/SOFAs Deadline***"), and conditionally waiving the requirement that the Debtors file the Schedules and SOFAs upon confirmation of the Plan; and (vii) granting related relief.

  7.    The Debtors request authority to proceed with these chapter 11 cases on the expedited confirmation schedule set forth in the Scheduling Motion.  As described more fully in

3

the Declaration, the Debtors commenced these Chapter 11 Cases to effectuate the restructuring contemplated in their prepackaged plan of reorganization that is supported by an overwhelming majority of their capital structure.  The restructuring contemplated by the restructuring support agreement (the "***RSA***")[2] and the Plan is designed to substantially deleverage the Debtors' capital structure, maximize value for all stakeholders, and position the Debtors to continue to be the market leader in their sector with significantly enhanced financial flexibility.  As of the date of filing the Debtors' chapter 11 petition, approximately 94.4% in number and 75.5% in dollar amount of the voting holders of the Class 3—Senior Lender Claims have voted to accept the Plan. Further, I do not believe that any parties are prejudiced by the relief requested in the Scheduling Motion given the facts and circumstances of the Chapter 11 Cases.  I, therefore, submit that considering the adequacy of the Disclosure Statement and the confirmation of the Plan on the schedule set forth in the Scheduling Motion as well as the other relief requested therein is in the best interests of the Debtors, their estates, and all stakeholders and that the Scheduling Motion should be approved.

8.    In connection with the relief requested in the Scheduling Motion, the Debtors submit the following schedule of proposed dates:

| Event | Date |
| --- | --- |
| Voting Record Date[3] | February 23, 2018 |
| Commencement of Solicitation | February 26, 2018 |
| Voting Deadline | March 5, 2018 |
| Petition Date | March 7, 2018 |

---

[2]    The "***RSA***" means the restructuring support agreement dated February 8, 2018, by and among the Debtors and the Restructuring Support Parties, as amended, modified, or supplemented, from time to time.

[3]    The "***Voting Record Date***" is the date as of which a holder of record of a claim entitled to vote on the Plan must have held such claim to cast a vote to accept or reject the Plan.

| Notice Date[4] | March 13, 2018 |
|---|---|
| Second Day Hearing | April 3, 2018 |
| Plan Supplement Filing Deadline | April 11, 2018 |
| Objection Deadline | April 16, 2018 |
| Reply Deadline | April 20, 2018 |
| Combined Hearing | April 24, 2018 |
| Schedules/SOFAs Deadline | May 9, 2018 |

9.     I submit that confirming the Plan on the expedited schedule set forth in the Scheduling Motion as well as the other relief requested in the Scheduling Motion is in the best interests of the Debtors, their estates, and all stakeholders and should be approved.

**C.     Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief (the "*Cash Collateral Motion*")**

10.     Through the Cash Collateral Motion, the Debtors seek entry of an interim order (the "*Interim Order*"), and subsequently a final order:   (i) authorizing the Debtors to use Cash Collateral and all other Prepetition Collateral (each as defined in the Cash Collateral Motion) in accordance with the terms of the Interim Order; (ii) granting adequate protection to the Agent and the Lenders (each as defined in the Cash Collateral Motion and collectively, the "*Prepetition Secured Parties*") of their interests in the Prepetition Collateral, including Cash Collateral; (iii) modifying the automatic stay imposed by section 362 of title 11 of the United States Code (the "*Bankruptcy Code*") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the final order; and (iv) granting related relief.

11.     The Debtors require immediate access to Cash Collateral to satisfy the day-to-day financing needs of the Debtors' business operations.  The Debtors use cash on hand and cash flow

---

[4]     The "*Notice Date*" is the date by which the Combined Notice will be served upon the Debtors' creditor matrix and all interest holders of record to provide notice of the Combined Hearing.

US 5246684

from operations to procure goods and services from vendors, pay their employees, meet overhead costs, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of these chapter 11 cases.  I believe that the inability to use these funds during the chapter 11 cases would cripple the Debtors' business operations, causing immediate and irreparable harm to the Debtors and their estates.

12.    Additionally, the Debtors request authority to provide the Prepetition Secured Parties with adequate protection as set forth in the Cash Collateral Motion.  I understand based on advice of the Debtors' restructuring advisors that the adequate protection is reasonable under the circumstances and necessary in order to allow the Debtors to use Cash Collateral.

13.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

**D.    Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (C) Pay Independent Contractor Obligations, and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations (the "*Wages Motion*")**

14.    By the Wages Motion, the Debtors seek entry of an interim and subsequently a final order authorizing: (i) the Debtors to pay in an amount up to $1,450,000 in the aggregate on an interim basis and any additional outstanding prepetition amounts thereafter on a final basis on account of (a) prepetition obligations of the Debtors owing to or on behalf of Employees (defined below) and Independent Contractors (defined below) (the "***Employee Claims***" and "***Independent Contractor Claims***," respectively), whether accrued or currently due and payable, (b) prepetition amounts owed with respect to the Employee Benefits (as defined below), whether accrued or

6

currently due and payable, including payment of all applicable plan administrators and other service providers, (c) prepetition amounts owed to certain third-party providers of wage and benefit services, and (d) expense reimbursements as described in the Motion (collectively, the "***Obligations***"); (ii) the Debtors to continue certain Employee Benefits programs; (iii) all financial institutions to honor prepetition checks for payment of the Obligations and prohibiting such financial institutions from placing any holds on, or attempting to reverse, any transfers made to satisfy the Obligations; and (iv) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the Wages Motion on a final basis.

15.     The Debtors rely on the services of employed personnel (each, an "***Employee***" and collectively, the "***Employees***") to conduct their business operations and the Debtors incur obligations to or on account of such Employees.  There are approximately 580 Employees in the Debtors' corporate enterprise as of the Petition Date, comprised of approximately 504 crew member Employees (collectively, "***Crew Members***"), approximately nine hourly Employees (collectively, "***Hourly Employees***"), and 67 land-based and corporate Employees (collectively, "***Corporate Employees***") as well as approximately 15 to 20 independent contractors (the "***Independent Contractors***").

16.     Through its engagement of these Employees and Independent Contractors, the Debtors incur obligations to pay Compensation Obligations, Payroll Fees, Expenses, Payroll Taxes, and Garnishments (each as defined and described in greater detail below).

17.     In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries and wages, overtime, expense reimbursements, and allowances (the "***Base Compensation Obligations***") and, for certain eligible Employees, performance bonuses (the

7

"**_Performance Bonus Obligations_**" and collectively with the Base Compensation Obligations, the
"**_Compensation Obligations_**").  All Crew Members and Corporate Employees are employed by
Debtor Harvey Gulf International Marine, LLC.  Crew Members are then assigned to the various
other Debtors' vessels as needed.[5]

18.     The Debtors engage Crew Members and Hourly Employees on an as-needed basis
depending upon the services the Debtors have been contracted to perform.  Crew Members operate
the Debtors' offshore service vessels and perform a variety of services including, but not limited
to, the support of oil and gas operations, the transportation of fuel and equipment, on-
loading/offloading various cargo and equipment, the support of subsea construction operations,
and many other services for which the Debtors are engaged.  Hourly Employees are engaged for
task-specific services including welding, crane operations, and security guard services.

19.     Crew Members are paid pre-determined day rates while Hourly Employees are paid
pre-negotiated hourly wages.  For standing contracts, Crew members typically work shifts of two
to three weeks at a time during which they do not leave the vessel (including while in port).  Crew
Members may pick up shorter shifts for spot work.  Base Compensation Obligations for Crew
Members and Hourly Employees are paid bi-weekly every other Friday for work performed during
the two-week period ended on the preceding Sunday (i.e., one week in arrears).

20.     As of the Petition Date, the average two week payroll for Crew Members and
Hourly Employees for the 12 month period ended February 28, 2018, is $1.4 million.[6]  The Debtors

---

[5]     Debtor Harvey Gulf International Marine, LLC invoices its Non-Debtor Affiliate Harvey Stone, LLC in
arrears on a monthly basis for Crew Member and Corporate Employee services performed on its behalf during
the preceding month.  Non-Debtor Affiliates Gulf Coast Shipyard Group, Inc. and Gulf Coast Shipyard
Realty, LLC pay an annual management fee of $100,000 to Debtor Harvey Gulf International Marine, LLC
for management services provided pursuant to a management agreement between the two companies.

[6]     The average annual salary for those Crew Members who performed services for the Debtors during each of
the last four quarters is approximately $87,000 (excluding Performance Bonus Obligations).  The average

US 5246684

funded their Crew Member payroll on March 5, 2018, for the period of February 19, 2018, through March 6, 2018.  The Debtors funded their Hourly Employee payroll on March 5, 2018, for the period of February 26, 2018, through March 6, 2018.  As a result, I do not believe any Crew Member or Hourly Employee payroll are outstanding as of the Petition Date.

21.     The Debtors maintain a lean staff of Corporate Employees (relative to other industry participants) whom they typically employ on a full-time basis.[7]  The Debtors' Corporate Employees work at the Debtors' corporate headquarters in New Orleans and at other land-based business locations including in Houston, Texas and Fourchon, Louisiana.  Corporate Employees provide a variety of management, administrative, operational, and other support services for the Debtors, including, but not limited to, accounting, engineering, logistics, tax, governmental compliance, shipbuilding and vessel construction, security, and safety training.

22.     Corporate Employees are paid fixed wages.  Base Compensation Obligations for Corporate Employees are paid semi-monthly on the 15th of each month and on the last day of each month.  Certain Corporate Employees receive supplemental pay in addition to their normal full time wages (the "*Supplemental Service Pay*") for additional services performed including but not limited to:  (i) overtime pay for welders, security guards, and drivers worked in excess of 40 hours in a given week; (ii) vessel ride pay for safety managers for days on which they perform shipboard service; and (iii) "on-call" duty pay for Operational Managers for those days on which they serve 24 hour phone standby coverage for operational incidents.  In the Wages Motion, the Debtors include Supplemental Service Pay as part of their Corporate Employees' Base Compensation Obligations.

---

annual salary for Corporate Employees is approximately $150,000 (excluding Performance Bonus Obligations).

[7]     There are two Corporate Employees who are engaged on a part-time basis (the "*Part-Time Employees*").

23.     As of the Petition Date, the semi-monthly payroll for Corporate Employees Base Compensation is approximately $440,000.  The Debtors funded their Corporate Employee payroll on March 5, 2018, for the period of March 1, 2018, through March 6, 2018.  As a result, I do not believe that Base Compensation for Corporate Employees is owed as of the Petition Date.

24.     All of the Employees' skills and knowledge of the Debtors' vessels and operations are essential to the continued preservation of the Debtors' business, and their ongoing, uninterrupted services are vital to the Debtors' reorganization efforts.  Thus, although I do not believe any prepetition Compensation Obligations are owed to Employees, given the importance of the Employees to the success of their operations, out of an abundance of caution, the Debtors seek authority to satisfy any unpaid prepetition Base Compensation Obligations (including Supplemental Service Pay) to the extent such obligations exist of up to $12,850 on an interim basis and any remaining unpaid Compensation Obligations in excess of the $12,850 statutory priority provided by section 507(a)(4)(A) of the Bankruptcy Code upon entry of the Final Order (after notice to, and consultation with, the U.S. Trustee)  in the ordinary course of business.

25.     The Debtors have historically implemented two bonus programs, a safety bonus program (the "***Safety Bonus Program***") and an annual bonus program (the "***Annual Bonus Program***").

26.     Crew Members are eligible to receive Performance Bonus Obligations quarterly subject to certain qualifying criteria including number of days worked in preceding quarter, number of days worked during preceding quarter without safety incident, and submission of proper documentation.  In the ordinary course of business, the Debtors have authorized the payment of Performance Bonus Obligations to eligible Crew Members in the form of cash awards on a quarterly basis pursuant to the Safety Bonus Program.  Crew Members who have worked a

10

minimum of 35 days in the preceding quarter without safety incident are eligible for performance bonuses of approximately $250 per person under the Safety Bonus Program provided they file the requisite documentation (an additional $250 is payable at the end of each year to Crew Members who collected the quarterly bonus each quarter of the preceding year).  On January 26, 2018, the Debtors paid $129,000 in bonuses to Crew Members pursuant to the Safety Bonus Program which included payments for the quarter ended December 31, 2017, and the annual bonus for Crew Members who qualified in each quarter of 2017.

27.     No amounts under the Safety Bonus Program will become due and payable during the interim period.  The Debtors request authority to make Safety Bonus Program payments in the ordinary course of business in accordance with prepetition practices.  The Safety Bonus Program incentivizes Crew Members to comply with the Debtors' high safety standards, which are critical to maintaining the Debtors' excellent long-term safety record.  Failure to pay Crew Members expected payments pursuant to the Safety Bonus Program may also drive current Crew Members to seek employment from competitors.  As such, I believe continuing the Safety Bonus Program and communicating such continuance to the Crew Members is critical to the successful reorganization of the Debtors and should be approved.

28.     The Debtors have historically paid Performance Bonus Obligations to eligible Corporate Employees on an annual basis at year end in the form of cash awards pursuant to an Annual Bonus Program.  Most current Corporate Employees are eligible for performance bonuses under the Annual Bonus Program.[8]  The decision to award performance bonuses and the amount of such awards under the Annual Bonus Program is in the sole discretion of the Debtors' Chief Executive Officer.  Historically, nearly all Corporate Employees have received awards under the

---

[8]     Part-Time Employees and Hourly Employees are not eligible to participate in the Annual Bonus Program.

Annual Bonus Program.  On December 15, 2017, the Debtors paid approximately $390,000 (plus related taxes) in bonuses to Corporate Employees pursuant to the Annual Bonus Program for the 2017 calendar year.

29.     The Debtors do not seek to authorize any payment under the Annual Bonus Program at this time, but reserve the right to request authority to continue payments under the Annual Bonus Program postpetition at a later date.

30.     In the ordinary course of business, in addition to the Employees, the Debtors rely on the services of 15 to 20 Independent Contractors to conduct their business operations and the Debtors incur obligations to or on account of such Independent Contractors (the "*Independent Contractor Obligations*").  The Independent Contractors provide valuable services including services relating to legal work, safety management, operational management, transportation services, and to market the availability of the Debtors' vessels and are therefore an integral component to the Debtors' business.  The Independent Contractors submit invoices to the Debtors for hours worked and are paid in arrears on either a monthly or bi-weekly basis.[9]

31.     The average aggregate monthly payroll for the Independent Contractors during the 12 month period ending February 28, 2018, is approximately $40,000.  The Debtors funded all invoiced amounts then owed to Independent Contractors prior to March 6, 2018.  As a result, I do not believe that any Independent Contractors are owed in excess of the $12,850 statutory priority provided by section 507(a)(4)(A) of the Bankruptcy Code as a result of prepetition work.  Out of an abundance of caution, the Debtors seek authority to satisfy any unpaid prepetition Independent Contractor Obligations to the extent such obligations exist of up to $12,850 on an interim basis

---

[9]     From time to time in the ordinary course of business, certain of the Debtors' Independent Contractors are engaged to market the availability of the Debtors' vessels, and will receive a commission on such sales (the "*Independent Contractor Sales Commission*").  For the purposes of the Wages Motion, the Independent Contractor Obligations include the Independent Contractor Sales Commission.

and any remaining unpaid prepetition Independent Contractor Obligations in excess of the $12,850 statutory priority provided by section 507(a)(4)(A) of the Bankruptcy Code upon entry of the Final Order (after notice to, and consultation with, the U.S. Trustee) in the ordinary course of business.

32.     The Debtors facilitate the payment of all Compensation Obligations through ADP Payroll Solutions Company ("**ADP**").   ADP uses a direct deposit program for all payroll remittances to Employees.   In order to fund such amounts, ADP sweeps certain of the Debtors' operating accounts two business days before each scheduled pay date.   The Debtors pay approximately $6,000 in aggregate in monthly fees for ADP's payroll services (the "*Payroll Fees*").   Payroll Fees are typically paid one week after the last pay date.   As of the Petition Date, I believe less than $6,000 of Payroll Fees are due with respect to prepetition payroll activity.   The Debtors request authority to pay any Payroll Fees attributable to prepetition payroll activity when due and payable in the ordinary course of business.

33.     The Debtors reimburse expenses incurred on various corporate credit cards, including:   (i) payments to Comdata Network, Inc. ("*Comdata*"), for fuel purchases made on Comdata fuel cards (the "*Fuel Cards*"); (ii) payments to Regions Bank ("*Regions*") for operating expenses paid using Regions-issued VISA cards (the "*Regions Cards*"); payments to American Express for operating expenses paid using corporate American Express cards (the "*AmEx Cards*," and together with the Fuel Cards and the Regions Cards, the "*Corporate Credit Cards*").[10]   Debtor Employees are issued respective Corporate Credit Cards on an as needed basis, based on their roles with the Debtors.   Employees use their:  Fuel Cards to purchase fuel for company vehicles; Regions Cards to pay for business expenses that they incur while performing their employment duties; and

---

[10]     The Debtors also utilize American Express Central Billed Accounts, which include business travel accounts issued to the Debtors used to charge Employee business travel for airlines, hotels, and car rental companies.

AmEx Cards to pay larger and higher volume operating expenses (such as purchases of supplies and equipment) as well as other business expenses (collectively, the "*Expenses*").  The Debtors receive monthly invoices for purchases made with the Corporate Credit Cards in the preceding month and typically pay such amounts within 10 days of receipt of such statements.

34.     From time to time, Employees also use their personal credit cards (the "*Personal Cards*") for Expenses.  Employees that incur Expenses on the Personal Cards submit their Expense reimbursement requests each month and, upon approval, the Debtors reimburse the Employees for such Expenses.

35.     Based on payroll records during the 12 month period ending December 31, 2017, aggregate Expense reimbursements for both Corporate Credit Cards and Personal Cards use averaged approximately $400,000 per month.  Because of the irregular nature of requests for Expenses reimbursements, it is very difficult for the Debtors to determine the amount of unpaid Expenses at any given time.  The Debtors paid approximately $13,000, $60,000, $140,000, and $50,000 to Comdata, Regions, American Express, and Employees, respectively, prior to March 7, 2018, which amounts constituted substantially all prepetition invoiced amounts in respect of Expenses on such date.  The Debtors estimate that less than $200,000 in aggregate shall become due and payable on account of prepetition Expenses during the interim period.

36.     It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue to make payments for the charges incurred through use of Corporate Credit Cards and Personal Cards.  Accordingly, the Debtors seek authority to:  (i) satisfy any and all prepetition amounts due and owing to Comdata, Regions, American Express, and the Employees (through use of their Personal Cards) and to reimburse all outstanding prepetition Expenses as they arise in the ordinary course of business; (ii) continue use of the Fuel Cards,

14

Regions Cards, AmEx Cards, and Personal Cards, as well as the Comdata, Regions, and American Express programs in place as of the Petition Date; and (iii) continue to pay all amounts due and owing to Comdata, Regions, American Express, and the Employees (through use of their Personal Cards) on account of the Expense reimbursements when due and payable in the ordinary course of business.

37.     The Debtors are required by law to withhold from Employees' salaries and wages certain amounts related to federal and state income taxes, social security taxes, Medicare taxes, and other taxes imposed by the law (each, a "***Withholding Tax***" and collectively, the "***Withholding Taxes***") and to remit any such withheld amounts to the appropriate taxing authorities (the "***Taxing Authorities***") according to schedules established by such Taxing Authorities.

38.     The Debtors are also required to make certain additional payments from their own funds in connection with the Withholding Taxes, including matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance (collectively, the "***Contribution Taxes***" and, together with the Withholding Taxes, the "***Payroll Taxes***").  The Debtors remit federal Contribution Taxes each payroll period and state Contribution Taxes at frequencies determined under applicable law.  The Debtors estimate that, on account of the Payroll Taxes, the Debtors withhold and contribute approximately $1.15 million per month.

39.     As of the Petition Date, I do not believe that any Payroll Taxes are due and payable on account of prepetition periods.  Out of an abundance of caution, the Debtors seek authority to pay any and all unpaid prepetition Payroll Taxes pursuant to the Wages Motion in accordance with applicable law.

US 5246684

40.     In the ordinary course of processing Employee payroll, the Debtors may be required by law to withhold from certain Employees' wages and salaries amounts on account of tax levies, child support, and court-ordered garnishments (collectively, "***Garnishments***").  Amounts withheld on account of Garnishments are remitted to the appropriate state and federal authorities.  On average during the year ended December 31, 2017, approximately $41,000 per month was withheld from Employees' salaries and wages on account of Garnishments.  I do not believe that any Garnishments on account of prepetition payroll will become due and owing during the interim period.  Out of an abundance of caution, the Debtors seek authority to pay any and all unpaid prepetition Garnishments pursuant to the Wages Motion in accordance with applicable law.

41.     In the ordinary course of business, the Debtors make various benefit plans available to their full-time Employees.[11]  These benefit plans fall within the following categories:  (i) paid time off, including sick days, vacation days, and bereavement leave (together, the "***Employee Leave Benefits***"); (ii) Debtor-funded medical, life insurance, workers' compensation, and maintenance and cure coverage as well as Employee-elected supplemental medical, dental, vision, life insurance, accidental death and dismemberment ("***AD&D***") insurance, and short-term and long-term disability (together, the "***Health and Welfare Benefits***"); (iii) 401(k) plan benefits ("***Retirement Benefits***"); and (iv) miscellaneous benefits (each of (i) – (iv), an "***Employee Benefit***," and collectively, the "***Employee Benefits***").  Although the Debtors maintain certain Employee Benefits plans themselves, other Employee Benefits plans, such as certain of the Health and Welfare Benefits plans, are maintained by third parties.  Through the Wages Motion, the Debtors seek authority to pay any prepetition amounts owed on account of the Employee Benefits

---

[11]     The Debtors employ approximately two part-time Corporate Employees who work less than 30 hours each week and who do not receive any Employee Benefits from the Debtors.

US 5246684

when due and payable in each case in the ordinary course of business and in accordance with prepetition practices.

42.     The Employee Leave Benefits are administered by the Debtors.  Eligible Corporate Employees[12] accrue paid vacation, sick leave, time off, and related benefits as generally described below.  Through the Wages Motion, the Debtors seek authority to pay any prepetition amounts owed on account of the Employee Leave Benefits when due and payable in accordance with prepetition practices.

43.     Each eligible Corporate Employee receives a certain number of paid vacation days each calendar year based upon his or her position and tenure with the Debtors as follows:

| Years of Accumulated Service/Position | Vacation Benefit per Calendar Year |
|---|---|
| 0 – 15 years' service | 80 hrs. |
| +15 years' service | 120 hrs. |
| Senior Management | 160 hrs. to 240 hrs. |

44.     Crew Members are not eligible to receive paid vacation days due to the shift nature of their work.  The Debtors provide Crew Members with bereavement pay in the event of a death within the Crew Member's immediate family (up to 72 hours of paid time off).

45.     Vacation days accrue in full on the first day of the calendar year.  Employees may use vacation days at their discretion, however, no unused vacation may be carried over to the following year.

---

[12]     The Debtors' security guards are not eligible to receive Employee Leave Benefits given the nature of their shift work which is structured in week-long shifts every other week.

17

46.     In the event a Corporate Employee is terminated or resigns, that Corporate Employee is reimbursed for accrued but unused vacation days at the Corporate Employee's Base Compensation rate, or as required by law.

47.     As of the Petition Date, approximately $640,000 worth of vacation days remains unused.

48.     Eligible Corporate Employees are entitled to take up to six personal days off annually on uncertified paid leave on account of sickness or for other matters ("*Personal Days*"). Time used in excess of the Personal Days reduces available vacation.

49.     The Debtors sponsor several Health and Welfare Benefits plans to provide benefits to eligible Employees.  The Health and Welfare Benefits include the Debtors' self-funded medical and life insurance programs as well as employee-funded supplemental medical, dental, life, and short- and long-term disability benefits programs.   The Health and Welfare Benefits are administered by third-party insurers.

50.     The Debtors sponsor several Health and Welfare Benefits plans to provide benefits to full-time Employees.  The Health and Welfare Benefits include the Debtors' self-funded medical and life insurance programs as well as employee-funded supplemental medical, dental, life, and short- and long-term disability benefits programs.  The Health and Welfare Benefits are administered by third-party insurers.

51.     The Debtors provide self-funded medical insurance (the "*Self-Funded Healthcare Plan*") which is administered by United Healthcare ("*UHC*") and which provides healthcare coverage including prescription drug benefits to eligible Employees and their families.

52.     The Debtors are required to pay in arrears administrative fees to UHC of approximately $135 per covered Employee monthly.

18

53.     Under the Self-Funded Healthcare Plan, UHC funds the administrative fees, the costs of medical services, and benefits for covered Employees out of the Debtors' $146,000 balance in its designated Debtor bank account with Bank of America, N.A. (the "***Health Insurance Account***").[13]  At the beginning of each week the Debtors transfer funds from one of their operating accounts with Regions Bank to the Health Insurance Account, in order to reach a balance of $146,000.  The Debtors' costs under the Self-Funded Healthcare Plan are subsidized by Employee contributions which are withheld from Employees' paychecks.

54.     Transfers into and out of the Health Insurance Account have averaged approximately $76,000 per week over the year ended December 31, 2017, and the Debtors estimate that approximately $500,000 in prepetition obligations under the Self-Funded Healthcare Plan may be outstanding as of the Petition Date.  While the Self-Funded Healthcare Plan's expenses are paid on a rolling weekly basis, it is difficult for the Debtors to predict with great accuracy the amount of such transfers from week to week or the amount of underlying claims under the Self-Funded Healthcare Plan as these amounts will fluctuate significantly due to the nature, timing, and number of claims arising in any given week.

55.     Through the Wages Motion, the Debtors seek authority to pay any unpaid prepetition amounts on account of the Self-Funded Healthcare Plan when due and payable in accordance with prepetition practices.

56.     The Debtors offer a life insurance plan (the "***Life Insurance Plan***"), to eligible Employees.  The Life Insurance Plan is administered by Guardian.  The Debtors provide $20,000 of coverage for each Employee and $5,000 for each Employee's spouse and child dependents, as

---

[13]     On occasion, the Health Insurance Account will end the week with a negative balance due to the payment of medical expenses in excess of $146,000.

US 5246684

applicable, under the Life Insurance Plan.  Employees can elect supplemental coverage for each covered Employee and/or their family members under the Life Insurance Plan at their own expense.

57.     The Debtors pay premiums each month on account of the Life Insurance Plan of (i) approximately $1,540 in aggregate for Employees and (ii) approximately $393 in aggregate for participating Employees' spouses and children.  Such premiums are paid in advance, and as such, as of the Petition Date, I do not believe the Debtors owe any prepetition amounts with respect to the Life Insurance Plan.

58.     Under the laws of various states in which the Debtors operate, the Debtors are required to maintain workers' compensation insurance ("***Workers' Compensation***") for their Corporate Employees.  The Debtors maintain Workers' Compensation for their Corporate Employees under a policy administered by Louisiana Workers Compensation Corporation.  The Debtors pay an annual premium of approximately $127,000 for such coverage.  The Debtors make monthly payments on the workers' compensation and employers' liability policy in an amount of approximately $11,000 per month.  $11,000 of such premiums will become due and payable during the interim period on account of prepetition coverage.

59.     The Jones Act exempts the Debtors' Crew Members from state and federal Workers' Compensation requirements.  The Debtors are required to pay Crew Members injured in the course of their duties in accordance with the Jones Act's requirements (such payments, ("***Maintenance and Cure***").  Maintenance and Cure payments relate to healthcare arising from injuries or conditions of Crew Members that occur or manifest while the Crew Member is aboard the Debtors' vessels which must be paid until the Crew Member reached Maximum Medical

20

Improvement (as defined in the Jones Act). If a Crew Member must miss work due to such injury or condition, Maintenance and Cure is paid at a rate of $40 a day.

60.    Importantly, under the Jones Act, Crew Members who successfully bring suit for Maintenance and Cure "unreasonably withheld" are entitled to recover punitive damages. While the standard of "unreasonably withheld" is legally elevated above that of simple non-payment, in practice, where payment of Maintenance and Cure is delayed, plaintiff Crew Members often sue for punitive damages and ultimately settle for amounts in excess of the original Maintenance and Cure obligations.

61.    Maintenance and Cure is either paid directly by the Debtors as it is incurred or prefunded by the Debtors through Aucoin Claims Service, Inc. ("***Aucoin***") which administers the payment of Maintenance and Cure obligations. Maintenance and Cure obligations in excess of $25,000 are reimbursed by the Debtors' protection, pollution and maritime employers liability insurance.

62.    Maintenance and Cure claims arise on a day-to-day basis and it is difficult for the Debtors to predict with any certainty the number of claims for Maintenance and Cure or the amount of such claims which may arise from time to time. As of the Petition Date, Aucoin is paying known Maintenance and Cure obligations of $40 a day with respect to one Crew Member. I do not believe the Debtors owe any prepetition amounts with respect to Workers' Compensation or Maintenance and Cure claims other than those identified above. Nonetheless, because payment of Workers' Compensation and Maintenance and Cure claims is essential to the continued operation of the Debtors' business under federal, state, and maritime law, the Debtors seek authority to pay any and all prepetition Workers' Compensation and Maintenance and Cure claims, to continue to fund the Workers' Compensation policy in the ordinary course of business, and to modify the

21

automatic stay pursuant to Section 362(d) of the Bankruptcy Code as necessary to allow Employees and Crew Members to proceed with their claims for Workers Compensation and Maintenance and Cure in appropriate judicial or administrative forums.

63.    In addition to supplemental coverage under the Life Insurance Plan, Employees may purchase supplemental medical, dental, vision, AD&D, and short-term and long-term disability insurance (the "***Supplemental Benefits***") through Guardian.  The Debtors facilitate payments by their Employees through their payroll systems, but do not incur any additional fees or expenses in respect of the Supplemental Benefits, are not aware of any outstanding claims that may be made against the Debtors in respect of these Supplemental Benefits, and do not believe the Debtors owe any significant prepetition amounts in respect of these Supplemental Benefits. Nonetheless, because the continued maintenance of these Supplemental Benefits is essential to the continued operation of the Debtors' business, the Debtors seek authority to pay any and all prepetition claims and continue to fund any future obligations that may arise in respect of the Supplemental Benefits.

64.    The Debtors maintain supplemental healthcare coverage for medical, dental, vision, prescription and other eligible expenses for certain executive employees (the "***Executive Supplemental Benefits***"), which is administered through Armadacare.   The Executive Supplemental Benefits provide coverage for the applicable Employee, the Employee's spouse and child dependents up to $10,000 per person, annually.  The Debtors pay an annual premium of approximately $66,000 for such coverage, which is paid monthly in an amount of approximately $5,500 per month.  The monthly amounts are paid in advance, and as such, as of the Petition Date, I do not believe that the Debtors owe any prepetition amounts with respect to the Executive Supplemental Benefits.

US 5246684

65.     The Debtors provide Retirement Benefits to full-time Employees whom have been employed by the Debtors for more than six months as described below.  Specifically, the Debtors provide these eligible Employees the opportunity to participate in their retirement plan (the "***401(k) Plan***").  The 401(k) Plan is provided and administered by Fidelity who submits quarterly invoices that are paid in arrears.

66.     Each Employee participant in the 401(k) Plan may elect for the Debtors to contribute up to 75% of the Employee's salary to the 401(k) Plan, subject to limitations under applicable law (such discretionary contribution, a "***Plan Contribution***").  At the sole discretion of the Chief Executive Officer, the Debtors may elect to make contributions to the 401(k) Plan which is typically distributed *pro rata* on account of participating Employees' Plan Contributions during the prior year (collectively, the "***Plan Matching Contributions***").  The Debtors' have not made any Plan Matching Contributions in the last two years.

67.     As of the Petition Date, approximately 170 Employees actively participate in the 401(k) Plan.  The Debtors estimate that the annual administrative fees paid to Fidelity in respect of the 401(k) Plan are $2,400.  The Debtors have not received quarterly invoices from Fidelity for 401(k) Plan administration fees for the period from September 30, 2017, to December 31, 2017.  Accordingly, the Debtors estimate that approximately $1,000 of administrative fees will become due and payable during the interim period on account of prepetition 401(k) Plan activities.

68.     As of the Petition Date, Plan Contributions for the most recent Employee payroll on March 4, 2018, have not been funded and the Debtors estimate that approximately $60,000 will become due and payable during the interim period.

69.     Through the Wages Motion, the Debtors seek authority to pay any prepetition Plan Contributions on behalf of Employees and any prepetition administrative fees when due and payable in the ordinary course of business and in accordance with prepetition practices.

70.     In the course of their employment, certain Corporate Employees use approximately 50 Debtor-owned or leased vehicles (the "***Company Vehicles***").  The estimated average monthly expenditure on account of the Company Vehicles during the year ended December 31, 2017, was approximately $15,000 (including lease payments, fuel, and maintenance).  I believe less than $5,000 may be owed or become due and payable during the interim period on account of prepetition Company Vehicles expenditures.  Through the Wages Motion, the Debtors seek authority to continue providing allowances for and making payments on account of the Company Vehicles consistent with prepetition practices.

71.     The Debtors provide land-based Employees at their Fourchon, Louisiana site with onsite meals, value added services (including a secure travel assistance program), reimbursement of parking fees, and cell phones, (collectively, the "***Miscellaneous Benefits***").  The Debtors estimate the Miscellaneous Benefits cost approximately $24,000 per month.  The Debtors pay these expenses as they arise in the ordinary course of business and believe that no amounts are owed on account of prepetition miscellaneous benefits.  However, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts owed on account of the Miscellaneous Benefits up to $10,000 on an interim basis and on a final basis in the ordinary course consistent with prepetition practices.

72.     The Debtors operate in the highly competitive maritime oilfield services sector.  I believe that one of the Debtors' recognized advantages over its peers is its outstanding service and lean and efficient operating model.  I believe that the Debtors earned this reputation due to the

professionalism, loyalty, and morale of its Employees and Independent Contractors, which are ultimately the most important part of the Debtors' business.  I believe that any delayed payment of or failure to pay the Obligations would gut the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most critical and impose significant and needless financial hardship on their families.  The Debtors' business operations cannot tolerate such disruption, nor should the Employees and Independent Contractors endure such hardship.

73.     I also believe that payment of the Obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.  Without this relief, I believe that otherwise loyal Employees and Independent Contractors may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  I believe that payment of the Obligations will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption, and that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.

74.     I believe that reimbursement of Expenses is necessary because any other treatment of Employees would be highly inequitable.  Employees who have incurred Expenses should not be forced personally to bear the cost of the Expenses, especially because the Employees incurred the Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

75.     I believe that payment of administrative fees to the administrators of the Debtors' payroll and Employee Benefit programs is also necessary.  Without the continued service of these administrators, the Debtors will be unable to continue to honor their obligations to Employees

under the Employee Benefit plans.  The Wages Motion requests only permission for the Debtors, in their discretion, to:  (i) make payments consistent with existing policies to the extent such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code; and (ii) continue to honor practices, programs, and policies with respect to Employees as such were in effect before the Petition Date.

76.     The Debtors have sufficient liquidity to pay the amounts described in the Wages Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the payments requested to be made through the Wages Motion.  I believe that checks, wire transfers, and electronic transfer requests, other than those relating to authorized payments, will not be honored inadvertently.

77.     Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

**E.      Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363, and 503 (I) Authorizing the Debtors to Pay Prepetition Claims of Trade Creditors and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations (the "*Trade Claims Motion*")**

78.     In the Trade Claims Motion, the Debtors request entry of interim and final orders: (i) authorizing the Debtors to pay prepetition claims (collectively, the "*Trade Claims*") of secured and general unsecured creditors that provide goods or services related to the Debtors' operations (collectively, the "*Trade Creditors*") when due and payable but subject to their right to request the Customary Trade Terms (as defined below) (a) on an interim basis, in an amount not to exceed $3,600,000 in the aggregate, and (b) on a final basis, any outstanding prepetition amounts

26

thereafter; and (ii) authorizing applicable banks and financial institutions to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.  Additionally, the Debtors request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the Trade Claims Motion on a final basis.

79.     The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  During the 12 month period ending December 2017, the Debtors paid Trade Creditors, on average, approximately $6,740,000 each month.  The Debtors estimate that as of the Petition Date, they owe a total of approximately $4,000,000 on account of undisputed Trade Claims.  The Debtors estimate that approximately $3,600,000 of that amount will become due and payable during the 21 days after the Petition Date.

80.     The Debtors do not seek to pay these amounts immediately or in one lump sum. Rather, the Debtors request authority to pay these amounts as they become due and payable in the ordinary course of the Debtors' business, subject to their right to request Customary Trade Terms as described in the Trade Claims Motion.  As of the Petition Date, the Debtors have approximately $75 million in cash on hand.  The Debtors' cash on hand and the cash generated by the Debtors' business will provide ample liquidity for payment of the Trade Claims in the ordinary course during the administration of these chapter 11 cases.

81.     The Debtors operate their top-end fleet of 60 vessels qualified under the Jones Act to support offshore oil and gas exploration and production.  In the ordinary course of operations, the Debtors contract with various Trade Creditors comprised of service providers and suppliers essential to the Debtors' offshore, land-based, and corporate operations, including, among others, vendors who provide services and goods necessary to the continued operations of the Debtors'

vessels. The contractual terms between the Debtors and the Trade Creditors can vary significantly. Some Trade Creditors have long-term supply contracts with the Debtors that could be enforced if such Trade Creditors refuse to perform. Other Trade Creditors, could refuse to continue doing business with the Debtors without the risk of incurring damages or other contractual obligations. Regardless of the contractual terms, I believe that the Debtors' positive relationships with their Trade Creditors are critical to their business operations.

82. Additionally, I understand based on discussions with the Debtors' restructuring advisors that many of the Debtors' prepetition Trade Claims arguably qualify as Miscellaneous Debtor Lien Claims, 503(b)(9) Claims, or Foreign Vendor Claims (each as defined below) which bankruptcy courts may authorize for payment during the pendency of chapter 11 cases. In some cases, Trade Claims may qualify as more than one such category of claims.

83.     The nature and amounts of these Trade Claims are summarized in the following table and descriptions:

| Category | Description of Services Provided | Estimated Amount Outstanding as of Petition Date | Approximate Amount Due within 21 Days |
|---|---|---|---|
| Miscellaneous Debtor Lien Claims | Suppliers of goods or services utilized on or provided to rigs operated by the Debtors that may assert maritime or other liens (includes many foreign vendors). | $3,370,000[14] | $3,010,000[5] |
| 503(b)(9) Claims | Suppliers that provided goods to the Debtors that were received within 20 days before the Petition Date. | $460,000[15] | $410,000[6] |
| Foreign Vendor Claims | Suppliers of goods or services that are based outside the United States. | $10,000[16] | $10,000[7] |
| **Total amount of priority Trade Claims:** | | **$3,840,000** | **$3,430,000** |
| **Total amount of outstanding Trade Claims:** | | **$4,000,000** | **$3,600,000** |

84.     The Debtors regularly contract with certain Trade Creditors to make improvements and repairs to, and obtain supplies for, their vessels and other property and equipment that the Debtors use in the operation of their business.  Aside from the Debtors' payroll obligations, these goods and services constitute the bulk—approximately 85%—of the Debtors' monthly operating expenses.  I understand based on discussions with the Debtors' restructuring advisors that the Trade Creditors providing such goods and services, which include among other things, engines, electrical systems, plumbing systems, other various parts, and repairs, may be entitled to statutory

---

[14]     Amount may also include: (i) $2,270,000 of Miscellaneous Debtor Lien Claims also qualifying as 503(b)(9) Claims and (ii) $70,000 of Miscellaneous Debtor Lien Claims that also constitute Foreign Vendor Claims.

[15]     To avoid duplication, excludes all 503(b)(9) Claims also qualifying as Miscellaneous Debtor Lien and/or Foreign Vendor Claims.

[16]     To avoid duplication, excludes all Foreign Vendor Claims also qualifying as Miscellaneous Debtor Lien and/or 503(b)(9) Claims.

US 5246684

protections in the form of maritime liens, mechanic's liens, and materialman's liens or other liens (the "***Miscellaneous Debtor Lien Claims***") against the Debtors' property, including the Debtors' vessels, for their respective Trade Claims.

85.     The Debtors estimate that an aggregate amount of approximately $3,370,000[17] of the Trade Claims could give rise to potential Miscellaneous Debtor Lien Claims of which the Debtors estimate $3,010,000 will become due and payable in the 21 days after the Petition Date.

86.     The Debtors have received goods from certain Trade Creditors in the 20 days prior to the Petition Date for which I understand based on discussions with the Debtors' restructuring advisors that Trade Creditors may assert claims (the "***503(b)(9) Claims***").  In addition, prior to the Petition Date, and in the ordinary course of business, the Debtors ordered goods that will not be delivered until on or after the Petition Date (the "***Prepetition Orders***").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to related goods, certain Trade Creditors may refuse to ship or transport such goods or may recall such shipments with respect to such Prepetition Orders or refuse to deliver future orders unless the Debtors issue substitute purchase orders postpetition or pay for such goods.  Thus granting the requested relief in the Trade Claims Motion with respect to the 503(b)(9) Claims and the Prepetition Orders is essential to preventing any disruption to the Debtors' operations.

87.     The Debtors estimate that an aggregate amount of approximately $2,737,000[18] Trade Claims could give rise to potential 503(b)(9) Claims or are in connection with Prepetition

---

[17]     The Debtors estimate that the $3,370,000 of Miscellaneous Debtor Lien Claims include: (i) $2,270,000 of Trade Claims also qualifying as 503(b)(9) Claims or Petition Date Orders, as well as (ii) $70,000 of Trade Claims that also constitute Foreign Vendor Claims.

[18]     The Debtors estimate that the $2,737,000 of Trade Claims which are either 503(b)(9) Claims or are in connection with Petition Date Orders include: (i) $2,270,000 of 503(b)(9) Claims or Petition Date Orders also qualifying as Miscellaneous Debtor Lien Claims as well as (ii) $7,000 of 503(b)(9) Claims or Petition Date Orders that also constitute Foreign Vendor Claims.

US 5246684

Orders of which the Debtors estimate $2,447,000 will become due and payable during the 21 days after the Petition Date.

88.     The Debtors regularly purchase goods and materials, and obtain services from entities located in countries outside of the United States (the "***Foreign Vendors***").  Many of these Foreign Vendors supply goods or materials or render services to the Debtors that are crucial to the Debtors' ongoing U.S. operations.  These business relationships may give rise to claims for goods or materials delivered and services provided to the Debtors.

89.     The Debtors estimate that an aggregate amount of approximately $80,000[19] of the Trade Claims are held by Foreign Vendors, of which $75,000 will become due and payable in the 21 days after the Petition Date.

90.     Consequently, I believe the relief requested by the Trade Claims Motion is essential to preserve the value of their estates and is merited in light of the limited amount of relief requested relative to the total funded debt being administered in these cases, the priority nature of the vast majority of the Trade Claims to be paid, the vote by eligible creditors in support of the Plan, and the unimpaired treatment of the Debtors' other creditors in these chapter 11 cases.

91.     To avoid opportunism by Trade Creditors and to preserve the Debtors' operations and the value of their estates, the Debtors also request authority to condition the payment of Trade Claims upon the respective Trade Creditor's agreement to maintain or reinstate contract terms during the pendency of these chapter 11 cases that are at least as favorable as the trade terms most favorable to the Debtors existing in the six months before the Petition Date or such other trade terms acceptable to the Debtors (the "***Customary Trade Terms***").

---

[19]     The Debtors estimate that of the $80,000 of Foreign Vendor Claims include:  (i) $7,000 of Trade Claims that also constitute 503(b)(9) Claims or Petition Date Orders, and (ii) $70,000 of Trade Claims that also constitute Miscellaneous Debtor Lien Claims.

31

92.     The Debtors also propose that if a Trade Creditor, after receiving a payment on account of its Trade Claim, does not maintain or reinstate its Customary Trade Terms during the pendency of these chapter 11 cases, then any payments made on account of the Trade Claim to such Trade Creditor after the Petition Date may, in the Debtors' sole discretion, either be deemed applied to postpetition amounts payable to such Trade Creditor or treated as an unauthorized postpetition transfer recoverable by the Debtors.

93.     I understand the goal of these prepackaged chapter 11 cases is to quickly effectuate a financial restructuring that will substantially deleverage the Debtors' balance sheet without interrupting its business operations.  Given the highly competitive maritime oilfield services industry in which the Debtors compete for business, I believe that disruption to the Debtors' timely receipt of necessary goods and services from Trade Creditors would likely negatively impact the Debtors' operations, harm its business, damage market reputation, and possibly lead to loss of customers.  Such disruptions, and any adverse actions taken by Trade Creditors against the Debtors' Non-Debtor Affiliates not sheltered by the Bankruptcy Code, could also adversely impact such Non-Debtor Affiliates' value and ultimately reduce the value of the Debtors' estates. Recognizing these risks, I understand the Plan leaves General Unsecured Claims (which include those of Trade Creditors) unimpaired.

94.     I believe that the Restructuring Support Lenders (as defined in the Plan) understand the importance of maintaining the Debtors' relationships with their Trade Creditors and have agreed to the unimpaired treatment of the General Unsecured Claims and all other Trade Claims under the Plan.  Their concern for the Debtors' continued operational success is manifest by the supporting vote as a class of 75.5% in amount and 94.4% in number of the voting holders of Senior Lender Claims in support of the Plan.  Through the Trade Claims Motion, the Debtors seek merely

to avoid any unnecessary delay in the payment of Trade Creditors during the pendency of these chapter 11 cases.  Accordingly, I believe the relief requested in the Trade Claims Motion furthers the Debtors' restructuring goals to maximize the value of their estates in accordance with the Plan.

95.    I believe that the relief requested in the Trade Claims Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Trade Claims Motion should be approved.

   **F.    Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements and (II) Granting Related Relief (the "*Cash Management Motion*")**

96.    The Cash Management Motion seeks entry of an interim order, and subsequently a final order:  (i) authorizing the Debtors to (a) maintain their existing bank accounts and Cash Management System (as defined below), (b) authorizing the Debtors to continue using their existing business forms and checks, (c) authorizing the Debtors to continue to engage in intercompany transfers in the ordinary course of business and consistent with past practice, and (d) authorizing the Debtors to pay any undisputed prepetition bank fees and continue to pay the bank fees in the ordinary course of business; and (ii) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the Cash Management Motion on a final basis.

97.    The Debtors manage their cash, receivables, and payables through a centralized cash management system (the "*Cash Management System*").  The Cash Management System consists of eight bank accounts (collectively, the "*Bank Accounts*") each maintained at one of four different banks (collectively, the "*Banks*") as well as certain Non-Debtor Affiliate Bank Accounts (as defined below) maintained at Non-Debtor Affiliate Banks (as defined below).  A list describing

33

each of the Bank Accounts and a diagram illustrating the Cash Management System and the relationship between the Bank Accounts is attached to the Cash Management Motion.

98.     The Debtors use the Cash Management System to efficiently collect, transfer, and disburse funds generated from their operations.  The Debtors maintain accounting controls with respect to each of the Bank Accounts and are able to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable, including in connection with intercompany transactions.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, the Debtors will be able to accurately document, record, and trace the transactions occurring within the Cash Management System for the benefit of their bankruptcy estates (the "*Estates*") and for all parties in interest.

99.     The Bank Accounts are described in the following table:

| Account | Account Description |
| --- | --- |
| *Harvey Gulf International Marine, LLC* | |
| Regions Bank – Concentration Deposit Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S.-based concentration account with Regions Bank (the "*Concentration Account*" and together with the Galliano Operating Account and the Corporate Operating Account, the "*Regions Accounts*").  The Concentration Account is the recipient account of all payments made to the Debtors.  Funds are automatically transferred from the Concentration Account to the Galliano Operating Account and the Corporate Operating Account to be paid to third parties. |
| Regions Bank – Galliano Operating Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S. based operating account with Regions Bank (the "*Galliano Operating Account*").  The Galliano Operating Account is an active disbursement account used primarily to pay all operating expenses for the Debtors' vessel operations including Crew Member payroll and the operations of the Debtors' Fourchon, LA office.  Each day, the Concentration Account funds the Galliano Operating Account in an amount equal to the projected outgoing payments for that day.  As a result, except as a result of a delayed payment or during the |

34

| Account | Account Description |
|---|---|
| | brief period of time before disbursements are made, the Galliano Operating Account typically maintains a zero balance. |
| Regions Bank – Corporate Operating Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S. based corporate operating account with Regions Bank (the "***Corporate Operating Account***").  The Corporate Operating Account is an active disbursement account used primarily to pay all operating expenses of the Debtors' corporate office, which includes Corporate Employee payroll and interest and principal on the Debtors' funded indebtedness.  Each day the Corporate Operating Account is funded from the Concentration Account with funds in an amount equal to the outgoing payments for that day.  As a result, except as a result of a delayed payment or during the brief period of time before disbursements are made, the Corporate Operating Account typically maintains a zero balance. |
| Whitney Bank – Corporate Savings Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S. based corporate savings account with Whitney Bank in which Debtor deposits of approximately $84,223 are currently collecting interest.  This account has not been used in the last year. |
| Whitney Bank – Operations Savings Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S. based operations savings account with Whitney Bank in which Debtor deposits of approximately $535,546 are currently collecting interest. |
| Bank of America – Insurance Account | Debtor Harvey Gulf International Marine, LLC maintains a U.S. based insurance payments account with Bank of America, N.A. (the "***Health Insurance Account***").  The Health Insurance Account is an active checking account used to make payments owed on account of the Debtors' employee medical insurance plan. The Health Insurance Account begins each week with a balance of $146,000.  Over the course of each week, United Healthcare, the Debtors' healthcare administrator, disperses funds from the Health Insurance Account on an as-needed basis to pay claims, deductibles, co-pays, and other amounts owed under the employee medical insurance plan (occasionally resulting in a negative balance). Every Monday, the Corporate Operating Account transfers funds to the Health Insurance Account in an amount sufficient to return the Health Insurance Account balance to $146,000. |

| Account | Account Description |
|---|---|
| **HGIM Corp.** | |
| HSBC – Savings Account | Debtor HGIM Corp. maintains a U.S.-based savings account with HSBC (the "***HSBC Savings Account***").  The HSBC Savings Account was created in conjunction with the establishment of the Mexican Operating Accounts (as defined below) of the Debtors' Mexican non-Debtor affiliate, Harvey Gulf International Marine S.A.P.I. de C.V. Presently, the HSBC Savings Account contains Debtor deposits of approximately $895,824 that are collecting interest.  Funds are periodically transferred from this account to the HSBC Fees Account to pay all fees incurred to maintain the HSBC Bank Accounts (as defined below). |
| HSBC – Fees Account | Debtor HGIM Corp. maintains a U.S.-based fees account with HSBC (the "***HSBC Fees Account***" and together with the HSBC Savings Account and the Mexican Operating Accounts, the "***HSBC Bank Accounts***").  The HSBC Fees Account is a checking account created in conjunction with the Mexican Operating Accounts.  Funds are periodically deposited in the HSBC Fees Account from the HSBC Savings Account to pay all fees associated with maintaining and administering the HSBC Bank Accounts. |

100.    The Debtors respectfully request that the Court authorize the Debtors to maintain and continue to use the Bank Accounts, and direct their Banks to maintain, service, and administer the Bank Accounts without interruption and in the ordinary course of business.  In this regard, the Debtors request the Banks be authorized and directed to receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto provided that sufficient funds are on deposit and standing the Debtors' credit in the applicable Bank Accounts to cover such payments.  Notwithstanding the foregoing, any check, advice, draft, or other notification that the Debtors inform the Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

US 5246684

101.    There are liens over the foregoing Bank Accounts with respect to the Senior Secured Term and Revolving Credit Agreement dated as of June 18, 2013 (the "*Credit Agreement*"), that I believe are valid and have been perfected (i) in the case of the Regions Accounts, through a valid and effective Deposit Account Control Agreement dated July 12, 2013, with Bank of America N.A., as administrative agent; and (ii) in each of the foregoing Bank Accounts, by being maintained by one of the lenders and secured parties under the Credit Agreement pursuant to section 9-104(a)(1) of the Uniform Commercial Code.

102.    Each Bank Account is maintained at a bank that is insured by the Federal Deposit Insurance Corporation (the "*FDIC*") and, therefore, complies with section 345(b) of the Bankruptcy Code.

103.    I understand based on discussions with the Debtors' restructuring advisors that the U.S. Trustee has established certain operating guidelines (the "*U.S. Trustee Guidelines*") for debtors in possession.[20]  I understand that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, deposit all estate funds with a financial institution that is an authorized depository approved by the U.S. Trustee and that agrees to comply with the requirements of the U.S. Trustee.

104.    Here, the Debtors maintain the majority of their deposits with Regions Bank, Whitney National Bank, and Bank of America N.A., all authorized depository institutions in the Southern District of Texas.  However, the Debtors also maintain two accounts with *de minimis* balances at HSBC Bank USA, N.A. ("*HSBC*"), which is not an authorized depository institution in the Southern District of Texas.  As described above, the Bank Accounts maintained by HSBC

---

[20]    *See Guidelines for Debtors-in-Possession*, U.S. Department of Justice, United States Trustee Program, Region 7, *available at* http://www.justice.gov/sites/default/files/ust-regions/legacy/2011/07/13/DIP_Guidelines.pdf.

were formed in connection with the establishment of the Mexican Operating Accounts of the Debtors' Mexican non-Debtor affiliate, Harvey Gulf International Marine de Mexico S.A.P.I. de C.V., and are necessary to maintain these foreign accounts.  I believe re-establishing these accounts in the future may prove costly for the Debtors and limit optionality for their business operations. The Debtors respectfully request the Court authorize the Debtors to maintain, service, and administer the HSBC Bank Accounts, without interruption and in the ordinary course of business, notwithstanding the fact that HSBC is not an authorized depository institution under the U.S. Trustee Guidelines; indeed, HSBC is a well-capitalized financial institution that is one of the largest banking and financial services institutions in the world.  Accordingly, the Debtors submit that it is appropriate to continue to maintain their Bank Accounts at HSBC.

105.    In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, a number of fees and expenses related to the cost of administering the Bank Accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "***Bank Fees***").  The Bank Fees are either debited directly from the Debtors' Bank Accounts or are paid in connection with wire transfers.  The Debtors pay the Banks an average of approximately $695 per month in Bank Fees for the last 12 months.  The Debtors estimate that they owe the Banks approximately $400 as of the Petition Date, the entirety of which will become due and payable within 21 days of the Petition Date.

106.    As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "***Business Forms***") in the ordinary course of their business.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, and vendors during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their

continued use of all correspondence and Business Forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted and future checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as required under the U.S. Trustee Guidelines.  Further, to the extent the Debtors exhaust their existing supply of Business Forms during these chapter 11 cases, the Debtors will transition to using checks and other Business Forms with the designation "debtor in possession" and the corresponding bankruptcy case number on all such forms.

107.    As described above, the Debtors make a variety of bank account, intracompany, and intercompany transfers (the "***Transfers***") of funds in the ordinary course of business to ensure their businesses have ample operating liquidity.  The Transfers are made through wire transfers and direct deposits to either:  (i) fund the Debtors' operating accounts to pay anticipated business expenditures including employee payroll, operational expenses, and interest and principal payment on funded indebtedness; (ii) fund employee healthcare benefit expenses through the Debtors' self-insured healthcare plan; or (iii) arrange for payment of certain fees to the Banks.

108.    As summarized above, the Regions Accounts are the centerpiece of the Debtors' Cash Management System.  Debtor Harvey Gulf International Marine, LLC's Concentration Account receives all incoming payments from each of the other Debtors' various customers.  Funds are manually transferred via Transfers from the Concentration Account to the Galliano Operating Account and the Corporate Operating Account daily from which Debtor Harvey Gulf International Marine, LLC funds the other Debtors' operating expenses (including in certain instances through automated clearinghouse debits from the Galliano Operating Account and the Corporate Operating Account).  Each of the Transfers is made on an as-needed basis.  The Debtors track all fund

39

transfers in their respective accounting system and can ascertain, trace, and account for all Transfers.  Each of the Transfers is made on an as-needed basis.  The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Transfers.

109.    I believe the Transfers are integral to the Debtors' operations.  For instance, the Debtors' employees are paid through the respective Galliano Operating Account and the Corporate Operating Account.  These accounts do not receive any revenues or income except from the Debtors' Concentration Account which is the Debtors' sole recipient account from customers. Accordingly, if the Transfers were to be discontinued the Debtors would be required to, at a minimum, restructure their payroll system and notice their customers of new payment procedures unnecessarily disrupting the Debtors' operations.

110.    Further, I believe requiring the Debtors to cease Transfers would be a costly and time-consuming endeavor.  The Debtors would be required to, among other things:

- modify their internal accounting systems;
- expend substantial employee time adjusting the Company's treasury and accounting functions;
- open new bank accounts; and
- put new general ledgers in place.

I believe such disruptions to the Cash Management System and the Debtors' operations would cause immediate and irreparable harm to the Debtors, and would be a distraction to consummation of the transactions contemplated by the Plan and the RSA.

111.    Under the Cash Management System, the Debtors also maintain and administer additional bank accounts for certain of their non-Debtor affiliates (the "***Non-Debtor Affiliate Bank Accounts***") at two separate banks (the "***Non-Debtor Affiliate Banks***"):  (i) to fund the Mexican operations of Harvey Gulf International Marine de Mexico S.A.P.I. de C.V.; and (ii) to fund

40

operations, payments of principal and interest, and required reserves relating to the Debtors' unrestricted subsidiary, Harvey Stone, LLC (the holding company for the offshore vessel, the *Harvey Stone*).

112.    The Non-Debtor Affiliate Bank Accounts are managed directly by the Debtors' Chief Executive Officer, Chief Financial Officer, and treasury team.  As a result, Transfers between the Debtors' Bank Accounts and the Non-Debtor Affiliate Bank Accounts are well documented, ensuring careful management of funds for the Debtors' Estates.

113.    The Non-Debtor Affiliate Bank Accounts are described in the following table:

| *Harvey Gulf International Marine de Mexico S.A.P.I. de C.V.* | |
|---|---|
| HSBC – US$ Operating Account | The US$ operating account of Harvey Gulf International Marine de Mexico S.A.P.I. de C.V. (the "***HSBC Mexican Operations Dollar Account***") with HSBC was established with the intention of using it to pay US dollar ($)-denominated operating expenses for the Debtors' Mexican non-Debtor affiliate. |
| HSBC – MXN Operating Account | The MXN operating account of Harvey Gulf International Marine de Mexico S.A.P.I. de C.V. (together with the HSBC Mexican Operations Dollar Account, the "***Mexican Operating Accounts***") with HSBC was established with the intention of using it to pay Mexican peso (P)-denominated operating expenses for the Debtors' Mexican non-Debtor affiliate. |
| *Harvey Stone, LLC* | |
| Wells Fargo – Construction Trust Account | Harvey Stone, LLC's construction trust account is no longer actively used but previously was used to make payments for the construction of *Harvey Stone* under the Harvey Stone Financing.[21] |

---

[21]    To finance the construction of the *Harvey Stone*, Harvey Stone, LLC issued $45 million aggregate principal amount of 4.91% Senior Secured Notes Due 2016 (the "***Harvey Stone Note***") under that certain Note Purchase Agreement dated August 24, 2017, and other related agreements by and among *inter alia*, Harvey Stone, LLC and Wells Fargo Northwest, N.A. ("***Wells Fargo***") (collectively, all such documentation together with the Harvey Stone Note, the "***Harvey Stone Financing***").  Further details of the Harvey Stone Financing are available in the First Day Declaration.

| | |
|---|---|
| Wells Fargo – Project Trust Account | Harvey Stone, LLC's project trust account (the "***Project Trust Account***") is the principal means of funding operating expenses and receiving cash receipts for the operations of the *Harvey Stone*. Harvey Gulf International Marine, LLC funds the Harvey Stone's operating expenses from the Galliano Operating Account via draws on the Concentration Account. Harvey Stone, LLC periodically makes payments from the Project Trust Account to the Concentration Account to reimburse Harvey Gulf International Marine, LLC for the operating expenses incurred under its management agreement with Harvey Stone, LLC. These payments must be authorized in advance by Wells Fargo. |
| Wells Fargo – Interest Payment Trust Account | Harvey Stone, LLC's interest payment trust account (the "***Interest Payment Trust Account***") is used to fund payments of interest on the Harvey Stone Note. Harvey Stone, LLC pays funds into the Interest Payment Trust Account from the Project Trust Account ahead of each interest payment. These payments must be authorized in advance by Wells Fargo. |
| Wells Fargo – Principal Payment Trust Account | Harvey Stone, LLC's principal payment trust account (the "***Principal Payment Trust Account***") is used to fund payments of principal on the Harvey Stone Note. Harvey Stone, LLC arranges for payment of funds into the Principal Payment Trust Account from the Project Trust Account ahead of each payment of principal on the Harvey Stone Note. These payments must be authorized in advance by Wells Fargo. |
| Wells Fargo – Proceeds Trust Account | Harvey Stone, LLC's proceeds trust account (the "***Proceeds Trust Account***") is required under the Harvey Stone Financing. While it has not yet been used by Harvey Stone, LLC, the purpose of the Proceeds Trust Account is to fund payments of proceeds stemming from any disposition of assets or insurance recoveries relating to the *Harvey Stone*. |
| Wells Fargo – Reserve Trust Account | Harvey Stone, LLC's reserve trust account is required under the Harvey Stone Financing to be funded with approximately $3.5 million at all times. Since the account's initial funding, the account has been and remains fully funded. |

US 5246684

| Wells Fargo – Distributions Trust Account | The Debtors' distributions trust account (the "***Distributions Trust Account***") is required under the Harvey Stone Financing.   While it has not yet been used by Harvey Stone, LLC the purpose of the Distributions Trust Account is to fund distributions to the Debtors on account of the equity interests in Harvey Stone, LLC in the event such distributions are permitted under the terms of the Harvey Stone Financing. Such payments would require prior coordination with Wells Fargo. |

114.    Neither the Debtors nor Harvey Gulf International Marine de Mexico S.A.P.I. de C.V. currently conduct any Mexican operations.   The Mexican Operating Accounts are a prerequisite for the conduct of business operations in Mexico under Mexican law and they were established at significant expense in anticipation of future Mexican operations.   The Mexican Operating Accounts would be difficult and costly to replace in the event the Debtors or Harvey Gulf International Marine de Mexico S.A.P.I. de C.V. seek to commence Mexican operations following their reorganization and emergence from chapter 11.

115.    Similarly, if the Debtors were required to modify their practices with respect to the operations and financing of the Harvey Stone, the Debtors would be required to, at a minimum, obtain consent from Wells Fargo and the lenders under the Harvey Stone Note, restructure their current mechanism for funding Harvey Stone operating expenses, and notify the Harvey Stone's customers of new payment procedures, unnecessarily disrupting the Debtors' and the Harvey Stone's operations.   Accordingly, by the Cash Management Motion, the Debtors request permission to continue their prepetition practices with respect to the Non-Debtor Affiliate Bank Accounts.

116.    Unlike those of Harvey Gulf International Marine de Mexico S.A.P.I. de C.V. and Harvey Stone, LLC, the finance operations of the Debtors' other Non-Debtor Affiliates, Q-LNG Transport, LLC, and the Shipyard Entities are not part of the Debtors' Cash Management System.

43

The Debtors receive an annual fee for services provided under management agreements with each of Q-LNG Transport, LLC and the Shipyard Entities, however, the Debtors do not fund the operations of Q-LNG Transport, LLC or the Shipyard Entities in the ordinary course of business. Instead, both Q-LNG Transport, LLC and the Shipyard Entities administer their own cash management operations and invoice the Debtors or are invoiced by the Debtors as though they are third parties.

117.    The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtors and their Estates, including the ability to:  (i) control corporate funds; (ii) ensure the maximum availability of funds when necessary; and (iii) reduce borrowing costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

118.    As set forth in the Cash Management Motion, to ensure that all transfers and transactions will be documented in their books and records, the Debtors will continue to maintain records of all transfers within the Cash Management System and use the Debtors' common treasury and finance team to administer the Bank Accounts and Non-Debtor Affiliate Bank Accounts.  To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors request in the Cash Management Motion that their Banks be directed not to honor, subject to certain exceptions approved by this Court, any checks drawn on the Debtors' Bank Accounts prior to the Petition Date.  To assist in this process, the Debtors will notify each Bank with a disbursement account of the commencement of these chapter 11 cases and will instruct each Bank, subject to certain exceptions approved by this Court, not to honor any checks dated prior to the Petition Date and below an identified check number.

119.     To avoid disruption of the Cash Management System and unnecessary expense, the Debtors seek a waiver of the requirement to immediately purchase new checks and business forms that include the term "debtor-in-possession" and the case number assigned to these chapter 11 cases.  The Debtors have an inventory of check stock and business forms for the Bank Accounts that would go to waste if new checks were to be ordered and used.  Additionally, requiring the Debtors to obtain new checks, which bear the designation "debtor-in-possession," for the Bank Accounts would cause the Debtors to incur undue expense and delay.

120.     I believe that the Transfers occur "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.  The Transfers are not just a matter of routine in the Debtors' business:  they are the type of transactions that are common among many complex business enterprises that operate through multiple affiliates.  Yet, precisely because of their routine nature, I believe the Transfers are integral to the Debtors' ability to operate their business.  I believe that requiring the Debtors to modify their current practices would be a costly and time-consuming undertaking, distracting the Debtors and their employees from the important task of continuing to operate the Debtors' business in the ordinary course and proceed towards the successful consummation of the transactions contemplated by the Plan and the RSA.

121.     I believe that the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

### G.     Emergency Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees (the "*Taxes Motion*")

122.     The Taxes Motion seeks entry of an interim order (i) authorizing the Debtors to remit and pay certain prepetition Taxes and Fees (as defined below) that will become payable during the pendency of these chapter 11 cases and (ii) granting related relief.  In addition, the

Debtors request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the Taxes Motion on a final basis.

123.    In the ordinary course of business, the Debtors collect, withhold, and incur franchise taxes, property taxes, sales and use taxes, and state income taxes as well as certain other administrative, environmental, and regulatory fees and assessments (collectively, the "***Taxes and Fees***").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "***Authorities***").  The Debtors remit and pay the Taxes and Fees through checks and electronic funds transfers that are processed through their banks and other financial institutions.[22]  The Debtors estimate that approximately $7,500 in Taxes and Fees have accrued and remain unpaid as of the Petition Date, all of which will become due and owing to the Authorities during the first 21 days after the Petition Date.  However, there may be Taxes and Fees that have accrued and remain unpaid as of the petition date of which the Debtors are presently unaware.  Accordingly, the Debtors request authority to pay up to $25,000 on account of Taxes and Fees during the interim period.

---

[22]    Contemporaneously with the Taxes Motion, the Debtors filed the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Maintenance of the Existing Cash Management System, (B) Continued Use of Existing Checks and Business Forms, and (C) Continued Intercompany Arrangements and (II) Granting Related Relief*, which seeks relief from the Court with respect to the Debtors' bank accounts and Cash Management System.

124.    Such estimated Taxes and Fees are summarized below:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days After the Petition Date |
|---|---|---|---|
| Property Taxes | Taxes and obligations related to real and personal property holdings. | $0.00 | $0.00 |
| Franchise Taxes | Taxes required to conduct business in the ordinary course. | $0.00 | $0.00 |
| Sales and Use Taxes | Taxes related to the sale and use of certain goods and services. | $7,500.00 | $7,500.00 |
| Income Taxes | Taxes on net income for corporate income taxes in various states | $0.00 | $0.00 |
| Regulatory Fees and Other Miscellaneous Taxes | Fees related to business, administrative, environmental, and regulatory assessments. | $0.00 | $0.00 |
|  |  | **$7,500.00** | **$7,500.00** |

125.    State and local laws in the jurisdictions where the Debtors operate generally grant Authorities the power to levy property taxes (the "***Property Taxes***") against the Debtors' real and personal property.  The obligation to pay Property Taxes is often statutorily secured by the underlying property.  The Debtors typically pay Property Taxes in the ordinary course of business on an annual basis.  Although I believe the Debtors are current with respect to payment of the Property Taxes, out of an abundance of caution, the Debtors request authority to continue to pay any prepetition Property Taxes if and when they become due.

126.    The Debtors are required to pay various state franchise taxes and fees (the "***Franchise Taxes***") in order to continue conducting their businesses pursuant to state and local laws.  The Franchise Taxes are assessed annually and are necessary for the Debtors to remain in

good standing and conduct their businesses in the applicable jurisdictions.  Although I believe the Debtors are current with respect to payment of the Franchise Taxes, out of an abundance of caution, the Debtors request authority to continue to pay any prepetition Franchise Taxes if and when they become due.

127.    The Debtors are required to pay state and local sales and use taxes (the "*Sales and Use Taxes*") to the Authorities in connection with the sale and use of certain goods and services. The Debtors typically pay Sales and Use Taxes in the ordinary course of business and on a monthly basis.  As of the Petition Date, the Debtors estimate that their accrued but unpaid liability for the Sales and Use Taxes totals approximately $7,500.00, all of which the Debtors expect to become due and payable in the 21 days following the Petition Date.

128.    The Debtors are required to pay corporate income taxes on their taxable net income in various states, including Louisiana and Texas (the "*Income Taxes*").  The Income Taxes are filed and paid annually.  Although I believe the Debtors are current with respect to payment of the Income Taxes, out of an abundance of caution, the Debtors request authority to continue to pay any prepetition Income Taxes if and when they become due.

129.    The Debtors incur, in the ordinary course of business, certain regulatory fees and assessments, permitting fees, licensing fees, levies, and other miscellaneous taxes related to business, administrative, and environmental rules and regulations (the "*Regulatory Fees and Other Miscellaneous Taxes*").  The Debtors remit these fees to the relevant Authorities on an annual basis.  Although I believe the Debtors are current with respect to payment of the Regulatory Fees and Other Miscellaneous Taxes, out of an abundance of caution, the Debtors request authority

to continue to pay any prepetition Regulatory Fees and Other Miscellaneous Taxes if and when they become due.

130.    I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

H.    **Emergency Motion for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates (the "*NOL Motion*")**

131.    In the NOL Motion, the Debtors seek entry of an interim order authorizing the Debtors to:  (i) establish and implement restrictions and notification requirements regarding the Tax Ownership and certain transfers of, and declarations of worthlessness in, common stock of HGIM Holdings Corp. (the "*Stock*"); (ii) notify holders of Stock of the restrictions, notification requirements, and procedures set forth in the NOL Motion; and (iii) direct that any purchase, sale, or other transfer of Stock in violation of the procedures set forth in the NOL Motion shall be null and void *ab initio*.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the NOL Motion on a final basis.

132.    I understand based on discussions with the Debtors' restructuring advisors that a company generates net operating losses ("*NOLs*") if its expenses exceed revenues generated during a single tax year.  The Debtors have incurred and expect to continue to incur significant NOLs.  I estimate that as of December 31, 2017, the Debtors have NOLs of $720.7 million and $51.8 million for federal and state tax reporting purposes, respectively.  In addition, as of December 31, 2017, the Debtors have generated $2.9 million in minimum tax credits ("*AMT Credits*"), $1.0 million in Foreign Tax Credits, and $2,300 in general business credits ("*Business Credits*," and together with the AMT Credits and the NOLs, the "*Tax Attributes*") for federal tax

49

reporting purposes.[23]  I also understand that the Tax Attributes are extremely valuable assets of the Debtors' estates because the Internal Revenue Code of 1986 (as amended, the "***IRC***") allows a corporation to "carry forward" certain tax attributes to offset taxable income and tax liability, thereby reducing future aggregate tax obligations and enhancing the corporation's liquidity in the future.  Specifically, I understand sections 39 and 172 of the IRC allow corporations to carry forward Business Credits and NOLs to offset future taxable income for up to 20 taxable years, thereby reducing future aggregate tax obligations.  In addition, I understand section 53 of the IRC allows corporations to carry forward AMT Credits indefinitely, thereby reducing future aggregate tax obligations.

133.    The Debtors' Tax Attributes may be worth as much as $155.5 million in potential future tax savings.[24]  Even if Section 108(b) of the IRC significantly reduces or eliminates the Debtor's Tax Attributes pursuant to a chapter 11 plan of reorganization as a result of the discharge of debt, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of the plan.  Accordingly, the value of the Tax Attributes could provide a significant benefit to the Debtors' estates and will inure to the benefit of all of the Debtors' stakeholders.  Accordingly, the value of the Tax Attributes could provide a significant benefit to the Debtors' estates and will inure to the benefit of all of the Debtors' stakeholders.

134.    I understand that if a corporation undergoes an Ownership Change (as defined in the NOL Motion), the IRC limits such corporation's ability to use its Tax Attributes to offset future income.  I understand that if the Debtors were to undergo an Ownership Change before the

---

[23]    I understand that the Tax Attributes have been reduced to account for cancellation of indebtedness income ("***CODI***").

[24]    This projection is based upon (i) tax savings generated by the NOLs based on a U.S. federal corporate income tax rate of 21% and a Louisiana state corporate income tax rate of 8%, and (ii) a dollar-for-dollar reduction in U.S. federal income taxes for the Business Credits, the AMT Credits, and the Foreign Tax Credits.

confirmation of a plan it would result in a significant loss in the value of the Tax Attributes to the Debtors.  Accordingly, in the NOL Motion, the Debtors request certain Stock trading procedures and restrictions (the "**Procedures**").  The Procedures will allow the Debtors to monitor, and, if necessary, object to, certain transfers of Stock.  The Procedures are fully set forth in the NOL Motion.

135.    I believe that the Debtors' ability to meet the requirements of the applicable tax laws to protect their Tax Attributes may be seriously jeopardized unless procedures are established to ensure that certain trading in Stock is either precluded or closely monitored and made subject to Court approval.  I also believe that the proposed Procedures are necessary to protect the value of the Tax Attributes, which are valuable assets of the Debtors' estates, while providing appropriate latitude for trading in Stock below specified levels.

136.    I believe that the relief requested in the NOL Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

    **I.**       **Emergency Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as the Debtors' Claims, Noticing, and Solicitation Agent, Effective *Nunc Pro Tunc* to the Petition Date ("*Claims Agent Application*")**

137.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Prime Clerk as the Claims and Noticing Agent  (as defined below) for the Debtors in their chapter 11 cases, to, among other tasks:  (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, soliciting, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the

Debtors' bankruptcy cases, pursuant to the Engagement Agreement, which is attached as Exhibit B to the Claims Agent Application.

138.     I understand Prime Clerk is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases.   Prime Clerk has substantial experience providing services, including claims, and noticing services, in matters comparable in size and complexity to this matter.

139.     Given the complexity of these chapter 11 cases and the number of creditors and other parties in interest involved in these chapter 11 cases, I believe that appointing Prime Clerk as the Claims and Noticing Agent in these chapter 11 cases will maximize the value of the Debtors' estates for all its stakeholders.   Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application be approved.

**J.     Emergency Motion (I) For Authority to File a Consolidated List of Creditors; (II) For Authority to File a Consolidated List of 30 Largest Unsecured Creditors; and (III) For Authority to Redact Certain Personal Identification Information for Individual Creditors (the "*Consolidated Creditor List Motion*")**

140.     Through the Consolidated Creditor List Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and (ii) authorizing the Debtors to redact certain personal identification information for individual creditors.

141.     Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors respectfully request authority to file one consolidated list of creditors (the "*Creditor Matrix*") for all of the Debtors. Because a large number of creditors assert claims against multiple Debtors, the Debtors also

request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "***Top 30 List***").

142.   I believe that cause exists to authorize the Debtors to redact address information of individual creditors – many of whom are the Debtors' employees – and interest holders from the Creditor Matrix because such information could be used to perpetrate identity theft.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the following parties upon their request:  (i) the Court, (ii) the Office of the United States Trustee for the Southern District of Texas, (iii) counsel to the administrative agent, and (iv) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases.

143.   For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Consolidated Creditor List Motion.

**K.      Notice of Designation as Complex Chapter 11 Cases (the "*Notice of Complex Designation*")**

144.   Currently, the Debtors' have debt of more than $10 million in the aggregate and there are more than 50 parties in interest in these cases.  I believe that application of the Complex Chapter 11 Procedures to these cases will assure appropriate notice of the filings in these cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders.  Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Designation.

**<u>Exhibit B</u>**



1. Includes wholly-owned subsidiaries thereof.