**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 18-[•]** |
| | § | |
| **HGIM HOLDINGS, LLC,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | |

**DISCLOSURE STATEMENT FOR THE DEBTORS'
JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

<div style="border:1px solid black">

**NO CHAPTER 11 CASE HAS BEEN
COMMENCED AS OF THE DATE OF DISTRIBUTION OF THIS
DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT IS
DISTRIBUTED TO YOU AS PART OF A PREPETITION SOLICITATION
OF YOUR VOTE ON A PREPACKAGED PLAN OF REORGANIZATION.**

</div>

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Gladiator Marine, Inc. (3298), Golden Lane Marine, Inc. (4167), Guidry Brothers, Inc. (6568), Harvey America LNG, LLC (8857), Harvey Badger, LLC (2525), Harvey Bear, LLC (6355), Harvey Beaver, LLC (2298), Harvey Blue-Sea, LLC (0837), Harvey Bobcat, LLC (0099), Harvey Bronco, LLC (6441), Harvey Buffalo, LLC (8949), Harvey Bull, LLC (2896), Harvey Carrier, LLC (8502), Harvey Challenger, LLC (0334), Harvey Champion, LLC (9246), Harvey Charger, LLC (0316), Harvey Clipper, LLC (1593), Harvey Colt, LLC (6038), Harvey Condor, LLC (8252), Harvey Cougar, LLC (5816), Harvey Cowboy, LLC (0864), Harvey Deep-Sea, LLC (8407), Harvey Eagle, LLC (1135), Harvey Energy, LLC (8717), Harvey Explorer 242, L.L.C. (5016), Harvey Express 225, LLC (0818), Harvey Falcon, LLC (0858), Harvey Freedom, LLC (5429), Harvey Gator, LLC (7401), Harvey Giant, LLC (1757), Harvey Gladiator, LLC (0222), Harvey Grizzly, LLC (1887), Harvey Gulf International Marine, LLC (4472), Harvey Hauler, LLC (9654), Harvey Hawk, LLC (5055), Harvey Hawkeye, LLC (3208), Harvey Heat, LLC (0384), Harvey Herd, LLC (3095), Harvey Hurricane, LLC (1196), Harvey Husky, LLC (3647), Harvey Hustler, LLC (5552), Harvey Indian, LLC (0709), Harvey Intruder, L.L.C. (1512), Harvey Jaguar, LLC (8702), Harvey Leader, LLC (7641), Harvey Legend, LLC (3187), Harvey Liberty, LLC (0308), Harvey Lightning, L.L.C. (3787), Harvey Lion, LLC (6760), Harvey Mariner, LLC (3917), Harvey Mustang, LLC (9266), Harvey Otter, LLC (4295), Harvey Pacer, LLC (5543), Harvey Panther, LLC (8839), Harvey Patriot, LLC (4297), Harvey Pioneer, LLC (7920), Harvey Pirate, LLC (9649), Harvey Power, LLC (8862), Harvey Provider 240, L.L.C. (5017), Harvey Raider, LLC (9905), Harvey Rain, LLC (2933), Harvey Ram, LLC (7523), Harvey Raven, LLC (1432), Harvey Razorback, LLC (3556), Harvey Rebel, LLC (3584), Harvey Redhawk, LLC (8299), Harvey Rover, LLC (0651), Harvey Runner, LLC (1882), Harvey Sailor, LLC (2032), Harvey Saint, LLC (1609), Harvey Sea Lion, LLC (2325), Harvey Sea-Hawk, LLC (1664), Harvey Seas, LLC (0471), Harvey Spirit, L.L.C. (6777), Harvey Spur, LLC (5474), Harvey Steeler, LLC (5881), Harvey Storm, LLC (7078), Harvey Subsea, LLC (6477), Harvey Supporter, LLC (9141), Harvey Thunder, L.L.C. (5020), Harvey Tiger, LLC (4232), Harvey Tugs, LLC (8947), Harvey War Horse, L.L.C. (5019), Harvey War Horse III, L.L.C. (3785), Harvey Wave, LLC (2246), Harvey Wind, LLC (0974), Harvey Wolf, LLC (7836), Harvey Worker, LLC (2503), HGIM Corp. (0829), HGIM Holdings, LLC (0448), and N.J. Guidry & Sons Towing Co., Inc. (9524).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  One Shell Square, 701 Poydras Street, Suite 3700, New Orleans, Louisiana 70139.

US 5252960

Harry A. Perrin (TX 15796800)                David S. Meyer (*pro hac vice* admission pending)
Garrick C. Smith (TX 24088435)               Jessica C. Peet (*pro hac vice* admission pending)
First City Tower                             Lauren R. Kanzer (*pro hac vice* admission pending)
1001 Fannin Street, Suite 2500               666 Fifth Avenue, 26th Floor
Houston, TX 77002-6760                       New York, NY 10103-0040

**VINSON & ELKINS LLP**
**PROPOSED ATTORNEYS FOR THE DEBTORS**

**Dated:  February 26, 2018**

---

**THE DEADLINE TO VOTE ON THE PLAN IS MARCH 5, 2018, AT 5:00 P.M. CENTRAL TIME UNLESS EXTENDED BY THE DEBTORS (THE "*VOTING DEADLINE*").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY PRIME CLERK BEFORE THE VOTING DEADLINE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.**

**THE DEBTORS AND THE RESTRUCTURING SUPPORT PARTIES SUPPORT THE PLAN AND STRONGLY URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

---

HGIM Holdings, LLC ("*HGIM Holdings*") and its 90 Debtor affiliates (collectively, the "*Debtors*," "*Harvey Gulf*," or the "*Company*") are providing you with the information in this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "*Disclosure Statement*") for the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* because you may be a creditor entitled to vote on the Plan. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. The Debtors are commencing the solicitation of your vote to approve the Plan before the Debtors consider filing voluntary reorganization cases under chapter 11 of the Bankruptcy Code.

If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtors intend to file voluntary reorganization cases (the "*Chapter 11 Cases*") under chapter 11 of the Bankruptcy Code to implement the Plan. Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*" or the "*Court*") as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek an order of the Bankruptcy Court: (i) approving this Disclosure Statement as containing "adequate information"; (ii) approving the solicitation of votes as complying with section 1126(b) of the Bankruptcy Code; and (iii) confirming the Plan. The Bankruptcy Court may order additional disclosures.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

---

Neither this Disclosure Statement nor the Plan has been filed or reviewed by the Bankruptcy Court or any state authority. The Plan has not been approved (or disapproved) by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement was prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) (but has not been approved by the Bankruptcy Court as complying with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b)) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act or any securities regulatory authority of any state under any state securities law (any such law, a "*Blue Sky Law*"). Prior to the filing of the Chapter 11 Cases, the Debtors will rely on the exemption provided by 4(a)(2) of the Securities Act

---

[2]     Capitalized terms used but not immediately defined herein have the meanings ascribed to such terms later in the Disclosure Statement or in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated February 26, 2018, attached hereto as **Exhibit A** (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "*Plan*"), as applicable; *provided*, that any capitalized term used but not defined herein or in the Plan that is defined in chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), or the Bankruptcy Local Rules for the Southern District of Texas (the "*Local Rules*") will have the meaning ascribed to such term in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, as applicable.

to the extent section 1145 of the Bankruptcy Code is not available, and after the filing of the Chapter 11 Cases, the Debtors expect to rely on the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," "continue," the negative thereof, or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and that there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis set forth in Exhibit D, the Valuation Analysis set forth in Exhibit E, and distribution projections and other information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to holders of Allowed Claims and Interest may be affected by many factors that cannot now be predicted. Any analyses, estimates, or recovery projections may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

The Debtors cannot assure you that the Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases: (i) will contain any of the terms described in this Disclosure Statement; or (ii) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each holder of a Claim or Interest: (i) to read and carefully consider this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below); and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

No independent auditor or accountant has reviewed or approved the Financial Projections or the Liquidation Analysis herein. The Debtors have not authorized any person to give any information or advice, or to make any representation in connection with the Plan or this Disclosure Statement. This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or Objections to Claims. Holders of Claims should not construe the contents of this Disclosure Statement as providing any legal, business, financial, securities, or tax advice and should consult with their own advisors before voting on the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and holders of Interests in, the Debtors (including, without limitation, those holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Prime Clerk, LLC ("*Prime Clerk*"), the Debtors' Notice and Claims Agent by either: (i) visiting its website at http://cases.primeclerk.com/harveygulf; or (ii) calling 844-205-4337.

**TABLE OF CONTENTS**

I.     EXECUTIVE SUMMARY ........................................................................................ 1

    A.    Introduction ........................................................................................ 1
    B.    Purpose of the Disclosure Statement ................................................ 2
    C.    The Solicitation Package ................................................................... 2
    D.    The Plan ............................................................................................. 3
    E.    Voting on the Plan ............................................................................. 7
    F.    Confirmation of the Plan .................................................................. 9

II.    THE DEBTORS' BUSINESS AND CORPORATE STRUCTURE ....................... 11

    A.    Overview .......................................................................................... 11
    B.    The Debtors' Business .................................................................... 11
    C.    The Debtors' Prepetition Capital Structure ................................... 21
    D.    Events Leading to the Restructuring ............................................... 23

III.    DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11
    CASES ............................................................................................................. 27

    A.    Commencement of the Chapter 11 Cases ...................................... 27
    B.    Automatic Stay ................................................................................ 27
    C.    First Day Motions and Certain Related Relief .............................. 27
    D.    Other Administrative Motions and Retention Applications ........... 29
    E.    Confirmation Hearing ..................................................................... 29
    F.    Confirmation of the Plan ................................................................ 29

IV.    SUMMARY OF THE PLAN ............................................................................. 29

    A.    Classification and Treatment of Claims and Interests .................... 30
    B.    Means for Implementation of the Plan ........................................... 37
    C.    Treatment of Executory Contracts and Unexpired Leases ............. 46
    D.    Provisions Governing Distributions ............................................... 48
    E.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ................... 52
    F.    Settlement, Release Injunction, and Related Provisions ................ 54
    G.    Conditions Precedent to Confirmation and Consummation of the Plan ...................... 58
    H.    Modification, Revocation, or Withdrawal of the Plan .................... 60
    I.    Retention of Jurisdiction ................................................................. 61
    J.    Miscellaneous Provisions ............................................................... 62

V.    Confirmation Procedures .................................................................................... 65

    A.    Statutory Requirements for Confirmation for the Plan .................. 65
    B.    Alternatives to Confirmation and Consummation of the Plan ....... 67
    C.    Contact for More Information ......................................................... 68

VI.    CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 68

    A.    Certain Bankruptcy Law Considerations ....................................... 69
    B.    Additional Factors Affecting the Value of the Reorganized Debtors ............................. 73
    C.    Risks Relating to the Debtors' Business and Financial Condition ................................. 73
    D.    Factors Relating to Securities to Be Issued Under the Plan .......... 75
    E.    Additional Factors .......................................................................... 76

VII.    IMPORTANT SECURITIES LAW DISCLOSURE ................................................................ 76

VIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ...................................................................................................................................... 78

    A.    Introduction ................................................................................................................ 78
    B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................................ 79
    C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Senior
        Lender Claims ............................................................................................................ 80
    D.    U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and
        Disposition of the New Common Stock .................................................................... 82
    E.    U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and
        Disposition of the Takeback Term Loans ................................................................. 83
    F.    Information Reporting and Back-Up Withholding ..................................................... 84

IX.    CONCLUSION AND RECOMMENDATION ......................................................................... 84

**EXHIBITS**

**EXHIBIT A**       Plan of Reorganization

**EXHIBIT B**       Amendment No 1 to Restructuring Support Agreement

                **EXHIBIT B-1**    Amended & Restated Restructuring Support Agreement

                **EXHIBIT B-2**    Amended and Restated Restructuring Term Sheet

                **EXHIBIT B-3**     Subsidiaries

                **EXHIBIT B-4**    Warrant Term Sheet

                **EXHIBIT B-5**    Form of Joinder

                **EXHIBIT B-6**    Exit Term Sheet

**EXHIBIT C**       Corporate Structure Chart

**EXHIBIT D**       Liquidation Analysis

**EXHIBIT E**       Financial Projections

**EXHIBIT F**       Valuation Analysis

US 5252960

## I.      EXECUTIVE SUMMARY

This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  This Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.  The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement and the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.

### A.      Introduction

The Debtors submit this Disclosure Statement in connection with the Debtors' solicitation of votes on the Plan.  The Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas on or about March 7, 2018.  The Debtors and the Restructuring Support Parties (as defined in the RSA) urge you to vote to accept the Plan.

The Debtors have a long history as market leaders in the offshore supply boat and service sector.  Although the oilfield services market suffered a sustained downturn following the 2014 collapse in oil prices, the Debtors continued to outperform other offshore supply boat and service market participants in the Gulf of Mexico by obtaining important contracts with key customers and pursuing aggressive cost-savings strategies.  However, as the downturn persisted through 2017, the Debtors recognized the need for a comprehensive, balance-sheet restructuring to ensure their business could continue to successfully compete.

To achieve this goal, the Debtors engaged with certain Lenders under the Credit Agreement to negotiate a consensual deleveraging of the Debtors' balance sheet.  After months of hard-fought, arm's-length negotiations, the Debtors, these Lenders, and the Debtors' equity sponsor, The Jordan Company, L.P. ("**TJC**") and certain of its affiliates, successfully reached agreement on the terms of a comprehensive restructuring transaction (the "*Restructuring*").  The parties memorialized this agreement in a restructuring support agreement (the "**RSA**"), which formed the foundation for the Plan.  Pursuant to the RSA, the Debtors, certain Lenders holding approximately 64% in principal amount of the loans under the Credit Agreement, and TJC committed to support the Plan, subject to certain requirements and milestones set forth in the RSA.

The primary objective of the Plan is the deleveraging of the Debtors' balance sheet through the consensual equitization of approximately 70% of the Debtors' approximately $1.2 billion in secured debt under the Credit Agreement.  This deleveraging will right-size the Debtors' balance sheet, eliminate burdensome covenants and amortization payments, and reduce interest expense on an annual basis by approximately $47 million.  Improved cashflow will enable the Debtors to offer more attractive pricing to their customers and to maintain and expand their state-of-the-art fleet.  The Plan also encompasses a settlement with TJC, whereby, among other things, HGIM Group, LLC, an affiliate of TJC, contributes its equity interests in a shipyard in Gulfport, Mississippi. This Shipyard is important to the Debtors' operations because, among other things, its allows the Debtors' to construct new vessels and service its existing vessels without relying on a third-party shipyard.

Importantly, the Plan does not impair General Unsecured Creditors, preserving the Debtors' relationships with valued trade and contract counterparties.  Moreover, the transactions contemplated by the Plan ensure that the Debtors remain compliant with the Jones Act, an essential requirement for the Debtors' business operations.

The RSA establishes certain milestones to facilitate an expeditious and efficient restructuring and thus minimize the impact of the proposed Chapter 11 Cases on the Debtors' businesses.  The key milestones in the RSA provide that:

- No later than March 7, 2018, each Debtor shall commence the Chapter 11 Cases by filing the Petitions and any and all other documents necessary to commence the Chapter 11 Case of each Debtor with the Bankruptcy Court.

- No later than five days after the Petition Date, the Bankruptcy Court shall have entered: (i) an interim Cash Collateral Order; and (ii) the Scheduling Order, each in form and substance as set out in the RSA.

1

- No later than 35 days after the Petition Date, the Bankruptcy Court shall have entered a final Cash Collateral Order, in form and substance as set out in the RSA.

- No later than 60 days after the Petition Date, the Bankruptcy Court shall have entered an order approving a Disclosure Statement and the Confirmation Order, each in form and substance as set out in the RSA.

- No later than 15 days after the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan.

The RSA includes a milestone associated with finalizing Mr. Guidry's employment agreement and modifications to the operating agreement and vessel management agreement of Q-LNG Transport, LLC, a non-debtor affiliate of Harvey Gulf.  If the Debtors, Mr. Guidry (and his affiliates), and the Required Restructuring Support Lenders have not agreed on the forms of such agreements 30 days after the Petition Date then the Restructuring Toggle could be triggered by the Agent, as further described herein.

The Debtors believe that implementing the transactions under the Plan on the timeline proposed will maximize value for all stakeholders, protect the jobs of employees, and preserve business opportunities and important relationships with the Debtors' key customers and partners.

**B.      Purpose of the Disclosure Statement**

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code in connection with:  (i) the solicitation of votes on the Plan and; and (ii) a hearing to consider confirmation of the Plan. Subject to the approval of the Board of Directors of HGIM Holdings and the applicable governing body of each other potential Debtor, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "***Petitions***") in the United States Bankruptcy Court for the Southern District of Texas on or about March 7, 2018.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.  The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain holders of Claims against the Debtors because the Debtors are asking such holders of Claims to vote to accept the Plan.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan.  Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of negotiations among the Debtors and other parties, have not been finally agreed upon, and may be modified.  In particular, the Plan Supplement will set forth the certificates or articles of incorporation, certificates of formation, bylaws, operating agreements, or such other applicable formation, organizational, and governance documents of each of the Reorganized Debtors, including the terms of any Registration Rights Agreement and the Stockholders Agreement.  Such documents may or may not, in the discretion of the Required Restructuring Support Lenders, include:  (i) limitations on the ability of holders of the Reorganized HGIM Equity to cast votes above a specified threshold (as described in Section I.D.6 of this Disclosure Statement); (ii) requirements for the Reorganized Debtors to seek to cause the New Common Stock and New Lender Warrants to be quoted on a recognized over-the-counter market; and/or (iii) other provisions necessary to ensure compliance with the Jones Act. The transactions contemplated by the Plan are also subject the Restructuring Toggle and may be modified if the Restructuring Toggle occurs as set forth in Section VI.A.10 of this Disclosure Statement.  If the RSA is terminated solely with respect to the TJC Parties in accordance with the terms thereof and the Shipyard Contribution is not consummated, the Plan may be modified as set forth in Section VI.A.9 of this Disclosure Statement. A vote to accept the Plan is also a vote to accept the Plan as it may be modified as set forth in Sections VI.A.9 or VI.A.10 of this Disclosure Statement.

**C.      The Solicitation Package**

Only record holders of Class 3 – Senior Lender Claims as of the voting record date, February 23, 2018, are entitled to vote on the Plan.  Holders of Class 3 – Senior Lender Claims will receive a solicitation package consisting of the following materials:

US 5252960

- a form ballot (the "***Ballot***"), which shall include the voting instructions;

- a U.S. citizenship packet consisting of an affidavit of qualification as a U.S. Citizen and a questionnaire setting forth back-up information regarding qualification as a U.S. Citizen; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

## D.     The Plan

### 1.     Purpose and Effect of the Plan

If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtors intend to reorganize under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.

Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat claims and interests.  A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by such bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, will constitute a separate plan for each of the 91 Debtors in the Chapter 11 Cases.  Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.  Among other things, subject to certain limited exceptions and except as otherwise provided in the Plan or a confirmation order with respect to the Plan (the "***Confirmation Order***"), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and Interests of prepetition equity holders and substitute the obligations set forth in the Plan for those prepetition Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

### 2.     Feasibility of the Plan

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan, and pay their obligations in the ordinary course of the Debtors' business.  As part of this analysis, the Debtors prepared a projected consolidated income statement, which includes the consolidated, projected, unaudited financial statement information of the Reorganized Debtors (collectively, the "***Financial Projections***," attached hereto as **Exhibit E**) for the five-year period ending December 31, 2022.  Although the Debtors believe that the Financial Projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty.  Actual results may differ from the projections, and the differences may be material.

### 3.     Analysis of Recoveries to Holders of Claims and Interests under the Plan

The Plan provides for a comprehensive restructuring of the Debtors' approximately $1.2 billion in prepetition funded debt obligations under the Credit Agreement.  Substantially all of the Debtors' assets are subject to valid and perfected Liens held by the Lenders, which require payment in full before other distributions can be made.  The Plan reflects the reality that, based upon operating performance and cashflow projections, the Debtors' enterprise value is significantly less than the amount of secured debt under the Credit Agreement.  The treatment of Class 3 – Senior Lender Claims is the product of extensive negotiations between the Debtors and the Steering Committee.  Importantly, the Plan provides for payment in full in the ordinary course in Cash for general unsecured creditors which are, therefore, Unimpaired under the Plan.

US 5252960

In developing the Plan, the Debtors gave due consideration to various other restructuring alternatives.  After a careful review of their current operations, prospects as an ongoing business, Financial Projections, and estimated recoveries to creditors in a forced sale scenario given current market conditions, the Debtors concluded that the Debtors will maximize recoveries to their stakeholders by reorganizing as a going concern via the Restructuring embodied in the Plan.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation, a partial sale of assets, or a sale of all or substantially all of their assets, would result in materially lower recoveries for stakeholders, significant delays, protracted litigation, and greater costs.  For these reasons, the Debtors believe that their business and assets have significant value that would not be realized in a forced sale or a liquidation, either in whole or in substantial part, and that the value of the Debtors' estates is considerably greater as a going concern.

As set forth more fully in Section V.B, the Debtors believe that the Plan provides the best recoveries possible for the Debtors' stakeholders and recommend that, if you are entitled to vote, you vote to accept the Plan.

---

**THE DEBTORS AND THE RESTRUCTURING SUPPORT PARTIES BELIEVE
THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE
OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.**

**FOR THESE REASONS AND OTHERS DESCRIBED
HEREIN, THE DEBTORS URGE ALL PARTIES ENTITLED
TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

---

**4.      Treatment and Classification**

The Plan organizes the Debtors' creditors and equity holders into groups called "Classes."  For each Class, the Plan describes:  (i) the Claims or Interests comprising such Class; (ii) the recovery available to the holders of Allowed Claims or Interests in that Class under the Plan; (iii) whether the Class is "Impaired" under the Plan, meaning that the holders in such Class will receive less than full value on account of their Claims or Interest, or that the legal or equitable rights of such holders will be altered in some other form; and (iv) the form of recovery, if any, that such holders will receive on account of their respective Claims or Interests.

The table below summarizes the classification, treatment, and estimated recoveries of Claims and Interests under the Plan.  A more detailed description of the classification and treatment of Claims and Interests is set forth in Section IV.A of this Disclosure Statement.  As demonstrated in the liquidation analysis (the "*Liquidation Analysis*," attached hereto as **Exhibit D**), recoveries of each Class of Claims and Interests are equal to or greater under the Plan than through a hypothetical chapter 7 liquidation.  The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  The information in the table below is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  Because each Debtor's Plan contemplates distributions to holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

| Class | Claim or Equity Interest | Treatment | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan | Estimated Percentage Recovery of Allowed Claims or Interests under Chapter 7 Liquidation |
|---|---|---|---|---|
| 1 | Other Priority Claims | Either:  (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim; or (ii) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders. | 100% | 100% |

4

| Class | Claim or Equity Interest | Treatment | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan | Estimated Percentage Recovery of Allowed Claims or Interests under Chapter 7 Liquidation |
|---|---|---|---|---|
| 2 | Other Secured Claims | At the Debtor's Election, either: (i) Cash equal to the full Allowed amount of its Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder; or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders. | 100% | 100% |
| 3 | Senior Lender Claims | Pro Rata share of: (i) the Exit Facility; and (ii) subject to the U.S. Citizen determination procedure described below in Article III.B.3.d, 100.0% of the Reorganized HGIM Equity, in the form of (y) New Common Stock to the extent permitted under the Jones Act Restriction and (z) New Lender Warrants to the extent that shares of New Common Stock cannot be issued to such holder because it is a Non-U.S. Citizen and its ownership of its Pro Rata share of New Common Stock, alone or when added to the Pro Rata shares of New Common Stock being issued to other holders that are Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction; provided, however, that a holder of an Allowed Senior Lender Claim may direct any distribution under clause (ii) of Article III.B.3.c of the Plan to one or more Permitted Designees. Holders of Allowed Senior Lender Claims shall also be entitled to payment of the Agent's unpaid fees and expenses in accordance with Article IV.S of the Plan.<br><br>In the case of holders of Allowed Senior Lender Claims that are Non-U.S. Citizens, the ratio of the number of shares of New Common Stock to the number of New Lender Warrants to be issued as of the Effective Date to each such Non-U.S. Citizen pursuant to clause (ii) of Article III.B.3.c of the Plan shall be the same for each such Non-U.S. Citizen holder of an Allowed Senior Lender Claim. | 57%-84% | 27-33% |
| 4 | General Unsecured Claims | Either: (i) payment in full of such Allowed General Unsecured Claim in the ordinary course of business; or (ii) payment in full of such Allowed General Unsecured Claim in Cash, including interest at the contractual rate, upon the later of (x) the Effective Date, (y) the date on which such General Unsecured Claim | 100% | 0% |

5

US 5252960

| Class | Claim or Equity Interest | Treatment | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan | Estimated Percentage Recovery of Allowed Claims or Interests under Chapter 7 Liquidation |
|---|---|---|---|---|
| | | against the Debtors becomes an Allowed General Unsecured Claim, or (z) such other date as may be ordered by the Court; *provided*, that no TJC Party or any of its Associated Entities shall receive any distribution on account of any General Unsecured Claims, other than the Shipyard Consideration, as set forth in the Article IV.R of the Plan. | | |
| 5 | Intercompany Claims | Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled.  No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable. | 100% | 0% |
| 6 | Intercompany Interests | Intercompany Interests, other than Intercompany Interests in HGIM Corp. (which shall be cancelled), shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled. Intercompany Interests in HGIM Corp. shall be cancelled.  No distribution shall be made on account of any Intercompany Interests. | 0-100% | 0% |
| 7 | HGIM Holdings Interests | Cancelled, released, discharged, and extinguished.  Holders of HGIM Holdings Interests shall not receive any distribution on account of such Interests. | 0% | 0% |

### 5.      Releases and Exculpations

As set forth more fully in Section IV.F.5-7 herein and Article VIII of the Plan, the Plan provides certain releases and exculpations to the Released Parties (as defined in the Plan).  Each of the Released Parties made substantial and valuable contributions to the Restructuring through efforts to negotiate and implement the Plan and the Debtors intend to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Specifically, as set forth more fully in Section II.D of this Disclosure Statement, each of the Released Parties participated in the six-month long negotiations which ultimately led to the Restructuring embodied in the RSA and implemented through the Plan.  Through the Plan, the Lenders are agreeing to equitize 70% of their secured debt holdings under the Credit Agreement, without which the Debtors could not implement the Restructuring.  Furthermore, as set forth more fully in Sections II.B.3.iii and II.D.4.a of this Disclosure Statement, the TJC Parties (as defined in the RSA) have agreed to support the Restructuring and to contribute the Shipyard to the Debtors.  Accordingly, the Debtors believe that the releases and exculpation provisions included in the Plan are an integral part of the Restructuring which will maximize the value of the Debtors for the benefit of all stakeholders.

US 5252960

6.        **The Plan Supplement**

The Debtors intend to file a compilation of documents and forms of documents, schedules, and exhibits to the Plan (collectively, the "***Plan Supplement***"), to be filed by the Debtors no later than seven Business Days before the Confirmation Hearing, including the following, as applicable:  (i) the Exit Facility Documents; (ii) the Shipyard Warrant Agreement; (iii) the New Lender Warrant Agreement; (iv) the Management Incentive Plan and MIP Warrant Agreement; (v) the Management Employment Agreements, if applicable; (vi) the New Organizational Documents of New Parent; (vii) the Registration Rights Agreement; (viii) the Stockholders Agreement, if applicable; (ix) the Shipyard Assignment Agreement; (x) the Schedule of Rejected Executory Contracts and Unexpired Leases; (xi) the Description of the Transaction Steps; (xii) the identity of the members of the New Boards and the officers of the Reorganized Debtors as of the Effective Date; and (xii) any other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan (each as defined by the Plan).

The Plan Supplement may or may not, in the discretion of the Debtors and the Required Restructuring Support Lenders, include: (i) limitations on the ability of holders of the Reorganized HGIM Equity to cast votes above a specified threshold (which limitations may be materially different from the Governance Proposal, as defined in the RSA); (ii) requirements for the Reorganized Debtors to seek to cause the New Common Stock and New Lender Warrants to be quoted on a recognized over-the-counter market; and/or (iii) other provisions necessary to ensure compliance with the Jones Act.  Any such provisions will be reflected in the Definitive Documents filed in the Plan Supplement.  Further, the New Organizational Documents will condition transfers of the Reorganized HGIM Equity upon such transferee becoming a party to the Stockholders Agreement.  The Definitive Documentation governing the Warrants will condition receipt of Reorganized HGIM Equity pursuant to an exercise of the Warrants or any transfer of the Warrants upon such recipient or transferee becoming a party to the Stockholders Agreement.

E.        **Voting on the Plan**

1.        **Holders of Claims Entitled to Vote on the Plan**

Pursuant to the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (i) a plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, a plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only Class 3—Senior Lender Claims—are entitled to vote to accept or reject the Plan.  The holders of Claims in Class 3 are Impaired under the Plan and, subject to such claims being Allowed Claims and certain other exceptions described herein, shall receive a distribution under the Plan.  Accordingly, holders of Claims in Class 3 have the right to vote to accept or reject the Plan.

Holders of Claims in Classes 1, 2, and 4 are Unimpaired under the Plan and, therefore, are not entitled to vote on the Plan and are deemed to accept the Plan.  Holders of Claims or Interests in Classes 5 and 6 are not entitled to vote as such holders are either Unimpaired, in which case the holders in such Classes conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or impaired, in which case such holders are deemed to have rejected the Plan.  Holders of Interests in Class 7 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan.

The following table provides a summary of the status and voting rights of each Class (and each holder within such Class) under the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Senior Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | HGIM Holdings Interests | Impaired | Deemed to Reject |

**2.** **The Voting Record Date**

The voting record date is February 23, 2018. The voting record date will determine which holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

**3.** **Voting on the Plan**

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class, counting only those claims that actually voted to accept or to reject such plan.

As of the date of this Disclosure Statement, and as described further in Section II.C below, certain lenders affiliated with TJC hold a meaningful portion of the loans outstanding under the Credit Agreement, and are required to vote such loans in favor of the Plan pursuant to the terms of the RSA. As an insider of the Debtors, such votes to accept the Plan will not be counted for purposes of determining if the Debtors meet the requirements of section 1129(a)(10) of the Bankruptcy Code.

**The Voting Deadline for the Plan is 5:00 p.m. prevailing Central Time on March 5, 2018**. In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and timely delivered. Holders entitled to vote can either: (i) electronically complete, sign, and return your customized electronic Ballot (the "***E-Ballot***") by utilizing the E-Ballot platform on Prime Clerk's website no later than the Voting Deadline by (a) visiting http://cases.primeclerk.com/harveygulfballots, (b) clicking on the "Submit E-Ballot" section of the website, and (c) following the instructions to submit your Ballot; or (ii) complete, sign, and return your Ballot by first class mail, overnight courier, or hand delivery so that it is actually received by Prime Clerk no later than the Voting Deadline (unless such time is extended by the Debtors). Any unsigned or non-original Ballot will not be counted. Return the completed Ballot to:

<div align="center">

Harvey Gulf Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, New York 10022
Phone: 844-205-4337 (U.S. toll free)
917-962-8384 (international)

</div>

**4.** **Ballots Not Counted; Waiver of Defects; Irregularities**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by Prime Clerk and the Debtors in their sole discretion, and such determination will be final and binding. Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtors' written consent or an order of the Bankruptcy Court. The Debtors also reserve the right to reject any and all

<div align="center">8</div>

Ballots not in proper form, if the acceptance of which would, in the opinion of the Debtors with the advice of their counsel, be unlawful.

The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions therein) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities are cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

If you cast more than one ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.  If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

| |
|---|
| **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT PRIME CLERK.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.** |

F.     **Confirmation of the Plan**

       1.     **Plan Objection Deadline**

The Bankruptcy Court will set a deadline by which objections to the Plan must be filed and served (the "***Plan Objection Deadline***").  This means that written objections to confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be actually received on or before the Plan Objection Deadline by the following parties (as well as to the Bankruptcy Court chambers):

       1)     **Debtors or Reorganized Debtors:**

              HGIM Corp.
              701 Poydras Street
              Suite 3700
              New Orleans, Louisiana 70139
              Attn:    Robert A. Vosbein, Jr.

       2)     **Proposed Attorneys for the Debtors:**

              Vinson & Elkins LLP
              First City Tower
              1001 Fannin Street, Suite 2500
              Houston, Texas 77002-6760
              Attn:    Harry A. Perrin and Garrick C. Smith
              Tel:     (713) 758-2222
              Email:   hperrin@velaw.com; gsmith@velaw.com

              – and –

US 5252960

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Attn:    David S. Meyer, Jessica C. Peet, and Lauren R. Kanzer
Tel:      (212) 237-0000
Email:   dmeyer@velaw.com; jpeet@velaw.com; lkanzer@velaw.com

3)    **The United States Trustee:**

Office of the U.S. Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002

4)    **Counsel to the Agent:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:    Damian S. Schaible and Angela M. Libby
Tel:      (212) 450-4000
Email: damian.schaible@davispolk.com; angela.libby@davispolk.com

**2.      Confirmation Hearing**

Following commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule a combined hearing to approve the Disclosure Statement and consider confirmation of the Plan (the "*Confirmation Hearing*").  The Debtors will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on any master service list ordered by the Bankruptcy Court and any entities which filed objections to the Plan, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

**3.      Effect of Confirmation and Consummation of the Plan**

Following Confirmation, subject to Article IX of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in VIII of the Plan will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and consummation of the Plan will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.  Additionally, for a more detailed description of the provisions set forth in Article VIII of the Plan, please refer to Section IV herein.

**4.      Risk Factors**

As described in Article IX of the Plan, confirmation of the Plan requires satisfaction of certain conditions described in detail herein.  If these conditions are not satisfied, the Plan may not be confirmed.  Additionally, the RSA and the Plan require that certain documents, including the CEO Employment Agreement and Q-LNG Agreements, be finalized prior to confirmation of the Plan in accordance with the Management Document Milestone.  If such documents are not finalized, a Restructuring Toggle may occur and the Debtors and Required Restructuring Support Lenders may agree to: (i) seek confirmation of the Plan as modified, as described in Section VI.A.10 of this Disclosure Statement; or (ii) pursue an alternative transaction(s) and/or process to implement the Restructuring other than that which is contemplated by the Plan.

10

> **IF CONFIRMED, THE PLAN WILL BIND ALL HOLDERS OF
> CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST
> EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE,
> INCLUDING SECTIONS 524 AND 1141, AND BY ALL OTHER APPLICABLE LAW.**

> **THE DEBTORS AND THE
> RESTRUCTURING SUPPORT PARTIES BELIEVE THAT THE
> PLAN MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND REPRESENTS
> THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.**
>
> **THE PLAN IS SUPPORTED BY THE RESTRUCTURING
> SUPPORT LENDERS.  ALL SUCH PARTIES STRONGLY URGE HOLDERS
> OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

## II.    THE DEBTORS' BUSINESS AND CORPORATE STRUCTURE

### A.    Overview

Harvey Gulf is a leading provider of offshore supply vessels ("**OSV**") and marine support services to support offshore oil and gas exploration and production.  Headquartered in New Orleans, Louisiana, Harvey Gulf primarily operates in the Gulf of Mexico (the "**GoM**"), where strong exploration and production activity has historically created robust project returns and resulted in a strong market for the Company's services.  Harvey Gulf obtained its position as a market leader by providing innovative, technologically advanced, safe, and energy efficient, support vessels to meet the evolving production and drilling support needs of the deepwater and ultra-deepwater energy industry, which operates in water depths from 1,000 to more than 12,000 feet.  In particular, Harvey Gulf provides offshore production and drilling vessel support services including the transportation of supplies, equipment, and personnel to support drilling and production activities, offshore construction, remotely operated underwater vehicles, and subsea support services, and a variety of other specialized vessel services.  Harvey Gulf exclusively operates vessels qualified under the under U.S. cabotage laws known as the Shipping Act of 1916 and the Merchant Marine Act of 1920 (as amended, the "**Jones Act**").

Harvey Gulf achieved and maintained its historic success through the hard work of its management team and employees, its state-of-the-art vessels, and its critical relationships and contracts with its key customers.  Above all, Harvey Gulf prides itself on its industry-wide reputation for safety.  The Company is proud that there has never been a loss of life caused by the Company's operations in its more than 60 years of existence, and that it consistently outperforms industry benchmarks for safety standards.

### B.    The Debtors' Business

#### 1.    Company History

##### a.    Founding and Early History

Numa Guidry started Harvey Gulf as a fishing company in 1946.  In 1955, he assembled a fleet of inland towing vessels to service the Gulf Coast transportation market and named his company Harvey Canal Towing Company.  In 1965, Numa Guidry's sons—Robert Guidry and Richard Guidry—joined the family enterprise and helped expand it into the offshore ocean towing and rig moving industry.  The company adopted a new name to reflect its new direction: Harvey Gulf International Marine, Inc.[3]

---

[3]    Harvey Gulf International Marine, Inc. originally was a corporation, but in 2009 was converted to Harvey Gulf International Marine, LLC, a Louisiana limited liability company.

In 1972, Robert Guidry was elected as the President and Chief Executive Officer of what now is Harvey Gulf. In 1994, Shane J. Guidry became the President of Harvey Gulf, and in 1997, when Robert Guidry stepped down as Chief Executive Officer, Mr. Guidry was elected Chief Executive Officer and became the third-generation family member to serve as President and Chief Executive Officer of Harvey Gulf.

### b.       Harvey Gulf's Expansion to the OSV and MPSV Sector

In 2003, Harvey Gulf entered a new age with its foray into the OSV and multi-purpose support vessel ("*MPSV*") market. Management saw an opportunity in the deepwater market, and determined that it was best to divest the Company's tugboat business and invest in OSVs and MPSVs. Accordingly, Harvey Gulf built and began operating a number of new OSVs and MPSVs in the GoM between 2003 and 2006. In 2014, as part of the its continued evolution from a tugboat company into an OSV company, Harvey Gulf sold its entire towing division, including all eight vessels, and no longer operates in the tugboat or towing sector.

In 2008, Mr. Guidry partnered with The Resolute Fund II, L.P., an investment fund managed by TJC, to acquire Harvey Gulf. The acquisition was designed to pair Harvey Gulf with a sophisticated sponsor with strong access to the debt and capital markets. Working with a well-capitalized and respected financial entity enabled Harvey Gulf to complete a series of strategic acquisitions that positioned Harvey Gulf to compete with the biggest OSV companies operating in the GoM and created opportunities to enter new geographic markets. Between 2012 and 2014, Harvey Gulf acquired approximately 62 OSVs through a series of acquisitions of three different OSV companies. Each time, the Company hired primarily the crews necessary to staff the newly acquired vessels, maintaining a lean corporate staffing structure in line with a strong culture of efficiency and accountability that continues today.

### 2.       Assets and Operations

### a.       Vessels

Harvey Gulf's fleet is one of the most technologically advanced fleets operating in the GoM. For example, Harvey Gulf's recent achievements include:

- in 2015, Harvey Gulf became the first company in North America to own and operate a marine service vessel that uses liquefied natural gas ("*LNG*") as its primary fuel source;

- in 2016, the Company accepted delivery of the Harvey Stone, a highly specialized, technologically advanced multi-purpose field support vessel ("*MPFSV*"); and

- in 2017, the Company accepted delivery of the Harvey Sub-Sea, a large capacity "best in class" MPSV with the technical capabilities to efficiently, effectively, and safely perform high-quality field development activities.

In addition, Harvey Gulf is renowned across the industry for its safety-focused culture:

- the Company consistently outperforms industry benchmarks for safety standards;

- Harvey Gulf's vessels have dynamic positioning, or anchorless station-keeping capability, which allow for safer operations in adverse conditions; and

- there has never been a loss of life caused by the Company's operations in its over 60 years of existence.

12

US 5252960

Harvey Gulf's fleet also is one of the most environmentally friendly in the GoM. All of Harvey Gulf's extra-large OSVs and its MPSVs are designated as American Bureau of Shipping ENVIRO+[4] and Green Passport class.[5]

The fleet currently consists of 60 vessels, divided among four categories as set forth in the chart below.

| Vessels by Category | |
| --- | --- |
| Offshore Supply Vessels (OSVs) | 50 |
| Multi-Purpose Support Vessels (MPSVs) | 4 |
| Multi-Purpose Field Support Vessel (MPFSV) | 1 |
| Fast Supply Vessels (FSVs) | 5 |
| **Total** | **60**[6] |

i.      **Offshore Supply Vessels**



*The Harvey Spirit, a large OSV*

Harvey Gulf is a leading provider of high-spec new generation OSVs operating in the GoM. OSVs are differentiated from other types of marine support vessels by their cargo-handling flexibility, longer range, and large capacity. Specifically, OSVs use space on and below deck to transport equipment and supplies such as fuel, water, drilling fluids, drill pipe, deck equipment, provisions, and other cargo. The Company's fleet includes 50 OSVs comprised of:

---

[4]      ENVIRO+ class vessels are "green" vessels that comply with many international environmental protection requirements.

[5]      Green Passport notation certifies that a vessel was not built with environmentally unfriendly materials.

[6]      Including the *Harvey Herd*, an OSV which Harvey Gulf is in the process of selling, such sale is expected to be consummated imminently; but not including the *Harvey America*, an LNG-powered OSV which is to be delivered to Harvey Gulf imminently.

| Type | # | Length (ft) | DWT |
|------|---|-------------|-----|
| Extra-Large OSVs | 8 | 300+ | 5,000 ft+ |
| Large OSVs | 11 | 250-280 | 3,000-4000 |
| Medium OSVs | 8 | 230-250 | 2,000-3,000 |
| Small OSVs | 23 | 205-220 | 1,000-2,000 |

The extra-large and large OSVs provide support to rigs, production facilities and offshore construction, maintenance, and salvage projects in the deepwater and ultra-deepwater GoM, medium OSVs are generally chartered to customers in the deepwater and intermediate water depths of the GoM, and small OSVs primarily serve the shallow-water market.

### ii.    Multi-Purpose Support Vessels



*Harvey Sub-Sea, an MPSV*

The Company's fleet includes four MPSVs.  MPSVs are distinguished from OSVs in that they are larger and more specialized vessels that are principally used to support complex deepwater subsea construction, installation, repair, and maintenance.  MPSVs also support remotely operated underwater vehicle operations, diving activities, well intervention, platform decommissioning, and other offshore topside and subsea construction applications.

### iii.    Multi-Purpose Field Support Vessel

The Company's fleet includes one MPFSV, the *Harvey Stone*, a highly specialized, technologically advanced vessel with the capability to operate as the dedicated pull-back tug in support of large tankers.

14

### iv.    Fast Supply Vessels



*Harvey Express, an FSV*

The Company's fleet includes five fast supply vessels ("**FSV**").  FSVs are distinguished from OSVs in that they are smaller vessels that are primarily used for quick transportation of equipment and personnel to drilling rigs, production facilities, and other offshore assets.  While traditional OSVs travel at an average speed of approximately 10 knots, FSVs are capable of reaching speeds of up to 30 knots and are used to transport deck cargo, fuel, and water for offshore installations.  FSVs are also capable of transporting personnel to and from offshore assets when helicopters cannot be used due to adverse weather conditions or other unforeseen events.

### b.    LNG Vessels and Investments



*Harvey Energy, an extra-large LNG-powered OSV*



*Harvey Freedom, an extra-large LNG-powered OSV*

After discussions with its key customers, Harvey Gulf determined that LNG-powered vessels are the future of the offshore supply boat and service sector.  Harvey Gulf believes that LNG-powered vessels have distinct advantages over those powered by traditional fuels, including: (i) lower cost; (ii) virtually no sulfur oxide emission; (iii) significantly reduced nitrogen oxide emission; (iv) significantly reduced hazardous particulate matter; (v) greater reliability; (vi) increased safety; and (vii) their ability to withstand increasingly stringent environmental regulatory requirements.

Because of these advantages and based on input from customers, Harvey Gulf invested in developing and building LNG-powered vessels in order to ensure its place at the forefront of LNG technology.  In 2015, the Company completed construction and commenced operations of an LNG marine fueling facility in Port Fourchon, Louisiana, the first such LNG marine fueling facility in the United States.  This LNG fueling facility supports critical operations of the oil and gas industry's OSV fleet operating on alternative, cleaner burning fuel.

15

That same year, Harvey Gulf accepted delivery of the *Harvey Energy* OSV, becoming the first company in North America to own and operate a marine service vessel that uses LNG as its primary fuel source. Harvey Gulf has since accepted delivery of three additional LNG-powered OSVs: the *Harvey Liberty*, the *Harvey Power*, and the *Harvey Freedom*.

These investments were well-received by customers, created significant opportunities for the Company, and are a key part of the Debtors' long-term strategy to maintain their position as market leaders.



*LNG Marine Fueling Facility in Port Fourchon, LA*

### c.        Operations

#### i.        Key Customer Relationships

Harvey Gulf's customer relationships are crucial to its success. The customer base includes oil majors, independent exploration and production ("*E&P*") companies, and drilling contractors, some of which have been customers for over 50 years. The Company's top 10 customers accounted for 93%, 96%, and 95% of its revenues on a consolidated basis in 2015, 2016, and 2017, respectively.

#### ii.        The Debtors' Employees

The Debtors currently employ approximately 580 employees, comprised of 504 crew members, nine hourly employees, and 67 land-based and corporate employees. None of the Debtors' employees is represented by a labor union. The Debtors provide employees with a defined-contribution savings plan qualified pursuant to 401(k) of the Internal Revenue Code of 1986, as amended (the "***Internal Revenue Code***").

#### iii.        Regulation of the Debtors' Business

The Debtors' business operations are subject to extensive government regulations in the form of United States federal, state, and local statutes, and regulations governing the operation and maintenance of vessels. The Company's vessels are subject to the jurisdiction of the United States Coast Guard, the National Transportation Safety Board, United States Customs and Border Protection, and the United States Maritime Administration.

Notably, the Debtors and certain Non-Debtor Affiliates are subject to the restrictions of the U.S. cabotage laws known as the Shipping Act of 1916 and the Merchant Marine Act of 1920—the Jones Act—under which the transporting of merchandise or passengers for hire in the coastwise trade of the United States is generally restricted to vessels built in the United States, registered under the U.S. flag, manned by predominantly U.S. crews, and owned and operated by "U.S. Citizens" within the meaning of the Jones Act. Generally, a business entity must satisfy two requirements in order to qualify as a U.S. Citizen under the Jones Act, and, thereby, be eligible to own and operate a vessel in the U.S. coastwise trade. First, the entity must be eligible to document a vessel in the United States with the

U.S. Coast Guard.[7]  Second, the entity must be at least 75% owned by U.S. citizens eligible to own and operate a vessel in the coastwise trade.[8]

Before, during, and upon completion of the Restructuring contemplated by the Plan, the Debtors will continue to take all necessary steps to remain Jones Act compliant.

### 3.       Corporate Organizational Structure

The Debtors are comprised of 91 entities, each organized under Delaware or Louisiana law.  HGIM Holdings, a Delaware limited liability company, is the ultimate parent company of each of the Debtors.  Harvey Gulf also has 11 affiliates that will not be Debtors in the Chapter 11 Cases (the "**Non-Debtor Affiliates**").  A chart illustrating the full organizational structure is attached as **Exhibit C**, and a simplified chart is depicted below.

---

[7]       46 U.S.C. § 55102(b)(2).  For a corporation to document a vessel in the United States: (1) it must be incorporated under the laws of the United States or a state; (2) its chief executive officer, and the chairman of the board of directors, must be U.S. citizens; and (3) no more than a minority of the number of directors necessary to constitute a quorum can be noncitizens.  *Id*.; § 12103(b)(4); 46 C.F.R. §§ 67.39(a), 221.3(c)(2).  For a general partnership: (1) each general partner must be a citizen; and (2) U.S. citizens must own at least 50% of the "equity interest in the partnership."  46 C.F.R. § 67.35; *see also* 46 U.S.C. § 12103(b)(3); 46 C.F.R. § 221.3(c)(3).  For a limited liability company, it is either subject to the corporation or general partnership requirements depending on how it is organized; it is generally considered to be organized like a corporation if it is managed by a board of managers rather than directly by the members.

[8]       46 U.S.C. § 50501(a); 55 Fed. Reg. 51,244 (Dec. 12, 1990).  A 75 percent interest exists only if: (1) title to at least 75 percent of the stock in the corporation is vested in citizens of the United States free from any trust or fiduciary obligation in favor of a person not a citizen of the United States; (2) at least 75 percent of the voting power in the corporation is vested in citizens of the United States;  (3) there is no contract or understanding by which more than 25 percent of the voting power in the corporation may be exercised, directly or indirectly, in behalf of a person not a citizen of the United States; and (4) there is no other means by which control of more than 25 percent of any interest in the corporation is given to or permitted to be exercised by a person not a citizen of the United States.  46 U.S.C. § 50501(d).

The regulations clarify that the 75% requirement is only met if: (1) "[a]t least 75 percent of the stock interest in the corporation . . . is owned by citizens."  46 C.F.R. § 67.39(b)(2); (2) "stock or equity interest requirements for citizenship . . ." encompass title to all classes of stock, title to voting stock, and ownership of equity."  *Id*. § 67.31(a); and (3) where title to a vessel is held by an entity comprised, in whole or in part, of other entities which are not individuals, each entity contributing to the stock or equity interest qualifications of the entity holding title must be a citizen eligible to document vessels in its own right . . . ."  46 C.F.R. § 67.31(d).

<div align="center">17</div>



1. Includes wholly-owned subsidiaries thereof
2. Harvey Thunder, LLC is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc.,
   a wholly-owned direct subsidiary of HGIM Corp.

### a.    The Debtors

HGIM Holdings and HGIM Corp., a corporation organized under Delaware law and a wholly-owned direct subsidiary of HGIM Holdings, were each formed on May 20, 2008, in connection with Mr. Guidry's and TJC's acquisition of the Company.  HGIM Holdings has no investments or ownership interests other than its ownership of the equity in HGIM Corp.

Except as otherwise noted herein, HGIM Corp. holds 100% of the equity of all other Debtor subsidiaries,[9] each of which is a limited liability company or corporation organized under Louisiana law.  All of HGIM Corp.'s Debtor subsidiaries are single-asset (vessel) entities, except:  (i) Harvey Gulf International Marine, LLC ("*Harvey Gulf International Marine*"), which holds no assets but is the manager of each of HGIM Corp.'s other wholly-owned direct Debtor subsidiaries and of Harvey Thunder, LLC; (ii) Harvey America LNG, LLC, which owns the *Harvey America* and approximately 49.9% of the outstanding common units in GCSG Holdings, LLC and its subsidiaries, which own and operate a shipyard in Gulfport, Mississippi (as further described below); (iii) Guidry Brothers Inc., which leases the facility in Port Fourchon, Louisiana; and (iv) certain entities that no longer hold any assets or liabilities except for being guarantors under the Senior Secured Term and Revolving Credit Agreement, dated June 18, 2013 (as amended, the "*Credit Agreement*") among HGIM Corp., as borrower, HGIM Holdings and its Debtor subsidiaries (other than HGIM Corp.), as guarantors, a syndicate of financial institutions as lenders (the "*Lenders*"), and Bank of America, N.A., as administrative agent (the "*Agent*").[10]

### b.    Non-Debtor Affiliates

The Debtors have 11 affiliates that will not be Debtors in the Chapter 11 Cases.  Of these entities, the Non-Debtor Affiliates with significant assets or liabilities are: (i) Harvey Stone Holdings, LLC and its subsidiary Harvey Stone, LLC; (ii) Q-LNG Transport LLC ("*Q-LNG*") and Q-LNG Operating I, LLC; and (iii) GCSG Holdings, LLC and its subsidiaries.  Importantly, these entities are not borrowers or guarantors under any of the Debtors' debt obligations and such entities and their operations are not expected to be affected by the Chapter 11 Cases except as otherwise described herein.  The remaining Non-Debtor Affiliates have no assets or liabilities.

---

9       Harvey Thunder, LLC is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc., a wholly-owned direct subsidiary of HGIM Corp.

10      The Debtors anticipate dissolving such entities in connection with the Plan.

18

   **i.**   **Harvey Stone Holdings, LLC and Harvey Stone, LLC**

   HGIM Corp. owns a 100% interest in Harvey Stone Holdings, LLC (a Non-Debtor Affiliate), which in turn owns a 100% interest in Harvey Stone, LLC (a Non-Debtor Affiliate). Both entities are limited liability companies organized under Louisiana law; neither is a borrower or guarantor under the Credit Agreement. Harvey Stone, LLC's primary assets are the *Harvey Stone*, a highly specialized MPFSV, and a 10-year contract for use of the *Harvey Stone* vessel. Harvey Stone, LLC is a borrower under approximately $41 million in secured notes (the "**Harvey Stone Notes**"), entered into in conjunction with the construction of the *Harvey Stone* and secured by a first-priority mortgage on the *Harvey Stone*.

   Like certain other subsidiaries, Harvey Stone, LLC is party to a management agreement with Debtor Harvey Gulf International Marine. Under the terms of the management agreement, Harvey Gulf International Marine pays Harvey Stone, LLC's operating expenses in the ordinary course of business and invoices Harvey Stone, LLC for such expenses. Harvey Stone, LLC periodically reimburses Harvey Gulf International Marine for these expenses. Harvey Stone, LLC is permitted under its financing with its lenders to, under certain circumstances, make distributions to the Debtors on account of Harvey Stone, LLC's equity interests. As of the Petition Date, no such distributions have ever been made.



*The Harvey Stone, an MPFSV*

   **ii.**   **Q-LNG**

   Q-LNG is a limited liability company organized under Louisiana law. In 2016, one of the Company's key customers contacted Harvey Gulf's management about providing articulated tug and barge ("**ATB**") and integrated tug-barge ("**ITB**") vessels for the purpose of transporting LNG fuel. Harvey Gulf invested in an exclusivity and engineering services agreement, an intellectual property license agreement, and certain related rights (collectively, the "**IP Materials**") as an initial step toward evaluating whether to pursue this opportunity, which was outside the scope of the Company's existing business. HGIM Holdings' Board of Directors, including each of its disinterested directors, ultimately decided not to invest additional capital to pursue the ATB and ITB business and authorized Mr. Guidry to explore alternatives for this business.

   Accordingly, in January 2017, Q-LNG was formed to pursue the ATB and ITB business opportunity. In connection with the creation of Q-LNG, Harvey Gulf International Marine contributed the IP Materials to Q-LNG. In return, HGIM Corp. received 30% of the common units outstanding and all 2,071,346 preferred units of Q-LNG. AGIII, LLC, an affiliate of Mr. Guidry, owns the remaining 70% of the common units outstanding. In November 2017, AGIII, LLC made a $10 million capital contribution to Q-LNG in connection with the financing of the first ATB vessel to be constructed by Q-LNG. Q-LNG and AGIII, LLC have elected to delay the issuance of additional equity interests in Q-LNG for such capital contribution until the resolution of any modifications to the Q-LNG Agreements (as defined below). Additionally, Harvey Gulf International Marine manages Q-LNG in exchange for a management fee pursuant to an Amended and Restated Vessel Management Agreement dated October 27, 2017 (the "**Q-LNG Management Agreement**").

As part of the Restructuring, Q-LNG's operating agreement (the "*Q-LNG Operating Agreement*") and the Q-LNG Management Agreement (together with the Q-LNG Operating Agreement, the "*Q-LNG Agreements*") may be amended to reflect certain terms negotiated between the Steering Committee and Q-LNG.  Any amended Q-LNG Agreements will not be filed in the Chapter 11 Cases given the commercially sensitive nature of the documents and Q-LNG's status as a Non-Debtor Affiliate.  Holders of Class 3—Senior Lender Claims will be able to access summaries of any such documents via the Agent's Syndtrak website.  Copies of any amended Q-LNG Agreements will be provided to the Court and the U.S. Trustee during the Chapter 11 Cases.

### iii.      Gulf Coast Shipyard and Contracts

GCSG Holdings, LLC ("*GCSG Holdings*," and together with its direct and indirect wholly-owned subsidiaries,[11] the "*Shipyard Entities*"), a limited liability company organized under Delaware law, owns and operates a shipyard (the "*Shipyard*") located in Gulfport, Mississippi that is currently used exclusively by the Debtors to store, maintain, and construct their vessels.  The Shipyard contains, among other things: (i) a total operating area of over 60 acres; (ii) production and outfitting buildings with over 700,000 square feet of under-cover manufacturing space; and (iii) a large construction bay that is suitable to simultaneously build and/or service multiple large vessels.

Debtor Harvey America LNG, LLC owns 49.9% of the common units[12] of GCSG Holdings; TJC, through HGIM Group, LLC, owns approximately 41.3% of the common units; Mr. Guidry owns approximately 6.7% of the common units; and members of the executive management team own the remaining common units.  Certain Shipyard Entities are borrowers under a first lien credit facility with Hancock Bank as lender, dated as of June 23, 2015.  As of February 2018, there was approximately $5.5 million outstanding under such facility.  None of the Debtors are borrowers or guarantors of this debt.

The Debtors have entered into certain key contracts with the Shipyard Entities including: (i) a vessel construction contract which governs the building of certain LNG-powered vessels; (ii) a shipyard management agreement by which Debtor Harvey Gulf International Marine manages the operations of the Shipyard; and (iii) a master storage contract which governs the terms by which Harvey Gulf can dock and store vessels at the Shipyard.

The Plan provides that, as part of a settlement under Bankruptcy Rule 9019, HGIM Group, LLC will contribute its membership interests in GCSG Holdings, including all of its common and preferred units, to Debtor Harvey America LNG, LLC (the "*Shipyard Contribution*").  As a result of the Shipyard Contribution, Debtor Harvey America LNG, LLC will own approximately 91.2% of the common units in GCSG Holdings.  The Debtors believe that the Shipyard Contribution will preserve value for the Debtors and Reorganized Debtors both under current market conditions and when the industry recovers.  Ownership of the Shipyard enables Harvey Gulf to reliably store its vessels without using a third-party shipyard. Likewise, Harvey Gulf can repair its vessels at the Shipyard on a consistent and expedited timetable. When the industry recovers, storage at the Shipyard will facilitate Harvey Gulf's ability to return stacked vessels to work quicker than its competitors. In addition, ownership of the Shipyard will position Harvey Gulf

---

[11]      GCSG Holdings owns 100% of the equity in GCSR Holdings, Inc., a corporation organized under Delaware law, which in turn owns 100% of the equity in Gulf Coast Shipyard Group, Inc. and GCS Realty, Inc., each of which are corporations organized under Delaware law.  Equity in Gulf Coast Shipyard Realty, LLC, a limited liability company organized under Delaware law, is 90% held by GCSR Holdings, Inc., and 10% held by GCS Realty, Inc.

[12]      In connection with entry into GCSG Holdings' Second Amended and Restated Limited Liability Company Agreement, dated May 11, 2017, GCSG Holdings: (i)  issued $24 million in preferred units (98% of which are held by HGIM Group, LLC and 2% of which are held by Mr. Guidry) corresponding to their $24 million capital contribution to GCSG Holdings; and (ii)  agreed to issue up to $20 million of additional preferred units to Harvey America LNG, LLC in connection with certain expenditures by Harvey America LNG, LLC associated with the building of the *Harvey America* vessel at the Shipyard.  The Debtors will disclose the amount of preferred units issued to Harvey America LNG, LLC in connection with the filing of the Plan Supplement.

to build new vessels and resume construction of the *Harvey Patriot*, an LNG-powered vessel, quickly and efficiently. For further discussion of the Shipyard Contribution, *see* Section II.D.4.a of this Disclosure Statement.

The Plan further provides that: (i) holders of Class 3—Senior Lender Claims—that vote to accept the Plan shall release claims and causes of action in connection with the Shipyard against the Debtors (including Harvey America LNG, LLC), and certain of their affiliates, including any current or former officers and directors of the Debtors; and (ii) the Shipyard Entities shall release claims and causes of action against all Released Parties.

### c.    Directors, Officers, and Management

The Boards of Directors of HGIM Holdings and HGIM Corp. are currently comprised of Chairman Shane J. Guidry, W. Steve Orlando, Cornelius Dupré, II, A. Richard Caputo, Jr., Jeffrey B. Miller, Peter D. Suffredini, and Richard Nevins.

On September 30, 2017, in connection with entry into the Forbearance Agreement, the Boards of Directors of HGIM Holdings and HGIM Corp. appointed Richard Nevins to the boards of directors as an independent director. HGIM Holdings' Board of Directors created also a special committee, consisting of Mr. Nevins and Cornelius Dupré, II to:  (i) consider, review, and evaluate, in connection with any proposed transaction, any matters on which an actual or potential conflict exists between HGIM Holdings and its direct or indirect subsidiaries, on the one hand, and the members of HGIM Holdings and/or their respective affiliates (other than HGIM Holdings and its subsidiaries), on the other hand, and such other matters as the Board of Directors of HGIM Holdings may from time to time delegate; (ii) make recommendations to the full Board of Directors of HGIM Holdings with respect to any such matter; and (iii) determine whether any such matter is fair and reasonable to, and in the best interests of, HGIM Holdings and its members.

The Debtors' management team is currently comprised of the following:

| Name | Years with Harvey Gulf | Title |
|---|---|---|
| Shane J. Guidry | 28 | Chairman and Chief Executive Officer |
| Robert L. Gwinn, III | 36 | President |
| Jeffrey M. Henderson | 8 | Executive Vice President and Chief Financial Officer |
| Robert A. Vosbein, Jr. | 11 | Executive Vice President and General Counsel |
| Chad J. Verret | 8 | Executive Vice President LNG Operations |
| Lance A. Reynolds | 6 | Executive Vice President of Vessel Operations |
| Corby Autin | 10 | Executive Vice President HSSE and Personnel |

The composition of the board of directors and identity of the officers of each Reorganized Debtor, as well as the nature of any compensation to be paid to any director or officer who is an "insider" under the Bankruptcy Code, will be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5). The Debtors' existing management team will be retained on the Effective Date.

## C.    The Debtors' Prepetition Capital Structure

### 1.    Prepetition Indebtedness

As described in detail below, as of the date of this Disclosure Statement, the Debtors' significant outstanding funded debt obligations total approximately $1.2 billion. The Debtors' long-term debt obligations are owed under a Senior Secured Term and Revolving Credit Agreement, dated June 18, 2013, among HGIM Corp. as borrower, HGIM Holdings as guarantor, a syndicate of financial institutions as lenders, and Bank of America, N.A. as Agent. In addition to HGIM Holdings, each of HGIM Corp.'s Debtor subsidiaries is a guarantor under the Credit Agreement. The Credit Agreement has been amended four times, most recently on March 16, 2016.

The Credit Agreement consists of three credit facilities:  (i) a $270 million revolving credit facility (the "***Revolver***"); (ii) a $225 million Senior Secured Term A Facility (the "***Senior Secured Term A Facility***"); and (iii) an

$875 million Senior Secured Term B Facility (the "***Senior Secured Term B Facility***," and together with the Revolver and the Senior Secured Term A Facility, the "***Credit Facility***").  The Revolver and Senior Secured Term A Facility mature in June 2018 and the Senior Secured Term B Facility matures in June 2020.

Borrowings under all three tranches of the Credit Facility are secured on a *pari passu* basis by first lien mortgages on each of the Debtors' vessels and substantially all of the Debtors' personal property.  There is no subordination or intercreditor agreement between or among the Lenders.  The Agent generally acts at the direction of lenders holding a majority of the aggregate outstanding principal amount of the borrowings under the Credit Facility.

The Revolver has total commitments of $270 million, which are fully drawn as of the Petition Date.  All outstanding borrowings under the fully-drawn Revolver bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 3.75%, payable at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

The Senior Secured Term A Facility has an outstanding principal balance of $114,351,563 as of the Petition Date, as well as accrued and unpaid interest.  Principal outstanding under the Senior Secured Term A Facility is payable quarterly, at a rate of 6.25% of the original principal borrowed (approximately $13.9 million) for the quarters ending September 30, 2017 through March 31, 2018, with the remaining balance outstanding (approximately $72.5 million) due on June 18, 2018.  All outstanding borrowings under the Senior Secured Term A Facility bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 4.25%, at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

The Senior Secured Term B Facility has an outstanding principal balance of $842,187,500 as of the Petition Date, as well as accrued and unpaid interest.  Principal outstanding under the Senior Secured Term B Facility is payable quarterly, at a rate of 0.25% of the original principal borrowed (approximately $2.2 million) through the quarter ending March 31, 2020, with the remaining balance outstanding (approximately $818.1 million) due June 18, 2020.  All outstanding borrowings under the Senior Secured Term B Facility bear interest at the applicable LIBO rate (subject to a 1.00% floor) plus a margin of 4.50% at the end of the applicable interest period, or if the applicable interest period is longer than three months, each date during such interest period that is three, six, and nine months after the start of such interest period.

As of the date of this Disclosure Statement, certain lenders affiliated with TJC hold approximately $48,173,175 in principal amount of the loans outstanding under the Credit Agreement.

As forth more fully in Section II.D.4 herein, the Agent and requisite Lenders entered into a forbearance agreement on September 20, 2017, pursuant to which the Agent and Lenders have forborne from exercising remedies with respect to ongoing payment and covenant defaults under the Credit Agreement.

2.     **Equity Ownership**

As of the date of this Disclosure Statement, common units in HGIM Holdings are held by its members as set forth below:

| Member | Common Units |
|---|---|
| HGIM Group, LLC | 77,000 |
| Shane J. Guidry | 20,000 |
| Robert A. Vosbein, Jr. | 1,000 |
| Robert L. Gwinn, III | 1,000 |
| Jeffrey M. Henderson | 1,000 |
| **Total** | **100,000** |

HGIM Holdings also has a single Class B unit outstanding and issued to Shawn J. Guidry.  HGIM Group, LLC is owned by investment funds managed by TJC.

US 5252960

HGIM Corp. is a wholly-owned direct subsidiary of HGIM Holdings, and holds 100% of the equity of all other Debtor subsidiaries except for Harvey Thunder, LLC, which is 69.32% owned by HGIM Corp. and 30.68% owned by Guidry Brothers, Inc., a wholly-owned subsidiary of HGIM Corp.

**D.      Events Leading to the Restructuring**

**1.      Commodities Downturn and Industry Distress**

OSVs, which support offshore drilling, production, and decommissioning activities, form a maritime industry subsector that generated more than $25 billion in global annual revenues at its peak in 2013.  As a result of severely depressed oil prices, E&P companies, an important source of this revenue, have drastically cut the number of exploration and drilling projects in the GoM since 2014.

Rig demand, a highly relevant driver of OSV demand, also decreased substantially since the downturn began in 2014.  Diminishing rig counts are a negative bellwether for the offshore supply boat and service sector, and a trend that is unlikely to reverse itself if oil prices do not experience a significant and sustained recovery.  Oil companies are not utilizing their existing contracted capacity, as evidenced by numerous contract cancellations and the recent chapter 11 filings of certain other offshore supply boat and service market participants ("***OSSM Participants***").  Among other things, E&P companies will require a sustained price increase over a period of several months in order to justify expenditures in the area, and thus increase rig count.   Due to decreased GoM activity, oil production, decommissioning, and offshore drilling—especially deepwater drilling, the key driver for OSV demand—the OSV market suffered substantial drops in utilization and day rates.  Lower levels of utilization and day rates affected the offshore supply boat and service sector, contributing to considerable oversupply in the marketplace and granting E&P companies substantial pricing power.  OSV companies were forced to do more for less in this depressed price environment, resulting in decreased margins.

**2.      Aggressive Steps at the Outset of the Market Downturn**

Company management quickly recognized the early signs of the market downturn and took action to combat its impact.  Commencing in June 2014, Harvey Gulf initiated a series of operational and financial actions with the goal of weathering the market downturn, including:

- reducing crew member headcount by approximately 45%;

- reducing general and administrative expense headcount by approximately 50%;

- negotiating reduced insurance premium payments;

- eliminating the Company's 401(k) matching contribution program; and

- reducing employee bonuses and executive compensation.

These initiatives, along with certain others, succeeded in realizing an annualized $87 million in cost cuts, notwithstanding the Company's historically lean operating budget.  Contemporaneously, the Company made the strategic decision to execute long-term vessel use contracts with its key customers in order to prepare the Company to weather a potential downturn in the vessel spot market.  This approach successfully enabled Harvey Gulf to maintain positive EBITDA and significantly outperform other OSSM Participants during the now three-and-one-half-year long, industry-wide market downturn.  Indeed, in each of the past three years, Harvey Gulf increased its market share and EBITDA margin, and significantly outperformed many other OSSM Participants.  Over the past three years, Harvey Gulf:  (i) added more than 40 new customers to its existing customer base; (ii) increased its EBITDA margin by 27%; and (iii) realized a 10% return on assets.

US 5252960

### 3.     The Prolonged Market Downturn Hits the Debtors

The market downturn, however, lasted far longer than anticipated and could no longer be weathered without taking additional steps.  As the downturn extended into late 2015, the Debtors determined that they would need relief from certain covenants under the Credit Agreement and successfully negotiated such amendments in 2016.  When the downturn persisted into 2017 with no signs of imminent recovery, Company management realized that their efforts to date could no longer adequately shield Harvey Gulf from the pressures facing the rest of the OSSM Participants.

A portion of Harvey Gulf's long-term vessel use contracts began to roll off in 2017 and will continue to do so into 2019 and beyond.  As these long-term contracts roll off, the Debtors must choose to either:  (i) attempt to replace them with new contracts; (ii) stack the previously contracted-for vessels; or (iii) take their chances in the increasingly unstable vessel spot market.  As a result, the Company's EBITDA and EBITDA margin declined in 2017 and, without significant deleveraging, are projected to decline precipitously in 2018.  Furthermore, the Debtors' liquidity strain is exacerbated by approximately $34 million in Senior Secured Term A Facility and Senior Secured Term B Facility amortization and interest payments due quarterly, and the impending maturity of the Revolver and the Senior Secured Term A Facility on June 18, 2018.

### 4.     Hiring Restructuring Advisors and Commencing Negotiations with the Steering Committee

As an initial step in early 2017, the Debtors began negotiations with the Agent with the goal of amending the Credit Agreement and obtaining relief from certain financial covenants, interest payments, and principal payments, while also extending the maturity of the Revolver and Senior Secured Term A Facility.  When it became apparent that a more comprehensive transaction would be necessary to deleverage the Debtors' balance sheet, the Company hired Blackhill Partners, LLC ("*Blackhill*"), as investment banker, and Vinson & Elkins LLP, as counsel (together, the "*Restructuring Advisors*"), to explore additional strategic alternatives.

Over the next few months, the Debtors and the Restructuring Advisors engaged with the Agent and a steering committee of lenders now holding approximately 49% of the debt outstanding under the Credit Agreement (the "*Steering Committee*") and their advisors (including PJT Partners LP, as financial advisor, and Davis Polk & Wardwell LLP, as counsel to the Agent) to negotiate a restructuring of the Debtors' funded indebtedness under the Credit Agreement.  The parties met frequently, exchanged proposals, and engaged in hard fought, arm's-length negotiations on the terms of a comprehensive restructuring transaction to be achieved through a consensual prepackaged plan.  During this time period, the Debtors and the Steering Committee negotiated and ultimately agreed on the framework for the Restructuring by which the Lenders would, subject to the Restructuring Toggle, consensually equitize approximately 70% of their secured debt claims in exchange for equity in the Reorganized Debtors while ensuring that the Debtors and Reorganized Debtors remain compliant with the Jones Act.

While negotiating the Restructuring in September 2017, the Debtors sought to avoid making certain interest and amortization payments due under the Credit Agreement in order to preserve much-needed liquidity.   On September 20, 2017, the Debtors entered into an agreement with certain lenders under the Credit Agreement (as amended, the "*Forbearance Agreement*") under which the Lenders agreed to forbear from exercising, through October 31, 2017 (the "*Forbearance Termination Date*"), any remedies otherwise available to them as a result of the Debtors' decision to not make approximately $30 million in interest and principal payment due under the Credit Agreement in September 2017.  The Forbearance Agreement was amended seven times to extend the Forbearance Termination Date as restructuring negotiations continued, most recently through February 20, 2018.

As negotiations continued into 2018, the parties turned their attention to, among other things, the terms of the Exit Facility, the New Lender Warrants, the Management Incentive Plan, and the Shipyard Settlement (described below).  In early February 2018, when negotiations gained momentum with agreement on all other key terms, the Debtors and Restructuring Support Parties agreed that it was in the best interest of all stakeholders to execute the RSA with the built in Restructuring Toggle to allow the Debtors to proceed with the Restructuring as set forth in the Plan, but also allow the Debtors and Restructuring Support Lenders to pivot to an alternative transaction(s) and/or process to implement the Restructuring if the Management Document Milestone is not achieved.

### a.      The Shipyard Settlement

The Debtors and  the Restructuring Support Lenders entered into an agreement with the TJC Parties—to be implemented through the Plan as a settlement under Bankruptcy Rule 9019 (the "*Shipyard Settlement*")—which will settle all claims between the TJC Parties and their Associated Entities (as defined in the RSA), and the Debtors and their Associated Entities.  As part of the Plan and pursuant to the terms of the Shipyard Settlement:

- HGIM Group, LLC shall be entitled to receive:

  - $16 million in cash on the Effective Date payable by the Debtors; and

  - two series of warrants in an aggregate amount equal to 4.00% of the Reorganized HGIM Equity, which shall be exercisable by physical settlement in cash or on a cashless basis for a seven-year period commencing on the Effective Date, with: (i) the first series of warrants in an aggregate amount equal to 3.00% of the Reorganized HGIM Equity at a strike price based on a total enterprise value of $750 million; and (ii) the second series of warrants in an aggregate amount equal to 1.00% of the Reorganized HGIM Equity at a strike price based on a total enterprise value of $1,250 million; provided, that the strike price of the Shipyard Warrants shall be reduced for distributions of cash, securities, or other assets to holders of the New Common Stock and benefit from other customary anti-dilution protections.

- The TJC Parties and their Associated Entities shall waive and release any claims against the Debtors and their Associated Entities other than any Senior Lender Claims held by the TJC Parties, which Senior Lender Claims shall receive the same treatment and distributions as other Senior Lender Claims in full satisfaction and release of such claims pursuant to the Plan, and the Debtors, the Shipyard Entities, and their respective Associated Entities shall waive and release any claims against the TJC Parties and their Associated Entities.

- The Exit Facility shall allow for the existing debt obligations of the Shipyard and the existing liens on any Shipyard assets to remain in place on their existing terms the Exit Facility will allow for the existing debt obligations of the Shipyard Entities and the existing Liens on any Shipyard assets to remain in place on their existing terms.

### 5.      The Restructuring Support Agreement

After extensive negotiations, the Debtors, the Restructuring Support Lenders, and the TJC Parties succeeded in reaching agreement on the terms of a comprehensive restructuring transaction that deleverages the Debtors' balance sheet by equitizing more than 70% of their prepetition funded indebtedness.  The key terms of this transaction are set forth in the RSA.  The RSA was entered into on February 8, 2018 by the Debtors and the Restructuring Support Parties (as defined in the RSA), made effective on February 16, 2018, and subsequently amended and restated on February 21, 2018.  The RSA is critical to the Debtors' successful Restructuring because the Restructuring Support Parties, holding in excess of 64% in principal amount outstanding under the Credit Agreement, have committed to convert their secured debt claims into equity in the Reorganized Debtors, subject to certain requirements and milestones set forth in the RSA.[13]  Without the support of the Restructuring Support Lenders, the Debtors could not effectuate the Restructuring or equitize the Restructuring Support Lenders' secured claims.  The RSA includes, among other things, the following terms:

- extending the agreement by the Agent and Restructuring Support Lenders to forbear from exercising remedies as a result of continuing events of default;

---

[13]      As of the date of this Disclosure Statement, and as described further in Section II.C above, certain lenders affiliated with TJC hold a meaningful portion of the loans outstanding under the Credit Agreement.  As an insider of the Debtors, such votes to accept the Plan will not be counted for purposes of determining if the Debtors meet the requirements of section 1129(a)(10) of the Bankruptcy Code.

- setting forth requirements related to the definitive documents and agreements governing the Restructuring (including those definitive documents included in the Plan Supplement);

- governing the timeline for implementation of the Restructuring (set forth below);

- committing the Debtors and the Restructuring Support Parties to support consummation of the Restructuring;

- permitting the Debtors and the Restructuring Support Parties to terminate the RSA if certain milestones are not met or certain other events occur;

- providing representations and warranties by the Debtors and the Restructuring Support Parties; and

- providing that Mr. Guidry is to be the Chairman of the Board of Directors and Chief Executive Officer of the Reorganized Debtors, pursuant to the CEO Employment Agreement[14] to be assumed as amended, subject to the Restructuring Toggle.

The RSA establishes certain milestones (the "***RSA Milestones***") for the Chapter 11 Cases:

- no later than March 7, 2018, each Debtor shall commence the Chapter 11 Cases by filing the Petitions and any and all other documents necessary to commence the Chapter 11 Case of each Debtor with the Bankruptcy Court;

- on the Petition Date, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) entry of an order (the "***Scheduling Order***") scheduling a hearing to consider, among other things, approval of this Disclosure Statement, approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and confirmation of the Plan;

- on the Petition Date, the Debtors will propose such timeline to the Court:

  - no later than five days after the Petition Date, the Bankruptcy Court shall have entered: (i) the Cash Collateral Order (the "***Cash Collateral Order***"); and (ii) the Scheduling Order, each in forms and substance as set out in the RSA;

  - no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered a final Cash Collateral Order, in form and substance as set out in the RSA;

  - no later than 60 days after the Petition Date, the Bankruptcy Court shall have entered an order approving a Disclosure Statement and the Confirmation Order, each in forms and substance as set out in the RSA; and

  - no later than 15 days after the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan.

The RSA also includes a milestone associated with finalizing Mr. Guidry's employment agreement (the "***CEO Employment Agreement***") and Q-LNG Agreements.  Mr. Guidry (and his affiliates), the Debtors and the Required Restructuring Support Lenders shall have agreed on the forms of such agreements no later than 30 days after the Petition Date the ("***Management Document Milestone***") or the Agent (on behalf of the Restructuring Support Lenders) may send notice to the Debtors of a failure to reach the Management Document Milestone (the "***Restructuring Toggle***").  Upon occurrence of the Restructuring Toggle: (i) the Required Restructuring Support

---

[14]   In connection with the Restructuring, the Requiring Restructuring Support Lenders and Mr. Guidry are negotiating an amended employment agreement to replace his existing agreement.  In accordance with 11 U.S.C. § 107(b), any CEO Employment Agreement will not be filed in the Chapter 11 Cases given its commercially sensitive nature.  All holders of Claims in Class 3, the only Impaired Class, will be provided with such agreement via the Agent's Syndtrak website.  Any CEO Employment Agreement will be provided to the U.S. Trustee and the Court.

Lenders may request that a chief restructuring officer (the "*CRO*") be appointed (the identity of any CRO and the scope of any CRO's duties must be mutually agreed upon by the Debtors and the Required Restructuring Support Lenders); and/or (ii) the Required Restructuring Support Lenders and the Debtors may agree to (x) seek confirmation of the Plan, as modified as described in Section VI.A.10 of this Disclosure Statement, or (y) pursue an alternative transaction(s) and/or process to implement the Restructuring other than that which is contemplated by the Plan.

It is important to note that the Debtors maintain a "fiduciary out" under the RSA.  Specifically, Section 10(d) of the RSA provides that each Debtor may terminate its obligations thereunder if its board of directors, board of managers, or such similar governing body determines, based on advice of counsel, that proceeding with the contemplated restructuring transactions would be inconsistent with the exercise of its fiduciary duties or under applicable law.

## III.      DEVELOPMENTS AND ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

In accordance with the RSA, subject to the approval of the Board of Directors of HGIM Holdings and the applicable governing body of each other Debtor, and the outcomes of the vote on the Plan, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about March 7, 2018.  The filing of the Petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits and become subject to the limitations of the Bankruptcy Code.

The Debtors will request an accelerated timeline for the Chapter 11 Cases, and subject to Court approval anticipate the Chapter 11 Cases will proceed quickly and enable the Company to emerge from chapter 11 in May 2018.  The Debtors intend to continue to operate their business in the ordinary course during the pendency of the Chapter 11 Cases as they have before the Petition Date.  To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases and ensure that the Debtors' operations continue in the ordinary course during the pendency of the Chapter 11 Cases with minimal impact to employees, customers, and other partners.  However, no assurances can be made that the Bankruptcy Court will grant such relief or do so on the timetable anticipated by the Debtors.

## A.      Commencement of the Chapter 11 Cases

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of a debtor as of that date.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Following the Petition Date, the Debtors will continue to operate their businesses and manage their properties as debtors and debtors in possession.  The Debtors also intend to seek approval from the Bankruptcy Court to have their cases jointly administered for procedural purposes only.

## B.      Automatic Stay

The filing of the Petitions on the Petition Date will trigger the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

## C.      First Day Motions and Certain Related Relief

On the Petition Date, along with the Petitions, the Debtors intend to file several motions (collectively, the "*First Day Pleadings*") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, insurers, and taxing authorities, among others, following the commencement of the Chapter 11 Cases.  The

27

following is a brief overview of the relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course:

1.  **Cash Management System**

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors (and certain Non-Debtor Affiliates).  On the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to, among other things, maintain their existing bank accounts and cash management system, continue using their existing business forms and checks, continue to engage in intercompany transfers in the ordinary course of business and consistent with past practice, and pay any undisputed prepetition bank fees and continue to pay the bank fees in the ordinary course of business.

2.  **Trade Creditors**

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers.  Pursuant to the Plan, the Debtors intend to pay all of their obligations to such vendors and service providers in full in the ordinary course of business.  However, certain vendors or service providers may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due.  To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to satisfy their prepetition obligations to vendors and service providers in full in the ordinary course of business.

3.  **Taxes**

Pursuant to the Plan, the Debtors intend to pay all taxes and fees in full.  To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to pay all prepetition taxes, fees, and similar charges and assessments, to the appropriate taxing, regulatory, or other governmental authority.

4.  **Utilities**

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services including, among others, water, electricity, natural gas, waste management, and telecommunication services.  On the Petition Date, the Debtors will seek entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.

5.  **Insurance**

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance programs.  Maintaining the insurance programs is essential to the Debtors' operations and is required by laws, various regulations, and/or certain contracts.  Accordingly, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to pay prepetition obligations under the insurance programs.

6.  **Employee Wages and Benefits**

Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses.  To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to, among other things, pay:  (i) all prepetition obligations of the Debtors owing to or on behalf of employees and independent contractors whether accrued or currently due and payable; (ii) all prepetition amounts owed with respect to employee benefits, whether accrued or currently due and payable, including payment of all applicable plan administrators and other service providers; and (iii) all prepetition amounts owed to certain third-party providers of wage and benefit services.

7.        **Protection of Tax Benefits and Net Operating Losses**

The Debtors' net operating losses ("***NOLs***") and certain other tax attributes are valuable assets of the Debtors' estates.  These tax attributes are valuable because, for U.S. federal income tax purposes, a corporation can generally carry forward its losses to offset future income or tax, thereby reducing its tax liability in future periods.  The Debtors believe that, even after accounting for the cancellation of debt under the Plan, the Debtors' NOLs and other tax attributes may result in future tax savings.  These savings could enhance the Debtors' cash position and contribute to the successful reorganization of the Debtors.  Section 382 of the Internal Revenue Code limits a corporation's ability to use its NOLs and certain other tax attributes after the corporation undergoes a proscribed change of ownership.  Although an ownership change of the Debtors is expected to occur upon implementation of the Plan, the limitations imposed by section 382 of the Internal Revenue Code upon a change in ownership under a confirmed plan are significantly more relaxed than those otherwise applicable.  Accordingly, on the Petition Date, to protect the value of their NOL carryforwards and other tax attributes, the Debtors intend to seek authority from the Bankruptcy Court to restrict the trading of Interests (including claims of worthlessness) that could result in an ownership change prior to the Effective Date of the Plan.

---

**FOR A DISCUSSION OF CERTAIN U.S.
FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN TO THE DEBTORS AND THE POTENTIAL
IMPACT ON THE DEBTORS' TAX ATTRIBUTES, SEE SECTION VIII HEREOF.**

---

D.        **Other Administrative Motions and Retention Applications**

The Debtors intend to file several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases.  The Debtors also intend to file applications to retain various professionals to assist them in the Chapter 11 Cases.

E.        **Confirmation Hearing**

Contemporaneously with the filing of the Petitions, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider:  (i) the adequacy of this Disclosure Statement and the Solicitation in connection herewith; and (ii) confirmation of the Plan.  The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

F.        **Confirmation of the Plan**

In accordance with the RSA, the Debtors agreed to proceed with the implementation of the Plan through the Chapter 11 Cases.  RSA requires that the Bankruptcy Court enter the Confirmation Order within 60 days after the Petition Date.  Although the Debtors will request that the Bankruptcy Court approve the timetable set forth in the RSA, there can be no assurance that the Bankruptcy Court will grant such relief or that the Effective Date will occur on such timetable.

## IV.        SUMMARY OF THE PLAN[15]

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims. The Debtors believe that: (i) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code; and (ii) consummation of the Plan will maximize the recovery of the holders of Allowed Claims.

---

[15]        This section of this Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying Claims against, and interests in, a debtor. Confirmation of a plan makes such plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity holder in, a debtor, whether or not such creditor or equity holder: (i) is impaired under or has accepted the plan; or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges a debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by such plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept a plan. Accordingly, a debtor need not solicit votes from the holders of Claims or Interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept such plan and, therefore, need not be solicited to vote to accept or reject such plan. Any classes that are receiving a distribution of property under a plan but are not Unimpaired will be solicited to vote to accept or reject such plan.

Prior to soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires that a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding such plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein). The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein. The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

A. **Classification and Treatment of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Professional Fee Claims, Cure Claims, and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and are not classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to less favorable treatment of its claim or interest. The Debtors believe that they complied with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving

distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date of this Disclosure Statement and reflect the Debtors' views as of the date of this Disclosure Statement.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.      **Treatment of Administrative Claims and Priority Claims**

        a.      **Administrative Claims**

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Allowed Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date or such other date fixed by the Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

US 5252960

#### b.        Professional Compensation

##### i.        Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Court.

##### ii.        Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall not be subject to any Lien and shall be maintained in trust solely for the benefit of the Professionals.  The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

##### iii.        Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

##### iv.        Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court.

#### c.        Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

US 5252960

d.        **Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors or Reorganized Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first.  The Reorganized Debtors shall continue to file quarterly-post confirmation operating reports in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

2.        **Treatment of Classes**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Senior Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | HGIM Holdings Interests | Impaired | Deemed to Reject |

a.        **Class 1 – Other Priority Claims**

i.        **Classification**: Class 1 consists of Other Priority Claims.

ii.        **Treatment**: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each holder thereof shall receive (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim or (ii) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders.

iii.        **Voting**: Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Other Priority Claims will not be entitled to vote to accept or reject the Plan.

b.        **Class 2 – Other Secured Claims**

i.        **Classification**: Class 2 consists of Other Secured Claims.

ii.        **Treatment**: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such holder shall receive, at the Debtors' election, either (i) Cash equal to the full Allowed amount of its Claim, (ii) Reinstatement of such holder's Allowed Other Secured Claim, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders.

33

iii.     **Voting**: Class 2 is Unimpaired under the Plan.  Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

c.     **Class 3 – Senior Lender Claims**

i.     **Classification**: Class 3 consists of the Senior Lender Claims.

ii.     **Allowance**: The Senior Lender Claims shall be Allowed in the aggregate principal amount of $1,266,539,062.50, *plus* accrued and unpaid interest (including at any applicable default rate) and all applicable fees, costs, and expenses due under the terms of the Credit Agreement, in each case, as of the Petition Date.[16]

iii.     **Treatment**:   On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Senior Lender Claim, each such holder shall receive its Pro Rata share of (i) the Exit Facility, and (ii) subject to the U.S. Citizen determination procedure described in Article III.B.3.d of the Plan, 100.0% of the Reorganized HGIM Equity, in the form of (y) New Common Stock to the extent permitted under the Jones Act Restriction and (z) New Lender Warrants to the extent that shares of New Common Stock cannot be issued to such holder because it is a Non-U.S. Citizen and its ownership of its Pro Rata share of New Common Stock, alone or when added to the Pro Rata shares of New Common Stock being issued to other holders that are Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction; *provided, however*, that a holder of an Allowed Senior Lender Claim may direct any distribution under clause (ii) of Article III.B.3.c of the Plan to one or more Permitted Designees. Holders of Allowed Senior Lender Claims shall also be entitled to payment of the Agent's unpaid fees and expenses in accordance with Article IV.S of the Plan.

In the case of holders of Allowed Senior Lender Claims that are Non-U.S. Citizens, the ratio of the number of shares of New Common Stock to the number of New Lender Warrants to be issued as of the Effective Date to each such Non-U.S. Citizen pursuant to clause (ii) of Article III.B.3.c of the Plan shall be the same for each such Non-U.S. Citizen holder of an Allowed Senior Lender Claim.

iv.     **Procedure for U.S. Citizen Determination**: If a holder (or the holder's Permitted Designee(s)) of an Allowed Senior Lender Claim furnishes a U.S. Citizen Certification to HGIM Corp. on or before the Distribution Record Date and, after review, HGIM Corp., in its reasonable discretion, accepts such U.S. Citizen Certification as reasonable proof establishing that such holder or its Permitted Designee(s), if applicable, is a U.S. Citizen, such holder (or its Permitted Designee(s)) shall receive New Common Stock representing all of such holder's Pro Rata share of the Reorganized HGIM Equity; *provided, however*, that if such holder (or the holder's Permitted Designee(s)) does not furnish a U.S. Citizen Certification to HGIM Corp. on or before the Distribution Record Date, or if, after review by HGIM Corp., the U.S. Citizen Certification of such holder (or the holder's Permitted Designee(s)) has not been accepted or has been rejected by HGIM Corp., in its reasonable discretion, on or before the date that is five Business Days after the Distribution Record Date, such holder (or the holder's Permitted Designee(s)) shall receive a combination of (x) New Common Stock to

---

[16]     Allowance of the Senior Lender Claims is subject to the Reservation of Rights set forth in the Restructuring Support Agreement.

the extent permitted under the Jones Act Restriction, and (y) New Lender Warrants to the extent that shares of New Common Stock cannot be issued to such holder because it is a Non-U.S. Citizen and its ownership of its Pro Rata share of New Common Stock, alone or when added to the Pro Rata shares of New Common Stock being issued to other holders that are Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction.  In connection with HGIM Corp.'s review of any U.S. Citizen Certification under Article III.B.3.d of the Plan, HGIM Corp. shall, in consultation with counsel to the Agent, have the right to require the holder (or the holder's Permitted Designee(s)) furnishing the U.S. Citizen Certification to provide HGIM Corp. with such documents and other information as it may reasonably request as reasonable proof confirming that the holder (or such holder's Permitted Designee(s)) is a U.S. Citizen under the Jones Act.  HGIM Corp. shall treat all such documents and information provided by any holder (or the holder's Permitted Designee(s)) as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a need to know the contents thereof and to the U.S. Coast Guard as may be necessary.  The Debtors shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "*FOIA Request*") for any such documents and information submitted to the U.S. Coast Guard, and (ii) notify the relevant holder (or the holder's Permitted Designee(s)) (x) if any such holder's (or such holder's Permitted Designee's(s')) documents and information are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receive notice from the U.S. Coast Guard that it has received a FOIA Request and that such documents or information have been identified by the U.S. Coast Guard as responsive to such FOIA Request, then, the Debtors shall allow such holder (or such holder's Permitted Designee(s)) an opportunity to redact any confidential commercial, financial and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document.

    **v.**    **Voting**: Class 3 is Impaired under the Plan.  Holders of Senior Lender Claims will be entitled to vote to accept or reject the Plan.

**d.**    **Class 4 — General Unsecured Claims**

    **i.**    **Classification**: Class 4 consists of all Allowed General Unsecured Claims.

    **ii.**    **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each such holder shall receive, at the election of the applicable Debtor or Reorganized Debtor, either:  (i) payment in full of such Allowed General Unsecured Claim in the ordinary course of business or (ii) payment in full of such Allowed General Unsecured Claim in Cash, including interest at the contractual rate, upon the later of (x) the Effective Date, (y) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claim, or (z) such other date as may be ordered by the Court.[17]

    **iii.**    **Voting**: Class 4 is Unimpaired under the Plan.  Each holder of an Allowed General Unsecured Claim will be conclusively presumed to have accepted the Plan

---

[17]    No TJC Party or any of its Associated Entities shall receive any distribution on account of any General Unsecured Claims, other than the Shipyard Consideration, as set forth in Article IV.R of the Plan.

US 5252960

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of General Unsecured Claims will not be entitled to vote to accept or reject the Plan.

e. **Class 5 — Intercompany Claims**

    i. **Classification**: Class 5 consists of all Intercompany Claims.

    ii. **Treatment**: Intercompany Claims shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled. No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable.

    iii. **Voting**: Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

f. **Class 6 — Intercompany Interests**

    i. **Classification**: Class 6 consists of all Intercompany Interests.

    ii. **Treatment**: Intercompany Interests, other than Intercompany Interests in HGIM Corp., shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled. Intercompany Interests in HGIM Corp. shall be cancelled. No distribution shall be made on account of any Intercompany Interests.

      To the extent Intercompany Interests are Reinstated under the Plan, such Reinstatement is solely for the purposes of administrative convenience, for the ultimate benefit of the holders of the Reorganized HGIM Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (i) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the Reorganized Debtor that corresponds to the Debtor that owned such Intercompany Interests prior to the Effective Date; and (ii) except as set forth in the Description of the Transaction Steps, no Interests in a Debtor or Non-Debtor Subsidiary, or Affiliate of a Debtor or Non-Debtor Subsidiary, held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

    iii. **Voting**: Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

g. **Class 7 – HGIM Holdings Interests**

    i. **Classification**: Class 7 consists of all HGIM Holdings Interests.

      **ii.**      **Treatment**:  On the Effective Date, or as soon thereafter as reasonably practicable, all HGIM Holdings Interests shall be cancelled, released, discharged, and extinguished.  Holders of HGIM Holdings Interests shall not receive any distribution on account of such Interests.

      **iii.**      **Voting**: HGIM Holdings Interests are Impaired under the Plan.  Each holder of an HGIM Holdings Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of HGIM Holdings Interests will not be entitled to vote to accept or reject the Plan.

**3.**      **Special Provision Governing Unimpaired Claims**

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

**4.**      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests, and the filing of the Plan shall constitute a motion for such relief.

**5.**      **Elimination of Vacant Classes**

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**6.**      **Subordinated Claims**

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**B.**      **Means for Implementation of the Plan**

**1.**      **Restructuring Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, with the consent of the Required Restructuring Support Lenders, such consent not to be unreasonably withheld, the Reorganized Debtors shall undertake the Restructuring Transactions, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the issuance of securities, including the New Common Stock and the Warrants, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (5) the execution and delivery of the Exit Facility Documents; (6) the

37

execution and delivery of the Q-LNG Agreements; (7) entry into the CEO Employment Agreement; (8) entry into the Management Employment Agreements, if applicable; (9) the execution and delivery of Definitive Documentation not otherwise included in the foregoing, if applicable; (10) any actions necessary to effectuate the Shipyard Contribution; and (11) all other actions that the Debtors, the Reorganized Debtors, or the Required Restructuring Support Lenders determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

2.      **Corporate Action**

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable:  (1) entry into the Exit Facility; (2) execution and delivery of the Exit Facility Documents; (3) the issuance of the New Common Stock; (4) the issuance of the Warrants; (5) appointment of the directors and officers for New Parent and the other Reorganized Debtors; (6) the adoption of the Management Incentive Plan in accordance with Article IV.O of the Plan; (7) execution and delivery of the Q-LNG Agreements; (8) implementation of the Shipyard Contribution; (9) implementation of the Restructuring Transactions; (10) entry into the CEO Employment Agreement; (11) entry into the Management Employment Agreements, if applicable; and (12) all other actions contemplated by the Plan. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by Article IV.B of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

3.      **Sources of Consideration for Plan Distributions**

The Reorganized Debtors shall fund distributions under the Plan as follows:

a.      **Cash on Hand**

The Reorganized Debtors shall use Cash on hand available on the applicable distribution date to fund distributions to certain holders of Claims entitled to receive Cash.

b.      **Exit Facility**

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility in accordance with the terms of the Exit Facility Term Sheet.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted

38

in accordance with the Exit Facility Documents (including any Liens and security interests previously granted with respect to the Credit Agreement that are deemed to be granted in accordance with the Exit Facility Documents) (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### c. Issuance and Distribution of New Common Stock and New Lender Warrants

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the New Common Stock and the New Lender Warrants in accordance with the terms of the Plan without the need for any further corporate action.  All of the New Common Stock and the New Lender Warrants, when so issued, shall be duly authorized, validly issued, and, in the case of (i) the New Common Stock, fully paid, and non-assessable, and (ii) the New Lender Warrants, valid, binding, and enforceable in accordance with the terms of the New Lender Warrant Agreement.  In no event shall (a) Non-U.S. Citizens in the aggregate hold more than 24% of the total number of shares of New Common Stock issued and outstanding as of the Effective Date, and (b) any Non-U.S. Citizen hold more than 4.9% of the total number of shares of New Common Stock issued and outstanding as of the Effective Date (together, the "***Jones Act Restriction***").  All of the New Common Stock underlying the New Lender Warrants (upon payment of the exercise price in accordance with the terms of such New Lender Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The New Lender Warrants will be issued pursuant to the terms of the New Lender Warrant Agreement.  Each New Lender Warrant will, subject to the terms of the New Lender Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the New Lender Warrant Agreement.  The New Lender Warrant Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and the New Parent and each holder of the New Lender Warrants shall be bound thereby.

To the extent that any New Common Stock or New Lender Warrants are distributed pursuant to the Plan to the holder of an Allowed Claim or Allowed Interest against a Debtor other than Reorganized HGIM Corp., such New Common Stock or New Lender Warrants shall be treated as contributed by Reorganized HGIM Corp. directly or indirectly to such Debtor and then distributed on behalf of such Debtor in accordance with the Plan.

Each distribution and issuance of the New Common Stock and the New Lender Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### d. Continued Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Organizational Documents.

US 5252960

### e.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Except with respect to Liens and security interests securing the Exit Facility, to the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors.  The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of.  The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s).  Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

### f.    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date :  (1) the obligations of the Debtors under the Credit Agreement, all HGIM Holdings Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding the releases set forth in Article VIII.F of the Plan, Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, that any and all indemnification obligations pursuant to the Credit Agreement, including the reimbursement of fees and expenses of the Agent (including the fees and expenses of its professionals) incurred in connection with the Credit Agreement after the Effective Date, shall survive Confirmation and occurrence of the Effective Date; and *provided*, *further*, that nothing in this section shall effectuate a cancellation of any New Common Stock, Warrants, Intercompany Interests, Intercompany Claims, or Indemnification Obligations.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Article IV.F of the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under

40

any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Court.

       **g.**       **New Organizational Documents**

To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New Organizational Documents, as applicable, with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

The New Organizational Documents, or related agreements, such as the Stockholders Agreement, may or may not, in the discretion of the Required Restructuring Support Lenders, include: (i) limitations on the ability of holders of the Reorganized HGIM Equity to cast votes above a specified threshold; (ii) requirements for the Reorganized Debtors to seek to cause the New Common Stock and New Lender Warrants to be quoted on a recognized over-the-counter market; and/or (iii) provisions necessary to ensure compliance with the Jones Act. Any such provisions will be reflected in the New Organizational Documents filed in the Plan Supplement.

On the Effective Date, the New Organizational Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

       **h.**       **Stockholders Agreement**

The Stockholders Agreement shall be effective as of the Effective Date and, as of the such date, shall be deemed to be valid, binding and enforceable in accordance with its terms, and the New Parent and each recipient of the New Common Stock or Warrants issued pursuant to the Plan shall be bound thereby without further action or signature. The New Organizational Documents will condition transfers of the Reorganized HGIM Equity upon such transferee becoming a party to the Stockholders Agreement. The Definitive Documentation governing the Warrants will condition receipt of Reorganized HGIM Equity pursuant to an exercise of the Warrants or any transfer of the Warrants upon such recipient or transferee becoming a party to the Stockholders Agreement.

       **i.**       **Directors and Officers of the Reorganized Debtors**

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire automatically, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. The initial New Parent Board shall consist of seven members, composed of: (i) Shane J. Guidry as the Chairman; (ii) one U.S. Citizen director appointed by Mr. Guidry, who shall be W. Steve Orlando; and (iii) five other Persons selected by the Required Restructuring Support Lenders, subject to compliance with the Jones Act (such that Reorganized HGIM Corp. is at all times eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade), including the requirement that no more than a minority of the number of directors necessary to constitute a quorum of the New Parent Board (and any committee thereof) shall be Non-U.S. Citizens.

All officers of New Parent (and, to the extent applicable, of all other Reorganized Debtors) shall be U.S. Citizens. On the Effective Date, New Parent will execute the CEO Employment Agreement and will execute the Management Employment Agreements, if applicable.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New

Parent Board, as well as those Persons that will serve as an officer of New Parent. To the extent any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

### j.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Warrants, in the name of and on behalf of New Parent or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

### k.    Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security (including, without limitation, of the New Common Stock and the Warrants) or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

### l.    Exemption from Registration Requirements

The offering, issuance, and distribution of the New Common Stock and the New Lender Warrants (and the New Common Stock issuable upon exercise thereof) pursuant to the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (a) the Securities Act and all rules and regulations promulgated thereunder and (b) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities. Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Lender Warrants issued under the Plan will be freely transferable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments, including, any restrictions on the transferability under the terms of the New Organizational Documents, the Stockholders Agreement (if any), or the New Lender Warrant Agreement; and (c) any other applicable regulatory approval. The equity and equity-linked interests associated with the Management Incentive Plan (including the MIP Warrants and the New Common Stock issuable upon exercise thereof) and the Shipyard Warrants (including the New Common Stock issuable upon exercise thereof) will be issued pursuant to an available exemption from registration under the Securities Act, including Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Stock, the New Lender Warrants, or the Shipyard Warrants to be held through the facilities of DTC (if such New Common Stock, New Lender Warrants, or Shipyard Warrants, respectively, are DTC-eligible at such time), then the Reorganized Debtors shall not be required to provide any further evidence other than the Plan and Confirmation Order with respect to the treatment of such applicable portion of the New Common Stock, New Lender Warrants, or Shipyard Warrants, as applicable, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the Warrants are exempt from registration.

### m.   Registration Rights Agreement

On the Effective Date, the Registration Rights Beneficiaries and Reorganized HGIM Corp. shall enter into a registration rights agreement in form and substance reasonably acceptable to (i) the Required Restructuring Support Lenders, (ii) the Registration Rights Beneficiaries, and (iii) Reorganized HGIM Corp. The registration rights agreement shall provide the Registration Rights Beneficiaries with customary registration rights.

### n.   Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.N of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

### o.   Director and Officer Liability Insurance

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each such D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

p.       **Management Incentive Plan**

i.       **Awards Under the Management Incentive Plan**

The Management Incentive Plan will be a comprehensive, long-term equity-based award plan that constitutes a portion of the go-forward compensation for the Reorganized Debtors' officers, directors, and employees. The Management Incentive Plan will be structured in a manner to minimize tax consequences to recipients of awards thereunder, subject to the reasonable consent of the Required Restructuring Support Lenders; *provided* that such tax structuring shall not result in incremental costs to the Debtors or Reorganized Debtors.

The Management Incentive Plan shall provide for the issuance of (i) equity-based awards, which may take the form of restricted stock units or other equity, granted immediately upon the Effective Date, in an aggregate amount equal to 3.00% of the total New Common Stock, on a fully-diluted basis, which shall vest quarterly over five years from issuance, and which shall not be diluted by the exercise of the Warrants; and (ii) three series of warrants, subject to dilution, which shall vest quarterly over five years from the Effective Date and, which shall be exercisable for a seven-year period commencing on the Effective Date, with (x) the first series of warrants exercisable into an aggregate amount equal to 6.00% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $750 million, (y) the second series of warrants exercisable into an aggregate amount equal to 2.50% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $1,000 million, and (z) the third series of warrants exercisable into an aggregate amount equal to 2.50% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $1,250 million.

Awards under the Management Incentive Plan shall be allocated such that Mr. Guidry shall receive or be allocated 87.00% of the total grants on the Effective Date. The remaining 13.00% of the total grants under the Management Incentive Plan shall be allocated to other members of management by the Chief Executive Officer and the HGIM Holdings Board of Directors, based on the Chief Executive Officer's recommendation on the Effective Date. All of the awards under the Management Incentive Plan will be issued on the Effective Date.

The Confirmation Order shall authorize the Reorganized Debtors to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.P of the Plan. The equity-based awards under the Management Incentive Plan shall dilute all of the Reorganized HGIM Equity.

ii.       **Issuance of the MIP Warrants**

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the MIP Warrants in accordance with the terms of the Plan and the MIP Warrant Agreement without the need for any further corporate action. All of the MIP Warrants, when so issued, shall be duly authorized, validly issued, and enforceable in accordance with the terms of the MIP Warrant Agreement. All of the New Common Stock underlying the MIP Warrants (upon payment of the exercise price in accordance with the terms of such MIP Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The MIP Warrants will be issued pursuant to the terms of the MIP Warrant Agreement. Each MIP Warrant will, subject to the terms of the MIP Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the MIP Warrant Agreement. The exercise price for the MIP Warrants shall be adjusted for distributions of cash, securities, or other assets to holders of New Common Stock, and the MIP Warrants shall benefit from other customary anti-dilution protections, all as more fully set forth in and as governed by the terms of the MIP Warrant Agreement.

q.       **Employee and Retiree Benefits**

The Debtors may enter the CEO Employment Agreement and the Management Employment Agreements, as set forth in the Restructuring Support Agreement and Disclosure Statement.

Except as otherwise provided in the Plan or the Plan Supplement and excluding the CEO Employment Agreement and Management Employment Agreements, all written employment, severance, retirement, and other

44

similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors, and any items approved as part of the Confirmation Order, retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors subject to the consent of the Required Restructuring Support Lenders, pursuant to the Plan and  if so assumed, shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided, however*, that each employee-related agreement or arrangement will be assumed as modified so as to clarify that the Chapter 11 Cases and the Restructuring Transactions will not constitute a "good reason," "change in control," or similar event; and *provided, further*, that none of the foregoing shall apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding any of the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### r.       Shipyard Contribution

#### i.       Contribution of Certain Shipyard Equity Interests

In connection with a settlement, pursuant to Bankruptcy Rule 9019, of all Claims and Causes of Action between the TJC Parties (or their Associated Entities), including any General Unsecured Claims, but excluding any Senior Lender Claims, and the Debtors (and their Associated Entities) in respect of the Shipyard, on the Effective Date, HGIM Group shall contribute its preferred units and common units in GCSG Holdings, LLC to debtor Harvey America (such contribution, the "*Shipyard Contribution*") pursuant to the Plan, the Confirmation Order, and the Shipyard Assignment Agreement.  As consideration for the Shipyard Contribution, (a) HGIM Group shall receive the Shipyard Consideration, and (b) the TJC Parties, the Shipyard, and each of their respective Associated Entities shall be Released Parties, Releasing Parties, and Exculpated Parties.  Notwithstanding anything to the contrary herein, the Shipyard Contribution and the settlement described in Article IV.R shall not affect the rights of any of the TJC Parties or their Associated Entities in their capacity as Lenders, and any of the TJC Parties and their Associated Entities that hold Allowed Senior Lender Claims shall be entitled to receive distributions pursuant to Article III.B.3 of the Plan on account of such Allowed Senior Lender Claims.

The assets of Harvey America shall vest in Reorganized Harvey America in accordance with Article IV.E of the Plan.  The assets and liabilities of the Shipyard shall be unaffected by the Shipyard Contribution, and the Exit Facility shall include provisions allowing the existing debt obligations of the Shipyard and the existing liens on any Shipyard assets, in each case as of the Effective Date, to remain in place on their existing terms.

#### ii.       Issuance of the Shipyard Warrants

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the Shipyard Warrants to HGIM Group in accordance with the terms of the Plan without the need for any further corporate action.  All of the Shipyard Warrants, when so issued, shall be duly authorized, validly issued, and valid, binding, and enforceable in accordance with the terms of the Shipyard Warrant Agreement.  All of the New Common Stock underlying the Shipyard Warrants (upon payment of the exercise price in accordance with the terms of such Shipyard Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The Shipyard Warrants will be issued pursuant to the terms of the Shipyard Warrant Agreement.  Each Shipyard Warrant will, subject to the terms of the Shipyard Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the Shipyard Warrant Agreement.

s.        **Payment of Fees and Expenses of the Agent**

The Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Agent and its advisors, including: Davis Polk & Wardwell LLP, PJT Partners LP, Holland & Knight LLP, as special maritime counsel, Haynes and Boone, LLP, as local counsel, and an insurance reviewer, without application to or approval of the Court, whether incurred prior to or after the Effective Date..

**C.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date, in each case, subject to the consent of the Required Restructuring Support Lenders.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Required Restructuring Support Lenders, alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three days' notice to the applicable non-Debtor counterparties.

**2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in any Proof of Claim to the contrary**. Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**3.      Cure of Defaults and Objections for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed and served on the Reorganized Debtors on or before 30 days after the Effective Date. If such Cure Claim dispute is not resolved within

46

7 days of the Reorganized Debtors' receiving such Cure Claim dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Court within 7 days. **Any such request and/or objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Court.** Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided, however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

4.      **Indemnification Obligations**

The Indemnification Obligations shall not be discharged or impaired by confirmation of the Plan and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Reorganized Debtors; *provided, however*, that the Reorganized Debtors shall not indemnify directors or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct. No assumption of an Indemnification Obligation shall in any way extend the scope or term of any Indemnification Obligation beyond that contemplated in the applicable agreement governing such Indemnification Obligation. Notwithstanding anything to the contrary herein, any indemnification or reimbursement provision under the Credit Agreement that is expressly stated to survive any repayment under, or termination of, the Credit Agreement shall survive any cancellation or discharge under this Plan in accordance with its terms, and any rights that the Agent may have under the agency provisions of the Credit Agreement shall survive any such cancellation or discharge.

5.      **Insurance Policies**

All of the Debtors' insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

6.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements

47

that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Required Restructuring Support Lenders, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.        Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8.        Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9.        Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

### D.        Provisions Governing Distributions

### 1.        Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder or Permitted Designee, as applicable, of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class; *provided, however,* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the

48

provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.        Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent (which, for the avoidance of doubt, shall not be the Agent) on the Effective Date, or as soon as reasonably practicable thereafter.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims and Interests as of the Distribution Record Date, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.

### 3.        Rights and Powers of Disbursing Agent

####         a.        Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

####         b.        Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Court, and to the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 4.        Delivery of Distributions and Unclaimed Property

####         a.        Delivery of Distributions

#####                 i.        Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, the Agent, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors, the Reorganized Debtors, the Agent, and the Disbursing Agent, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

#####                 ii.        Delivery of Distributions in General

Except as otherwise provided herein, distributions to holders or Permitted Designees, as applicable, of an Allowed Claim or Interest shall be made to the holders of record as of the Distribution Record Date by the Disbursing Agent as follows:  (1) at the address set forth in the Debtors' or Reorganized Debtors' books and records; (2) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors after the Effective Date; or (3) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

<div align="center">49</div>

In the event that any distribution to any holder or Permitted Designee is returned as undeliverable, no further distributions shall be made to such holder or such Permitted Designee unless and until the Disbursing Agent is notified in writing of such holder's or Permitted Designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or Permitted Designees, as applicable, of undeliverable distributions.

### iii.    Delivery of Distributions to Lenders

Any and all distributions to holders of Senior Lender Claims as of the Distribution Record Date shall be governed by the Credit Agreement.  The Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within a reasonable time period following the Distribution Record Date, but not later than five Business Days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Senior Lender Claims as of the Distribution Record Date, including the address on file for each such holder and the amount of principal and accrued interest of Senior Lender Claims held by each such holder.

### iv.    Distributions of New Common Stock and New Lender Warrants

All New Common Stock, and New Lender Warrants to be distributed pursuant to the Plan shall be issued in the names of such holders, their nominees of record, or their Permitted Designees as of the Distribution Record Date in accordance with DTC's book-entry exchange procedures and other customary practices if such New Common Stock and New Lender Warrants are DTC-eligible and permitted to be held through DTC's book-entry system.  If the New Common Stock or New Lender Warrants are not eligible for distribution in accordance with DTC's book-entry exchange procedures and other customary practices, then Reorganized HGIM Corp. will, and if on or prior to the Effective Date, in consultation with the Required Restructuring Support Lenders, take such reasonable actions as may be required to cause distributions of the New Common Stock and the New Lender Warrants under the Plan using, if requested by the Required Restructuring Support Lenders, a transfer agent appointed by Reorganized HGIM Corp. and such transfer agent's customary book-entry procedures.  No distributions will be made other than through DTC if the New Common Stock and the New Lender Warrants are permitted to be held through DTC's book-entry system. Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date shall be forfeited.

### b.    Minimum Distributions

No fractional shares of New Common Stock or New Lender Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or New Lender Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Lender Warrants shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock and New Lender Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Reorganized Debtors or their property.

### c.    Unclaimed Property

In the event that any distribution is returned as undeliverable or is unclaimed, such distribution shall remain in the Debtors' possession until such time as a distribution becomes deliverable or such holder or Permitted Designee, as applicable, accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such

distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of attempted distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

5.       **Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors or the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

6.       **Allocations**

Each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion.

7.       **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

8.       **Setoffs and Recoupment**

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the holder of such Allowed Claim.

9.       **Claims Paid or Payable by Third Parties**

a.       **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to Debtors or the Reorganized Debtors, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

US 5252960

### b.        Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

### c.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## E.        Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.        Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file Proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (a) Proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors and (b) Proofs of Claim that have been objected to by the Debtors before the Effective Date, any Proof of Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn upon the Effective Date.  To the extent not otherwise provided in the Plan, the deemed withdrawal of a Proof of Claim is without prejudice to such claimant's rights, from and after the Effective Date, to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 2.        Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Court, shall together have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

### 3.        Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court

US 5252960

estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

    **4.**       **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

    **5.**       **Disallowance of Claims**

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

    **6.**       **No Distributions Pending Allowance**

No payment or distribution provided under the Plan shall be made to the extent that any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII of the Plan, unless and until such Disputed Claim becomes an Allowed Claim; *provided that* any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

    **7.**       **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

    **8.**       **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest.

US 5252960

**F.**     **Settlement, Release Injunction, and Related Provisions**

**1.**     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.   The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**2.**     **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

**3.**     **Term of Injunctions or Stays**

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

**4.**     **Release of Liens**

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), or in any other contract, instrument, agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized**

54

Debtors.  In addition, to the extent applicable, at the Debtors' or Reorganized Debtors' sole expense, the Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors, or the administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

> 5.      **Releases by the Debtors**

> Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, each Released Party[18] is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Credit Agreement, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, Q-LNG, the Q-LNG Modifications, the Shipyard, the Shipyard Contribution, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in Article VIII.E of the Plan do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions; and (ii) nothing in Article VIII.E of the Plan shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

> Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and

---

[18]      "Released Party" means each of the following solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Agent; (d) the Secured Parties; (e) the Lenders; (f) Q-LNG; (g) the Shipyard; (h) the TJC Parties; and (i) with respect to each of the foregoing parties under (a) through (h), such Entity and its Associated Entities.

US 5252960

opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

6.      **Releases by Holders of Claims and Interests**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Credit Agreement, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, Q-LNG, the Q-LNG Modifications, the Shipyard, the Shipyard Contribution, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that except as expressly provided under the Plan, the foregoing releases shall not release obligations arising under agreements among the Releasing Parties and the Released Parties other than the Debtors. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in Article VIII.F of the Plan do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions; and (ii) nothing in Article VIII.F of the Plan shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in Article VIII.F of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring Transactions; and (7) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

Any Holder entitled to vote on the Plan, as described in Section I.E of this Disclosure Statement, that: (i) votes to accept the Plan; (ii) votes to reject the Plan but does not affirmatively opt out of the releases described in the Plan; or (iii) abstains from voting on the Plan but does not affirmatively opt out of the releases described in the Plan, is automatically deemed to have accepted the release provisions in Article VIII of the Plan and be a Releasing Party in accordance with the terms of the Plan.

7.      **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation,

US 5252960

suit, judgment, damage, demand, loss, liability, or remedy for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in- or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.       **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

9.       **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11

Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 10. Recoupment

In no event shall any holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 11. Subordination Rights

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### 12. Reimbursement or Contribution

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### G. Conditions Precedent to Confirmation and Consummation of the Plan

### 1. Conditions Precedent to the Confirmation Date

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

a. the Restructuring Support Agreement shall not have been breached or terminated and shall remain in full force and effect;

b. an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court;

c. the Q-LNG Agreements shall be in form and substance agreed by the parties thereto, the Debtors, and the Required Restructuring Support Lenders;

d. the CEO Employment Agreement shall be in form and substance agreed by Shane J. Guidry, the Debtors, and the Required Restructuring Support Lenders;

e. the Confirmation Order shall have been entered by the Court in form and substance reasonably acceptable to the Debtors and the Required Restructuring Support Lenders; and

f. the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, shall have been Filed subject to the terms hereof.

58

US 5252960

2.        **Conditions Precedent to the Effective Date**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

a.        the Confirmation Order shall have been entered and the Confirmation Order shall have become a Final Order that has not been stayed, modified, or vacated on appeal;

b.        the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance reasonably acceptable to the Debtors and the Required Restructuring Support Lenders;

c.        the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

d.        the Q-LNG Agreements shall have been executed and delivered by all of the Entities that are parties thereto, and any other actions necessary to effectuate the Q-LNG Modifications shall have been taken;

e.        the CEO Employment Agreement shall have been effected or executed in accordance with the terms hereof and in accordance with the Restructuring Support Agreement;

f.        the Shipyard Assignment Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and any other actions necessary to effectuate the Shipyard Contribution shall have been taken;

g.        all other Definitive Documentation shall have been effected or executed in accordance with the terms of the Plan and in accordance with the Restructuring Support Agreement;

h.        all conditions precedent to the issuance of the New Common Stock and the Warrants, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

i.        the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions;

j.        all required governmental and third-party approvals and consents, including Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

k.        all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Facility Documents); and

US 5252960

l.       all Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Escrow Account shall have been funded in the Professional Fee Reserve Amount.

### 3.      Waiver of Conditions

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan may be waived only by the Debtors, with the consent of the Required Restructuring Support Lenders (at their sole discretion), without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

### 4.      Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### 5.      Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## H.      Modification, Revocation, or Withdrawal of the Plan

### 1.      Modification and Amendments

Subject to the limitations contained herein, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

### 2.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3.      Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor

Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

**I.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors (with the consent of the Required Restructuring Support Lenders) or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V of the Plan, the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      ensure that distributions to holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5.      hear and determine all disputes related to any determination by HGIM Corp. as to the acceptance, non-acceptance, or rejection of any U.S. Citizen Certification as reasonable proof establishing that any holder of a Senior Lender Claim (or its Permitted Designee(s)) is a U.S. Citizen under the Jones Act;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

10.     enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan or the Restructuring Support Agreement;

US 5252960

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I.1 of the Plan;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring Transactions;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

**J.**     **Miscellaneous Provisions**

    **1.**     **Immediate Binding Effect**

Subject to Article IX.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.   All Claims and debts shall be as fixed, adjusted, or

US 5252960

compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

**2.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**3.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

**4.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**5.      Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| **Debtors or Reorganized Debtors** | **HGIM Corp.**<br>701 Poydras Street<br>Suite 3700<br>New Orleans, Louisiana 70139<br>Attn:    Robert A. Vosbein, Jr. |
| **Proposed Attorneys for the Debtors** | **Vinson & Elkins LLP**<br>First City Tower<br>1001 Fannin, Suite 2500<br>Houston, Texas 77002-6760<br>Attn:    Harry A. Perrin and Garrick C. Smith<br><br>*and*<br><br>**Vinson & Elkins LLP**<br>666 Fifth Avenue, 26th Floor<br>New York, New York 10103-0040<br>Attn:  David S. Meyer, Jessica C. Peet, and Lauren R. Kanzer |
| **United States Trustee** | **Office of the United States Trustee<br>for the Southern District of Texas**<br>515 Rusk Street, Suite 3516 |

US 5252960

Houston, Texas 77002

**Counsel to the Agent**                **Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, New York 10017
Attn:    Damian S. Schaible and Angela M. Libby

**6.        Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**7.        Entire Agreement**

Except as otherwise indicated, on the Effective Date, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**8.        Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/harveygulf or the Court's website at www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

**9.        Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Required Restructuring Support Lenders. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Required Restructuring Support Lenders' consent; and (3) nonseverable and mutually dependent.

**10.       Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Agent, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

11.     **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

12.     **Waiver or Estoppel**

Except with respect to the Restructuring Support Agreement and the parties thereto, each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

## V.     CONFIRMATION PROCEDURES

A.     **Statutory Requirements for Confirmation for the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  Among the requirements for the Confirmation of the Plan are that the Plan: (i) is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of holders of Claims.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan was proposed in good faith.

1.     **Best Interests of Creditors Test and Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either: (i) has accepted the plan; or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.  This requirement is often referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and Interests under the Plan.

Attached hereto as **Exhibit D** and incorporated herein by reference is the Liquidation Analysis prepared by the Debtors with the assistance of Blackhill, the Debtors' investment banker.  The Liquidation Analysis provides the Debtors analysis with respect to liquidations of each of: HGIM Holdings and its Debtor affiliates.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in significantly less value for holders of Claims and Interests as compared to the distributions contemplated under the Plan.  Consequently, the Debtors believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

> **ANY LIQUIDATION ANALYSIS IS SPECULATIVE,
> AS IT IS NECESSARILY PREMISED ON ASSUMPTIONS
> AND ESTIMATES WHICH ARE INHERENTLY SUBJECT
> TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES, MANY
> OF WHICH WOULD BE BEYOND THE CONTROL OF THE DEBTORS.  THE
> LIQUIDATION ANALYSIS IS SOLELY FOR THE PURPOSE OF DISCLOSING TO
> HOLDERS OF CLAIMS AND INTERESTS THE EFFECTS OF A HYPOTHETICAL CHAPTER 7
> LIQUIDATION OF THE DEBTORS, SUBJECT TO THE ASSUMPTIONS SET FORTH THEREIN.**
>
> **THERE CAN BE NO ASSURANCE
> AS TO VALUES THAT WOULD ACTUALLY BE REALIZED IN A CHAPTER
> 7 LIQUIDATION NOR CAN THERE BE ANY ASSURANCE THAT A BANKRUPTCY COURT
> WILL ACCEPT THE DEBTORS' CONCLUSIONS OR CONCUR WITH SUCH ASSUMPTIONS
> IN MAKING ITS DETERMINATIONS UNDER SECTION 1129(A)(7) OF THE BANKRUPTCY CODE.**

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

For purposes of determining whether the Plan meets this requirement, the Debtors, with the assistance of Blackhill, have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared a consolidated income statement, which includes the consolidated, projected, unaudited financial statement information of the Reorganized Debtors for the five-year period ending December 31, 2022.  The Financial Projections are based on an assumed Effective Date of April 30, 2018.  To the extent that the Effective Date occurs before or after April 30, 2018, recoveries on account of Allowed Claims could be impacted.  Creditors and other interested parties should review Section VI of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe they will be a viable operation following the Chapter 11 Cases and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or Interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the Plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the Plan.  Thus, a class of claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### 4.    Additional Requirements for Nonconsensual Confirmation

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided that* the plan has been accepted by at least one impaired class.  Pursuant to

US 5252960

section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or Interests that is Impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan document, including the right to amend or modify the Plan document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### a.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.

### b.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and requires: (i) that no class of claims receive more than 100% of the allowed amount of the claims in such class; and (ii) that no holder of any claim or interest that is junior in priority to a dissenting creditor receive or retain any property under the plan on account of such junior claim or interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### c.      Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The valuation analyses are set forth in **Exhibit F** attached hereto (the "*Valuation Analysis*") and incorporated herein by reference.

## B.      Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the primary alternatives to the Plan are: (i) the preparation and presentation of an alternative plan of reorganization; (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### 1.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The

US 5252960

Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

Furthermore, as set forth in Section II.D.5 above, upon the occurrence of the Restructuring Toggle, the Required Restructuring Support Lenders and the Debtors may agree to: (i) seek confirmation of the Plan, as modified as described in Section VI.A.10 of this Disclosure Statement; or (ii) pursue an alternative transaction(s) and/or process to implement the Restructuring other than that which is contemplated by the Plan.

### 2.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Class 3 would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Class 3 would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Class 4.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan, especially given the challenges facing the offshore supply boat and service sector in light of the prolonged market downturn.

Furthermore, as set forth in Section II.D.5 above, upon the occurrence of the Restructuring Toggle, the Required Restructuring Support Lenders and the Debtors may agree to: (i) seek confirmation of the Plan, as modified as described in Section VI.A.10 of this Disclosure Statement; or (ii) pursue an alternative transaction(s) and/or process to implement the Restructuring other than that which is contemplated by the Plan, including an asset sale under section 363 of the Bankruptcy Code.

### 3.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.  As noted in Section V.A.1 of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases, and because of the challenges facing the offshore supply boat and service sector in light of the prolonged market downturn.

### C.      Contact for More Information

Any interested party desiring further information about the Plan can contact legal counsel to the Debtors, by: (i) writing to Vinson & Elkins LLP 666 Fifth Avenue, 26th floor,  New York, New York 10103-0040, Attention: Harvey Gulf; or (ii) calling Jessica Peet at (212) 237-0108.

## VI.      CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The risk factors below should not be regarded as the only risks associated with the Debtors' businesses or the Plan and its implementation.

US 5252960

A.      **Certain Bankruptcy Law Considerations**

1.      **General**

While the Debtors believe that, as set out in the RSA, the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the RSA is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure the parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' ability to develop and execute their business plan, their financial condition, and their liquidity.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

2.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or Interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.      **The Conditions Precedent to the Confirmation Date and/or Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

4.      **The Debtors May Fail to Satisfy Voting Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

5.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

US 5252960

6. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

7. **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the Plan; and (iii) the value of distributions to nonaccepting holders of claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

8. **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

9. **Risk of Termination of the Restructuring Support Agreement**

The RSA contains certain provisions that give the Required Restructuring Support Parties the ability to terminate the RSA if various conditions are satisfied, such as the failure to meet the proposed milestones or the

conversion of one or more of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code. Should a termination event occur, all obligations of the Restructuring Support Parties under the RSA will terminate (except that any party's termination solely with respect to itself will not result in the termination of the RSA with respect to any other party) and Restructuring Support Parties will be entitled to cast new votes (or, in the case of a termination solely with respect to a Restructuring Support Party, such Restructuring Support Party will be entitled to cast a new vote).. Termination of the RSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, employees, and major customers.

If the RSA is terminated solely with respect to the TJC Parties in accordance with the terms thereof and the Shipyard Contribution is not consummated, the Plan may be modified to incorporate the following revisions (collectively, the "**_Shipyard Settlement Modifications_**"):

- the Shipyard Settlement (including the Shipyard Contribution and the Shipyard Assignment Agreement) shall not be consummated;

- the Debtors shall not be required to consult with the TJC Parties in selecting the Effective Date;

- the Shipyard Entities and the TJC Parties shall not be Exculpated Parties, unless otherwise consented to by the Required Restructuring Support Lenders, which consent, if any, shall be disclosed prior to the Confirmation Hearing;

- the Shipyard Entities, the TJC Parties and their respective Associated Entities shall not be Released Parties, unless otherwise consented to by the Required Restructuring Support Lenders, which consent, if any, shall be disclosed prior to the Confirmation Hearing;

- the Shipyard Entities, the TJC Parties and their respective Associated Entities shall not be Releasing Parties, unless otherwise consented to by the Shipyard Entities or the TJC Parties, respectively, which consent, if any, shall be disclosed prior to the Confirmation Hearing; and

- the Shipyard Entities, the TJC Parties, and their respective Associated Entities shall be deemed to have reserved all of their respective rights, including to pursue any and all General Unsecured Claims.

Additionally, if the RSA has been terminated solely with respect to the TJC Parties, the RSA may be terminated by the Required Restructuring Support Lenders if the Debtors fail to file a pleading disputing, objecting to the allowance of, and/or moving to subordinate any claims asserted by the TJC Parties within five business days following a request in writing by the Required Restructuring Support Lenders to file such objection.

If the Plan is modified solely to incorporate the Shipyard Settlement Modifications, and/or the Restructuring Toggle Modifications described in Section VI.A.10 below, the Debtors may not resolicit votes on the Plan, and a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as modified by the Shipyard Settlement Modifications and/or the Restructuring Toggle Modifications. If the Restructuring Support Agreement has been terminated solely with respect to the TJC Parties, then, on or prior to the Effective Date, Shane J. Guidry shall execute an agreement with Reorganized HGIM Corp., in form and substance reasonably acceptable to the Debtors, the Required Restructuring Support Lenders, and Mr. Guidry, which provides, among other things, that Mr. Guidry will grant Harvey America a proxy (irrevocable for the Proxy Period) to vote Mr. Guidry's common units in GCSG Holdings, LLC on any Shipyard matters requiring a vote of the common unitholders.

### 10. Risk of Restructuring Toggle

While the Debtors hope that the Management Document Milestone is achieved, there can be no assurances that the Management Document Milestone will be achieved. If the Management Document Milestone is not achieved the Agent (on behalf of the Restructuring Support Lenders) may send notice to the Debtors of a failure to reach the Management Document Milestone, which would trigger the Restructuring Toggle. Upon occurrence of such Restructuring Toggle: (i) the Required Restructuring Support Lenders may request that a CRO be appointed. The identity of any CRO and the scope of any CRO's duties must be mutually agreed upon by the Debtors and the Required

US 5252960

Restructuring Support Lenders; (ii) the Plan may be modified as summarized below; and/or (iii) the Required Restructuring Support Lenders and the Debtors may agree to pursue an alternative transaction(s) and/or process to implement the Restructuring than that which is contemplated by the Plan.  Furthermore, if the Management Document Milestone is not achieved, the RSA may terminate according to its terms.  For risk factors associated with the risk of termination of the RSA please refer to Section VI.A.9 herein.

If the Restructuring Toggle occurs, the Plan may be modified to incorporate the following revisions (collectively, the "***Restructuring Toggle Modifications***"):

- Q-LNG and Mr. Guidry shall not be Exculpated Parties, unless otherwise consented to by the Required Restructuring Support Lenders, which consent, if any, shall be disclosed prior to the Confirmation Hearing;

- Q-LNG and Mr. Guidry shall not be Released Parties, unless otherwise consented to by the Required Restructuring Support Lenders, which consent, if any, shall be disclosed prior to the Confirmation Hearing;

- Q-LNG and Mr. Guidry shall not be Releasing Parties, unless otherwise consented to by Q-LNG and Mr. Guidry, respectively, which consent, if any, shall be disclosed prior to the Confirmation Hearing;

- the initial post-emergence board of directors of New Parent shall consist solely of five Persons selected by the Required Restructuring Support Lenders;

- none of the terms set forth in Article IV.O of the Plan or described in any Plan Supplement filed prior to the Restructuring Toggle shall be binding, and the Management Incentive Plan, if any, shall instead be set forth in the Plan Supplement in form and substance acceptable to the Debtors and the Required Restructuring Support Lenders;

- the Debtors and Mr. Guidry shall not execute the Shipyard Proxy Document; and

- the conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan that pertain to the Q-LNG Agreements and the CEO Employment Agreement shall be waived.

Additionally, if the Restructuring Toggle has occurred, the RSA may be terminated by the Required Restructuring Support Lenders if the Debtors fail to file a pleading disputing, objecting to the allowance of, and/or moving to subordinate any claims asserted by Mr. Guidry within five business days following a request in writing by the Required Restructuring Support Lenders to file such objection.

If the Plan is modified solely to incorporate the Restructuring Toggle Modifications and/or the Shipyard Settlement Modifications described in section VI.A.9 above, the Debtors may not resolicit votes on the Plan, and a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as modified by the Restructuring Toggle Modifications and/or the Shipyard Settlement Modifications

Alternatively, if the Restructuring Toggle occurs, the Plan, including the treatment of creditors and prepetition equity holders thereunder described in this Disclosure Statement, may not be consummated, and the treatment of creditors and prepetition equity holders may be modified significantly.  In addition, there can be no assurances that the Debtors and the Restructuring Support Lenders will be able to agree on the appointment of a CRO or an alternative transaction(s) and/or process to implement the Restructuring.

**11.    Conversion into Cases under Chapter 7 of the Bankruptcy Code**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7

US 5252960

of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.  See the Liquidation Analysis attached hereto as **Exhibit D** for further discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

**B.      Additional Factors Affecting the Value of the Reorganized Debtors**

      **1.      The Total Amount of Claims Could Be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than what the Debtors have estimated, which, in turn, could cause the value of distributions to be reduced substantially.

      **2.      Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains:  (i) estimates and assumptions which might ultimately prove to be incorrect; and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**C.      Risks Relating to the Debtors' Business and Financial Condition**

      **1.      Risks Associated with the Debtors' Business and Industry**

The Debtors operate in a market that is highly dependent on the commodities market.  Even in a more favorable commodity pricing climate, prices for crude oil and natural gas are highly volatile and extremely sensitive to the respective supply/demand relationship for crude oil and natural gas.  The significant decline in crude oil and natural gas prices that began in 2014 caused many E&P companies to significantly reduce drilling, completion and other production activities.  Many factors affect the supply of and demand for crude oil and natural gas and, therefore, influence prices of these commodities.

Other risks include:  (i) oversupply of vessels available to service customer base; (ii) a significant amount of Debtors' revenue is derived from a relatively small number of customers; (iii) risk of incurring losses or impairments related to vessels; and (iv) risks relating to vessel construction and maintenance programs.

      **2.      High Level of Competition in the Offshore Marine Service Industry**

The Debtors operate and the Reorganized Debtors will operate in a highly competitive industry, which could depress charter and utilization rates and adversely affect their financial performance.  The Debtors compete for business with their competitors on the basis of:  price; reputation for quality service; quality, suitability, and technical capabilities of vessels; availability of vessels; safety and efficiency; cost of mobilizing vessels from one market to a different market; and national flag preference.  In addition, competition in international markets may be adversely affected by regulations requiring, among other things, local construction, flagging, ownership or control of vessels, the awarding of contracts to local contractors, the employment of local citizens, and/or the purchase of supplies from local vendors.

3.        **Challenging Macroeconomic Conditions**

Uncertainty about future global economic market conditions makes it challenging to forecast operating results and to make decisions about future investments.  The success of the Reorganized Debtors' businesses is both directly and indirectly dependent upon conditions in the global financial and credit markets that are outside of the Reorganized Debtors' control and difficult to predict.  Uncertain economic conditions may lead the Reorganized Debtors' customers to postpone capital spending in response to tighter credit and reductions in customers' income or asset values.  Similarly, when lenders and institutional investors reduce, and in some cases, cease to provide funding to corporate and other industrial borrowers, the liquidity and financial condition of the Reorganized Debtors and their customers can be adversely impacted.  Factors such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation), trade barriers, commodity prices, currency exchange rates and controls, and national and international political circumstances (including wars, terrorist acts, security operations, and seaborne refugee issues) can have a material negative effect on the Reorganized Debtors' business, revenues, and profitability.

4.        **Liquidity During and After the Chapter 11 Cases**

Although the Debtors lowered their capital budget and reduced the scale of their operations significantly, their business remains capital intensive.  In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors believe that they will have sufficient cash on hand and cashflow from operations to continue to fund the Reorganized Debtors' operations after emergence from chapter 11.

The Debtors current liquidity may not be sufficient to allow the Debtors to satisfy their obligations related to the Chapter 11 Cases, proceed with the confirmation of a chapter 11 plan of reorganization, and/or emerge from bankruptcy.  While the Debtors have an agreement in principal with the Steering Committee on the terms of the Exit Facility, the Debtors can provide no assurance that they will be able to secure interim financing or exit financing, if needed, to meet their liquidity needs or, if sufficient funds are available, that any financing offered to the Debtors will be on terms acceptable to the Debtors.

5.        **Adverse Effect of Failure to Comply with the Jones Act**

Because the Debtors own and operate U.S.-flag vessels in the U.S. coastwise trade, they are subject to the Jones Act.  Under the Jones Act, at least 75% of the outstanding shares of each class or series of capital stock must be owned and controlled by U.S. Citizens.  The Company will be responsible for monitoring the ownership by Non-U.S. Citizens of its capital stock and the Interests in its subsidiaries that own U.S.-flag vessels to ensure compliance with the citizenship requirements of the Jones Act.  After the Effective Date, if the Reorganized Debtors do not continue to comply with such requirements, they would be prohibited from operating their U.S.-flag vessels in U.S. coastwise trade, may incur severe penalties, such as fines and/or forfeiture of such vessels.  Under certain circumstances unlikely to apply to the Debtors' vessels (such as a deliberate sale to a foreign corporation, redocumenting a vessel as a non-U.S. flag vessel, or rebuilding the vessel outside the United States), a vessel could permanently lose its U.S. coastwise trading privileges.

6.        **Post-Effective Date Indebtedness**

Following the Effective Date, the Reorganized Debtors will have significantly reduced their outstanding secured indebtedness, but will still have debt outstanding under the Exit Facility.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

**D.      Factors Relating to Securities to Be Issued Under the Plan**

**1.      Market for Securities**

A liquid trading market for the New Common Stock and New Lender Warrants is unlikely to develop.  As of the Effective Date, the New Common Stock and New Lender Warrants will not be listed for trading on any stock exchange or trading system and the Reorganized Debtors will not file any reports with the SEC.  Consequently, the trading liquidity of such securities will be limited as of the Effective Date.  The future liquidity of the trading market for such securities will depend, among other things, upon the number of holders of these securities, whether these securities become listed for trading on an exchange or trading system at some future time and whether the Reorganized Debtors begin to file annual and quarterly reports with the SEC.

Furthermore, Persons to whom the New Common Stock or New Lender Warrants are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis.  Accordingly, any market that does develop for such securities may be volatile.  Non-U.S. Citizens who receive New Lender Warrants may also be unable to exercise their New Lender Warrants, or have their requested exercise of their New Lender Warrants significantly delayed, because of the restrictions on aggregate ownership of the New Common Stock by Non-U.S. citizens.

**2.      Potential Dilution**

The ownership percentage represented by the Reorganized HGIM Equity distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Plan and the exercise of any New Lender Warrants issued under the Plan, as well as the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors could adversely affect the value of the Reorganized HGIM Equity issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

**3.      Interests Subordinated to the Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock and New Lender Warrants (and the New Common Stock issuable upon exercise thereof) would rank below all debt claims against the Reorganized Debtors.  As a result, holders of New Common Stock or New Lender Warrants will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

**4.      Implied Valuation of Reorganized HGIM Equity Not Intended to Represent the Trading Value of the Reorganized HGIM Equity**

The valuation of the Reorganized Debtors is not intended to represent the trading value of Reorganized HGIM Equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the Reorganized HGIM Equity is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the Reorganized HGIM Equity to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the Reorganized HGIM Equity in the public or private markets.

E.        **Additional Factors**

    1.        **The Debtors Could Withdraw the Plan**

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

    2.        **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

    3.        **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

    4.        **No Legal or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of Claims or Interests should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

    5.        **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

    6.        **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Section VIII hereof.

**VII.        IMPORTANT SECURITIES LAW DISCLOSURE**

The Plan provides for the offer, sale or distribution of the New Common Stock and New Lender Warrants. The Debtors believe that the New Common Stock and New Lender Warrants are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable Blue Sky Law.  Prior to the filing of the Chapter 11 Cases, the Debtors will rely on the exemptions from registration requirements provided by the Securities Act, including section 4(a)(2) thereof, to the extent section 1145 of the Bankruptcy Code is not available, and after the filing of the Chapter 11 Cases, the Debtors expect to rely on the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and applicable Blue Sky Law.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for Cash.

In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered or sold under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a Reorganized Debtor or its successor may be deemed to be a "controlling" person of such Reorganized Debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the Reorganized Debtor's or successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor that owns 10% or more of a class of voting securities of a Reorganized Debtor may be presumed to be a "controlling" person and, therefore, an underwriter.

To the extent that persons who receive the New Common Stock or New Lender Warrants are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those persons would, however, be permitted to sell New Common Stock or New Lender Warrants (or other securities) without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.  Whether any particular person would be deemed an "underwriter" (including whether such person is a "controlling" person) with respect to the New Common Stock or New Lender Warrants would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock or New Lender Warrants and, in turn, whether any Person may freely resell the New Common Stock or New Lender Warrants.

> **YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER."**

Under certain circumstances, holders of New Common Stock or New Lender Warrants deemed to be "underwriters" may be entitled to resell their securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available and in compliance with applicable Blue Sky Law.  Generally, these rules permit the public sale of such securities if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

## VIII.        CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtors and to the beneficial owners of Claims (each a "***Holder***") entitled to vote on the Plan.

This discussion is based on the Internal Revenue Code, the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect.  Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any Holder of a Claim or Interest.  The Debtors will not seek a ruling from the Internal Revenue Service (the "***IRS***") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any Holder of a Claim or Interest.  No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.  This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), the Medicare tax on net investment income or the tax consequences arising under the laws of any foreign, state, local or other jurisdiction or any income tax treaty.

This discussion does not apply to Holders of Claims that are not U.S. persons for U.S. federal income tax purposes or that are otherwise subject to special treatment under the Internal Revenue Code, including, for example, financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; certain former U.S. citizens or long-term residents; U.S. persons who hold their Claims or will hold New Common Stock or Takeback Term Loans through foreign financial entities or other foreign entities; persons who hold Claims or Interests as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons who received their Claims upon exercise of employee options or otherwise as compensation; persons who acquire New Common Stock in the secondary market; and holders not entitled to vote on the Plan.  The following discussion assumes that Holders hold their Claims or Interests as "capital assets" (as defined in section 1221 of the Internal Revenue Code).

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim or Interest entitled to vote on the Plan that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or a trust: (i) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust; or (ii) that has made a valid election under applicable U.S. Treasury regulations to be treated as a United States person.

THE FOLLOWING DISCUSSION OF CERTAIN
U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL
PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON
THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS
OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS
FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE
PLAN.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

As of December 31, 2017, the Debtors' consolidated U.S. NOL carryover was estimated to be approximately $720.7 million for U.S. federal tax reporting purposes, and $51.8 million for state tax reporting purposes.

Although the Debtors do not believe that these NOL carryforwards and other tax attributes are currently subject to limitation under section 382 of the Internal Revenue Code, subsequent trading activity and certain other actions prior to the Effective Date could result in an ownership change of the Debtors independent of the Plan which could adversely affect the ability to use any NOL carryforwards and/or other tax attributes remaining after implementation of the Plan. Accordingly, in an attempt to minimize the likelihood of such an ownership change occurring, the Debtors filed for a protective trading order at the inception of the Chapter 11 Cases.  *See* discussion at Section III.C.7.

**1.      Cancellation of Debt and Reduction of Tax Attributes**

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for U.S. federal income tax purposes) generally will give rise to cancellation of indebtedness ("**COD**") income that must be included in a debtor's income, subject to certain exceptions.  In particular, under section 108 of the Internal Revenue Code, COD income will be excluded from a debtor's income if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, a debtor is under a court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by a court (the "***Bankruptcy Exception***"). The Debtors expect that the consummation of the Plan will produce a significant amount of COD income.

Under the Internal Revenue Code, a debtor that excludes COD income from income under the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount.  Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards attributable to a debtor, attributes that arose in separate return limitation years of a debtor and a debtor's tax basis in its assets (including stock of subsidiaries).  A debtor's tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness.  A debtor with COD income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code.  The reduction in tax attributes with respect to COD income does not occur until after the determination of the debtor's income or loss for the taxable year in which the COD income is incurred.  Any excess COD income over the amount of available tax attributes is not subject to U.S. federal income tax.

The Debtors expect that their NOLs and other tax attributes will be substantially reduced or eliminated as a result of the Debtors' excluded COD income.  However, the exact amount of excluded COD income, and the resulting tax attribute reduction amount, will depend in part on:  (i) the fair market value of the New Common Stock, the New Lender Warrants and the Takeback Term Loans issued under the Exit Facility, which cannot be known with certainty as of the date of this Disclosure Statement; and (ii) the manner in which the Restructuring Transactions are implemented.

**2.      Limitation of NOL Carryforwards and Other Tax Attributes**

Section 382 of the Internal Revenue Code generally imposes an annual limitation on the use of NOLs, built-in losses and certain other tax attributes if a corporation with NOLs (a "***Loss Corporation***") undergoes an "ownership change." In general, an ownership change occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five-percent shareholders" increases by more than 50 percentage points over the lowest percentage of value owned by the five-percent shareholders at any time during the applicable testing period.

The testing period generally is the shorter of:  (i) the three-year period preceding the testing date; or (ii) the period of time since the most recent ownership change of the corporation.  The Debtors expect that the consummation of the Plan will result in an ownership change on the Effective Date.  If a Loss Corporation undergoes an ownership change under section 382 of the Internal Revenue Code, the amount of its pre-ownership change NOLs and/or built-in losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  In general, the amount of the annual limitation on a Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) is equal to the product of the long-term tax-exempt rate in effect on the date of the ownership change and the value of the Loss Corporation's outstanding stock immediately before the ownership change, which value is determined under special rules if the ownership change occurs in a case brought under the Bankruptcy Code (the "**Section 382 Limitation**").

In certain cases, however, unless the corporation elects otherwise, a special exception under section 382(l)(5) of the Internal Revenue Code will prevent application of the annual limitation provided that at least 50% of the stock of a debtor is owned by the shareholders and certain qualified creditors immediately following the reorganization.  Under this rule, NOL carryforwards would be subject to a one-time reduction, and a second ownership change within two years following the first ownership change would eliminate the debtor's ability to utilize any NOLs from periods before the first ownership change.  A debtor may elect not to apply section 382(l)(5) to an ownership change that otherwise satisfies its requirements.  This election must be made on the debtor's federal income tax return for the taxable year in which the ownership change occurs.

If the exchanges contemplated by the Plan do not qualify under section 382(l)(5) or if the Reorganized Debtors elect not to use that provision, the Reorganized Debtors' use of their NOLs to offset taxable income earned after consummation of the Plan will be subject to the Section 382 Limitation.  However, in that case, section 382(l)(6) of the Internal Revenue Code provides that the value of the Reorganized Debtors' stock, for the purpose of calculating its Section 382 Limitation, generally will be determined by reference to the net equity value of the stock immediately after the ownership change has occurred (rather than immediately before the ownership change, as is the case under the general rule for non-bankruptcy ownership changes).

In addition, under an applicable IRS notice, a corporation whose assets in the aggregate have a fair market value greater than its tax basis is permitted to increase its annual Section 382 Limitation during the five years immediately after the ownership change by an amount determined by reference to the depreciation and depletion deductions that a purchaser of a debtor's assets would have been permitted to claim if it had acquired a debtor's assets in a taxable transaction.

The Debtors do not expect to have a significant amount of NOLs after the required reduction due to excluded COD income.  The amount of tax attributes, if any, that will be available to the Reorganized Debtors following such reduction is based on a number of factors and is not possible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include the amount of taxable income or loss incurred by the Debtors in 2017 and 2018 and the amount of COD income recognized by the Debtors in connection with the consummation of the Plan.  Following the consummation of the Plan, the Debtors anticipate that any remaining NOLs and other tax attributes, if any, may be subject to limitation under section 382 of the Internal Revenue Code because of the transactions under the Plan.  The Debtors have not yet determined whether they will be eligible for or rely on the special rule under section 382(l)(5) or the special rule under section 382(l)(6).

**C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Senior Lender Claims**

**1.      U.S. Federal Income Tax Consequences to U.S. Holders of an Exchange Treated as a Recapitalization**

Pursuant to the Plan, each U.S. Holder of an Allowed Senior Lender Claim will receive a pro rata share of: (i) the "Takeback Term Loans" under the Exit Facility; and (ii) 100% of the Reorganized HGIM Equity[19], subject to dilution by the Management Incentive Plan.  Whether and to what extent the U.S. Holder of a Senior Lender Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Stock and the Takeback Term Loans depends, in part, on whether the exchange qualifies as recapitalization under the Internal Revenue Code (a

---

[19]      Subject to the U.S. Citizen determination procedure described in Article III.B.3.d of the Plan.

"*Recapitalization*").  Whether an exchange of such U.S. Holder's Senior Lender Claim for New Common Stock and the Takeback Term Loans qualifies as a Recapitalization with respect to such U.S. Holder further depends on whether the debt underlying the Senior Lender Claim surrendered and the Takeback Term Loans are treated as "securities" for purposes of the Internal Revenue Code.

Whether a debt instrument constitutes a "security" depends on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is one important factor.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  While the term of an instrument is often viewed as an important factor, there are numerous other factors that should also be considered in determining whether a debt instrument is a security.  It is not clear whether an interest in the Revolver or the term loans under the Senior Secured Term A Facility (the "*Term A Loans*") and the Senior Secured Term B Facility (the "*Term B Loans*") underlying the Senior Lender Claims would be treated individually as securities for U.S. federal income tax purposes.  It is also not clear whether the Takeback Term Loans would be treated as securities for U.S. federal income tax purposes.  To the extent the Debtors are required to take a position, they expect to treat the Term A Loans, the Term B Loans, and the Takeback Term Loans as securities for U.S. federal income tax purposes.  The Debtors do not intend to treat an interest in the Revolver as a security.  Based on that treatment, the exchange of an interest in the Revolver for New Common Stock and Takeback Term Loans would not qualify as a Recapitalization and instead would be treated as a taxable exchange, as discussed below.  An exchange in which a U.S. Holder exchanges both an interest in the Revolver and a Term A Loan and/or Term B Loan generally should be treated as part tax-free Recapitalization (subject to the discussion of "Accrued Interest," in Section VIII.C.3. of this Disclosure Statement) and part taxable exchange, with the tax consequences of each as described below.  It is possible that the IRS would not agree with the foregoing characterization of any of the Term A Loans, Term B Loans or Takeback Term Loans as securities or the characterization of an interest in the Revolver as not qualifying as a security.  Because of the inherently factual nature of these determinations, each U.S. Holder of a Senior Lender Claim is urged to consult its tax advisor regarding whether the debt underlying a Senior Lender Claim and the Takeback Term Loans constitute securities for U.S. federal income tax purposes.

If, consistent with the Debtors' characterizations described above, the exchange of a Term A Loan and/or Term B Loan for New Common Stock and Takeback Term Loans qualifies as a Recapitalization, then a U.S. Holder would not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section VIII.C.3. of this Disclosure Statement).  Such U.S. Holder's total combined tax basis in its New Common Stock and Takeback Term Loans received should equal the U.S. Holder's combined tax basis in the Term A Loan and/or Term B Loan surrendered therefor.  A U.S. Holder generally would allocate its combined basis between the New Common Stock and the Takedown Term Loans based on their relative fair market values.  A U.S. Holder's holding period for the New Common Stock and the Takeback Term Loans should include its holding period for the Term A Loan and/or Term B Loan surrendered therefor (except to the extent any portion of the New Common Stock or Takeback Term Loans is allocable to accrued but unpaid interest, in which case its holding period in such New Common Stock and/or Takeback Term Loans would begin on the day following the Effective Date).  A U.S. Holder that exchanges both Term A Loans and Term B Loans may have a different holding period in the New Common Stock and Takeback Term Loans based on the respective holding periods of the Term A Loans and Term B Loans deemed exchanged therefor.

2.      **U.S. Federal Income Tax Consequences to U.S. Holders of a Taxable Exchange**

As described above, the Debtors do not intend to treat an interest in the Revolver as a security that would qualify for Recapitalization treatment.  To the extent that an exchange does not qualify in whole or in part as a Recapitalization, a U.S. Holder of a Senior Lender Claim will be treated as exchanging such Senior Lender Claim (or a portion thereof) for New Common Stock and Takeback Term Loans in a taxable exchange.  Accordingly, each U.S. Holder of such Senior Lender Claim should recognize gain or loss equal to the difference between the fair market value of New Common Stock and Takeback Term Loans received in exchange for the Senior Lender Claim (or portion thereof) and such U.S. Holder's adjusted basis, if any, in such Senior Lender Claim (or portion thereof).  Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Senior Lender Claim in such U.S. Holder's hands, whether the Senior Lender Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Senior Lender Claim.  *See* Sections VIII.C.3. and VIII.C.4. of this Disclosure Statement, entitled "Accrued Interest" and "Market Discount."  A U.S. Holder's tax basis in any New Common Stock and

Takeback Term Loans received should equal the fair market value of such New Common Stock and Takeback Term Loans as of the date such New Common Stock and Takeback Term Loans are distributed to the holder. A U.S. Holder's holding period for the New Common Stock and Takeback Term Loans received should begin on the day following such distribution date.

**3.      Accrued Interest**

To the extent that any amount received by a U.S. Holder of a Senior Lender Claim is attributable to accrued but unpaid interest (including accrued original issue discount ("*OID*")) on the debt instruments constituting the surrendered Senior Lender Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. Holder of a Senior Lender Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest (including accrued OID) was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Senior Lender Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the plan, each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion. The IRS could take the position that the consideration received by a holder should be allocated in a manner other than as determined by such holder.

> **U.S. HOLDERS SHOULD CONSULT THEIR OWN**
> **TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION**
> **RECEIVED IN SATISFACTION OF THEIR SENIOR LENDER CLAIMS AND THE**
> **U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

**4.      Market Discount**

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than: (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest"; or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount. Any gain recognized by a U.S. Holder on the taxable disposition of a Senior Lender Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Senior Lender Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

To the extent that the Senior Lender Claims that were acquired with market discount are exchanged in a Recapitalization for other property, any market discount that accrued on the Senior Lender Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**D.      U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Common Stock**

**1.      Distributions on New Common Stock**

The gross amount of any distribution of cash or property made to a U.S. Holder with respect to New Common Stock generally will be includible in gross income by a U.S. Holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed Reorganized HGIM Corp.'s current and accumulated earnings and profits, the distribution: (i) will be treated as a non-taxable return of the U.S. Holder's adjusted basis in the New Common Stock;

US 5252960

and (ii) thereafter as capital gain. Dividends received by non-corporate U.S. Holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a corporate U.S. Holder and certain other requirements are satisfied.

### 2.     Sale, Exchange, or Other Taxable Disposition of New Common Stock

For U.S. federal income tax purposes, a U.S. Holder generally will recognize gain or loss on the sale, exchange, or other taxable disposition of any of its New Common Stock in an amount equal to the difference, if any, between the amount realized for the New Common Stock and the U.S. Holder's adjusted tax basis in the New Common Stock. Subject to the rules discussed above under Section VIII.C.4., entitled "Market Discount," any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the New Common Stock of more than one year as of the date of disposition. Non-corporate U.S. Holders may be eligible for reduced rates of taxation on long-term capital gains. The deductibility of capital losses may be subject to limitation.

### E.     U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Takeback Term Loans

### 1.     Stated Interest and Original Issue Discount

Stated interest on indebtedness generally is taxable to a U.S. Holder as ordinary income at the time it is received or accrued in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes.

The Takeback Term Loans will be treated as issued with original issue discount ("*OID*") for U.S. federal income tax purposes if the issue price of the Takeback Term Loans, determined under applicable Treasury regulations, is less than their principal amount by more than a specified *de minimis* amount. In such case, a U.S. Holder of a Takeback Term Loan would generally be required to include OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis) over the term of the Takeback Term Loan in advance of the receipt of cash payments attributable to that income. Under these rules, the amount of OID required to be included in income would generally equal the sum of the "daily portions" of OID with respect to the Takeback Term Loan for each day during the taxable year or portion of the taxable year in which the U.S. Holder held such Takeback Term Loan ("*Accrued OID*"). The daily portion is determined by allocating to each day in each "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for the Takeback Term Loan may be of any length and may vary in length over the term of the Takeback Term Loan, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period.

The amount of OID allocable to any accrual period other than the final accrual period would be an amount equal to the excess, if any, of: (i) the product of the applicable Takeback Term Loan adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period); over (ii) the aggregate of all qualified stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price of the Takeback Term Loan at the beginning of the final accrual period. The adjusted issue price of the Takeback Term Loan at the beginning of any accrual period is equal to its issue price, increased by the Accrued OID for each prior accrual period, and reduced by any payments previously made on the Takeback Term Loan. Under these rules, U.S. Holders of the Takeback Term Loans generally would include in income increasingly greater amounts of OID in successive accrual periods. A U.S. Holder's tax basis in the Takeback Term Loan debt will be increased by the amount of OID included in the U.S. Holder's gross income and will be decreased by the amount of any payments received by the U.S. Holder with respect to such Takeback Term Loan, whether the payments are denominated as principal or interest.

2.     **Disposition of the Takeback Term Loans**

A U.S. Holder generally will recognize capital gain or loss on the sale, redemption, exchange, retirement, or other taxable disposition of a Takeback Term Loan equal to the difference, if any, between the amount realized on such disposition and the U.S. Holder's adjusted tax basis in the Takeback Term Loan.  The amount realized will include the amount of any cash and the fair market value of any other property received for the Takeback Term Loan. To the extent that any portion of the amount realized on a sale, redemption, exchange, retirement, or other taxable disposition of a Takeback Term Loan is attributable to accrued but unpaid interest on the Takeback Term Loan, this amount generally will be taxed in the same manner as described above in "Stated Interest and Original Issue Discount." A U.S. Holder's adjusted tax basis in the Takeback Term Loan generally will equal the amount such U.S. Holder paid for the Takeback Term Loan.  Any gain or loss will be long-term capital gain or loss if the U.S. Holder held the note for more than one year at the time of the sale, redemption, exchange, retirement, or other taxable disposition.  Non-corporate U.S. Holders may be eligible for reduced rates of taxation on long-term capital gains.  The deductibility of capital losses may be subject to limitation.

F.     **Information Reporting and Back-Up Withholding**

Information reporting generally will apply to payments of interest (including OID) on the Takeback Term Loans and dividends on New Common Stock.  Backup withholding generally will not apply to such payments or to consideration received under the Plan if the appropriate certifications are received.  A U.S. Holder generally can meet such certification requirement by providing a properly executed IRS Form W-9 certifying to a complete exemption from backup withholding.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, the Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN ARE COMPLEX.  THE FOREGOING DISCUSSION
DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION
THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH
HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS
OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS
AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS
CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY
STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

---

## IX. CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Respectfully submitted, as of the date first set forth above,

Dated: February 26, 2018                           HGIM HOLDINGS, LLC
                                                   on behalf of itself and all other Debtors


                                                   /s/ Shane J. Guidry
                                                   Shane J. Guidry
                                                   Chairman & Chief Executive Officer
                                                   701 Poydras Street
                                                   Suite 3700
                                                   New Orleans, Louisiana 7013

US 5252960

**EXHIBIT A**

**Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-[•] |
| | § | |
| **HGIM HOLDINGS, LLC,** *et al.*, | § | (Chapter 11) |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |

### DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THE DEBTORS HAVE NOT COMMENCED CHAPTER 11 CASES. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Gladiator Marine, Inc. (3298), Golden Lane Marine, Inc. (4167), Guidry Brothers, Inc. (6568), Harvey America LNG, LLC (8857), Harvey Badger, LLC (2525), Harvey Bear, LLC (6355), Harvey Beaver, LLC (2298), Harvey Blue-Sea, LLC (0837), Harvey Bobcat, LLC (0099), Harvey Bronco, LLC (6441), Harvey Buffalo, LLC (8949), Harvey Bull, LLC (2896), Harvey Carrier, LLC (8502), Harvey Challenger, LLC (0334), Harvey Champion, LLC (9246), Harvey Charger, LLC (6139), Harvey Clipper, LLC (1593), Harvey Colt, LLC (6038), Harvey Condor, LLC (8252), Harvey Cougar, LLC (5816), Harvey Cowboy, LLC (0864), Harvey Deep-Sea, LLC (8407), Harvey Eagle, LLC (1135), Harvey Energy, LLC (8717), Harvey Explorer 242, L.L.C. (5016), Harvey Express 225, LLC (0818), Harvey Falcon, LLC (0858), Harvey Freedom, LLC (5429), Harvey Gator, LLC (7401), Harvey Giant, LLC (1757), Harvey Gladiator, LLC (0222), Harvey Grizzly, LLC (1887), Harvey Gulf International Marine, LLC (4472), Harvey Hauler, LLC (9654), Harvey Hawk, LLC (5055), Harvey Hawkeye, LLC (3208), Harvey Heat, LLC (0384), Harvey Herd, LLC (3095), Harvey Hurricane, LLC (1196), Harvey Husky, LLC (3647), Harvey Hustler, LLC (5552), Harvey Indian, LLC (0709), Harvey Intruder, L.L.C. (1512), Harvey Jaguar, LLC (8702), Harvey Leader, LLC (7641), Harvey Legend, LLC (3187), Harvey Liberty, LLC (0308), Harvey Lightning, L.L.C. (3787), Harvey Lion, LLC (6760), Harvey Mariner, LLC (3917), Harvey Mustang, LLC (9266), Harvey Otter, LLC (4295), Harvey Pacer, LLC (5543), Harvey Panther, LLC (8839), Harvey Patriot, LLC (4297), Harvey Pioneer, LLC (7920), Harvey Pirate, LLC (9649), Harvey Power, LLC (8862), Harvey Provider 240, L.L.C. (5017), Harvey Raider, LLC (9905), Harvey Rain, LLC (2933), Harvey Ram, LLC (7523), Harvey Raven, LLC (1432), Harvey Razorback, LLC (3556), Harvey Rebel, LLC (3584), Harvey Redhawk, LLC (8299), Harvey Rover, LLC (0651), Harvey Runner, LLC (1882), Harvey Sailor, LLC (2032), Harvey Saint, LLC (1609), Harvey Sea Lion, LLC (2325), Harvey Sea-Hawk, LLC (1664), Harvey Seas, LLC (0471), Harvey Spirit, L.L.C. (6777), Harvey Spur, LLC (5474), Harvey Steeler, LLC (5881), Harvey Storm, LLC (7078), Harvey Subsea, LLC (6477), Harvey Supporter, LLC (9141), Harvey Thunder, L.L.C. (5020), Harvey Tiger, LLC (4232), Harvey Tugs, LLC (8947), Harvey War Horse, L.L.C. (5019), Harvey War Horse III, L.L.C. (3785), Harvey Wave, LLC (2246), Harvey Wind, LLC (0974), Harvey Wolf, LLC (7836), Harvey Worker, LLC (2503), HGIM Corp. (0829), HGIM Holdings, LLC (0448), and N.J. Guidry & Sons Towing Co., Inc. (9524). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: One Shell Square, 701 Poydras Street, Suite 3700, New Orleans, Louisiana 70139.

Harry A. Perrin (TX 15796800)
Garrick C. Smith (TX 24088435)
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760

David S. Meyer (*pro hac vice* admission pending)
Jessica C. Peet (*pro hac vice* admission pending)
Lauren R. Kanzer (*pro hac vice* admission pending)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

**VINSON & ELKINS LLP**
**PROPOSED ATTORNEYS FOR THE DEBTORS**

**Dated:  February 26, 2018**

# TABLE OF CONTENTS

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION**
**OF TIME, AND GOVERNING LAW** ........................................................................1

    A.    *Defined Terms* ...........................................................................1
    B.    *Rules of Interpretation* ............................................................15
    C.    *Computation of Time* ...............................................................15
    D.    *Governing Law* ........................................................................15
    E.    *Reference to Monetary Figures* ...............................................16
    F.    *Reference to the Debtors or the Reorganized Debtors* ............16
    G.    *Consent Rights of the Restructuring Support Parties* .............16
    H.    *Controlling Document* .............................................................16

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS,**
**AND PRIORITY CLAIMS** .....................................................................................16

    A.    *Administrative Claims* ............................................................16
    B.    *Professional Compensation* ....................................................17
    C.    *Priority Tax Claims* ................................................................18
    D.    *Statutory Fees* .........................................................................18

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........18

    A.    *Summary of Classification* ......................................................18
    B.    *Treatment of Claims and Interests* ..........................................19
    C.    *Special Provision Governing Unimpaired Claims* ..................24
    D.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ...................24
    E.    *Elimination of Vacant Classes* ...............................................24
    F.    *Subordinated Claims* ...............................................................24

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................25

    A.    *Restructuring Transactions* .....................................................25
    B.    *Corporate Action* ....................................................................25
    C.    *Sources of Consideration for Plan Distributions* ....................26
    D.    *Continued Corporate Existence* ..............................................28
    E.    *Vesting of Assets in the Reorganized Debtors* .........................28
    F.    *Cancellation of Existing Securities and Agreements* ..............29
    G.    *New Organizational Documents* ..............................................29
    H.    *Stockholders Agreement* ..........................................................30
    I.    *Directors and Officers of the Reorganized Debtors* ...............30
    J.    *Effectuating Documents; Further Transactions* .......................31
    K.    *Exemption from Certain Taxes and Fees* .................................31
    L.    *Exemption from Registration Requirements* ............................31
    M.    *Registration Rights Agreement* ...............................................32
    N.    *Preservation of Causes of Action* ...........................................32

O.  *Director and Officer Liability Insurance* ..............................................33
P.  *Management Incentive Plan* ...................................................................33
Q.  *Employee and Retiree Benefits* ..............................................................34
R.  *Shipyard Contribution* ..........................................................................35
S.  *Payment of Fees and Expenses of the Agent* .........................................36

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............36**

A.  *Assumption and Rejection of Executory Contracts and Unexpired Leases* ...........36
B.  *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ............37
C.  *Cure of Defaults and Objections for Assumed Executory Contracts and*
    *Unexpired Leases* ..................................................................................37
D.  *Indemnification Obligations* ..................................................................38
E.  *Insurance Policies* .................................................................................38
F.  *Modifications, Amendments, Supplements, Restatements, or Other*
    *Agreements* ...........................................................................................39
G.  *Reservation of Rights* ............................................................................39
H.  *Nonoccurrence of Effective Date* ...........................................................39
I.  *Contracts and Leases Entered into After the Petition Date* .....................39

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS ..................................................39**

A.  *Timing and Calculation of Amounts to Be Distributed* ...........................39
B.  *Disbursing Agent* ..................................................................................40
C.  *Rights and Powers of Disbursing Agent* ................................................40
D.  *Delivery of Distributions and Unclaimed Property* ................................41
E.  *Compliance with Tax Requirements* ......................................................43
F.  *Allocations* ...........................................................................................43
G.  *No Postpetition Interest on Claims* ........................................................43
H.  *Setoffs and Recoupment* ........................................................................43
I.  *Claims Paid or Payable by Third Parties* ..............................................44

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
**AND DISPUTED CLAIMS .................................................................................45**

A.  *Disputed Claims Process* ......................................................................45
B.  *Claims and Interests Administration Responsibilities* ...........................45
C.  *Estimation of Claims* .............................................................................45
D.  *Adjustment to Claims Without Objection* ...............................................46
E.  *Disallowance of Claims* .........................................................................46
F.  *No Distributions Pending Allowance* .....................................................46
G.  *Distributions After Allowance* ...............................................................46
H.  *Single Satisfaction of Claims* ................................................................47

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................47**

A.  *Compromise and Settlement of Claims, Interests, and Controversies* ..................47

B.      *Discharge of Claims and Termination of Interests*....................................................47
C.      *Term of Injunctions or Stays* ..................................................................................48
D.      *Release of Liens* .....................................................................................................48
E.      *Releases by the Debtors* .........................................................................................48
F.      *Releases by Holders of Claims and Interests* ..........................................................49
G.      *Exculpation* ............................................................................................................51
H.      *Injunction* ..............................................................................................................51
I.      *Protection Against Discriminatory Treatment*.........................................................52
J.      *Recoupment* ............................................................................................................52
K.      *Subordination Rights* .............................................................................................52
L.      *Reimbursement or Contribution* .............................................................................53

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN** .......................................................................................**53**
A.      *Conditions Precedent to Confirmation* ....................................................................53
B.      *Conditions Precedent to the Effective Date* .............................................................53
C.      *Waiver of Conditions* .............................................................................................55
D.      *Substantial Consummation* .....................................................................................55
E.      *Effect of Non-Occurrence of Conditions to the Confirmation Date or the*
        *Effective Date* ..........................................................................................................55

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........................**55**
A.      *Modification and Amendments* ................................................................................55
B.      *Effect of Confirmation on Modifications* .................................................................55
C.      *Revocation or Withdrawal of the Plan*.....................................................................56

**ARTICLE XI.**
**RETENTION OF JURISDICTION** .......................................................................................**56**

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**.........................................................................................**58**
A.      *Immediate Binding Effect* .......................................................................................58
B.      *Additional Documents*.............................................................................................59
C.      *Reservation of Rights* .............................................................................................59
D.      *Successors and Assigns*...........................................................................................59
E.      *Service of Documents* .............................................................................................59
F.      *Term of Injunctions or Stays* ..................................................................................60
G.      *Entire Agreement* ...................................................................................................60
H.      *Exhibits* ..................................................................................................................60
I.      *Nonseverability of Plan Provisions* .........................................................................61
J.      *Votes Solicited in Good Faith* .................................................................................61
K.      *Closing of Chapter 11 Cases* ..................................................................................61
L.      *Waiver or Estoppel* .................................................................................................61

## INTRODUCTION

HGIM Holdings, LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases jointly propose this prepackaged chapter 11 plan of reorganization. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.  *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.  "***Administrative Claim***" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

2.  "***Administrative Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

3.  "***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

4.  "***Agent***" means Bank of America, N.A., in its capacity as administrative agent under the Credit Agreement.

5.  "***Allowed***" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan; and (b) the Debtors may affirmatively

determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim or request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of an Executory Contract or Unexpired Lease, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

6. "***Associated Entities***" means with respect to any Person or Entity, such Person's or Entity's Affiliates, current and former officers, managers, members, directors, managed accounts and funds, predecessors, successors and assigns, and each of their (or such person's) respective professionals, advisors, accountants, attorneys, financial advisors, investment bankers, consultants, employees, principals, members, partners, limited partners, agents and other representatives, each solely in its capacity as such; *provided* that none of the Debtors, their wholly-owned subsidiaries, or Q-LNG shall, in its capacity as such, be Associated Entities of any of the TJC Parties, and none of the TJC Parties or their wholly-owned subsidiaries shall, in its capacity as such, be Associated Entities of any of the Debtors, their wholly-owned subsidiaries, or Q-LNG.

7. "***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

8. "***Bankruptcy Code***" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

9. "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court other than the Local Rules.

10. "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

11. "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

12. "***Causes of Action***" means any action, claim, cause of action, controversy, third-party claim, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on,

or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defense set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

13.    "**CEO Employment Agreement**" means that certain amended employment agreement to be entered into between Reorganized HGIM Corp. and Shane J. Guidry as Chief Executive Officer and Chairman of Reorganized HGIM Corp. on the Effective Date, and which shall be in form and substance reasonably satisfactory to the Debtors,  the Required Restructuring Support Lenders, and Shane J. Guidry. No later than the deadline to file the Plan Supplement, the CEO Employment Agreement will be made available to the Lenders on the Agent's Syndtrak website, as set forth in the Disclosure Statement, and to the U.S. Trustee and the Court. Furthermore, the Debtors will disclose the nature of Mr. Guidry's compensation to the extent required by section 1129(a)(5) of the Bankruptcy Code.

14.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Court; and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Court.

15.    "**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

16.    "**Claims Register**" means the official register of Claims against and Interests in the Debtors maintained by the Notice and Claims Agent.

17.    "**Class**" means a category of Claims against or Interests in the Debtors as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

18.    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

19.    "**Confirmation Date**" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

20.    "**Confirmation Hearing**" means the hearing held by the Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

21.    "**Confirmation Order**" means the Final Order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

22.    "**Consummation**" means the occurrence of the Effective Date.

23.     "**Court**" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

24.     "**Credit Agreement**" means that certain Senior Secured Term and Revolving Credit Agreement, dated as of June 18, 2013 by and among HGIM Corp., each of the guarantors party thereto, the Agent, and the lenders and agents from time to time party thereto (as amended, restated, modified, or supplemented from time to time prior to the Petition Date).

25.     "**Cure Claim**" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

26.     "**D&O Liability Insurance Policies**" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

27.     "**Debtors**" means, collectively, the following:  Gladiator Marine, Inc.; Golden Lane Marine, Inc.; Guidry Brothers, Inc.; Harvey America LNG, LLC; Harvey Badger, LLC; Harvey Bear, LLC; Harvey Beaver, LLC; Harvey Blue-Sea, LLC; Harvey Bobcat, LLC; Harvey Bronco, LLC; Harvey Buffalo, LLC; Harvey Bull, LLC; Harvey Carrier, LLC; Harvey Challenger, LLC; Harvey Champion, LLC; Harvey Charger, LLC; Harvey Clipper, LLC; Harvey Colt, LLC; Harvey Condor, LLC; Harvey Cougar, LLC; Harvey Cowboy, LLC; Harvey Deep-Sea, LLC; Harvey Eagle, LLC; Harvey Energy, LLC; Harvey Explorer 242, L.L.C.; Harvey Express 225, LLC; Harvey Falcon, LLC; Harvey Freedom, LLC; Harvey Gator, LLC; Harvey Giant, LLC; Harvey Gladiator, LLC; Harvey Grizzly, LLC; Harvey Gulf International Marine, LLC; Harvey Hauler, LLC; Harvey Hawk, LLC; Harvey Hawkeye, LLC; Harvey Heat, LLC; Harvey Herd, LLC; Harvey Hurricane, LLC; Harvey Husky, LLC; Harvey Hustler, LLC; Harvey Indian, LLC; Harvey Intruder, L.L.C.; Harvey Jaguar, LLC; Harvey Leader, LLC; Harvey Legend, LLC; Harvey Liberty, LLC; Harvey Lightning, L.L.C.; Harvey Lion, LLC; Harvey Mariner, LLC; Harvey Mustang, LLC; Harvey Otter, LLC; Harvey Pacer, LLC; Harvey Panther, LLC; Harvey Patriot, LLC; Harvey Pioneer, LLC; Harvey Pirate, LLC; Harvey Power, LLC; Harvey Provider 240, L.L.C.; Harvey Raider, LLC; Harvey Rain, LLC; Harvey Ram, LLC; Harvey Raven, LLC; Harvey Razorback, LLC; Harvey Rebel, LLC; Harvey Redhawk, LLC; Harvey Rover, LLC; Harvey Runner, LLC; Harvey Sailor, LLC; Harvey Saint, LLC; Harvey Sea Lion, LLC; Harvey Sea-Hawk, LLC; Harvey Seas, LLC; Harvey Spirit, L.L.C.; Harvey Spur, LLC; Harvey Steeler, LLC; Harvey Storm, LLC; Harvey Subsea, LLC; Harvey Supporter, LLC; Harvey Thunder, L.L.C.; Harvey Tiger, LLC; Harvey Tugs, LLC; Harvey War Horse, L.L.C.; Harvey War Horse III, L.L.C.; Harvey Wave, LLC; Harvey Wind, LLC; Harvey Wolf, LLC; Harvey Worker, LLC; HGIM Corp.; HGIM Holdings, LLC; and N.J. Guidry & Sons Towing Co., Inc.

28.     "**Definitive Documentation**" means the definitive documents and agreements governing the Restructuring Transactions and shall include, without limitation:  (a) the Plan (and

all exhibits thereto) and the Confirmation Order; (b) the Disclosure Statement; (c) the solicitation materials with respect to the Plan; (d) the Exit Facility Documents; (e) the Shipyard Warrant Agreement; (f) the New Lender Warrant Agreement; (g) the Management Incentive Plan and MIP Warrant Agreement; (h) the CEO Employment Agreement; (i) the Management Employment Agreements, if applicable; (j) the New Organizational Documents; (k) the Q-LNG Agreements; (l) the Registration Rights Agreement; (m) the Stockholders Agreement; (n) the Shipyard Assignment Agreement; and (o) any other documents included in the Plan Supplement. Any document that is included within this definition of "Definitive Documentation," including any amendment, supplement, or modification thereof, shall contain terms and conditions consistent with the Restructuring Support Agreement and shall otherwise be in form and substance reasonably satisfactory to the Debtors and the Required Restructuring Support Lenders and, (i) in the case of the Plan, Disclosure Statement, and Confirmation Order, satisfactory in form and substance to the Debtors and the Required Restructuring Support Lenders, and (ii) in the case of the Shipyard Warrant Agreement, Shipyard Assignment Agreement, and the Plan provisions related to the Shipyard Contribution, in form and substance reasonably satisfactory to the Debtors, the Required Restructuring Support Lenders, and the TJC Parties.

29.     "***Description of the Transaction Steps***" means the description of the Restructuring Transactions as set forth in the Plan Supplement.

30.     "***Disallowed***" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, which is not Allowed.

31.     "***Disbursing Agent***" means, on the Effective Date, the Debtors, their agent(s), or any Entity or Entities designated by the Debtors to make or facilitate distributions that are to be made pursuant to the Plan.

32.     "***Disclosure Statement***" means the disclosure statement for the Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, which is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

33.     "***Disputed***" means, with respect to any Claim or Interest, a Claim or Interest that is not yet Allowed.

34.     "***Distribution Record Date***" means the date that is two Business Days after the Confirmation Date.

35.     "***DTC***" means The Depository Trust Company.

36.     "***Effective Date***" means the date that is a Business Day selected by the Debtors, in consultation with the Required Restructuring Support Lenders and the TJC Parties, on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan becomes effective.

37.     "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

38.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

39.     "*Exculpated Party*" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Released Party; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's Associated Entities.

40.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

41.     "*Exit Facility*" means a senior secured term loan facility in an aggregate amount equal to $350 million, on the terms and conditions set forth in the Exit Facility Term Sheet, and otherwise reasonably satisfactory to the Debtors and the Required Restructuring Support Lenders.

42.     "*Exit Facility Documents*" means the credit agreement, and any guarantee agreement, security agreement, and other relevant documentation with respect to the Exit Facility.

43.     "*Exit Facility Term Sheet*" means that certain term sheet attached as **Exhibit E** to the Restructuring Support Agreement and incorporated herein by reference.

44.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

45.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Notice and Claims Agent or the Court through the PACER or CM/ECF website.

46.     "*Final Order*" means (a) an order or judgment of the Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

47. "**General Unsecured Claim**" means any Unsecured Claim against any Debtor (including, for the avoidance of doubt, any Claim arising from the rejection of an Executory Contract or Unexpired Lease) that is not otherwise paid in full or otherwise satisfied during the Chapter 11 Cases pursuant to an order of the Court, other than a Professional Fee Claim, an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, or an Intercompany Claim.

48. "**Governmental Unit**" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

49. "**Harvey America**" means debtor Harvey America LNG, LLC, a Louisiana limited liability company.

50. "**HGIM Group**" means HGIM Group, LLC, a Delaware limited liability company.

51. "**HGIM Holdings**" means debtor HGIM Holdings, LLC, a Delaware limited liability company.

52. "**HGIM Holdings Interests**" means all Interests in HGIM Holdings.

53. "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

54. "**Indemnification Obligations**" means each of the Debtors' indemnification obligations for the current and former directors and the officers of the Debtors, whether set forth in the Debtors' bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts.

55. "**Intercompany Claim**" means any Claim held against one Debtor by another Debtor or a Non-Debtor Subsidiary.

56. "**Intercompany Interest**" means, other than an Interest in HGIM Holdings, an Interest in one Debtor held by another Debtor or Non-Debtor Subsidiary.

57. "**Interests**" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests or units of any Debtor, including, without limitation, any options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

58. "**Interim Compensation Order**" means the order entered by the Court establishing procedures for compensation of Professionals [Docket No. •].

59.     "*Internal Revenue Code*" means title 26 of the United States Code, 26 U.S.C. §§ 1–9834.

60.     "*Jones Act*" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b), and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. coastwise trade.

61.     "*Jones Act Restriction*" has the meaning set forth in Article IV.C.3 of the Plan.

62.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

63.     "*Lenders*" means, collectively, the lenders party to the Credit Agreement.

64.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

65.     "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas.

66.     "*Management Employment Agreements*" means new employment agreements that may be entered into on the Effective Date between Reorganized HGIM Corp. and (a) Robert L. Gwinn, III as President; (b) Jeffrey M. Henderson as Chief Financial Officer; and (c) Robert A. Vosbein, Jr. as General Counsel, the forms of which shall, if any is to be entered into, be included in the Plan Supplement.

67.     "*Management Incentive Plan*" means a post-emergence management incentive plan, which shall be on the terms and conditions set forth in **Exhibit A** to the Restructuring Support Agreement, and the form of which shall be included in the Plan Supplement.

68.     "*MIP Warrant Agreement*" means the warrant agreement governing the terms of the MIP Warrants, the form of which shall be included in the Plan Supplement.

69.     "*MIP Warrants*" means equity warrants distributed pursuant to the Management Incentive Plan, which shall be on the terms and conditions set forth in **Exhibit A** to the Restructuring Support Agreement.

70.     "*New Boards*" means the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor, including the New Parent Board.

71.     "*New Common Stock*" means the common stock of Reorganized HGIM Corp. to be issued pursuant to the Plan on the Effective Date.

72.     "*New Lender Warrant Agreement*" means the warrant agreement governing the terms of the New Lender Warrants, which shall be on the terms and conditions set forth in

**Exhibit C** to the Restructuring Support Agreement, and which may incorporate additional or modified terms as may be requested by the Required Restructuring Support Lenders (subject to the receipt of any regulatory approvals that are reasonably necessary), as further set forth in the Restructuring Support Agreement.  The form of the New Lender Warrant Agreement shall be included in the Plan Supplement

73.     "*New Lender Warrants*" means the warrants to be issued to holders of Allowed Senior Lender Claims pursuant to Article III.B.3 of the Plan, entitling the holders thereof to purchase New Common Stock with an exercise price per warrant equal to the par value of the New Common Stock, and governed by the terms of the New Lender Warrant Agreement.

74.     "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of formation, bylaws, operating agreements, or such other applicable formation, organizational, and governance documents of each of the Reorganized Debtors.

75.     "*New Parent*" means Reorganized HGIM Corp.

76.     "*New Parent Board*" means the initial board of directors of New Parent, as determined pursuant to Article IV.I.

77.     "*Non-Debtor Subsidiaries*" means all of HGIM Holdings' wholly and not-wholly owned, direct and indirect subsidiaries who are not Debtors in these Chapter 11 Cases, including: GCSG Holdings, LLC; GCS Realty, Inc.; GCSR Holdings, Inc.; Golden Meadow Medical Clinic, LLC; Gulf Coast Shipyard Group, Inc.; Gulf Coast Shipyard Realty, LLC; Harvey Gulf Mexico S.A.P.I. de C.V.; Harvey Stone Holdings, LLC; Harvey Stone, LLC; Q-LNG Operating I, LLC; and Q-LNG Transport, LLC.

78.     "*Non-U.S. Citizen*" means, regardless of actual citizenship, residence, domicile, or jurisdiction of organization, a Person or Entity other than a U.S. Citizen.

79.     "*Notice and Claims Agent*" means Prime Clerk, LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases, or its successor in that capacity.

80.     "*Other Priority Claim*" means any Claim against a Debtor other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases.

81.     "*Other Secured Claim*" means any Secured Claim other than the Senior Lender Claims.

82.     "*Permitted Designee*" means, with respect to any holder of an Allowed Senior Lender Claim, any Person or Entity that is designated (in a writing to be delivered to the Debtors on or before the Distribution Record Date) by such holder to receive distributions of Reorganized HGIM Equity pursuant to Article III.B.3 of the Plan.

83. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

84. "*Petition Date*" means the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

85. "*Plan*" means this chapter 11 plan of reorganization, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan.

86. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), each of which shall be in form and substance reasonably acceptable to the Debtors and the Required Restructuring Support Lenders (and in the case of the Shipyard Warrant Agreement and Shipyard Assignment Agreement, in form and substance reasonably acceptable to the Debtors, the Required Restructuring Support Lenders, and the TJC Parties), to be Filed by the Debtors no later than three Business Days before the deadline to file objections to the Plan, including the following, as applicable:  (a) the Exit Facility Documents; (b) the Shipyard Warrant Agreement; (c) the New Lender Warrant Agreement; (d) the Management Incentive Plan and MIP Warrant Agreement; (e) the Management Employment Agreements, if applicable; (f) the New Organizational Documents of New Parent; (g) the Registration Rights Agreement; (h) the Stockholders Agreement; (i) the Shipyard Assignment Agreement; (j) the Schedule of Rejected Executory Contracts and Unexpired Leases; (k) the Description of the Transaction Steps; (l) the identity of the members of the New Parent Board and the officers of New Parent as of the Effective Date; and (m) any other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with the Restructuring Support Agreement.

87. "*Priority Tax Claim*" means any Claim, whether Secured or Unsecured, against a Debtor of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

88. "*Pro Rata*" means, unless indicated otherwise, the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that respective Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Interest under the Plan.

89. "*Professional*" means an Entity employed pursuant to a Final Order of the Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

90. "***Professional Fee Claims***" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court. To the extent the Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Allowed Professional Fee Claim.

91. "***Professional Fee Escrow Account***" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.B.

92. "***Professional Fee Reserve Amount***" means the total amount of Professional Fee Claims estimated in accordance with Article II.B.3.

93. "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

94. "***Q-LNG***" means Q-LNG Transport LLC, a Louisiana limited liability company, and a Non-Debtor Subsidiary, together with its direct and indirect subsidiaries.

95. "***Q-LNG Agreements***" means (a) the Q-LNG Operating Agreement, as amended to reflect the Q-LNG Modifications and (b) the Q-LNG Management Agreement, as amended to reflect the Q-LNG Modifications.

96. "***Q-LNG Management Agreement***" means that certain Amended and Restated Vessel Management Agreement, dated as of October 27, 2017, between Harvey Gulf International Marine, LLC and Q-LNG Operating I, LLC.

97. "***Q-LNG Modifications***" means certain modifications to the Q-LNG Agreements, agreed to by Q-LNG, the Required Restructuring Support Lenders, and the Debtors as set forth in the Restructuring Support Agreement. On or prior to the deadline for filing the Plan Supplement, summaries of the Q-LNG Modifications will be distributed to the Lenders via the Agent's Syndtrak website, as set forth in the Disclosure Statement, and the modified Q-LNG Agreements will be made available to the U.S. Trustee and the Court.

98. "***Q-LNG Operating Agreement***" means the Operating Agreement of Q-LNG Transport LLC, dated as of January 6, 2017, by and among Shane J. Guidry, HGIM Corp., and any Members party thereto.

99. "***Registration Rights Agreement***" means the registration rights agreement for the benefit of the Registration Rights Beneficiaries, the form of which shall be included in the Plan Supplement.

100. "***Registration Rights Beneficiaries***" means each party to the Restructuring Support Agreement that, alone or together with its affiliates, (a) receives 10% or more of the New Common Stock; (b) receives New Lender Warrants underlying which is 10% or more of the New Common Stock; or (c) otherwise reasonably determines that it is an "affiliate" of the

Reorganized Debtors (as such term is defined in Rule 144 promulgated under the Securities Act) and receives New Common Stock or New Lender Warrants that constitute "restricted securities" (within the meaning of Rule 144) or "control securities" (within the meaning of U.S. federal securities laws).

101.    "**_Reinstated_**" or "**_Reinstatement_**" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

102.    "**_Released Party_**" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Agent; (d) the Secured Parties; (e) the Lenders; (f) Q-LNG; (g) the Shipyard; (h) the TJC Parties; and (i) with respect to each of the foregoing parties under (a) through (h), such Entity and its Associated Entities.

103.    "**_Releasing Party_**" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Agent; (d) the Secured Parties; (e) the Restructuring Support Lenders; (f) Q-LNG; (g) the Shipyard; (h) the TJC Parties; (i) all holders of Claims and Interests that are deemed to accept the Plan; (j) all holders of Claims who vote to accept the Plan; (k) all holders of Claims who are entitled to vote on the Plan, abstain from voting on the Plan, and do not opt out of the releases provided by the Plan; (l) all holders of Claims who vote to reject the Plan and do not opt out of the releases provided by the Plan; and (m) with respect to each of the foregoing parties under (a) through (l), such Entity and its Associated Entities.

104.    "**_Reorganized Debtors_**" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

105.    "**_Reorganized HGIM Corp._**" means HGIM Corp. or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

106.    "**_Reorganized HGIM Equity_**" means the New Common Stock, collectively with the New Common Stock issuable upon exercise of the New Lender Warrants, which New Common Stock is subject to dilution by the Management Incentive Plan and by the Shipyard Warrants.

107.    "**_Required Restructuring Support Lenders_**" is used as defined in the Restructuring Support Agreement.

108.    "**_Restructuring Support Agreement_**" means that certain Restructuring Support Agreement, dated February 8, 2018, as amended and restated pursuant to that certain Amendment No. 1 dated as of February 22, 2018, by and among the Debtors and the Restructuring Support Parties, as amended, modified, or supplemented, from time to time.

109.    "**_Restructuring Support Lenders_**" is used as defined in the Restructuring Support Agreement.

110.    "**_Restructuring Support Parties_**" is used as defined in the Restructuring Support Agreement.

111.    "**Restructuring Transactions**" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, or contemplated by the Restructuring Support Agreement and the Plan, including the Plan Supplement.

112.    "**Schedule of Rejected Executory Contracts and Unexpired Leases**" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended from time to time prior to the Effective Date.

113.    "**Secured**" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

114.    "**Secured Parties**" means the "Secured Parties" as such term is defined in the Credit Agreement.

115.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

116.    "**Security**" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

117.    "**Senior Lender Claims**" means, collectively, Claims against the Debtors arising under the Credit Agreement, each of which is a Secured Claim.

118.    "**Series A Shipyard Warrants**" means warrants to purchase a number of shares of New Common Stock equal to 3.0% of the Reorganized HGIM Equity, which warrants shall be exercisable by physical settlement in cash or on a cashless basis for a seven-year period commencing on the Effective Date, with a strike price based on a total enterprise value of $750,000,000; *provided*, that the strike price shall be adjusted for distributions of cash, securities, or other assets to holders of New Common Stock, and the Series A Shipyard Warrants shall benefit from other customary anti-dilution protections, all as more fully set forth in and as governed by the terms of the Shipyard Warrant Agreement.

119.    "**Series B Shipyard Warrants**" means warrants to purchase a number of shares of New Common Stock equal to 1.0% of the Reorganized HGIM Equity, which warrants shall be exercisable by physical settlement in cash or on a cashless basis for a seven-year period commencing on the Effective Date, with a strike price based on a total enterprise value of $1,250,000,000; *provided*, that the strike price shall be adjusted for distributions of cash, securities, or other assets to holders of New Common Stock, and the Series B Shipyard Warrants shall benefit from other customary anti-dilution protections, all as more fully set forth in and as governed by the terms of the Shipyard Warrant Agreement.

120.   "***Shipyard***" means Non-Debtor Subsidiary GCSG Holdings, LLC, together with its direct and indirect subsidiaries GCS Realty, Inc.; GCSR Holdings, Inc.; Gulf Coast Shipyard Group, Inc.; and Gulf Coast Shipyard Realty, LLC.

121.   "***Shipyard Assignment Agreement***" means the definitive document(s) necessary to give effect to the Shipyard Contribution.

122.   "***Shipyard Consideration***" means (a) $16,000,000 Cash payable by the Debtors to HGIM Group on the Effective Date; and (b) the Shipyard Warrants.

123.   "***Shipyard Contribution***" has the meaning set forth in Article IV.R hereof.

124.   "***Shipyard Warrant Agreement***" means the warrant agreement governing the terms of the Shipyard Warrants, the form of which shall be included in the Plan Supplement.

125.   "***Shipyard Warrants***" means, collectively, the Series A Shipyard Warrants and the Series B Shipyard Warrants.

126.   "***Stockholders Agreement***" means a stockholders agreement for the New Parent.

127.   "***TJC Parties***" is used as defined in the Restructuring Support Agreement.

128.   "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

129.   "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are "unimpaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

130.   "***Unsecured***" means, with respect to a Claim, not Secured.

131.   "***U.S. Citizen***" means, regardless of actual citizenship, residence, domicile, or jurisdiction of organization, a Person or Entity that is a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade, and that has adequately certified such eligibility to the Debtors pursuant to this Plan.

132.   "***U.S. Citizen Certification***" means a certification by a holder of a Senior Lender Claim that such holder is a U.S. Citizen, in accordance with Article III.B.3.d.

133.   "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

134.   "***U.S. Trustee Fees***" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

135.    "***Warrants***" means, collectively, the New Lender Warrants, the MIP Warrants, and the Shipyard Warrants.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan and the Restructuring Support Agreement; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Consent Rights of the Restructuring Support Parties*

Notwithstanding anything herein to the contrary, any and all consent rights of the Restructuring Support Parties set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

H.    *Controlling Document*

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, the Disclosure Statement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS,
## AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed

Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date or such other date fixed by the Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

B.      *Professional Compensation*

1.      Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Court.

2.      Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall not be subject to any Lien and shall be maintained in trust solely for the benefit of the Professionals. The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors without any further action or order of the Court.

3.     Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.     *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D.     *Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors or Reorganized Debtors, as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or a final decree is issued, whichever occurs first. The Reorganized Debtors shall continue to file quarterly-post confirmation operating reports in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Summary of Classification*

Claims and Interests, except for Administrative Claims, Professional Fee Claims, Cure Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest

qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 7 shall be deemed to apply to each Debtor. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be seven Classes for each Debtor); *provided that* any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.E below.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Senior Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | HGIM Holdings Interests | Impaired | Deemed to Reject |

B.     *Treatment of Claims and Interests*

1.     Class 1 – Other Priority Claims

a.     *Classification*:  Class 1 consists of Other Priority Claims.

b.     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each holder thereof shall receive (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim or (ii) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders.

c.     *Voting*:  Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Other Priority Claims will not be entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

    a.    *Classification*:  Class 2 consists of Other Secured Claims.

    b.    *Treatment*:   Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each such holder shall receive, at the Debtors' election, either (i) Cash equal to the full Allowed amount of its Claim, (ii) Reinstatement of such holder's Allowed Other Secured Claim, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim to such holder, or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders.

    c.    *Voting*:  Class 2 is Unimpaired under the Plan.  Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, the holders of Other Secured Claims will not be entitled to vote to accept or reject the Plan.

3.    Class 3 – Senior Lender Claims

    a.    *Classification*:  Class 3 consists of the Senior Lender Claims.

    b.    *Allowance*:  The Senior Lender Claims shall be Allowed in the aggregate principal amount of $1,266,539,062.50, *plus* accrued and unpaid interest (including at any applicable default rate) and all applicable fees, costs, and expenses due under the terms of the Credit Agreement, in each case, as of the Petition Date.[2]

    c.    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Senior Lender Claim, each such holder shall receive its Pro Rata share of (i) the Exit Facility, and (ii) subject to the U.S. Citizen determination procedure described below in Article III.B.3.d, 100.0% of the Reorganized HGIM Equity, in the form of (y) New Common Stock to the extent permitted under the Jones Act Restriction and (z) New Lender Warrants to the extent that shares of New Common Stock cannot be issued to such holder because it is a Non-U.S. Citizen and its ownership of its Pro Rata share of New Common Stock, alone or when added to the Pro Rata shares of New Common Stock being issued to other holders that are Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction; *provided, however*, that a holder of an Allowed Senior Lender Claim may direct any

---

[2]    Allowance of the Senior Lender Claims is subject to the Reservation of Rights set forth in the Restructuring Support Agreement.

distribution under clause (ii) of this Article III.B.3.c to one or more Permitted Designees. Holders of Allowed Senior Lender Claims shall also be entitled to payment of the Agent's unpaid fees and expenses in accordance with Article IV.S of the Plan.

In the case of holders of Allowed Senior Lender Claims that are Non-U.S. Citizens, the ratio of the number of shares of New Common Stock to the number of New Lender Warrants to be issued as of the Effective Date to each such Non-U.S. Citizen pursuant to clause (ii) of this Article III.B.3.c shall be the same for each such Non-U.S. Citizen holder of an Allowed Senior Lender Claim.

d.      *Procedure for U.S. Citizen Determination*:  If a holder (or the holder's Permitted Designee(s)) of an Allowed Senior Lender Claim furnishes a U.S. Citizen Certification to HGIM Corp. on or before the Distribution Record Date and, after review, HGIM Corp., in its reasonable discretion, accepts such U.S. Citizen Certification as reasonable proof establishing that such holder or its Permitted Designee(s), if applicable, is a U.S. Citizen, such holder (or its Permitted Designee(s)) shall receive New Common Stock representing all of such holder's Pro Rata share of the Reorganized HGIM Equity; *provided, however*, that if such holder (or the holder's Permitted Designee(s)) does not furnish a U.S. Citizen Certification to HGIM Corp. on or before the Distribution Record Date, or if, after review by HGIM Corp., the U.S. Citizen Certification of such holder (or the holder's Permitted Designee(s)) has not been accepted or has been rejected by HGIM Corp., in its reasonable discretion, on or before the date that is five Business Days after the Distribution Record Date, such holder (or the holder's Permitted Designee(s)) shall receive a combination of (x) New Common Stock to the extent permitted under the Jones Act Restriction, and (y) New Lender Warrants to the extent that shares of New Common Stock cannot be issued to such holder because it is a Non-U.S. Citizen and its ownership of its Pro Rata share of New Common Stock, alone or when added to the Pro Rata shares of New Common Stock being issued to other holders that are Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction.  In connection with HGIM Corp.'s review of any U.S. Citizen Certification under this Article III.B.3.d, HGIM Corp. shall, in consultation with counsel to the Agent, have the right to require the holder (or the holder's Permitted Designee(s)) furnishing the U.S. Citizen Certification to provide HGIM Corp. with such documents and other information as it may reasonably request as reasonable proof confirming that the holder (or such holder's Permitted Designee(s)) is a U.S. Citizen under the Jones Act. HGIM Corp. shall treat all such documents and information provided by any holder (or the holder's Permitted Designee(s)) as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a need to know the contents thereof and to the U.S. Coast Guard as may be necessary.  The Debtors

shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "***FOIA Request***") for any such documents and information submitted to the U.S. Coast Guard, and (ii) notify the relevant holder (or the holder's Permitted Designee(s)) (x) if any such holder's (or such holder's Permitted Designee's(s')) documents and information are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receive notice from the U.S. Coast Guard that it has received a FOIA Request and that such documents or information have been identified by the U.S. Coast Guard as responsive to such FOIA Request, then, the Debtors shall allow such holder (or such holder's Permitted Designee(s)) an opportunity to redact any confidential commercial, financial and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document.

    e.    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Senior Lender Claims will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – General Unsecured Claims</u>

    a.    *Classification*:  Class 4 consists of all Allowed General Unsecured Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each such holder shall receive, at the election of the applicable Debtor or Reorganized Debtor, either:  (i) payment in full of such Allowed General Unsecured Claim in the ordinary course of business or (ii) payment in full of such Allowed General Unsecured Claim in Cash, including interest at the contractual rate, upon the later of (x) the Effective Date, (y) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claim, or (z) such other date as may be ordered by the Court.[3]

    c.    *Voting*:  Class 4 is Unimpaired under the Plan.  Each holder of an Allowed General Unsecured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of General Unsecured Claims will not be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Intercompany Claims</u>

    a.    *Classification*:  Class 5 consists of all Intercompany Claims.

---

[3]    No TJC Party or any of its Associated Entities shall receive any distribution on account of any General Unsecured Claims, other than the Shipyard Consideration, as set forth in Article IV.R.

b.    *Treatment*:  Intercompany Claims shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled.   No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable.

c.    *Voting*:  Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Interests</u>

a.    *Classification*:  Class 6 consists of all Intercompany Interests.

b.    *Treatment*:  Intercompany Interests, other than Intercompany Interests in HGIM Corp., shall be Reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be cancelled.  Intercompany Interests in HGIM Corp. shall be cancelled.   No distribution shall be made on account of any Intercompany Interests.

To the extent Intercompany Interests are Reinstated under the Plan, such Reinstatement is solely for the purposes of administrative convenience, for the ultimate benefit of the holders of the Reorganized HGIM Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (i) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the Reorganized Debtor that corresponds to the Debtor that owned such Intercompany Interests prior to the Effective Date; and (ii) except as set forth in the Description of the Transaction Steps, no Interests in a Debtor or Non-Debtor Subsidiary, or Affiliate of a Debtor or Non-Debtor Subsidiary, held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

c.    *Voting*:  Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code.  Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

    7.    <u>Class 7 – HGIM Holdings Interests</u>

        a.    *Classification*:  Class 7 consists of all HGIM Holdings Interests.

        b.    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, all HGIM Holdings Interests shall be cancelled, released, discharged, and extinguished.  Holders of HGIM Holdings Interests shall not receive any distribution on account of such Interests.

        c.    *Voting*:  HGIM Holdings Interests are Impaired under the Plan.  Each holder of an HGIM Holdings Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of HGIM Holdings Interests will not be entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests, and the filing of the Plan shall constitute a motion for such relief.

E.    *Elimination of Vacant Classes*

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Subordinated Claims*

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to

reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, with the consent of the Required Restructuring Support Lenders, such consent not to be unreasonably withheld, the Reorganized Debtors shall undertake the Restructuring Transactions, including:   (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the issuance of securities, including the New Common Stock and the Warrants, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (5) the execution and delivery of the Exit Facility Documents; (6) the execution and delivery of the Q-LNG Agreements; (7) entry into the CEO Employment Agreement; (8) entry into the Management Employment Agreements, if applicable; (9) the execution and delivery of Definitive Documentation not otherwise included in the foregoing, if applicable; (10) any actions necessary to effectuate the Shipyard Contribution; and (11) all other actions that the Debtors, the Reorganized Debtors, or the Required Restructuring Support Lenders determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.    *Corporate Action*

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable:  (1) entry into the Exit Facility; (2) execution and delivery of the Exit Facility Documents; (3) the issuance of the New Common Stock; (4) the issuance of the Warrants; (5) appointment of the directors and officers for New Parent and the other Reorganized Debtors; (6) the adoption of the Management Incentive Plan in accordance with Article IV.P of the Plan; (7) execution and delivery of the Q-LNG Agreements; (8) implementation of the Shipyard Contribution; (9) implementation of the Restructuring Transactions; (10) entry into the CEO Employment Agreement; (11) entry into the Management Employment Agreements, if applicable; and (12) all other actions contemplated by the Plan. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of

further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by this Article IV.B shall be effective notwithstanding any requirements under non-bankruptcy law.

C.      *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

1.      <u>Cash on Hand</u>

The Reorganized Debtors shall use Cash on hand available on the applicable distribution date to fund distributions to certain holders of Claims entitled to receive Cash.

2.      <u>Exit Facility</u>

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility in accordance with the terms of the Exit Facility Term Sheet.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (including any Liens and security interests previously granted with respect to the Credit Agreement that are deemed to be granted in accordance with the Exit Facility Documents) (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy

Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

      3.      <u>Issuance and Distribution of New Common Stock and New Lender Warrants</u>

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the New Common Stock and the New Lender Warrants in accordance with the terms of the Plan without the need for any further corporate action. All of the New Common Stock and the New Lender Warrants, when so issued, shall be duly authorized, validly issued, and, in the case of (i) the New Common Stock, fully paid, and non-assessable, and (ii) the New Lender Warrants, valid, binding, and enforceable in accordance with the terms of the New Lender Warrant Agreement. In no event shall (a) Non-U.S. Citizens in the aggregate hold more than 24% of the total number of shares of New Common Stock issued and outstanding as of the Effective Date, and (b) any Non-U.S. Citizen hold more than 4.9% of the total number of shares of New Common Stock issued and outstanding as of the Effective Date (together, the "***Jones Act Restriction***"). All of the New Common Stock underlying the New Lender Warrants (upon payment of the exercise price in accordance with the terms of such New Lender Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The New Lender Warrants will be issued pursuant to the terms of the New Lender Warrant Agreement. Each New Lender Warrant will, subject to the terms of the New Lender Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the New Lender Warrant Agreement. The New Lender Warrant Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and the New Parent and each holder of the New Lender Warrants shall be bound thereby.

To the extent that any New Common Stock or New Lender Warrants are distributed pursuant to the Plan to the holder of an Allowed Claim or Allowed Interest against a Debtor other than Reorganized HGIM Corp., such New Common Stock or New Lender Warrants shall be treated as contributed by Reorganized HGIM Corp. directly or indirectly to such Debtor and then distributed on behalf of such Debtor in accordance with the Plan.

Each distribution and issuance of the New Common Stock and the New Lender Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

D.     *Continued Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Organizational Documents.

E.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Plan Supplement (including the Description of the Transaction Steps), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Description of the Transaction Steps), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Except with respect to Liens and security interests securing the Exit Facility, to the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors.  The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of.  The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s).  Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

F.      *Cancellation of Existing Securities and Agreements*

Except as otherwise provided in the Plan, on the Effective Date:  (1) the obligations of the Debtors under the Credit Agreement, all HGIM Holdings Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument, agreement, or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding the releases set forth in Article VIII.F of the Plan, Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided, further*, that any and all indemnification obligations pursuant to the Credit Agreement, including the reimbursement of fees and expenses of the Agent (including the fees and expenses of its professionals) incurred in connection with the Credit Agreement after the Effective Date, shall survive Confirmation and occurrence of the Effective Date; and *provided*, *further*, that nothing in this section shall effectuate a cancellation of any New Common Stock, Warrants, Intercompany Interests, Intercompany Claims, or Indemnification Obligations.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article IV.F shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Court.

G.      *New Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New Organizational Documents, as applicable, with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other

constituent documents, as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

The New Organizational Documents, or related agreements, such as the Stockholders Agreement, may or may not, in the discretion of the Required Restructuring Support Lenders, include:  (i) limitations on the ability of holders of the Reorganized HGIM Equity to cast votes above a specified threshold; (ii) requirements for the Reorganized Debtors to seek to cause the New Common Stock and New Lender Warrants to be quoted on a recognized over-the-counter market; and/or (iii) provisions necessary to ensure compliance with the Jones Act.  Any such provisions will be reflected in the New Organizational Documents filed in the Plan Supplement.

On the Effective Date, the New Organizational Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

H.      *Stockholders Agreement*

The Stockholders Agreement shall be effective as of the Effective Date and, as of the such date, shall be deemed to be valid, binding and enforceable in accordance with its terms, and the New Parent and each recipient of the New Common Stock or Warrants issued pursuant to the Plan shall be bound thereby without further action or signature.  The New Organizational Documents will condition transfers of the Reorganized HGIM Equity upon such transferee becoming a party to the Stockholders Agreement.  The Definitive Documentation governing the Warrants will condition receipt of Reorganized HGIM Equity pursuant to an exercise of the Warrants or any transfer of the Warrants upon such recipient or transferee becoming a party to the Stockholders Agreement.

I.      *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire automatically, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  The initial New Parent Board shall consist of seven members, composed of: (i) Shane J. Guidry as the Chairman; (ii) one U.S. Citizen director appointed by Mr. Guidry, who shall be W. Steve Orlando; and (iii) five other Persons selected by the Required Restructuring Support Lenders, subject to compliance with the Jones Act (such that Reorganized HGIM Corp. is at all times eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade), including the requirement that no more than a minority of the number of directors necessary to constitute a quorum of the New Parent Board (and any committee thereof) shall be Non-U.S. Citizens.

All officers of New Parent (and, to the extent applicable, of all other Reorganized Debtors) shall be U.S. Citizens.  On the Effective Date, New Parent will execute the CEO Employment Agreement and will execute the Management Employment Agreements, if applicable.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any

Person proposed to serve on the initial New Parent Board, as well as those Persons that will serve as an officer of New Parent. To the extent any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

J.     *Effectuating Documents*; *Further Transactions*

On and after the Effective Date, the Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Warrants, in the name of and on behalf of New Parent or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

K.     *Exemption from Certain Taxes and Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a Security (including, without limitation, of the New Common Stock and the Warrants) or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

L.     *Exemption from Registration Requirements*

The offering, issuance, and distribution of the New Common Stock and the New Lender Warrants (and the New Common Stock issuable upon exercise thereof) pursuant to the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (a) the Securities Act and all rules and regulations promulgated thereunder and (b) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities. Pursuant to section 1145 of the Bankruptcy Code, the New Common Stock and New Lender Warrants issued under the Plan will be freely transferable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments, including, any restrictions on the transferability under the terms of the New Organizational Documents, the Stockholders Agreement (if any), or

the New Lender Warrant Agreement; and (c) any other applicable regulatory approval. The equity and equity-linked interests associated with the Management Incentive Plan (including the MIP Warrants and the New Common Stock issuable upon exercise thereof) and the Shipyard Warrants (including the New Common Stock issuable upon exercise thereof) will be issued pursuant to an available exemption from registration under the Securities Act, including Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Stock, the New Lender Warrants, or the Shipyard Warrants to be held through the facilities of DTC (if such New Common Stock, New Lender Warrants, or Shipyard Warrants, respectively, are DTC-eligible at such time), then the Reorganized Debtors shall not be required to provide any further evidence other than the Plan and Confirmation Order with respect to the treatment of such applicable portion of the New Common Stock, New Lender Warrants, or Shipyard Warrants, as applicable, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the Warrants are exempt from registration.

M.      *Registration Rights Agreement*

On the Effective Date, the Registration Rights Beneficiaries and Reorganized HGIM Corp. shall enter into a registration rights agreement in form and substance reasonably acceptable to (i) the Required Restructuring Support Lenders, (ii) the Registration Rights Beneficiaries, and (iii) Reorganized HGIM Corp. The registration rights agreement shall provide the Registration Rights Beneficiaries with customary registration rights.

N.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII hereof, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for

later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.N include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

O.    *Director and Officer Liability Insurance*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each such D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

P.    *Management Incentive Plan*

1.    <u>Awards Under the Management Incentive Plan</u>

The Management Incentive Plan will be a comprehensive, long-term equity-based award plan that constitutes a portion of the go-forward compensation for the Reorganized Debtors' officers, directors, and employees. The Management Incentive Plan will be structured in a manner to minimize tax consequences to recipients of awards thereunder, subject to the reasonable consent of the Required Restructuring Support Lenders; *provided* that such tax structuring shall not result in incremental costs to the Debtors or Reorganized Debtors.

The Management Incentive Plan shall provide for the issuance of (i) equity-based awards, which may take the form of restricted stock units or other equity, granted immediately upon the Effective Date, in an aggregate amount equal to 3.00% of the total New Common Stock, on a fully-diluted basis, which shall vest quarterly over five years from issuance, and which shall not be diluted by the exercise of the Warrants; and (ii) three series of warrants, subject to dilution,

33

which shall vest quarterly over five years from the Effective Date and, which shall be exercisable for a seven-year period commencing on the Effective Date, with (x) the first series of warrants exercisable into an aggregate amount equal to 6.00% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $750 million, (y) the second series of warrants exercisable into an aggregate amount equal to 2.50% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $1,000 million, and (z) the third series of warrants exercisable into an aggregate amount equal to 2.50% of the Reorganized HGIM Equity, at a strike price equal to a total enterprise value of $1,250 million.

Awards under the Management Incentive Plan shall be allocated such that Mr. Guidry shall receive or be allocated 87.00% of the total grants on the Effective Date.  The remaining 13.00% of the total grants under the Management Incentive Plan shall be allocated to other members of management by the Chief Executive Officer and the HGIM Holdings Board of Directors, based on the Chief Executive Officer's recommendation on the Effective Date.  All of the awards under the Management Incentive Plan will be issued on the Effective Date.

The Confirmation Order shall authorize the Reorganized Debtors to adopt and enter into the Management Incentive Plan, on the terms set forth in this Article IV.P.  The equity-based awards under the Management Incentive Plan shall dilute all of the Reorganized HGIM Equity.

    2.    <u>Issuance of the MIP Warrants</u>

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the MIP Warrants in accordance with the terms of the Plan and the MIP Warrant Agreement without the need for any further corporate action.  All of the MIP Warrants, when so issued, shall be duly authorized, validly issued, and enforceable in accordance with the terms of the MIP Warrant Agreement.  All of the New Common Stock underlying the MIP Warrants (upon payment of the exercise price in accordance with the terms of such MIP Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The MIP Warrants will be issued pursuant to the terms of the MIP Warrant Agreement. Each MIP Warrant will, subject to the terms of the MIP Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the MIP Warrant Agreement.  The exercise price for the MIP Warrants shall be adjusted for distributions of cash, securities, or other assets to holders of New Common Stock, and the MIP Warrants shall benefit from other customary anti-dilution protections, all as more fully set forth in and as governed by the terms of the MIP Warrant Agreement.

Q.    *Employee and Retiree Benefits*

The Debtors may enter the CEO Employment Agreement and the Management Employment Agreements, as set forth in the Restructuring Support Agreement and Disclosure Statement.

Except as otherwise provided in the Plan or the Plan Supplement and excluding the CEO Employment Agreement and Management Employment Agreements, all written employment, severance, retirement, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors, and any items approved as part of the Confirmation

Order, retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors, subject to the consent of the Required Restructuring Support Lenders, pursuant to the Plan and, if so assumed, shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided, however*, that each employee-related agreement or arrangement will be assumed as modified so as to clarify that the Chapter 11 Cases and the Restructuring Transactions will not constitute a "good reason," "change in control," or similar event; and *provided, further*, that none of the foregoing shall apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding any of the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.    *Shipyard Contribution*

1.    Contribution of Certain Shipyard Equity Interests

In connection with a settlement, pursuant to Bankruptcy Rule 9019, of all Claims and Causes of Action between the TJC Parties (or their Associated Entities), including any General Unsecured Claims, but excluding any Senior Lender Claims, and the Debtors (and their Associated Entities) in respect of the Shipyard, on the Effective Date, HGIM Group shall contribute its preferred units and common units in GCSG Holdings, LLC to debtor Harvey America (such contribution, the "***Shipyard Contribution***") pursuant to the Plan, the Confirmation Order, and the Shipyard Assignment Agreement.  As consideration for the Shipyard Contribution, (a) HGIM Group shall receive the Shipyard Consideration, and (b) the TJC Parties, the Shipyard, and each of their respective Associated Entities shall be Released Parties, Releasing Parties, and Exculpated Parties.  Notwithstanding anything to the contrary herein, the Shipyard Contribution and the settlement described in this Article IV.R shall not affect the rights of any of the TJC Parties or their Associated Entities in their capacity as Lenders, and any of the TJC Parties and their Associated Entities that hold Allowed Senior Lender Claims shall be entitled to receive distributions pursuant to Article III.B.3 of the Plan on account of such Allowed Senior Lender Claims.

The assets of Harvey America shall vest in Reorganized Harvey America in accordance with Article IV.E.  The assets and liabilities of the Shipyard shall be unaffected by the Shipyard Contribution, and the Exit Facility shall include provisions allowing the existing debt obligations of the Shipyard and the existing liens on any Shipyard assets, in each case as of the Effective Date, to remain in place on their existing terms.

2.       Issuance of the Shipyard Warrants

On the Effective Date, Reorganized HGIM Corp. shall be authorized to and shall issue the Shipyard Warrants to HGIM Group in accordance with the terms of the Plan without the need for any further corporate action.  All of the Shipyard Warrants, when so issued, shall be duly authorized, validly issued, and valid, binding, and enforceable in accordance with the terms of the Shipyard Warrant Agreement.  All of the New Common Stock underlying the Shipyard Warrants (upon payment of the exercise price in accordance with the terms of such Shipyard Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

The Shipyard Warrants will be issued pursuant to the terms of the Shipyard Warrant Agreement.  Each Shipyard Warrant will, subject to the terms of the Shipyard Warrant Agreement, be exercisable for one share of New Common Stock or as provided under the Shipyard Warrant Agreement.

S.       *Payment of Fees and Expenses of the Agent*

The Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Agent and its advisors, including:  Davis Polk & Wardwell LLP, PJT Partners LP, Holland & Knight LLP, as special maritime counsel, Haynes and Boone, LLP, as local counsel, and an insurance reviewer, without application to or approval of the Court, whether incurred prior to or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date, in each case, subject to the consent of the Required Restructuring Support Lenders.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified

by the provisions of the Plan or any order of the Court.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Required Restructuring Support Lenders, alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three days' notice to the applicable non-Debtor counterparties.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in any Proof of Claim to the contrary**.  Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults and Objections for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed and served on the Reorganized Debtors on or before 30 days after the Effective Date.  If such Cure Claim dispute is not resolved within 7 days of the Reorganized Debtors' receiving such Cure Claim dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Court within 7 days.  **Any such request and/or objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Court.**  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided, however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim.  The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled

omnibus hearing for which such objection is timely filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.    *Indemnification Obligations*

The Indemnification Obligations shall not be discharged or impaired by confirmation of the Plan and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Reorganized Debtors; *provided, however*, that the Reorganized Debtors shall not indemnify directors or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes intentional fraud, gross negligence, or willful misconduct. No assumption of an Indemnification Obligation shall in any way extend the scope or term of any Indemnification Obligation beyond that contemplated in the applicable agreement governing such Indemnification Obligation. Notwithstanding anything to the contrary herein, any indemnification or reimbursement provision under the Credit Agreement that is expressly stated to survive any repayment under, or termination of, the Credit Agreement shall survive any cancellation or discharge under this Plan in accordance with its terms, and any rights that the Agent may have under the agency provisions of the Credit Agreement shall survive any such cancellation or discharge.

E.    *Insurance Policies*

All of the Debtors' insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Required Restructuring Support Lenders, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder or

Permitted Designee, as applicable, of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class; *provided, however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent (which, for the avoidance of doubt, shall not be the Agent) on the Effective Date, or as soon as reasonably practicable thereafter.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims and Interests as of the Distribution Record Date, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred on or After the Effective Date</u>

Except as otherwise ordered by the Court, and to the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

D.  *Delivery of Distributions and Unclaimed Property*

1. <u>Delivery of Distributions</u>

a.  Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, the Agent, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims and Interests.  The Debtors, the Reorganized Debtors, the Agent, and the Disbursing Agent, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

b.  Delivery of Distributions in General

Except as otherwise provided herein, distributions to holders or Permitted Designees, as applicable, of an Allowed Claim or Interest shall be made to the holders of record as of the Distribution Record Date by the Disbursing Agent as follows:  (1) at the address set forth in the Debtors' or Reorganized Debtors' books and records; (2) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors after the Effective Date; or (3) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

In the event that any distribution to any holder or Permitted Designee is returned as undeliverable, no further distributions shall be made to such holder or such Permitted Designee unless and until the Disbursing Agent is notified in writing of such holder's or Permitted Designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or Permitted Designees, as applicable, of undeliverable distributions.

c.  Delivery of Distributions to Lenders

Any and all distributions to holders of Senior Lender Claims as of the Distribution Record Date shall be governed by the Credit Agreement.  The Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such

distributions, including providing, within a reasonable time period following the Distribution Record Date, but not later than five Business Days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Senior Lender Claims as of the Distribution Record Date, including the address on file for each such holder and the amount of principal and accrued interest of Senior Lender Claims held by each such holder.

<div align="center">d.    Distributions of New Common Stock and New Lender Warrants</div>

All New Common Stock, and New Lender Warrants to be distributed pursuant to the Plan shall be issued in the names of such holders, their nominees of record, or their Permitted Designees as of the Distribution Record Date in accordance with DTC's book-entry exchange procedures and other customary practices if such New Common Stock and New Lender Warrants are DTC-eligible and permitted to be held through DTC's book-entry system.  If the New Common Stock or New Lender Warrants are not eligible for distribution in accordance with DTC's book-entry exchange procedures and other customary practices, then Reorganized HGIM Corp. will, and if on or prior to the Effective Date, in consultation with the Required Restructuring Support Lenders, take such reasonable actions as may be required to cause distributions of the New Common Stock and the New Lender Warrants under the Plan using, if requested by the Required Restructuring Support Lenders, a transfer agent appointed by Reorganized HGIM Corp. and such transfer agent's customary book-entry procedures.  No distributions will be made other than through DTC if the New Common Stock and the New Lender Warrants are permitted to be held through DTC's book-entry system.  Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date shall be forfeited.

<div align="center">2.    Minimum Distributions</div>

No fractional shares of New Common Stock or New Lender Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or New Lender Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Lender Warrants shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock and New Lender Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder shall be forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

      3.    <u>Unclaimed Property</u>

      In the event that any distribution is returned as undeliverable or is unclaimed, such distribution shall remain in the Debtors' possession until such time as a distribution becomes deliverable or such holder or Permitted Designee, as applicable, accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of attempted distribution.  After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

E.     *Compliance with Tax Requirements*

      In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors or the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.     *Allocations*

      Each holder of an Allowed Claim shall have the option to apply such holder's Pro Rata share of consideration distributed under the Plan to satisfy outstanding principal of or accrued interest on such holder's Allowed Claim, as such allocation is determined by such holder in its sole discretion.

G.     *No Postpetition Interest on Claims*

      Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.     *Setoffs and Recoupment*

      The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor may have against the claimant, but neither the failure to do so nor the

allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor of any such Claim it may have against the holder of such Allowed Claim.

I.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to Debtors or the Reorganized Debtors, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
## AND DISPUTED CLAIMS

A.    *Disputed Claims Process*

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file Proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (a) Proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors and (b) Proofs of Claim that have been objected to by the Debtors before the Effective Date, any Proof of Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn upon the Effective Date.  To the extent not otherwise provided in the Plan, the deemed withdrawal of a Proof of Claim is without prejudice to such claimant's rights, from and after the Effective Date, to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Court, shall together have the sole authority:  (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy

Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.   All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

D.       *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

E.       *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

F.       *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made to the extent that any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided that* any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

G.       *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.   As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals shall be paid to the holder of such Allowed Claim on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

H.   *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus applicable interest.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.   *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.   *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the

Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), or in any other contract, instrument, agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors.  In addition, to the extent applicable, at the Debtors' or Reorganized Debtors' sole expense, the Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors, or the administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.**

E.    *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized**

48

Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Credit Agreement, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, Q-LNG, the Q-LNG Modifications, the Shipyard, the Shipyard Contribution, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.E do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions; and (ii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

F.     *Releases by Holders of Claims and Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever, whether known or unknown, foreseen or unforeseen,

existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Credit Agreement, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring Transaction, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities or other property pursuant to the Plan, Q-LNG, the Q-LNG Modifications, the Shipyard, the Shipyard Contribution, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations arising under agreements among the Releasing Parties and the Released Parties other than the Debtors.  Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.F do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Restructuring Transactions; and (ii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring Transactions; and (7) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

G.    *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, liability, or remedy for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in- or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Definitive Documentation), or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

H.    *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any**

kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Recoupment*

In no event shall any holder of an Allowed Claim be entitled to recoup against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

L.      *Reimbursement or Contribution*

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      the Restructuring Support Agreement shall not have been breached or terminated and shall remain in full force and effect;

2.      an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court;

3.      the Q-LNG Agreements shall be in form and substance agreed by the parties thereto, the Debtors, and the Required Restructuring Support Lenders;

4.      the CEO Employment Agreement shall be in form and substance agreed by Shane J. Guidry, the Debtors, and the Required Restructuring Support Lenders;

5.      the Confirmation Order shall have been entered by the Court in form and substance reasonably acceptable to the Debtors and the Required Restructuring Support Lenders; and

6.      the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, shall have been Filed subject to the terms hereof.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      the Confirmation Order shall have been entered and the Confirmation Order shall have become a Final Order that has not been stayed, modified, or vacated on appeal;

2.      the Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance reasonably acceptable to the Debtors and the Required Restructuring Support Lenders;

3.      the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

4.      the Q-LNG Agreements shall have been executed and delivered by all of the Entities that are parties thereto, and any other actions necessary to effectuate the Q-LNG Modifications shall have been taken;

5.      the CEO Employment Agreement shall have been effected or executed in accordance with the terms hereof and in accordance with the Restructuring Support Agreement;

6.      the Shipyard Assignment Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and any other actions necessary to effectuate the Shipyard Contribution shall have been taken;

7.      all other Definitive Documentation shall have been effected or executed in accordance with the terms hereof and in accordance with the Restructuring Support Agreement;

8.      all conditions precedent to the issuance of the New Common Stock and the Warrants, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

9.      the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions;

10.      all required governmental and third-party approvals and consents, including Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

11.      all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Facility Documents); and

12.     all Allowed Professional Fee Claims approved by the Court shall have been paid in full and the Professional Fee Escrow Account shall have been funded in the Professional Fee Reserve Amount.

C.     *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by the Debtors, with the consent of the Required Restructuring Support Lenders (at their sole discretion), without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

D.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.     *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments*

Subject to the limitations contained herein, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the

Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.       Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections relating to any of the foregoing;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.       resolve any matters related to: (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors (with the consent of the Required Restructuring Support Lenders) or the Reorganized Debtors, as applicable, amending, modifying, or supplementing, pursuant to Article V hereof, the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.     ensure that distributions to holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5.     hear and determine all disputes related to any determination by HGIM Corp. as to the acceptance, non-acceptance, or rejection of any U.S. Citizen Certification as reasonable proof establishing that any holder of a Senior Lender Claim (or its Permitted Designee(s)) is a U.S. Citizen under the Jones Act;

6.     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.     adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.     adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

10.     enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan or the Restructuring Support Agreement;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I.1 hereof;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring Transactions;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| **Debtors or Reorganized Debtors** | **HGIM Corp.**<br>701 Poydras Street<br>Suite 3700<br>New Orleans, Louisiana 70139<br>Attn:  Robert A. Vosbein, Jr. |
| **Proposed Attorneys for the Debtors** | **Vinson & Elkins LLP**<br>First City Tower<br>1001 Fannin, Suite 2500<br>Houston, Texas 77002-6760<br>Attn:  Harry A. Perrin<br>            Garrick C. Smith<br>and |

**Vinson & Elkins LLP**
666 Fifth Avenue, 26th Floor
New York, New York  10103-0040
Attn:  David S. Meyer
           Jessica C. Peet
           Lauren R. Kanzer

United States Trustee                    **Office of the United States Trustee**
                                         **for the Southern District of Texas**
                                         515 Rusk Street, Suite 3516
                                         Houston, Texas 77002

Counsel to the Agent                     **Davis Polk & Wardwell LLP**
                                         450 Lexington Avenue
                                         New York, New York 10017
                                         Attn:  Damian S. Schaible
                                                    Angela M. Libby

F.      *Term of Injunctions or Stays*

        Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or
stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or
any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays
contained in the Plan or the Confirmation Order) shall remain in full force and effect until the
Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall
remain in full force and effect in accordance with their terms.

G.      *Entire Agreement*

        Except as otherwise indicated, on the Effective Date, the Plan and the Plan Supplement
shall supersede all previous and contemporaneous negotiations, promises, covenants,
agreements, understandings, and representations on such subjects, all of which have become
merged and integrated into the Plan.

H.      *Exhibits*

        All exhibits and documents included in the Plan Supplement are incorporated into and are
a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed,
copies of such exhibits and documents shall be available upon written request to the Debtors'
counsel at the address above or by downloading such exhibits and documents from the Debtors'
restructuring website at http://cases.primeclerk.com/harveygulf or the Court's website at
www.txs.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of
the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the
Plan shall control.

I.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Required Restructuring Support Lenders.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Required Restructuring Support Lenders' consent; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Agent, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

L.      *Waiver or Estoppel*

Except with respect to the Restructuring Support Agreement and the parties thereto, each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

* * * *

Respectfully submitted, as of the date first set forth above,

Dated: February 26, 2018

HGIM HOLDINGS, LLC
on behalf of itself and all other Debtors


/s/ *Shane J. Guidry*
Shane J. Guidry
Chairman & Chief Executive Officer
701 Poydras Street
Suite 3700
New Orleans, Louisiana 70139

**EXHIBIT B**

**Amendment No 1 to Restructuring Support Agreement**

# HGIM HOLDINGS, LLC, *et al.*

## AMENDMENT NO. 1 TO RESTRUCTURING SUPPORT AGREEMENT

### February 22, 2018

This Amendment No. 1 (this "***Amendment***") dated as of February 22, 2018 (the "***Amendment No. 1 Effective Date***") to the Restructuring Support Agreement with respect to HGIM Holdings, LLC, dated as of February 8, 2018 (the "***Agreement***"),[1] is entered into by and among:

(i) the Debtors;

(ii) the Agent and Restructuring Support Lenders that, together with the Agent, constitute Required Restructuring Support Lenders (the "***Amending Lenders***"); and

(iii) (a) The Jordan Company, L.P., (b) HGIM Group, LLC, which holds approximately 77% of the common units of HGIM Holdings, and (c) certain lenders affiliated with TJC that are party to the Credit Agreement and that are signatories hereto (the entities set forth in this clause (iii), the "***TJC Parties***"; and the TJC Parties together with the Debtors, the Agent and the Amending Lenders, the "***Amending Parties***").

## RECITALS

WHEREAS, the Debtors and the Amending Lenders wish, subject to the terms and conditions of this Amendment, to amend and restate the Restructuring Support Agreement to incorporate the terms of a global settlement among the Debtors, the Restructuring Support Lenders, and the TJC Parties;

WHEREAS, the TJC Parties wish, subject to the terms and conditions of this Amendment, to become parties to the Restructuring Support Agreement, as amended and restated;

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Amending Parties, intending to be legally bound, hereby agrees as follows:

---

[1] Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them in the Amended and Restated Restructuring Support Agreement or in the Term Sheet attached to it, as applicable.

# AMENDMENT

1.  **Amendment and Restatement of Restructuring Support Agreement**.

    (a)  The Agreement (other than its signature pages, exhibits and schedules) is hereby amended and restated in its entirety and replaced with **Exhibit A** attached hereto.

    (b)  The Term Sheet is hereby amended and restated in its entirety and replaced with **Exhibit B** attached hereto.

    (c)  Each TJC Party's signature to this Amendment shall be deemed a signature to the Agreement (as amended and restated pursuant to this Amendment) as of the date of this Amendment.

2.  **Representations and Warranties**.

    (a)  The Agent and each Amending Lender and TJC Party, severally and not jointly, each for itself and not for any other person or entity, hereby repeats as of the date hereof, with respect to this Amendment, each of the representations and warranties set forth in Section 19(a) of the Agreement.

    (b)  Each Debtor, jointly and severally (and not any other person or entity other than the Debtors), hereby repeats as of the date hereof, with respect to this Amendment, each of the representations and warranties set forth in Section 19(b) of the Agreement.

3.  **Conditions to Effectiveness**. This Amendment shall become effective, and the Agreement amended as set forth in this Amendment, upon the first date that this Amendment has been executed by all of the following: (a) each Debtor; (b) the Agent; (c) Restructuring Support Lenders that, according to the Agent's books and records, constitute Required Restructuring Support Lenders; and (d) each of the TJC Parties.

4.  **Governing Law**. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to choice of law provisions which would require or permit the application of the law of any other jurisdiction.

5.  **Waiver of Right to Trial by Jury**. Each of the Amending Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Amendment. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

6.  **Successors and Assigns**. Except as otherwise provided in this Amendment or the Agreement, this Amendment is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

7.      **Entire Agreement**. This Amendment (including the exhibits attached to it) constitutes the entire agreement of the Amending Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Amending Parties with respect to the subject matter of this Amendment and the Agreement.

8.      **Counterparts**. This Amendment may be executed in one or more counterparts, and when executed, each of which shall be deemed to be an original, and all of which together shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

9.      **Headings**. The section headings of this Amendment are for convenience of reference only and shall not, for any purpose, be deemed a part of this Amendment.

[*Signatures and exhibits follow.*]

**Signature Pages Omitted**

**Exhibit B-1**

**Amended & Restated Restructuring Support Agreement**

**EXECUTION DRAFT**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, BINDING ON ANY OF THE PARTIES HERETO.**

---

## HGIM HOLDINGS, LLC, *et al*.

## AMENDED & RESTATED RESTRUCTURING SUPPORT AGREEMENT

## February 8, 2018

---

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, which includes, without limitation, the Term Sheet (as defined below) attached hereto as **Exhibit A**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"),[1] dated as of February 8, 2018 and amended and restated pursuant to that certain Amendment No. 1 dated as of February 22, 2018, is entered into by and among:

(i) HGIM Holdings, LLC ("***HGIM Holdings***"), HGIM Corp. ("***HGIM Corp.***"), and those certain additional subsidiaries thereof listed on **Exhibit B** (such subsidiaries, HGIM Holdings, and HGIM Corp., each a "***Debtor***" and, collectively, the "***Debtors***")[2]; and

(ii) certain of the lenders party to that certain Senior Secured Term and Revolving Credit Agreement, dated as of June 18, 2013, by and among HGIM Corp., HGIM Holdings, and Bank of America, N.A., as administrative agent (the "***Agent***"), and the lenders and agents from time to time party thereto (such agreement, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***Credit Agreement***") that are (or that may become in accordance with Section 13 or Section 16 hereof) signatories hereto (together with the Agent, the "***Restructuring Support Lenders***" and, collectively with each other lender under the Credit Agreement, the "***Lenders***");[3] and

(iii) (a) The Jordan Company, L.P. ("***TJC***"), (b) HGIM Group, LLC, which holds approximately 77% of the common units of HGIM Holdings (the "***TJC Equity Party***"), and (c) certain lenders affiliated with TJC that are party to the Credit Agreement and that are

---

[1]  Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them at a later point in this Agreement or in the Term Sheet (as defined herein), as applicable.

[2]  Until the occurrence of the Termination Date, every entity that is a Debtor in the Chapter 11 Cases shall be a party to this Agreement.

[3]  As used in this Agreement (including the Exhibits and Schedules (as defined below)), and notwithstanding Section 13(b), the terms "Restructuring Support Lenders" or "Required Restructuring Support Lenders" shall not include the TJC Entities (as defined in the Term Sheet) or their Associated Entities (as defined in the Term Sheet).

signatories hereto (the "***TJC Lender Parties***"; collectively with TJC and the TJC Equity Party, the "***TJC Parties***"; and the TJC Parties together with the Restructuring Support Lenders, the "***Restructuring Support Parties***").

This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "***Parties***" and each individually as a "***Party***."

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "***Restructuring Transactions***") pursuant to the terms and conditions set forth in this Agreement, including a joint prepackaged plan of reorganization for the Debtors on terms consistent with the restructuring term sheet attached hereto as **Exhibit A** (the "***Term Sheet***") and incorporated herein by reference pursuant to Section 2 hereof (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "***Plan***")[4];

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented (i) through jointly-administered voluntary cases commenced by the Debtors (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), and (ii) pursuant to the Plan, which will be filed by the Debtors in the Chapter 11 Cases; and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1. **RSA Effective Date**. This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that this Agreement has been executed by all of the following: (a) each Debtor; (b) the Agent; (c) Lenders holding a majority in principal amount outstanding of all claims against the Debtors arising on account of the Credit Agreement (the "***Senior Lender Claims***"); and (d) the TJC Parties.

2. **Exhibits and Schedules Incorporated by Reference**. Each of the exhibits attached hereto, including the Term Sheet, and any schedules to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. In the event of any

---

[4] The Plan shall be filed in accordance with the Milestones set forth in Section 4 of this Agreement.

inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.[5]

3.   **Definitive Documentation**.

(a)   The definitive documents and agreements governing the Restructuring Transactions (collectively, the "***Definitive Documentation***") shall include:

(i)   the Plan (and all exhibits thereto), including any plan supplement documents (the "***Plan Supplement***"), including, without limitation, the identity of the officers and directors of the reorganized Debtors, the governance documents for the reorganized Debtors, any equity holders' agreements with respect to the reorganized Debtors, the documents or agreements relating to any warrants to be issued, any registration rights agreement, the documents or agreements relating to the contemplated exit financing, and any post-emergence management incentive plan for the reorganized Debtors' officers and directors (the "***Management Incentive Plan***"), if applicable, in accordance with the Term Sheet;

(ii)   a post-emergence Chief Executive Officer and Chairman employment agreement for Shane J. Guidry (the "***CEO Employment Agreement***"), if applicable, in accordance with the Term Sheet;

(iii)   the amended and restated Operating Agreement of Q-LNG Transport LLC, by and among Shane J. Guidry, HGIM Corp., and any members party thereto (the "***Q-LNG Operating Agreement***") and the amended and restated Vessel Management Agreement between Harvey Gulf International Marine LLC and Q-LNG Operating I, LLC (the "***Q-LNG Management Agreement***" and, together with the Q-LNG Operating Agreement, the "***Q-LNG Agreements***"), if applicable, in accordance with the Term Sheet;

(iv)   the motions and proposed court orders that the Debtors file for the "first day hearing," and the "second day" motions and proposed court orders that the Debtors file thereafter, excluding any employment applications and proposed court orders that the Debtors file in the Chapter 11 Cases; *provided*, *however*, that nothing in this <u>Section 3(a)(iv)</u> shall limit the right of any Restructuring Support Lender to object to such employment applications and proposed court orders filed with the Court;

---

[5]   The Exhibits and Schedules attached hereto include (a) the Term Sheet at **Exhibit A**, setting forth the material terms of the Restructuring Transactions and (b) the Warrant Term Sheet at **Exhibit C**, setting forth the material terms of the New Lender Warrants.

(v)    the motion (the "**Cash Collateral Motion**") and proposed court orders (each, a "**Cash Collateral Order**") seeking to authorize the Debtors' use of cash collateral and other prepetition collateral;

(vi)    the confirmation order with respect to the Plan (the "**Confirmation Order**");

(vii)    the disclosure statement (and all exhibits thereto) with respect to the Plan (the "**Disclosure Statement**");

(viii)    the solicitation materials with respect to the Plan (collectively, the "**Solicitation Materials**");

(ix)    the order approving the Disclosure Statement and the Solicitation Materials as containing "adequate information," as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(x)    a motion (the "**Scheduling Motion**") seeking entry of an order (the "**Scheduling Order**") scheduling a hearing to consider, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) confirmation of the Plan;

(xi)    the Shipyard Settlement Documentation (as defined in the Term Sheet); and

(xii)    the motions seeking approval of each of the above, as applicable.

(b)    The Definitive Documentation identified in <u>Section 3(a)</u> will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including all exhibits hereto) and shall be in form and substance reasonably satisfactory to (i) the Debtors, (ii) the Required Restructuring Support Lenders and (iii) solely with respect to the Shipyard Settlement Documentation and provisions of the Plan that directly relate to the Shipyard Settlement, the TJC Parties; *provided, further*, that the Cash Collateral Motion, Cash Collateral Order, Plan, Disclosure Statement, and Confirmation Order shall be satisfactory in form and substance to the Required Restructuring Support Lenders and the Debtors. The "**Required Restructuring Support Lenders**" shall consist of the Agent and those Restructuring Support Lenders that hold, in the aggregate, at least the a majority in principal of the Senior Lender Claims held by Restructuring Support Lenders.

(c)    Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts

with respect to, the pursuit, approval, implementation, and consummation of the Restructuring Transactions as well as the negotiation, drafting, execution, and delivery of the Definitive Documentation. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

4.    **Bankruptcy Process; Milestones**. The Debtors shall implement the Restructuring Transactions on the following timeline (each deadline, a "***Milestone***"):

(a)    no later than 5 business days after February 16, 2018, the Debtors shall commence a solicitation of the Lenders seeking approval and acceptance of the Plan ("***Plan Solicitation***");

(b)    no later than 7 business days after commencement of Plan Solicitation, each Debtor shall commence the Chapter 11 Cases by filing with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of each Debtor (such filing date, the "***Petition Date***");

(c)    on the Petition Date, the Debtors shall file with the Bankruptcy Court: (i) the Plan, (ii) the Disclosure Statement, and (iii) the Scheduling Motion;

(d)    no later than 5 days after the Petition Date, the Bankruptcy Court shall have entered (i) an interim Cash Collateral Order and (ii) the Scheduling Order, each in form and substance satisfactory to the Required Restructuring Support Lenders;

(e)    no later than 30 days after the Petition Date, Shane J. Guidry (and his affiliates), the Debtors, and the Required Restructuring Support Lenders shall have agreed on forms of the CEO Employment Agreement and the Q-LNG Agreements (such documents, the "***Management Documents***"; this Milestone, the "***Management Document Milestone***");

(f)    no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered a final Cash Collateral Order, in form and substance satisfactory to the Required Restructuring Support Lenders;

(g)    no later than 60 days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order, each in form and substance satisfactory to the Required Restructuring Support Lenders; and

(h)    no later than 15 days after the Confirmation Order, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "***Effective Date***").

**EXECUTION DRAFT**

The Debtors may extend a Milestone with the express prior written consent of the Required Restructuring Support Lenders.

5. **Commitment of Restructuring Support Parties.**

(a) Each Restructuring Support Party shall (severally and not jointly), solely as it remains the legal or beneficial owner of Senior Lender Claims (in the case of Restructuring Support Lenders and TJC Lender Parties) or claims or interests in the Debtors (in the case of TJC Equity Party) or the investment advisor or manager of such a legal or beneficial owner with power and authority to bind any Senior Lender Claims (in the case of Restructuring Support Lenders and TJC Lender Parties) or claims or interests in the Debtors (in the case of TJC Equity Party) held by it or such legal or beneficial owner, from the RSA Effective Date until the occurrence of a Termination Date applicable to such Restructuring Support Party:

(i) support and make reasonable best efforts to cooperate with the Debtors to take all reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Term Sheet (but without limiting consent and approval rights provided in this Agreement and the Definitive Documentation), including: (i) voting, or causing or consenting to the votes of, all of its claims against, or interests in, as applicable, the Debtors now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over) to accept the Plan by the voting deadline in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials; and (ii) not "opting out" of any releases under the Plan;

(ii) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; *provided*, *however*, that nothing in this Agreement shall prevent any Restructuring Support Party from withholding, amending, or revoking (or causing the same) its consent or vote with respect to the Plan if this Agreement is terminated with respect to such Restructuring Support Party;

(iii) support and not object to, delay, impede, or take any other action to interfere with the Restructuring Transactions, or propose, file, support, or vote for any restructuring, workout, or chapter 11 plan for any of the Debtors other than the Restructuring Transactions and the Plan;

     (iv)     support and not object to, delay, impede, or interfere, directly or indirectly, with the entry by the Bankruptcy Court of the Cash Collateral Orders, or propose, file, or support any use of cash collateral other than as proposed in the Collateral Orders; and

     (v)     not take any other action that is materially inconsistent with its obligations under this Agreement.

    (b)     Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (y) be construed to prohibit any Restructuring Support Party from (i) enforcing any rights under this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or (iii) appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions, or (z) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or any other matter before the Bankruptcy Court.

    (c)     Furthermore, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall prevent (i) the Agent from providing written notice (the "***Restructuring Toggle Notice***") to the Debtors of a failure to meet the Management Document Milestone (the sending of the Restructuring Toggle Notice, the "***Restructuring Toggle***") or (ii) upon the occurrence of the Restructuring Toggle, the Required Restructuring Support Lenders (or the Agent on their behalf) from requesting and/or moving the court for (i) the appointment of a chief restructuring officer (a "***CRO***"),[6] and/or (ii) such other alternative agreed to by the Debtors and the Required Restructuring Support Lenders.[7] Upon receiving the Restructuring Toggle Notice, the Debtors shall file a notice on the Bankruptcy Court's docket in the Chapter 11 Cases within 1 business day.

    (d)     The Required Restructuring Support Lenders shall deliver a governance proposal addressing the ability of holders of New Common Stock to cast

---

[6] For the avoidance of doubt, in the event a CRO is to be appointed, the identity of the CRO, the scope of the CRO's duties, and the terms of the CRO's engagement shall be acceptable to the Debtors and the Required Restructuring Support Lenders.

[7] The Debtors shall consult with the Required Restructuring Support Lenders upon occurrence of a Restructuring Toggle in accordance with <u>Section 6(h)</u> of this Agreement.

votes (the "***Governance Proposal***") to the Debtors no later than 5 business days after February 16, 2018. The Governance Proposal shall be shared with the Restructuring Support Lenders contemporaneously with delivery to the Debtors, on terms to be determined by the Agent.[8]

(e)    Each of the TJC Parties agrees that it shall not sell, transfer, loan, hypothecate, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title or interest in respect of any of its interests in the Shipyard other than as contemplated by the Shipyard Settlement.

6.    **Commitment of the Debtors**.

(a)    Each of the Debtors agrees to (i) act in good faith and use its reasonable efforts to obtain confirmation of the Plan in accordance with the Bankruptcy Code and the local rules of the Bankruptcy Court and on terms consistent with this Agreement, (ii) act in good faith and use reasonable best efforts to support and complete successfully the solicitation for the Plan in accordance with the terms of this Agreement, (iii) support and make reasonable best efforts to complete the Restructuring Transactions set forth in the Plan and this Agreement, (iv) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Term Sheet, the Plan and this Agreement, (v) make reasonable best efforts to complete the Restructuring Transactions set forth in the Plan in accordance with each Milestone set forth in Section 4 of this Agreement, and (vi) not undertake any action inconsistent with the adoption and implementation of the Plan and the speedy confirmation thereof, including, without limitation, filing any motion to reject this Agreement.

(b)    The Debtors agree to (i) timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner, receiver, or trustee with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases, (B) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) dismissing one or more of the Chapter 11 Cases, (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, or (E) for relief that (1) is inconsistent with this Agreement in any material respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the

---

[8] For the avoidance of doubt, the Governance Proposal shall be subject to review and negotiation by the Debtors, and any documentation memorializing the Governance Proposal shall constitute Definitive Documentation subject to Section 3 of this Agreement.

Restructuring Transactions; (ii) provide draft copies of all material motions, applications, and other documents related to the Restructuring Transactions (including all of the Definitive Documentation) any Debtor intends to file with the Bankruptcy Court to the counsel listed in <u>Section 30,</u> if reasonably practicable, at least two business days before the date when the applicable Debtor intends to file any such motion, application, or other document (and, if not reasonably practicable, as soon as reasonably practicable before filing); and (iii) consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(c)     The Debtors agree to allow that certain independent professional (the "***Insurance Reviewer***") retained by the Agent to review documents and materials reasonably requested by the Insurance Reviewer relating to the Debtors' vessel insurance coverage and policies for the limited purpose of confirming such coverage and policies are consistent with prudent lender market practice.

(d)     Each Debtor agrees to provide the Agent and its representatives or any Restructuring Support Lender accompanied and coordinated by the Agent, with access to inspect such Debtor's financial records and properties pursuant to Section 8.2 of the Credit Agreement but without the limitations on the frequency of visits contained therein and at the expense of the Debtor, *provided* that such visits shall be during normal business hours.

(e)     Except as set forth in the Term Sheet, the Debtors shall not (i) settle, release, or otherwise compromise any claims against the TJC Entities or their Associated Entities or any current or former director or officer of any of the Debtors, or (ii) terminate, enter into, amend, restate, amend and restate, supplement or otherwise modify any agreement (other than the Credit Agreement) with the TJC Parties or their Associated Entities (other than the Debtors), Q-LNG Transport, LLC, Harvey Gulf Mexico S.A.P.I. de C.V., or Golden Meadow Medical Clinic, LLC, in each case without the prior express written consent of the Required Restructuring Support Lenders.

(f)     The Debtors shall not engage in any merger, consolidation, disposition, acquisition, investment, dividend, assignment for the benefit of creditors, incurrence of indebtedness or other similar transaction outside the ordinary course of business without the prior written consent of the Required Restructuring Support Lenders, other than the commencement of the Chapter 11 Cases.

(g)     Except as set forth in the Term Sheet, the Debtors shall not (i) amend, modify, or enter into any key employee incentive plan, key employee retention plan or similar arrangement, or agreement regarding executive

compensation or (ii) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, or pay or cause to be paid any bonus, incentive, retention, severance, change of control, or termination payments pursuant to the terms of such agreements or plans, as applicable, except as disclosed on that certain schedule provided to counsel to the Agent on September 19, 2017, in each case without the prior express written consent of the Required Restructuring Support Lenders.

(h) If the Restructuring Toggle has occurred, the Debtors shall consult in good faith with the Required Restructuring Support Lenders regarding (i) the appointment of a CRO, including the identity of the CRO, the scope of the CRO's duties, and the terms of the CRO's engagement or (ii) other potential restructuring alternatives; *provided* that, for the avoidance of doubt, that nothing in this Section 6(h) shall alter or impair the termination rights of the Restructuring Support Lenders set forth in Section 7.

(i) The Debtors shall in good faith (i) incorporate additional or modified terms for the New Lender Warrants as may be requested by the Required Restructuring Support Lenders (subject to the receipt of any required regulatory approvals), and (ii) work with the Required Restructuring Support Lenders to pursue any necessary regulatory approvals of such additional terms.

(j) The Debtors' commitments under this Agreement shall continue in force notwithstanding any exercise of rights pursuant to Section 5(c) of this Agreement. As of the date hereof, to the best of the actual knowledge, information, and belief of the special committee of the Debtors' board of directors and based on the advice of counsel, the exercise of rights pursuant to Section 5(c) of this Agreement would not trigger the Debtors' right to terminate this Agreement in accordance with Section 10(d) of this Agreement.

(k) Except as agreed to by the Required Restructuring Support Lenders or consistent with the Shipyard Settlement, the Debtors shall not pay or set aside funds for the purpose of making any payments to or on behalf of (i) the TJC Entities or their Associated Entities (other than the Debtors) and, with respect to payments required under existing contracts, other than GCSG Holdings, LLC and its direct and indirect subsidiaries (solely with respect to payments under that certain Vessel Construction Contract dated October 7, 2011, entered into by and between Gulf Coast Shipyard Group, Inc. and Harvey Freedom, LLC, Harvey America LNG, LLC and Harvey Patriot, LLC, and that certain Master Storage Contract by and between Gulf Coast Shipyard Group, Inc. and Harvey Gulf International Marine, LLC dated as of January 1, 2016)), (ii) Q-LNG Transport, LLC, (excluding, solely to the extent that the Restructuring Toggle has not

occurred and solely with respect to the Vessel Management Agreement between Harvey Gulf International Marine LLC and Q-LNG Transport LLC, reasonable and documented fees and expenses of Adams and Reese LLP, as counsel to Q-LNG Transport LLC), (iii) Harvey Gulf Mexico S.A.P.I. de C.V., or (iv) Golden Meadow Medical Clinic, LLC, and the Debtors shall send the Agent copies of any invoices paid on account of fees and expenses of Porter Hedges LLP, as counsel to Shane J. Guidry, or Adams and Reese LLP, as counsel to Q-LNG Transport LLC.

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the board of directors, board of managers, directors, managers, or officers or any other fiduciary of a Debtor to take any action, or to refrain from taking any action, to the extent such board of directors, board of managers, or such similar governing body determines, based on advice of counsel, that taking such action, or refraining from taking such action, as applicable, may be required to comply with applicable law or its fiduciary obligations under applicable law.

7.   **Restructuring Support Lender Termination Events**.

(a)   The Required Restructuring Support Lenders shall have the right, but not the obligation, upon written notice to the other Parties, to terminate the obligations of the Restructuring Support Lenders under this Agreement upon and at any time after the occurrence of any of the following events (each, a "***Restructuring Support Lender Termination Event***"), subject to the rights of the Restructuring Support Lenders to fully or conditionally waive in writing, on a prospective or retroactive basis, the occurrence of a Restructuring Support Lender Termination Event, if such event remains uncured on or within three business days after the giving of written notice of such breach to the other Parties, *provided* that the Restructuring Support Lender Termination Events in Section 7(a)(i) and 7(a)(x) shall occur automatically without any further notice:

(i)   any Debtor terminates its obligations under and in accordance with this Agreement;

(ii)   the occurrence of a "Termination Event" under a Cash Collateral Order;

(iii)   if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file or solicit acceptances of a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(iv)   the date that one or more of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by order of the Bankruptcy Court;

(v)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3), (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(vi)     any Debtor files, amends, or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation such that it does not comply with Section 3(b) of this Agreement;

(vii)     a breach by a Debtor of any representation, warranty, or covenant of such Party set forth in this Agreement;

(viii)     a breach by any TJC Party of any representation, warranty, or covenant of such Party set forth in this Agreement; provided that such termination shall be solely with respect to the TJC Parties;

(ix)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining or otherwise making impractical the substantial consummation of the Restructuring Transactions on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors shall have 30 days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (A) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, and (B) is acceptable to the Required Restructuring Support Lenders;

(x)     either (A) any Debtor files a motion, application, or adversary proceeding (or any Debtor supports any such motion, application, or adversary proceeding filed or commenced by any third party) (I) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Senior Lender Claims or the liens securing such claims,[9] or (II) asserting any other cause of action against, with respect to or relating to such claims or the prepetition liens securing such claims; or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of any Restructuring Support Lender with respect to any of the foregoing causes of action or proceedings;

(xi)     any board, officer, or manager (or party with authority to act) of a Debtor (or the Debtors themselves) takes any action in furtherance

---

[9] The Agent and Restructuring Support Lenders agree to waive any default arising under this Section 7(a)(ix) with respect to a motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Senior Lender Claims held by the TJC Entities or their Associated Entities, or the liens securing such claims.

of the rights available to it (or them) under <u>Section 10</u> of this Agreement that are materially inconsistent with the Restructuring Transactions as contemplated by the Term Sheet attached hereto as <u>**Exhibit A**</u>;

(xii)   the failure to meet any of the Milestones in <u>Section 4</u>;

(xiii)   the occurrence of any other material breach of this Agreement or the Term Sheet not otherwise covered in this list by any Debtor or TJC Party;

(xiv)   any Debtor files or announces that it will file, or joins in or supports, any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any assets, without the prior written consent of the Required Restructuring Support Lenders;

(xv)   Shane J. Guidry or any affiliate of TJC, each as the holder of common units in GCSG Holdings, LLC, votes such common units in a manner that could reasonably be expected to have a material and adverse effect on the Debtors' business; and

(xvi)   the Debtors fail to file a pleading disputing, objecting to the allowance of, and/or moving to subordinate any claims asserted by (i) the TJC Parties (solely in the event that the Restructuring Support Agreement has been terminated solely with respect to the TJC Parties), or (ii) if the Restructuring Toggle has occurred, Shane J. Guidry (each, a "***Claims Objection***") within 5 business days following a request in writing by the Required Restructuring Support Lenders to file such Claims Objection.

(b)   Each Restructuring Support Lender shall have the right, but not the obligation, upon written notice to the Debtors and the Agent, to terminate its obligations under this Agreement:

(i)   [reserved]

(ii)   within 2 business days following delivery of the Governance Proposal to the Restructuring Support Lenders pursuant to <u>Section 5(d)</u>.

Termination pursuant to this <u>Section 7(b)</u> shall be an "***Individual Lender Termination***," and the terminating Lender an "***Individual Terminating Lender***."

8.   **TJC Termination Events**. The TJC Parties shall have the right, but not the obligation, upon written notice to the other Parties, to terminate their obligations under this Agreement upon and at any time after the occurrence of any of the following events (each, a

"***TJC Termination Event***"), subject to the rights of the TJC Parties to fully or conditionally waive in writing, on a prospective or retroactive basis, the occurrence of a TJC Termination Event, if such event remains uncured on or within three business days after the giving of written notice of such breach to the other Parties, *provided* that the TJC Termination Event in <u>Section 8(a)</u> or 8(b) shall occur automatically without any further notice:

(a)　　any Debtor terminates its obligations under and in accordance with this Agreement;

(b)　　the Required Restructuring Support Lenders terminate their obligations under and in accordance with <u>Section 7(a)</u> of this Agreement;

(c)　　the date that one or more of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by order of the Bankruptcy Court;

(d)　　the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3), (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(e)　　a breach by a Debtor of any representation, warranty, or covenant of such Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Shipyard Settlement;

(f)　　a breach by any Required Restructuring Support Lenders of any representation, warranty, or covenant of such Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Shipyard Settlement;

(g)　　the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining or otherwise making impractical the substantial consummation of the Restructuring Transactions on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors shall have 30 days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (A) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, and (B) is acceptable to the TJC Parties;

(h)　　either (A) any Debtor files a motion, application, or adversary proceeding (or any Debtor supports any such motion, application, or adversary proceeding filed or commenced by any third party) (I) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Senior Lender Claims of the TJC Parties or the liens securing such claims, or (II) asserting any other cause of action against,

with respect to or relating to such claims or the prepetition liens securing such claims; or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of any TJC Party with respect to any of the foregoing causes of action or proceedings; or

(i)     any Debtor files, amends, or modifies, or files a pleading seeking authority to amend or modify, the Shipyard Settlement Documentation such that it does not comply with Section 3(b) of this Agreement.

9.     **Automatic Stay**. The Debtors acknowledge and agree that after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any Party pursuant to this Agreement, or the giving of a Restructuring Toggle Notice, shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code and the Debtors shall not take any action inconsistent with such acknowledgement and agreement; *provided* that nothing herein shall prejudice any Party's right to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

10.     **Debtors' Termination Events**. Each Debtor may, upon written notice to the Restructuring Support Lenders and the Agent, terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "***Company Termination Event***" and, together with the Restructuring Support Lender Termination Events and the TJC Termination Events, the "***Termination Events***"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of each Debtor to fully or conditionally waive in writing, on a prospective or retroactive basis, the occurrence of a Company Termination Event, if such event remains uncured on or within three business days after the giving of written notice of such breach to the Agent:

(a)     a breach by a Restructuring Support Lender of any representation, warranty, or covenant set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring Transactions or the consummation of the Restructuring Transactions; *provided*, *however*, that such termination shall solely be effective against such breaching Restructuring Support Lender;

(b)     the occurrence of a breach of this Agreement by any Restructuring Support Lender that has the effect of materially impairing any of the Debtors' ability to effectuate the Restructuring Transaction;

(c)     a breach by any TJC Party of any representation, warranty, or covenant of such Party set forth in this Agreement; provided that such termination shall be solely with respect to the TJC Parties;

(d)     if the board of directors or managers, as applicable, of a Debtor determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or

solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

(e)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of or rendering illegal the Restructuring Transactions or the consummation of the Plan; and

(f)    Lenders (i) comprising, in aggregate, a majority in number of all Lenders and (ii) holding two-thirds in principal amount outstanding of all Senior Lender Claims have not become Restructuring Support Parties within 7 business days following February 16, 2018 (and such failure has continued without interruption through the Debtor's notification to the Agent of a Company Termination Event pursuant to this Section 10(f).

11.    **Mutual Termination**. This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (a) each of the Debtors (b) the Required Restructuring Support Lenders, and (c) the TJC Parties. This Agreement will terminate automatically without any further required action or notice on the Effective Date.

12.    **Effect of Termination**. The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 7, 8, 10, or 11 of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***." Upon the occurrence of a Termination Date, (a) all Parties' obligations under this Agreement shall be terminated effective immediately (in the case of an Individual Lender Termination, solely with respect to obligations of or in favor of the Individual Terminating Lender), (b) the Parties shall be released from all commitments, undertakings, and agreements hereunder (in the case of an Individual Lender Termination, solely with respect to obligations of or in favor of the Individual Terminating Lender), and (c) any votes tendered by the Lenders (or, in the case of an Individual Lender Termination, solely by the Individual Terminating Lender) in favor of the Plan shall be deemed rescinded and null and void and such Lenders (or Individual Terminating Lender, as applicable) shall be provided an opportunity to tender new votes on account of their Senior Lender Claims to accept or reject the Plan and make any associated elections or opt-outs; *provided*, *however*, that each of the following shall survive any such termination: (x) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights with respect to such claims shall not be prejudiced in any way; (y) the Debtors' obligations in Section 17 of this Agreement accrued up to and including such Termination Date; and (z) Sections 12, 18, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 33, 34, 35, 36 and 37 hereof.

13.    **Transfers of Claims and Interests**.

(a)    Each Restructuring Support Lender and TJC Lender Party agrees, solely with respect to itself, that it shall not— (a) sell, transfer, loan, issue, hypothecate, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Lender's or TJC Lender Party's claims

against any Debtor, as applicable, in whole or in part, or (b) deposit any of such Restructuring Support Lender's or TJC Lender Party's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (a) and (b) are collectively referred to herein as a "***Transfer***" and the Restructuring Support Lender or TJC Lender Party making such Transfer is referred to herein as the "***Transferor***"), unless such Transfer is to a Restructuring Support Lender, a TJC Lender Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Debtors and to the Agent's counsel a joinder substantially in the form attached hereto as **Exhibit D** (the "***Joinder***") and thereby becomes a Restructuring Support Lender; *provided*, *however*, that HGIM Holdings' and the Required Restructuring Support Lenders' prior written consent shall be required in connection with a transfer of "beneficial ownership" (defined below) of HGIM Holdings' existing common units (the "***Existing Equity Interests***") (y) by an intended Transferor that, on the date hereof, is treated as the beneficial owner of more than 4.5% of Existing Equity Interests, or (z) if the intended transferee is treated as the beneficial owner of more than 4.5% of Existing Equity Interests prior to the proposed transfer, or such person would be treated as the beneficial owner of more than 4.5% of Existing Equity Interests immediately following such proposed transfer. For purposes of the proviso above, "beneficial ownership" shall be determined in accordance with applicable rules under section 382 of the Internal Revenue Code, the U.S. Department of Treasury regulations promulgated thereunder, and rulings issued by the Internal Revenue Service, and thus, to the extent provided in those rules, from time to time, shall include, without limitation, (a) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (b) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (c) in certain cases, the ownership of an option, contingent purchase, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest to acquire Existing Equity Interests. With respect to claims against or interests in a Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Restructuring Support Lender set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Each Restructuring Support Lender and TJC Lender Party agrees that any Transfer made in violation of this <u>Section 12</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any

prior notice provided to the Debtors and/or any Restructuring Support Lender or TJC Lender Party, and shall not create any obligation or liability of any Debtor or any other Restructuring Support Lender or TJC Lender Party to the purported transferee.

(b)     Any Lender may at any time agree in writing to become a Restructuring Support Lender and to be bound by the terms of this Agreement by executing and delivering to the Debtors and to the Agent's counsel a Joinder.

(c)     Upon execution of a Joinder or by a transferee upon consummation of a Transfer such Lender shall be deemed to make all of the representations, warranties, and covenants of a Restructuring Support Lender, as applicable, set forth in this Agreement. Upon consummation of a valid Transfer, the Transferor shall be deemed to relinquish its rights (and to be released from its obligations, except for any claim for a breach of this Agreement that occurred prior to such Transfer) under this Agreement.

14.     **Marketmaker**. Notwithstanding Section 13, (a) a Restructuring Support Lender may Transfer its Senior Lender Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Restructuring Support Lender; *provided, however*, that (i) such Qualified Marketmaker (A) must Transfer such right, title, or interest within 10 business days after its receipt thereof (or such earlier date as needed to comply with clause (i)(B) of this Section 14(a)) and (B) may not hold any claims in its capacity as Qualified Marketmaker on any date that is also a deadline for voting on the Plan, (ii) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such claims or equity is to a transferee that is or becomes (by executing a Transferee Joinder and delivering an executed copy thereof to the persons set forth in Section 30) a Restructuring Support Lender at the time of such Transfer, (iii) the transferor Restructuring Support Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of Sections 13 and 14, and (iv) any Transfer that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and the Debtors and each of the Restructuring Support Lenders shall have the right to enforce the voiding of such Transfer; and (b) to the extent that a Restructuring Support Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in claims or equity that the Qualified Marketmaker acquires from a Lender without the requirement that the transferee be or become a Restructuring Support Lender. A Qualified Marketmaker ("*Qualified Marketmaker*") means an entity that (y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter into with customers long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or marketmaker in such claims against the Debtors, and (z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). A Qualified Marketmaker acting in such capacity may purchase, sell, assign, transfer, or participate any claims other than claims held by a Restructuring Support Lender or TJC Lender Party without any requirement that the transferee be or become subject to this Agreement.

15.      **Forbearance.** Except as otherwise provided herein, during the period commencing on the RSA Effective Date and concluding on a Termination Date, each Restructuring Support Lender and TJC Lender Party hereby agrees, to forbear from the exercise of any rights (including any right of set off) or remedies it may have under the Credit Agreement, as applicable, and under applicable United States or foreign law or otherwise, with respect to any Designated Defaults (as defined in that certain Forbearance Agreement, dated as of September 20, 2017 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "*Forbearance Agreement*")) or in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Credit Agreement or that would be triggered as a result of the commencement of the Chapter 11 Cases or the undertaking of any Debtor hereunder to implement the Restructuring Transactions through the Chapter 11 Cases. The Restructuring Support Lenders and TJC Lender Parties further agree that if any applicable administrative agent takes any action inconsistent with any such Restructuring Support Lender's or TJC Lender Party's obligations under this Section 15, the Restructuring Support Lenders and TJC Lender Parties shall use commercially reasonable efforts to require such administrative agent to cease and refrain from taking any such action (the expense of which shall be borne by the Debtors). The Debtors agree that, prior to entry of the interim Cash Collateral Order, they will continue to comply with the financial reporting obligations set forth in Sections 4(f)–(g) and 5(a)–(b) of the Forbearance Agreement.

For the avoidance of doubt, nothing in this section shall constitute an extension of any of the Debtors' repayment obligations under the Credit Agreement and, notwithstanding the foregoing, no such forbearance shall constitute a release or waiver with respect to any Specified Event of Default (as defined in the Forbearance Agreement) or any other Default or Event of Default under the Credit Agreement. Furthermore, nothing in this section shall bar any Restructuring Support Lender or TJC Lender Party from filing a proof of claim or taking action to establish and have allowed the amount of its Senior Lender Claim.

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Restructuring Support Lender or TJC Lender Party or the ability of each Restructuring Support Lender and TJC Lender Party to protect and preserve its rights, remedies, and interests, including its claims against the Debtors, and the Debtors acknowledge and confirm that nothing in this Agreement amends, modifies, waives, or expands in any respect any obligation of the Debtors to pay interest or other amounts in accordance with the Credit Agreement. Each Restructuring Support Lender and TJC Lender Party fully reserves its rights and remedies in the event the transactions contemplated hereby are not consummated and/or this Agreement is terminated.

16.      **Further Acquisition of Claims or Interests**. Except as set forth in Section 13, nothing in this Agreement shall be construed as precluding any Restructuring Support Lender (or TJC Party) or any of its affiliates from acquiring additional Senior Lender Claims or interests in the instruments underlying the Senior Lender Claims consistent with such instruments; *provided, however,* that any additional Senior Lender Claims or interests in the underlying instruments acquired by any Restructuring Support Lender or TJC Party, and with respect to which such Restructuring Support Lender or TJC Party is the legal or beneficial owner or is the investment advisor or manager of the legal or beneficial owner with power and authority to bind any claims or interests held by it or such legal or beneficial owner, shall automatically be subject to the

terms and conditions of this Agreement. Upon any such further acquisition, such Restructuring Support Lender or TJC Party shall promptly notify counsel to the Agent.

17.     **Fees and Expenses**. The Debtors shall pay or reimburse when due (but in any event not later than 10 days following receipt of an invoice) all reasonable and documented fees and expenses related to the Restructuring Transactions (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the Agent, including the fees and expenses of Davis Polk & Wardwell LLP, PJT Partners LP, Holland & Knight LLP, as special maritime counsel, Haynes and Boone, LLP, as local counsel, and an Insurance Reviewer.

18.     **Consents and Acknowledgments**. Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan. The acceptance of the Plan by each of the Restructuring Support Lenders will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

19.     **Representations and Warranties**.

(a)     Each Restructuring Support Party hereby represents and warrants on a several and not joint basis, for itself and not any other person or entity, that the following statements are true, correct, and, to the best of its actual knowledge, complete as of the date hereof:

(i)      it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)     the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation, bylaws, or other organizational documents;

(iv)     subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(v)      it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "***Securities Act***"), with sufficient knowledge and

experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision in entering into this Agreement; and

(vi)    it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; or (C) does not directly or indirectly own any claims or interests against any Debtor other than as identified below its name on its signature page hereof.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) or manager(s), as applicable, of each of the corporate entities that comprise the Debtors;

(iii)    the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificates of incorporation, bylaws, or other organizational documents;

(iv)    the execution, delivery, and performance by it of this Agreement does not conflict with (result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except in connection with its filing of the Chapter 11 Cases;

21

(v)     the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)   it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and has made its own analysis and decision in entering into this Agreement.

20.     **Release**. In consideration of, among other things, the restructuring support provided for herein, each of the Debtors (each on its own behalf and on behalf of its subsidiaries) forever waives, releases and discharges any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff, and recoupment), causes of action, demands, suits, costs, expenses, and damages that they now have or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against the Agent and/or any Restructuring Support Lender (in their respective capacities as such) and any of their respective subsidiaries and affiliates, and each of their respective successors, assigns, officers, directors, employees, agents, attorneys, and other advisors or representatives (collectively, the "**_Lender Released Parties_**"); *provided* that in each case such claim is based in whole or in part on facts, events or conditions, whether known or unknown, existing on or prior to the date hereof and which arise out of or are related to the Credit Agreement, the other Loan Documents (as defined in the Credit Agreement), the Obligations (as defined in the Credit Agreement) or the Collateral (as defined in the Credit Agreement) (collectively, the "**_Lender Released Claims_**"). The Debtors further agree to refrain from commencing, instituting or prosecuting, or supporting any Person that commences, institutes, or prosecutes, any lawsuit, action or other proceeding against any and all Lender Released Parties with respect to any and all Lender Released Claims.

21.     **Survival of Agreement**. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtors and in contemplation of possible chapter 11 filings by the Debtors, and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

22.     **Waiver; Admissibility of Agreement**. If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in Section 20, and the Parties expressly reserve any and all of their respective rights. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding, or used by any party for any reason whatsoever, including in any proceeding, other than a proceeding to enforce its terms.

23.     **Relationship Among Parties**. Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.

24.     **Specific Performance**. It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

25.     **Governing Law and Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under, out of, or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of Texas (or, if such court lacks subject matter jurisdiction, then in any court of competent jurisdiction sitting in Harris County, Texas). By executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of Texas (or, if such court lacks subject matter jurisdiction, then in any court of competent jurisdiction sitting in Harris County, Texas), generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to Texas jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising under, out of, or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

26. <u>**Waiver of Right to Trial by Jury**</u>. Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

27. <u>**Successors and Assigns**</u>. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

28. <u>**Severability**</u>. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

29. <u>**No Third-Party Beneficiaries**</u>. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

30. <u>**Notices**</u>. All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing. Any notices or consents from the Agent, the Restructuring Support Lenders, or the Required Restructuring Support Lenders may be delivered on their behalf by the Agent's counsel. Any notice of termination or breach shall be delivered to all other Parties.

      (a)     If to any Debtor:

           HGIM Holdings, LLC
           Attn:   General Counsel
           701 Poydras St., Suite 3700
           New Orleans, LA 70139
           Tel:    (504) 348-2466
           Fax:    (504) 348-8060
           Email: shane@harveygulf.com

           *With a copy to:*

**EXECUTION DRAFT**

Vinson & Elkins LLP
Attn:   David S. Meyer
        Jessica C. Peet
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel:    (212) 237-0000
Fax:    (212) 237-0100
Email: dmeyer@velaw.com
        jpeet@velaw.com

Vinson & Elkins LLP
Attn:   Harry A. Perrin
        Garrick C. Smith
1001 Fannin Street
Houston, TX 10022-4611
Tel:    (713) 758-2222
Fax:    (713) 758-2346
Email: hperrin@velaw.com
        gsmith@velaw.com

(b)     If to the Agent or the Required Restructuring Support Lenders:

Davis Polk & Wardwell LLP
Attn:   Damian Schaible
        Angela Libby
450 Lexington Avenue
New York, NY 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5800
Email: damian.schaible@davispolk.com
        angela.libby@davispolk.com

**EXECUTION DRAFT**

    (c)    If to any TJC Party:

        Mayer Brown LLP
        Attn:   Philip O. Brandes
        1221 Avenue of the Americas
        New York, NY 10020-1001
        Tel:    (212) 506-2500
        Fax:    (212) 262-1910
        Email: pbrandes@mayerbrown.com

    (d)    If to Shane J. Guidry:

        Porter Hedges LLP
        Attn:   John F. Higgins
               Corey C. Brown
        1000 Main Street, 36th Floor,
        Houston, TX 77002
        Tel:    (713) 226-6000
        Fax:    (713) 228-1331
        Email: jhiggins@porterhedges.com
               cbrown@porterhedges.com

31.    **Entire Agreement**. This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

32.    **Amendments**. Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Debtors, the Required Restructuring Support Lenders and, with respect to any amendment that has an adverse effect on any TJC Party's rights hereunder, TJC.

33.    **Reservation of Rights**.

    (a)    Except as expressly provided in this Agreement or the Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)     Without limiting <u>Section 33(a)</u> in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement and the Term Sheet, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to <u>Sections 20</u> and 22. The Term Sheet, this Agreement, the Plan, and any related document shall in no event be construed as, or be deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

34.     **Counterparts**. This Agreement may be executed in one or more counterparts, and when executed, each of which shall be deemed to be an original, and all of which together shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

35.     **Public Disclosure**. Except to the extent disclosure is required by law, this Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality provisions set forth in the Credit Agreement; *provided, however,* that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein, excluding the terms of the Q-LNG Agreements and the terms of the CEO Employment Agreement not otherwise disclosed in the Term Sheet (excluding exhibits), Plan, or Disclosure Statement, if applicable, without the express written consent of the other Parties but may not disclose, and shall redact the holdings information of every Party to this Agreement as of the date hereof and at any time hereafter. In addition, each Party to this Agreement shall have the right, at any time, to know the identities and holdings information of every other Party to this Agreement, but must keep such information confidential and may not disclose such information to any person except as may be compelled by a court of competent jurisdiction. The Debtors take no position with regard to whether such information may be material nonpublic information, but may not disclose such information other than on a confidential basis or as may be ordered by the Bankruptcy Court.

36.     **Headings**. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

37.     **Interpretation**. When a reference is made in this Agreement to a section, exhibit, schedules, or annex, such reference shall be to a section, exhibit, schedule, or annex, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," and "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean

"and/or." This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.

[*Signatures and exhibits follow.*]

**Signature Pages Omitted**

## Exhibit B-2

**Amended and Restated Restructuring Term Sheet**

EXECUTION DRAFT

## HARVEY GULF INTERNATIONAL MARINE
### Restructuring Term Sheet

This term sheet (the "**Term Sheet**") sets forth the principal terms of a financial restructuring (as proposed, the "**Restructuring**") of the existing secured debt and other obligations of HGIM Holdings, LLC, HGIM Corp., and those certain additional subsidiaries thereof party to the Restructuring Support Agreement (collectively, "**HGIM**" or the "**Company**"), which shall be effected through the necessary definitive documents reflecting the transactions described herein.[1]

**THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE PLAN AND THE RELATED DEFINITIVE DOCUMENTATION GOVERNING THE RESTRUCTURING IDENTIFIED IN THE RESTRUCTURING SUPPORT AGREEMENT. SUCH DEFINITIVE DOCUMENTATION, ALL MOTIONS, AND RELATED ORDERS SHALL SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE, THE RESTRUCTURING SUPPORT AGREEMENT, AND THIS TERM SHEET.**

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING.  THE STATEMENTS CONTAINED HEREIN ARE PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE LENDERS AND THE DEBTORS.**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Restructuring Support Agreement.

| TERMS AND CONDITIONS OF THE PLAN | |
|---|---|
| **A.    Key Terms** | |
| **Associated Entities** | "*Associated Entities*" means, with respect to any person, such person's affiliates, current and former officers, managers, members, directors, managed accounts and funds, predecessors, successors and assigns, and each of their (or such person's) respective professionals, advisors, accountants, attorneys, financial advisors, investment bankers, consultants, employees, principals, members, partners, limited partners, agents and other representatives, each solely in its capacity as such; *provided* that none of the Debtors, their wholly-owned subsidiaries, or Q-LNG shall, in its capacity as such, be Associated Entities of any of the TJC Parties, and none of the TJC Parties or their wholly-owned subsidiaries shall, in its capacity as such, be Associated Entities of any of the Debtors or Q-LNG. |
| **Debtors** | "*Debtors*" means HGIM Holdings, LLC ("*HGIM Holdings*"), HGIM Corp. ("*HGIM Corp.*"), and those certain additional subsidiaries thereof listed on **Exhibit B** of the Restructuring Support Agreement.<br><br>After the Effective Date (as defined herein), the reorganized Debtors shall be referred to collectively as the "*Reorganized Debtors*." |
| **Effective Date** | The date selected by the Debtors on which all the conditions to consummation of the Plan have been satisfied in full or waived by the Debtors, with the consent of the Required Restructuring Support Lenders, and the Plan becomes effective.  On the Effective Date, the Reorganized Debtors shall be reorganized pursuant to the Plan in accordance with and pursuant to the Bankruptcy Code. |
| **Exit Facility** | "*Exit Facility*" means a senior secured term loan facility in an aggregate amount of $350 million on the terms set forth on **Exhibit E** of the Restructuring Support Agreement. |
| **HGIM Holdings Interests** | "*HGIM Holdings Interests*" means all ownership interests in HGIM Holdings. |
| **Intercompany Claim** | "*Intercompany Claim*" means any claim held against one Debtor by another Debtor or a non-Debtor subsidiary. |
| **Intercompany Interest** | "*Intercompany Interest*" means, other than an HGIM Holdings Interest, an ownership interest in one Debtor held by another Debtor or a non-Debtor subsidiary. |
| **Jones Act** | "*Jones Act*" means the U.S. cabotage laws known as the Shipping Act of 1916 and the Merchant Marine Act of 1920, each as amended. |

| | |
|---|---|
| **Jones Act Restriction** | "*Jones Act Restriction*" means that in no event shall (i) non-U.S. Citizens hold, in the aggregate, more than 24.00% of the total number of shares of New Common Stock issued and outstanding, or (ii) any non-U.S. Citizen hold more than 4.90% of the total number of shares of New Common Stock issued and outstanding. |
| **New Common Stock** | "*New Common Stock*" means the common stock of Reorganized HGIM Corp. to be issued pursuant to the Plan on the Effective Date. |
| **New Lender Warrants** | "*New Lender Warrants*" means the warrants to be issued by Reorganized HGIM Corp. to holders of allowed Senior Lender Claims to purchase New Common Stock, with an exercise price per warrant equal to the par value of the New Common Stock.  The terms of the New Lender Warrants are set forth in the New Lender Warrant term sheet (the "*Warrant Term Sheet*") attached as __Exhibit C__ to the Restructuring Support Agreement, and will be included in the form of warrant agreement, which will be a Definitive Document, filed with the Plan Supplement.  The Debtors shall in good faith (i) incorporate additional or modified terms for the New Lender Warrants (as defined herein) as may be requested by the Required Restructuring Support Lenders (subject to the receipt of any regulatory approvals reasonably necessary), and (ii) work with the Required Restructuring Support Lenders to pursue any such necessary regulatory approvals of such additional terms for the New Lender Warrants.<br><br>The Warrant Term Sheet will not be filed in the Chapter 11 Cases or included in the Disclosure Statement, but will be made available to the Lenders on the Agent's Syndtrak website. |
| **Q-LNG** | "*Q-LNG*" means Q-LNG Transport LLC and its direct and indirect subsidiaries. |
| **Reorganized HGIM Equity** | "*Reorganized HGIM Equity*" means the New Common Stock, collectively with the New Common Stock issuable upon exercise of the New Lender Warrants, which New Common Stock is subject to dilution by the Management Incentive Plan, if any, and the Shipyard Warrants. |
| **Required Restructuring Support Lenders** | "*Required Restructuring Support Lenders*" has the meaning set forth in the Restructuring Support Agreement. |
| **Restructuring Support Agreement** | "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated February 8, 2018, by and among the Debtors, the Agent, and the Restructuring Support Parties, as amended, modified, or supplemented, from time to time. |
| **Restructuring Support Lenders** | "*Restructuring Support Lenders*" has the meaning set forth in the Restructuring Support Agreement. |
| **Restructuring Support Parties** | "*Restructuring Support Parties*" has the meaning set forth in the Restructuring Support Agreement. |

| | |
|---|---|
| **Restructuring Toggle** | "*Restructuring Toggle*" has the meaning set forth in the Restructuring Support Agreement. |
| **TJC Parties** | "*TJC Parties*" has the meaning set forth in the Restructuring Support Agreement. |
| **U.S. Citizen** | "*U.S. Citizen*" means an Entity (as defined in the Bankruptcy Code) that is a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade.<br><br>If (i) an Entity does not furnish an affidavit of citizenship and supporting questionnaire to the Debtors on or before a date to be reasonably determined by the Debtors in consultation with the Required Restructuring Support Lenders, or (ii) such affidavit or questionnaire has not been accepted or has been rejected by the Debtors, in their reasonable discretion, then such Entity shall not be considered a U.S. Citizen for the purposes of the Jones Act Restriction. |
| **Venue** | The United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*"). |
| **B.    Treatment of Certain Claims and Interests under the Chapter 11 Plan[2]** | |
| **Other Priority Claims** | Each holder of an allowed priority claim (other than a priority tax claim or administrative claim) shall receive (i) payment in full, in cash, of the unpaid portion of its claim or (ii) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders. |
| **Other Secured Claims** | Each holder of an allowed secured claim (other than a Senior Lender Claim) shall receive, at the Debtors' election, either (i) cash equal to the full allowed amount of its claim, (ii) reinstatement of such holder's claim, (iii) the return or abandonment of the collateral securing such claim to such holder, or (iv) such other treatment as may otherwise be agreed to by such holder, the Debtors, and the Required Restructuring Support Lenders. |
| **Senior Lender Claims** | Each holder of an allowed Senior Lender Claim shall receive its *pro rata* share of (i) the Exit Facility, and (ii) 100.00% of the Reorganized HGIM Equity, in the form of (y) New Common Stock to the extent permitted under the Jones Act Restriction and (z) New Lender Warrants to the extent required by the Jones Act Restriction. |
| **General Unsecured Claims** | Each holder of an allowed general unsecured claim shall receive, in the sole discretion of the applicable Debtor or Reorganized Debtor, either: (i) payment in full of such claim in the ordinary course of business or (ii) payment in full of such claim in cash, including interest at the |

---

[2]    Treatment of Claims and Interests under the Plan shall be subject to the Reservation of Rights (described below).

| | contractual rate, upon the later of (A) the Effective Date, (B) the date on which such claim against the Debtors becomes an allowed claim, or (C) such other date as may be ordered by the Bankruptcy Court; *provided* that no TJC Party or Associated Entity shall receive any distribution on account of any General Unsecured Claim other than as set forth in the Shipyard Settlement. |
|---|---|
| **Intercompany Claims** | Intercompany Claims shall be reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be canceled.  No distribution shall be made on account of any Intercompany Claims other than in the ordinary course of business of the Reorganized Debtors, as applicable. |
| **Intercompany Interests** | Intercompany Interests shall be reinstated as of the Effective Date or, at the Reorganized Debtors' option, with the consent of the Required Restructuring Support Lenders, shall be canceled.  No distribution shall be made on account of any Intercompany Interests. |
| **HGIM Holdings Interests** | On the Effective Date, or as soon thereafter as reasonably practicable, all HGIM Holdings Interests shall be canceled and discharged. |
| **C.   Management and Governance** | |
| **Chairman and CEO and Other Management** | Unless the Restructuring Toggle has occurred, Shane Guidry shall serve as Chairman and CEO of Reorganized HGIM Corp. <br><br> Unless the Restructuring Toggle has occurred, the CEO Employment Agreement shall be assumed.  The CEO Employment Agreement will not be filed in the Chapter 11 Cases given the commercially sensitive nature of the document, except as required by court order, but will be made available to the Lenders on the Agent's Syndtrak website, as well as to the U.S. Trustee and the Bankruptcy Court.  The Debtors will disclose the nature of the CEO's compensation, as required by section 1129(a)(5) of the Bankruptcy Code. <br><br> Employment agreements for the CFO (Jeff Henderson), General Counsel (Rob Vosbein), and President (Robert Gwinn) of Reorganized HGIM Corp. are expected to be filed with the Plan Supplement and executed in connection with consummation of the Restructuring.  Any such employment agreements shall constitute Definitive Documentation, and, therefore, be subject to <u>Section 3</u> of the Restructuring Support Agreement. |
| **Governance** | The initial, post-emergence board of directors of Reorganized HGIM Corp. will consist of: <br><br> (i) Shane Guidry, the company's Chairman and Chief Executive Officer; <br><br> (ii) one U.S. Citizen director appointed by Mr. Guidry, who shall initially be W. Steve Orlando; and <br><br> (iii) five other members selected by the Required Restructuring Support |

| | Lenders; |
|---|---|
| | *provided, however*, that if the Restructuring Toggle has occurred, then the initial, post-emergence board of directors of Reorganized HGIM Corp. will consist solely of five members selected by the Required Restructuring Lenders. |
| | Unless a Restructuring Toggle has occurred, certain matters or actions of the board of directors will require a specified vote, which governance provisions shall be consistent with **Annex 1** attached hereto and finally determined prior to the Effective Date in accordance with the amended organizational documents of Reorganized HGIM Corp. If the Restructuring Toggle has occurred, the governance documents filed with the Plan Supplement will set forth any matters or actions of the board of directors that require a specified vote, if applicable. |
| | All officers of Reorganized HGIM Corp. shall be U.S. Citizens. The directors of Reorganized HGIM Corp. shall satisfy Jones Act requirements, including the requirement that no more than a minority of the number of directors necessary to constitute a quorum of the board of directors (and any committee thereof) shall be non-U.S. Citizens. |
| | Corporate governance for the Reorganized Debtors and their subsidiaries, including charters, bylaws, operating agreements, other organization or formation documents (for the avoidance of doubt, in the discretion of the Required Restructuring Support Lenders, such documents may or may not include limitations on equity holders' ability to cast votes above a specified threshold, may or may not include requirements for the Reorganized Debtors to seek to cause the New Common Stock and New Lender Warrants to be quoted on a recognized over-the-counter market, and may include provisions necessary to ensure compliance with the Jones Act), or related documents such as any shareholder's agreements, as applicable, shall be acceptable in form and substance to the Debtors and the Required Restructuring Support Lenders. |
| **Management Incentive Plan** | Unless the Restructuring Toggle has occurred, the Restructuring shall include a long-term management equity plan (the "***Management Incentive Plan***"). The Management Incentive Plan will be structured in a manner to minimize tax consequences to recipients of awards thereunder, subject to the reasonable consent of the Required Restructuring Support Lenders; *provided* that such tax structuring shall not result in incremental costs to the Debtors. The Management Incentive Plan will consist of: |
| | (i) restricted stock units or other equity granted immediately upon the Effective Date, in an aggregate amount equal to 3.00% of the |

Reorganized HGIM Equity (the "***Primary Equity Grant***"), on a fully diluted basis,[3] which shall vest quarterly over five years from issuance; and

(ii) three series of warrants (the "***MIP Warrants***") in an aggregate amount equal to 11.00% of the Reorganized HGIM Equity, subject to dilution, which shall vest quarterly over five years from the Effective Date and, which shall be exercisable for a seven-year period commencing on the Effective Date, with (x) the first series of warrants in an aggregate amount equal to 6.00% of the Reorganized HGIM Equity at a strike price equal to a total enterprise value of $750 million, (y) the second series of warrants in an aggregate amount equal to 2.50% of the Reorganized HGIM Equity at a strike price equal to a total enterprise value of $1,000 million, and (z) the third series of warrants in an aggregate amount equal to 2.50% of the Reorganized HGIM Equity at a strike price equal to a total enterprise value of $1,250 million.

The Management Incentive Plan shall be allocated such that Mr. Guidry shall receive or be allocated 87.00% of the total grants on the Effective Date. The remainder of the Management Incentive Plan shall be allocated to other members of management by Mr. Guidry and the HGIM Holdings board of directors, based on Mr. Guidry's recommendation, on the Effective Date, provided that all of the Primary Equity Grant and MIP Warrants will be issued on the Effective Date.

The portion of the Management Incentive Plan allocated to Mr. Guidry (the "***CEO MIP Allocation***") shall be subject to the following forfeiture and acceleration provisions:

(i) if Mr. Guidry resigns without Good Reason (as defined in the CEO Employment Agreement), Mr. Guidry shall receive only that portion of the CEO MIP Allocation that is vested as of the date of such resignation, and shall forfeit any unvested portion of the CEO MIP Allocation;

(ii) if Mr. Guidry is terminated for Cause (as defined in the CEO Employment Agreement), Mr. Guidry shall forfeit the CEO MIP Allocation, including any vested portion of the CEO MIP Allocation as of the date thereof;

(iii) if Mr. Guidry is terminated without Cause or resigns with Good Reason, the CEO MIP Allocation shall vest automatically and immediately and Mr. Guidry shall receive all of the CEO MIP Allocation, including any unvested portion; and

(iv) if the CEO Employment Agreement is terminated as a result of Mr.

---

[3]    For the avoidance of doubt, the Primary Equity Grant shall be adjusted if and when the New Lender Warrants, Shipyard Warrants, and/or MIP Warrants are exercised, such that the Primary Equity Grant shall continue to be in an aggregate amount equal to 3.00% of the Reorganized HGIM Equity.

| | |
|---|---|
| | Guidry's death or Disability (as defined in the CEO Employment Agreement), the CEO MIP Allocation that was scheduled to vest during the 12-month period following such termination shall vest automatically and immediately, and Mr. Guidry or his estate shall forfeit the remaining unvested portion of the CEO MIP Allocation; *provided* that, in the event that such death or Disability occurs in connection with and as a direct result of his activities for HGIM Corp. or its subsidiaries, the CEO MIP Allocation shall vest automatically and immediately and Mr. Guidry or his estate shall receive all of the CEO MIP Allocation, including any unvested portion.<br><br>For the avoidance of doubt, if the Restructuring Toggle has occurred, none of the terms set forth in this row labeled "Management Incentive Plan" shall be binding, and the Management Incentive Plan (if any) shall be acceptable to the Debtors and Required Restructuring Support Lenders. |
| **D.    Non-Debtor Provisions** | |
| **Shipyard Settlement** | Unless the Restructuring Support Agreement has been terminated solely with respect to the TJC Parties, the Plan shall include a settlement under Bankruptcy Rule 9019 of all potential claims between the TJC Parties (or their Associated Entities) and the Debtors (and their Associated Entities) in respect of the Shipyard (the "***Shipyard Settlement***") pursuant to which HGIM Group, LLC will contribute its equity interests in GCSG Holdings, LLC (together with its direct and indirect subsidiaries, the "***Shipyard***") to debtor Harvey America LNG, LLC ("***Harvey America***") (the definitive documentation for such assignment, the "***Shipyard Assignment Agreement***").   As part of the Plan and pursuant to the terms of the Shipyard Settlement:<br><br>(i) HGIM Group, LLC shall be entitled to receive (x) $16 million in cash on the Effective Date payable by the Debtors, and (y) two series of warrants (the "***Shipyard Warrants***" and, collectively with the form of warrant agreement governing the Shipyard Warrants, and the Shipyard Assignment Agreement, the "***Shipyard Settlement Documentation***") in an aggregate amount equal to 4.00% of the Reorganized HGIM Equity, which shall be exercisable by physical settlement in cash or on a cashless basis for a seven-year period commencing on the Effective Date, with (i) the first series of warrants in an aggregate amount equal to 3.00% of the Reorganized HGIM Equity at a strike price based on a total enterprise value of $750 million, and (ii) the second series of warrants in an aggregate amount equal to 1.00% of the Reorganized HGIM Equity at a strike price based on a total enterprise value of $1,250 million; provided, that the strike price of the Shipyard Warrants shall be reduced for distributions of cash, securities, or other assets to holders of the New Common Stock and benefit from other customary anti-dilution protections;<br><br>(ii) (x) the TJC Parties and their Associated Entities shall waive and release any claims against the Debtors and their Associated Entities other than any Senior Lender Claims held by the TJC Parties, which Senior Lender Claims shall receive the same treatment and distributions |

|   |   |
|---|---|
|   | as other Senior Lender Claims in full satisfaction and release of such claims pursuant to the Plan, and (y) the Debtors, the Shipyard and their respective Associated Entities shall waive and release any claims against the TJC Parties and their Associated Entities; and<br><br>(iii) the Exit Facility shall allow for the existing debt obligations of the Shipyard and the existing liens on any Shipyard assets to remain in place on their existing terms.<br><br>The Shipyard Settlement Documentation shall be included in the Plan Supplement, constitute Definitive Documentation, and therefore be subject to Section 3 of the Restructuring Support Agreement.<br><br>If (a) the Restructuring Support Agreement has been terminated solely with respect to the TJC Parties, and (b) the Restructuring Toggle has not occurred, Mr. Guidry shall execute an agreement with Reorganized HGIM Corp., which provides that:  (i) Mr. Guidry will grant Harvey America a proxy (irrevocable so long as Mr. Guidry is CEO of Reorganized HGIM Corp. or for two years after Mr. Guidry is terminated for Cause or resigns without Good Reason, each as defined in the CEO Employment Agreement (such period, the "***Proxy Period***")) to vote Mr. Guidry's common units on any Shipyard matters requiring a vote of the common unitholders (any such vote, a "***Proxy Vote***"); (ii) Reorganized HGIM Corp. shall indemnify Mr. Guidry for any claims or causes of action related to his actions during the Proxy Period as an equity holder, officer, or director of the Shipyard, including with respect to any of the matters described in clause (i) (to the extent that such actions are consistent with any Proxy Vote), but excluding claims by Reorganized HGIM Corp. against Mr. Guidry for any claims or causes of action related to his actions during the Proxy Period; and (iii) Reorganized HGIM Corp. shall release Mr. Guidry for any claims or causes of action arising prior to entry into such agreement and related to his actions as an equity holder, officer, director, or other fiduciary of the Shipyard.  The form of any such agreement shall be included in the Plan Supplement, constitute Definitive Documentation, and, therefore, be subject to Section 3 of the Restructuring Support Agreement. |
| **Q-LNG Modifications** | Unless the Restructuring Toggle has occurred, the Q-LNG Agreements shall be modified to reflect changes agreed to by the Debtors, Q-LNG, and the Required Restructuring Support Lenders.<br><br>The Q-LNG Agreements will not be filed in the Chapter 11 Cases, unless required by court order, given the commercially sensitive nature of the documents and Q-LNG's status as a non-debtor, but summaries of the modifications made to the Q-LNG Agreements will be distributed to the Lenders via the Agent's Syndtrak website in a form consistent with the materials shared with the Agent's steering committee.  Forms of the modified Q-LNG Agreements shall be shared on a confidential basis with the U.S. Trustee and the Bankruptcy Court. |

| E.   Other Restructuring Provisions | |
| --- | --- |
| **Restructuring Timeline** | The Restructuring described herein will take place in accordance with the Milestones set forth in the Restructuring Support Agreement. |
| **Conditions Precedent to Confirmation** | The Plan shall contain customary conditions to confirmation in form and substance to be agreed upon by the Debtors and Required Restructuring Support Lenders, including, without limitation:<br><br>(i)      the Restructuring Support Agreement shall not have been breached or terminated (as to all Lenders) and shall remain in full force and effect;<br><br>(ii)      an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;<br><br>(iii)      the Q-LNG Agreements and the CEO Employment Agreement shall be in form and substance agreed by the parties thereto and the Required Restructuring Support Lenders; and<br><br>(iv)      the Confirmation Order shall have been entered by the Bankruptcy Court, and the Plan and the Plan Supplement (including any exhibits, schedules, amendments, modifications or supplements thereto) shall have been filed, each in form and substance acceptable to the Debtors and the Required Restructuring Support Lenders. |
| **Conditions Precedent to the Effective Date** | The Plan shall contain customary conditions to effectiveness in form and substance to be agreed upon by the Debtors and Required Restructuring Support Lenders, including, without limitation:<br><br>(i)      the Confirmation Order shall have been entered, and the Confirmation Order shall have become a final order that is not stayed, modified, or vacated on appeal;<br><br>(ii)      all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;<br><br>(iii)      the Q-LNG Agreements shall have been executed and delivered by all of the parties thereto, and any other actions necessary to effectuate the agreed modifications taken;<br><br>(iv)      the CEO Employment Agreement shall have been executed and delivered by all of the parties thereto;<br><br>(v)      the Shipyard Assignment Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and any other actions necessary to effectuate the Shipyard Settlement shall |

| | |
|---|---|
| | have been taken; |
| | (vi) the Definitive Documentation relating to the Restructuring shall be executed and be in form and substance consistent with the consent rights of the Required Restructuring Support Lenders and the Debtors set forth in Section 3(b) of the Restructuring Support Agreement; and |
| | (vii) except as waived by the Required Restructuring Support Lenders in their sole discretion, the Management Documents shall have been executed in form and substance consistent with the consent rights of the Required Restructuring Support Lenders and the Debtors set forth in Section 3(b) of the Restructuring Support Agreement. |
| **Releases** | To the fullest extent permitted by applicable law, the Plan shall include a full mutual release from liability in favor of the Debtors, the Reorganized Debtors, non-debtor Q-LNG, non-debtor the Shipyard, the Lenders, the Agent, the TJC Parties, and each of their respective Associated Entities (the "***Released Parties***"), from any claims or causes of action, including derivative claims, arising on or prior to the Effective Date, including, but not limited to, claims or causes of action related to or in connection with the Debtors or Reorganized Debtors, Q-LNG, the Q-LNG Modifications, the Shipyard, the Shipyard Settlement, the Restructuring, the Restructuring Support Agreement, the Chapter 11 Cases, or the Plan. Notwithstanding the foregoing, none of the releases shall release any party from any claim or cause of action that is determined by a final order to be the result of such party's actual fraud, willful misconduct, or gross negligence. Nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification claims against the Debtors or any of its insurance carriers or any rights as beneficiaries of any insurance policies. |
| | For the avoidance of doubt, subject to the terms and conditions of the Restructuring Support Agreement and unless the Restructuring Toggle has occurred, the release provisions described herein (the "***Releases***") shall be included in the Plan as described herein and, as such, shall only become effective on the Effective Date. |
| | If (i) the Restructuring Support Agreement has been terminated solely with respect to the TJC Parties and (ii) the Shipyard Settlement is not consummated, the Releases shall be modified to exclude the Shipyard and the TJC Parties and their respective Associated Entities, unless otherwise consented to by the Required Restructuring Support Lenders. |
| | If the Restructuring Toggle has occurred, the Releases shall be modified to exclude Shane J. Guidry and non-Debtor Q-LNG, unless otherwise consented to by the Required Restructuring Support Lenders. |
| **Exculpation** | Ordinary and customary exculpation provisions shall be included in the Plan and Confirmation Order. |

| | |
|---|---|
| **Injunction** | Ordinary and customary injunction provisions shall be included in the Plan and Confirmation Order. |
| **Registration Rights** | Holders of the Reorganized HGIM Equity will have registration rights pursuant to a registration rights agreement agreeable to the Debtors and the Required Restructuring Support Lenders, which registration rights agreement shall be filed with the Plan Supplement. |
| **Executory Contracts and Unexpired Leases** | All material revenue contracts shall be assumed by the Debtors and assigned to the Reorganized Debtors.  All other executory contracts and unexpired leases shall be assumed or rejected by the Debtors under the Plan, subject to the consent of the Required Restructuring Support Lenders. |
| **Indemnification and Insurance** | The Debtors' indemnification obligations shall be assumed, or assumed and assigned by the Debtors under the Plan, and continue as obligations of the Reorganized Debtors; *provided* that, if the Restructuring Toggle has occurred, the Debtors and the Required Restructuring Support Lenders shall determine at such time whether the Debtors' indemnification obligations shall be assumed, assumed and assigned, or rejected by the Debtors under the Plan.<br><br>All of the Debtors' insurance policies, including all directors' and officers' liability insurance and any "tail" policy, shall be assumed, or assumed and assigned by the Debtors, under the Plan. |
| **Corporate Structure** | The Reorganized Debtors will be structured in a manner determined by the Debtors and Required Restructuring Support Lenders.  The Debtors and the Restructuring Support Lenders shall seek to effectuate the terms and conditions of the Restructuring (including the terms of any Management Incentive Plan) in a tax-efficient manner reasonably satisfactory to the Required Restructuring Support Lenders. |
| **Reservation of Rights** | The Debtors, the Agent, and the Restructuring Support Lenders reserve their rights to dispute, object to the allowance of, or move to subordinate any Claims, including Senior Lender Claims and General Unsecured Claims against the Debtors, in accordance with the Restructuring Support Agreement; *provided*, that nothing herein shall be deemed to grant standing to the Agent, the TJC Parties, or any Restructuring Support Lender to move to subordinate any Claims, to the extent that a motion for standing to pursue such causes of action is necessary. |
| **Securities Exemptions** | The issuance and distribution of (i) the New Common Stock, (ii) the New Lender Warrants, and (iii) the New Common Stock issuable upon exercise of the New Lender Warrants will be exempt from registration under the Securities Act or other applicable securities laws without further action by any Person pursuant to section 1145(a) of the Bankruptcy Code (to the extent applicable), and/or any other applicable exemption. |

## **Annex 1**

**Supermajority Governance Provisions**

The following action will require a majority vote (4 of 7 board members) of the Reorganized HGIM Corp. board of directors.

1. Approve all annual budgets, amend the terms of any approved annual budget or take any action inconsistent with an approved annual budget.

The following actions will require a supermajority vote (5 of 7 board members) of the Reorganized HGIM Corp. board of directors.

1. Purchase or otherwise acquire, or permit any Subsidiary to purchase or otherwise acquire, directly or indirectly, in one or a series of transactions, any business of any other Person, whether through the purchase of assets, securities or other property of such other Person, or any assets (other than equity securities, debt securities and cash equivalents) with a fair market value in excess of $20,000,000.

2. Sell, lease or otherwise dispose of, or permit any Subsidiary to sell, lease or otherwise dispose of, directly or indirectly, in one or a series of transactions, any assets with a fair market value in excess of $20,000,000.

3. Incur or become obligated for, or permit any Subsidiary to incur or become obligated for, indebtedness in excess of $20,000,000 in the aggregate.

4. Engage in, or permit any Subsidiary to engage in, any issuance, sale, repurchase or other disposition or acquisition of any equity securities or any securities convertible into such securities, or make distributions or pay dividends on any outstanding equity securities.

5. Engage in, or permit any Subsidiary to engage in, any merger, combination, consolidation, recapitalization, initial public offering, joint venture, sale or transfer of all or substantially all of the Company's or such Subsidiary's assets, or other liquidity event.

6. Make, or permit any Subsidiary, to engage in any investments other than in Persons directly or indirectly engaged primarily in owning and operating Coastwise Trade Vessels.

7. Cause the Company, or permit any Subsidiary, to engage in any business other than the Business (as defined in the CEO Employment Agreement).

The following action will require a supermajority vote of two-thirds of the disinterested directors of the Reorganized HGIM Corp. board of directors.

1. Engage in or permit any Subsidiary to engage in, any affiliated party transactions.

**Exhibit B-3**

**Subsidiaries**

## DEBTORS

| | | | | |
|---|---|---|---|---|
| 1. | Gladiator Marine, Inc. | | 45. | Harvey Leader, LLC |
| 2. | Golden Lane Marine, Inc. | | 46. | Harvey Legend, LLC |
| 3. | Guidry Brothers, Inc. | | 47. | Harvey Liberty, LLC |
| 4. | Harvey America LNG, LLC | | 48. | Harvey Lightning, L.L.C. |
| 5. | Harvey Badger, LLC | | 49. | Harvey Lion, LLC |
| 6. | Harvey Bear, LLC | | 50. | Harvey Mariner, LLC |
| 7. | Harvey Beaver, LLC | | 51. | Harvey Mustang, LLC |
| 8. | Harvey Blue-Sea, LLC | | 52. | Harvey Otter, LLC |
| 9. | Harvey Bobcat, LLC | | 53. | Harvey Pacer, LLC |
| 10. | Harvey Bronco, LLC | | 54. | Harvey Panther, LLC |
| 11. | Harvey Buffalo, LLC | | 55. | Harvey Patriot, LLC |
| 12. | Harvey Bull, LLC | | 56. | Harvey Pioneer, LLC |
| 13. | Harvey Carrier, LLC | | 57. | Harvey Pirate, LLC |
| 14. | Harvey Challenger, LLC | | 58. | Harvey Power, LLC |
| 15. | Harvey Champion, LLC | | 59. | Harvey Provider 240, L.L.C. |
| 16. | Harvey Charger, LLC | | 60. | Harvey Raider, LLC |
| 17. | Harvey Clipper, LLC | | 61. | Harvey Rain, LLC |
| 18. | Harvey Colt, LLC | | 62. | Harvey Ram, LLC |
| 19. | Harvey Condor, LLC | | 63. | Harvey Raven, LLC |
| 20. | Harvey Cougar, LLC | | 64. | Harvey Razorback, LLC |
| 21. | Harvey Cowboy, LLC | | 65. | Harvey Rebel, LLC |
| 22. | Harvey Deep-Sea, LLC | | 66. | Harvey Redhawk, LLC |
| 23. | Harvey Eagle, LLC | | 67. | Harvey Rover, LLC |
| 24. | Harvey Energy, LLC | | 68. | Harvey Runner, LLC |
| 25. | Harvey Explorer 242, L.L.C. | | 69. | Harvey Sailor, LLC |
| 26. | Harvey Express 225, LLC | | 70. | Harvey Saint, LLC |
| 27. | Harvey Falcon, LLC | | 71. | Harvey Sea Lion, LLC |
| 28. | Harvey Freedom, LLC | | 72. | Harvey Sea-Hawk, LLC |
| 29. | Harvey Gator, LLC | | 73. | Harvey Seas, LLC |
| 30. | Harvey Giant, LLC | | 74. | Harvey Spirit, L.L.C. |
| 31. | Harvey Gladiator, LLC | | 75. | Harvey Spur, LLC |
| 32. | Harvey Grizzly, LLC | | 76. | Harvey Steeler, LLC |
| 33. | Harvey Gulf International Marine, LLC | | 77. | Harvey Storm, LLC |
| 34. | Harvey Hauler, LLC | | 78. | Harvey Subsea, LLC |
| 35. | Harvey Hawk, LLC | | 79. | Harvey Supporter, LLC |
| 36. | Harvey Hawkeye, LLC | | 80. | Harvey Thunder, L.L.C. |
| 37. | Harvey Heat, LLC | | 81. | Harvey Tiger, LLC |
| 38. | Harvey Herd, LLC | | 82. | Harvey Tugs, LLC |
| 39. | Harvey Hurricane, LLC | | 83. | Harvey War Horse, L.L.C. |
| 40. | Harvey Husky, LLC | | 84. | Harvey War Horse III, L.L.C. |
| 41. | Harvey Hustler, LLC | | 85. | Harvey Wave, LLC |
| 42. | Harvey Indian, LLC | | 86. | Harvey Wind, LLC |
| 43. | Harvey Intruder, L.L.C. | | 87. | Harvey Wolf, LLC |
| 44. | Harvey Jaguar, LLC | | 88. | Harvey Worker, LLC |

89.     N.J.Guidry & Sons Towing Co., Inc.

**<u>Exhibit B-4</u>**

**Warrant Term Sheet**

**Available on the Agent's Syndtrak website**

**Exhibit B-5**

**Form of Joinder**

**Form of Joinder**

This joinder (this "***Joinder***") to the Restructuring Support Agreement (the "***Agreement***"),[11] dated as of February 8, 2018, by and among (i) HGIM Holdings, LLC ("***HGIM Holdings***"), HGIM Corp. ("***HGIM Corp.***"), and those certain additional subsidiaries thereof listed on **Exhibit B** to the Agreement (such subsidiaries, HGIM Holdings, and HGIM Corp., each a "***Debtor***" and, collectively, the "***Debtors***") and (ii) the Restructuring Support Lenders, is executed and delivered by [_____] (the "***Joining Party***") as of [_____].

1.      <u>Agreement to Be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Lenders, as applicable.

2.      <u>Representations and Warranties</u>. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (i) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (ii) makes, as of the date hereof, the representations and warranties set forth in <u>Section 18</u> of the Agreement to each other Party.

3.      <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the laws of the State of New York, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction.

4.      <u>Notice</u>. All notices and other communications to the Joining Party given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn: [RECIPIENT]
Facsimile: [FAX]
Email: [EMAIL]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[11] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

**[JOINING PARTY]**


By:

Name:

Title:

Holdings: $_____ of principal amount of
Senior Lender Claims under the Credit Agreement

**<u>Exhibit B-6</u>**

**Exit Term Sheet**

<div align="right">**EXECUTION**</div>

**HGIM CORP.**
**TAKEBACK FIRST LIEN TERM FACILITY**
**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

Terms used but not defined herein have the meanings given to such terms in either the Restructuring Support Agreement dated as of February 7, 2018 (together with all exhibits and annexes thereto, the "**Restructuring Support Agreement**") or the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* ("**Plan**") of the Credit Parties (as defined below).

| | |
|---|---|
| **Borrower:** | HGIM Corp., a Delaware corporation (the "**Borrower**"). |
| **Guarantors:** | The obligations of the Borrower under the Takeback Term Facility (as defined below) shall be unconditionally guaranteed jointly and severally by HGIM Holdings, LLC ("**Holdings**") and all existing restricted subsidiaries of the Borrower and all newly created or acquired restricted subsidiaries of the Borrower, subject to exceptions consistent with that certain Senior Secured Term and Revolving Credit Agreement, dated as of June 18, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and as in effect on the Petition Date, the "**Prepetition Credit Agreement**"), by and among the Borrower, Holdings, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto (collectively, the "**Guarantors**", and together with the Borrower, the "**Credit Parties**"). |
| **Administrative Agent:** | Bank of America, N.A. (in such capacity, together with its successors, the "**Administrative Agent**"). |
| **Takeback First Lien Term Facility:** | First lien term loan facility (the "**Takeback Term Facility**" or the "**Exit Financing**"; and the holders thereof referred to as the "**Exit Lenders**"), comprised of $350,000,000 of term loans (the "**Takeback Term Loans**") converted on the basis set forth in the Restructuring Support Agreement from the loans outstanding under the Prepetition Credit Agreement (the "**Existing Loans**") on the Closing Date (as defined below). Each Exit Lender shall receive a pro rata share of the Takeback Term Loans equal to its pro rata share of the Existing Loans plus accrued and unpaid interest outstanding as of the Petition Date. Takeback Term Loans that are prepaid may not be re-borrowed. |
| **Use of Proceeds:** | The Takeback Term Facility will be used to refinance a portion of the loans under the Prepetition Credit Agreement, as further provided in the Approved Plan. |
| **Closing Date:** | The date on which the Takeback Term Loan is issued under the Takeback Term Facility and the Reorganization is consummated pursuant to the Approved Plan (the "**Closing Date**"); which shall be the "Effective Date" under the Approved Plan. |

**EXECUTION**

| | |
|---|---|
| **Maturity:** | The date that is 5 years after the Closing Date (the "**Maturity Date**"). |
| **Collateral:** | A first priority perfected senior lien on substantially all assets of the Credit Parties, other than 34% of the voting equity of foreign subsidiaries that are "controlled foreign corporations" and other customary exceptions, subject to permitted liens. |
| **Interest Rate:** | Interest shall be paid in cash ("**Interest**"). Interest on the Takeback Term Loans shall accrue at the Libor Rate *plus* the Margin.<br><br>As used herein, (i) the term "**Margin**" means 6.0% per annum and (ii) the term "**Libor Rate**" shall have a meaning customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the Libor Rate shall be customary and appropriate for financings of this type (which in no event shall be less than 1.0%).<br><br>During the continuance of an event of default, the Takeback Term Loans and all other outstanding obligations will bear interest at an additional 2.00% per annum above the interest rate otherwise applicable. |
| **Scheduled Amortization:** | Annual amortization (payable in equal quarterly installments beginning the first quarter after the second anniversary of the Closing Date) of the Takeback Term Loans shall be required in an aggregate annual amount equal to 1.5% of the original principal amount of the Takeback Term Loans (it being understood and agreed that such amortization payments shall be reduced by application of debt prepayments as provided for herein on a pro rata basis).  The remaining aggregate principal amount of the Takeback Term Loans shall be payable in full on the Maturity Date. |
| **Optional Prepayment:** | Permitted in whole or in part, with prior written notice to the Administrative Agent, provided that any such optional prepayment shall be accompanied by accrued interest on the amount prepaid, any applicable breakage costs, and, solely in connection with a Repricing Event (as defined below), a prepayment premium equal to (i) in the case of any such prepayment made on or prior to the first anniversary of the Closing Date, 1.0% of the principal amount prepaid, (ii) in the case of any such prepayment made after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, 0.5% of the principal amount prepaid, and (iii) in the case of any such prepayment made after the second anniversary of the Closing Date, 0.0% of the principal amount prepaid.<br><br>The term "**Repricing Event**" means (i) any optional prepayment or mandatory prepayment of the Takeback Term Loans, in each case with the proceeds of any new secured loans, or with the proceeds of any |

**EXECUTION**

| | |
|---|---|
| | refinancing facilities, bearing interest with an "effective yield" that is less than the effective yield applicable to the Takeback Term Loans and (ii) any amendment to the Takeback Term Facility which reduces the effective yield applicable to the Takeback Term Loans and, in either case where the primary purpose of such prepayments or amendment is to reduce the effective yield of the Takeback Term Facility (it being understood that (x) any prepayment premium with respect to a Repricing Event shall apply to any required assignment by a non-consenting lender in connection with any such amendment pursuant to so-called yank-a-bank procedures and (y) in each case, the effective yield shall exclude any structuring, commitment and arranger fees or other similar fees unless such similar fees are paid to all lenders generally in the primary syndication of such new loans or refinancing facilities). |
| **Mandatory Prepayments:** | The Takeback Term Loans shall be prepaid with:<br><br>(a)   50% of Excess Cash Flow (to be defined in a manner consistent with the Prepetition Credit Agreement, provided that the definition of "Maintenance Capital Expenditures" shall be amended to include capital expenditures required to maintain the general condition and upkeep of vessels acquired after the Closing Date as of such vessel's acquisition date) for each fiscal year (starting with the fiscal year ending December 31, 2019 and only if the Total Leverage Ratio (to be defined in a manner consistent with the Prepetition Credit Agreement) as of the end of such fiscal year is equal to or greater than 3.50 to 1.00) *minus* voluntary prepayments of Takeback Term Loans during such fiscal year (except to the extent funded with indebtedness);<br><br>(b)   100% of the net cash proceeds of non-ordinary course asset sales, casualty events or condemnation events, subject to (i) baskets and exclusions consistent with the Prepetition Credit Agreement and (ii) a reinvestment right within 360 days of receipt thereof; and<br><br>(c)   100% of the proceeds of debt incurrences (other than debt permitted under the Exit Loan Documentation, except for permitted refinancing debt). |
| **Conditions to Closing:** | Usual and customary for facilities of this type, including, without limitation, the following:<br><br>A.   The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Financing, including an amended and restated credit agreement (the "**Exit Credit Agreement**"), amended and restated guaranty agreements, amended and restated security agreements, amended and restated pledge agreements, amended and restated mortgages (it being understood and agreed that existing vessel mortgages will be amended, restated and reaffirmed in a manner to be agreed |

**EXECUTION**

between the Majority Supporting Lenders and the Borrower) and other collateral documents, in each case substantially consistent with the terms set forth in this Term Sheet and satisfactory to the Majority Supporting Lenders and the Borrower (the "**Exit Loan Documentation**).

B. The Reorganization shall have been consummated in accordance with the Approved Plan (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Majority Supporting Lenders)), and substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Approved Plan in accordance with its terms shall have occurred contemporaneously with the closing of the Takeback Term Loans.

C. Delivery of evidence that all required insurance is being maintained and that the Administrative Agent is named as loss payee and additional insured.

D. Accuracy of representations and warranties contained in the Exit Loan Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) and absence of default and event of default under the Exit Loan Documentation.

E. Compliance with customary documentation conditions for facilities of this type, including the delivery of financial statements, customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance satisfactory to the Administrative Agent and the Majority Supporting Lenders.

F. The Administrative Agent shall have a first priority perfected senior lien on the Collateral of the Credit Parties or, if agreed by the Majority Supporting Lenders, satisfactory covenants to perfect such liens promptly after the Closing Date.

| | |
|---|---|
| | G. Receipt by the Administrative Agent of customary lien searches.<br><br>H. There shall be no litigation, governmental, administrative or judicial action against the Credit Parties that could reasonably be expected to restrain or prevent the Reorganization or the Takeback Term Facility.<br><br>I. Receipt by the Exit Lenders at least three business days prior to the Closing Date of all documentation and other information about the Credit Parties reasonably requested by the Exit Lenders at least 10 business days prior to the Closing Date that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.<br><br>J. Payment by the Borrower on the Closing Date of all fees and expenses then due. |
| **Exit Loan Documentation:** | The Exit Loan Documentation will be based on the Prepetition Credit Agreement and related loan documents (collectively, the "**Prepetition Loan Documents**") and take into account the terms and conditions set forth in this Term Sheet and reflect such other terms and conditions as may be agreed between the Majority Supporting Lenders and the Borrower, it being understood and agreed that unless otherwise set forth in this Term Sheet, the Exit Loan Documentation shall not be more favorable to the Credit Parties than those contained in the Prepetition Loan Documents unless agreed to by the Majority Supporting Lenders (the "**Documentation Principles**"). |
| **Representations and Warranties:** | Usual and customary for facilities of this type consistent with the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary for facilities of this type consistent with the Documentation Principles, including, without limitation, (i) the use of commercially reasonable efforts to obtain and maintain ratings for the Takeback Term Loans from each of Standard & Poor's Financial Services LLC and Moody's Investors Service, Inc. and (ii) usual and customary covenants relating to vessels constituting Collateral ("**Vessel Collateral**"). |
| **Appraisals:** | Appraisals of Vessel Collateral shall be conducted by approved appraisers to determine both the fair market value ("**FMV**") and the |

**EXECUTION**

| | |
|---|---|
| | orderly liquidation value ("**OLV**") of the Vessel Collateral. |
| **Negative Covenants:** | Usual and customary for facilities of this type consistent with the Documentation Principles, including without limitation, limitations on (i) changes in business, etc., (ii) mergers, consolidations and dispositions, (iii) liens, (iv) indebtedness, (v) loans and investments, (vi) restricted payments (including, without limitation, prepayment of subordinated indebtedness), (vii) transactions with affiliates, (viii) shipbuilding contracts and (ix) holding company activities. |
| **Financial Covenants:** | The Takeback Term Facility shall include the following financial covenants:<br><br>(a)   A minimum consolidated interest coverage ratio (measured as the ratio of (i) Consolidated EBITDA (to be defined in a manner consistent with the Prepetition Credit Agreement, except for the inclusion of any deemed EBITDA amounts) to (ii) the sum of (A) consolidated interest expense plus (B) the scheduled principal amount of all amortization payments on long-term indebtedness) of 1.10 to 1.00, measured as of the end of each fiscal quarter.<br><br>(b)   A minimum asset coverage ratio (measured as the ratio of (i) the most recent aggregate vessel appraised value (based on OLV) to (ii) the aggregate principal amount of indebtedness then outstanding under the Exit Credit Agreement of 2.00 to 1.00, measured as of the end of each fiscal quarter.<br><br>(c)   Minimum liquidity (to be defined as unrestricted cash and cash equivalents of the Credit Parties) of $10,000,000 at all times. |
| **Events of Default:** | Usual and customary for facilities of this type consistent with Documentation Principles. |
| **Required Lenders:** | Exit Lenders holding a majority of the Takeback Term Loans. |
| **Amendments and Voting:** | Required Lenders (other than items usual and customary for facilities of this type requiring consent of either all lenders or each lender directly and adversely affected thereby). |
| **Expenses and Indemnification:** | Usual and customary for facilities of this type. |
| **Other Provisions:** | The Exit Loan Documentation shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |

**EXECUTION**

| | |
|---|---|
| **Assignments and Participations:** | Usual and customary for facilities of this type. |
| **Governing Law:** | State of New York. |

**<u>EXHIBIT C</u>**

**Corporate Structure Chart**



1. *Includes wholly-owned subsidiaries thereof.*

**EXHIBIT D**

**Liquidation Analysis**

## LIQUIDATION VALUATION ANALYSIS

The following Liquidation Analysis for the Debtor should be reviewed with the accompanying notes:

**HGIM Holdings, LLC**
**Liquidation Analysis**
$ in 000's

| Note | | 12/31/2017 Net Book Value | [ Adjustments ] | 12/31/2017 Net Book Value | Recovery Estimate (%) Low | High | Recovery Estimate ($) Low | High |
|---|---|---|---|---|---|---|---|---|
| | **Current Assets** | | | | | | | |
| [1] | Cash | $ 79,752 | $ - | $ 79,752 | 100% | 100% | $ 79,752 | $ 79,752 |
| [2] | Accounts Receivable-Net | $ 37,282 | | 37,282 | 65% | 75% | 24,233 | 27,962 |
| [3] | Due from Unrestricted Subsidiary (Current) | $ - | | - | 90% | 95% | - | - |
| [4] | Other Current Assets | $ 13,917 | | 13,917 | 10% | 20% | 1,392 | 2,783 |
| | Total Current Assets | $ 130,951 | $ - | $ 130,951 | 80% | 84% | $ 105,377 | $ 110,497 |
| | **Vessels & Other Property** | | | | | | | |
| [5] | Vessels | $ 1,460,217 | $ - | $ 1,460,217 | 17% | 22% | $ 254,321 | $ 314,177 |
| [6] | Other Fixed Assets | 132,889 | | 132,889 | 5% | 13% | 6,645 | 17,798 |
| | Total Vessels & Other Property | $ 1,593,106 | $ - | $ 1,593,106 | 16% | 21% | $ 260,966 | $ 331,975 |
| | **Other Assets** | | | | | | | |
| [7] | Long Term Receivables | $ 2,323 | $ - | $ 2,323 | 10% | 20% | $ 232 | $ 465 |
| [8] | Due from Unrestricted Subsidiary (Long Term) | $ - | | - | 0% | 0% | - | - |
| [9] | Deferred Charges, Net | $ 1,200 | | 1,200 | 0% | 0% | - | - |
| | Total Other Assets | $ 3,523 | $ - | $ 3,523 | 7% | 13% | $ 232 | $ 465 |
| | Total Assets | $ 1,727,580 | $ - | $ 1,727,580 | 21% | 26% | $ 366,575 | $ 442,937 |
| | **Gross Proceeds from Liquidation** | | | | | | | |
| [10] | less: Liquidation Adjustments | | | | | | | |
| | Post-Conversion Cash Flow | | | | | | $ - | $ - |
| | Estate Wind-Down Costs | | | | | | $ (1,500) | $ (1,500) |
| | Wages & Severance Costs | | | | | | $ (2,500) | $ (2,500) |
| | Professional Fees | | | | | | $ (7,826) | $ (9,951) |
| | Ch. 7 Trustee Fees | | | | | | $ (5,217) | $ (6,634) |
| | Broker Fees | | | | | | $ (3,913) | $ (4,975) |
| | Stacking & Employee Return Fees | | | | | | $ (1,500) | $ (1,500) |
| | Total Liquidation Adjustments | | | | | | $ (22,456) | $ (27,060) |
| | **Net Liquidation Proceeds Available for Distribution** | | | | | | $ 344,120 | $ 415,876 |

**Summary of Liquidation Proceeds Distribution**

| Note | | Estimated Claim ($) | [ Adjustments ] | Adj. Estimated Claim | Recovery Estimate (%) Low | High | Recovery Estimate ($) Low | High |
|---|---|---|---|---|---|---|---|---|
| | Net Liquidation Proceeds Available for Distribution | | | | | | $ 344,120 | $ 415,876 |
| | **Other Priority Claims** | | | | | | | |
| | Administrative Claims | $ - | - | $ - | NA | NA | $ - | $ - |
| | Priority Claims | 10,000 | | 10,000 | 100% | 100% | 10,000 | 10,000 |
| | **Total Other Priority Claims** | $ 10,000 | $ - | $ 10,000 | 100% | 100% | $ 10,000 | $ 10,000 |
| | Remaining Amount Available for Distribution - Secured Claims | | | | | | $ 334,120 | $ 405,876 |
| | **Senior Lender Claims** | | | | | | | |
| [11] | Bank of America - Revolving Credit Facility | $ 270,000 | - | $ 270,000 | 27% | 33% | $ 73,550 | $ 89,346 |
| [12] | Bank of America - Term Loan A | 114,352 | | 114,352 | 27% | 33% | 31,150 | 37,840 |
| [13] | Bank of America - Term Loan B | 842,188 | | 842,188 | 27% | 33% | 229,419 | 278,690 |
| | **Total Senior Lender Claims** | $ 1,226,539 | $ - | $ 1,226,539 | 27% | 33% | $ 334,120 | $ 405,876 |
| | Remaining Amount Available for Distribution | | | | | | $ - | $ - |
| | **General Unsecured Claims** | | | | | | | |
| | Bank of America - Revolving Credit Facility (Deficiency Claims) | $ 196,450 | - | $ 180,654 | 0% | 0% | $ - | $ - |
| | Bank of America - Term Loan A (Deficiency Claims) | 83,201 | | 76,511 | 0% | 0% | - | - |
| | Bank of America - Term Loan B (Deficiency Claims) | 612,769 | | 563,498 | 0% | 0% | - | - |
| | Other General Unsecured Claims | 25,695 | | 25,695 | 0% | 0% | - | - |
| | **Total General Unsecured Claims** | $ 918,115 | $ - | $ 846,358 | 0% | 0% | $ - | $ - |
| | Remaining Amount Available for Distribution | | | | | | $ - | $ - |

[1] Cash consists of cash in banks and highly liquid investment securities. The liquidation proceeds of cash and equivalents for all entities holding cash is estimated to be 100.0% of the book value as of December 31, 2017.

[2] The analysis of accounts receivable assumes that the Trustee would retain certain existing staff to handle a collection effort for outstanding trade accounts receivable for the entities undergoing liquidation. Collectible accounts receivable includes all third-party trade accounts receivable due under normal trade terms. In addition, the Debtors assume that some customers may decline to pay a portion of outstanding accounts receivable to offset switching costs associated with changing to a new services provider subsequent to contract termination due to insolvency. This dynamic is expected to reduce the recovery associated with the accounts receivable. For purposes of the Liquidation Analysis, the liquidation proceeds of accounts receivable is estimated to range from 65.0% to 75.0% of the book value as of December 31, 2017.

[3] Receivables due from the unrestricted subsidiary represent reimbursements for expenses incurred on the unrestricted subsidiary's behalf. For purposes of the Liquidation Analysis, HGIM Holdings LLC's claim on Harvey

Stone, LLC is assumed to not receive 503(b)(9) status in the event that Harvey Stone, LLC files for Ch. 11 bankruptcy protection. For purposes of the Liquidation Analysis, the liquidation proceeds of receivables due from the unrestricted subsidiary is estimated to range from 90.0% to 95.0% of the book value as of December 31, 2017.

[4] The majority of Other Current Assets is made up of prepaid insurance and property taxes, and the accrual of a management fee related to the Harvey Stone. Because these would have little value in a liquidation, the liquidation proceeds of prepaid expenses and other current assets is estimated to range from 10.0% to 20.0% of the book value as of December 31, 2017.

[5] For purposes of the Liquidation Analysis, the recovery estimates from the sale of vessels are based on: i) vessel features (i.e. size, DWT, age, type, purpose, etc.); ii) current classification status and vessel condition; and iii) market conditions of the fleet's geographic location. Liquidation value of vessels is estimated to range from 17.4% to 21.5% of the book value as of December 31, 2017.

[6] Other Fixed Assets include: Construction in Process vessels and equipment, machinery & equipment, furniture & fixtures, automobiles, real property, leasehold improvements, fixed assets not in service, and software. Other fixed assets are estimated to yield an additional $6.6 million - $17.8 million in a liquidation scenario, equating to a recovery rate of 5.0% to 13.4% of the book value as of December 31, 2017 on a blended basis.

[7] Most long term receivables are related to the LNG Bunkering Barge. For purposes of the Liquidation Analysis, the liquidation proceeds of long term receivables is estimated to range from 10.0% to 20.0% of the book value as of December 31, 2017.

[8] Represents an equity investment in the unrestricted subsidiary. For purposes of the Liquidation Analysis, the liquidation proceeds of the equity value in the unrestricted subsidiary is estimated to be 0.0% of the book value as of December 31, 2017.

[9] Certain vessel maintenance is capitalized and amortized, resulting in deferred charges. For purposes of the Liquidation Analysis, the recovery estimates from drydock deferred charges is estimated to be 0.0% of the book value as of December 31, 2017.

[10] Liquidation adjustments are Chapter 7 case administrative expenses which include a trustee fee of 2.0% of non-cash proceeds, legal and professional fees of 3.0% and wind-down expenses including severance, return travel expenses, and stacking expenses while the vessels are pending sale.

[11] Represents the outstanding principal balance on the revolver of $270.0M and is not adjusted for any accrued interest.

[12] Represents the outstanding principal balance on the Term Loan A of $114.4M and is not adjusted for any accrued interest.

[13] Represents the outstanding principal balance on the Term Loan B of $842.2M and is not adjusted for any accrued interest.

**<u>EXHIBIT E</u>**

**Financial Projections**

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors believe that the Prepackaged Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Prepackaged Plan. In connection with the development of the Prepackaged Plan and for the purposes of determining whether the Prepackaged Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors prepared financial projections (the "Projections") for the balance of the 2018 fiscal year, and fiscal years 2019 through 2022 (the "Projection Period"), as set forth below.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Projections to holders of Claims or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies or pursuant to the provisions of the Prepackaged Plan. In connection with the planning and the development of the Prepackaged Plan, the Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Prepackaged Plan. The Projections assume that the Prepackaged Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts and variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development and production, demand for vessel services, competition within the industry, changes in the political environment, regulatory changes, and/or a variety of other factors. Consequently, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, the Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Projections included herein were last updated on February 16, 2018.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS. THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARDLOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PREPACKAGED PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE

MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PREPACKAGED PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth in this Disclosure Statement, the Prepackaged Plan, and the Prepackaged Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

| *(in US$ in thousands)* | 2017A | 2018F | 2019F | 2020F | 2021F | 2022F |
|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | |
| **Total Revenue** | **215,384** | **159,131** | **175,467** | **250,446** | **357,615** | **450,197** |
| Vessel Operating Expenses | 64,285 | 51,636 | 55,430 | 72,576 | 98,924 | 126,604 |
| Dry Docking Expense | - | 2,875 | 2,688 | 2,563 | 2,000 | 1,875 |
| Vessel Operating Expenses - Other | 85 | - | 1,800 | 3,000 | 1,500 | 900 |
| Start Up Costs | 4,810 | 1,000 | - | - | - | - |
| Other Operating Expenses | 5,134 | 2,496 | 2,496 | 3,441 | 6,771 | 13,296 |
| **Direct Vessel Profit** | **141,069** | **101,124** | **113,054** | **168,866** | **248,420** | **307,523** |
| *Margin %* | *65%* | *64%* | *64%* | *67%* | *69%* | *68%* |
| Depreciation & Amortization | 82,110 | 85,594 | 83,382 | 82,588 | 83,221 | 80,973 |
| G&A Expense | 21,874 | 20,389 | 23,592 | 29,266 | 34,735 | 37,755 |
| **Operating Profit** | **37,085** | **(4,860)** | **6,080** | **57,012** | **130,463** | **188,794** |
| *Margin %* | *17%* | *-3%* | *3%* | *23%* | *36%* | *42%* |
| Interest Expense, net | 67,276 | 48,117 | 31,907 | 30,523 | 30,119 | 29,696 |
| Other Expense (Income) | (20,927) | - | - | - | - | - |
| Restructuring Costs | 11,239 | 21,021 | - | - | - | - |
| **Net Income** | **(20,502)** | **(73,997)** | **(25,827)** | **26,489** | **100,344** | **159,098** |
| *Margin%* | *-10%* | *-47%* | *-15%* | *11%* | *28%* | *35%* |
| (+) Interest Expense | 67,276 | 48,117 | 31,907 | 30,523 | 30,119 | 29,696 |
| (+) D&A Expense | 82,110 | 85,594 | 83,382 | 82,588 | 83,221 | 80,973 |
| (+) Restructuring Costs | 11,239 | 21,021 | - | - | - | - |
| (+/-) Other Expense (Income) | (20,927) | - | - | - | - | - |
| **EBITDA** | **119,195** | **80,735** | **89,462** | **139,600** | **213,684** | **269,767** |
| *Margin%* | *55%* | *51%* | *51%* | *56%* | *60%* | *60%* |

| (in US$ in thousands) | 2017A | 2018F | 2019F | 2020F | 2021F | 2022F |
|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and Cash Equivalents | 85,811 | 103,686 | 127,522 | 205,811 | 347,759 | 544,996 |
| Accounts Receivable, net of Allowance | 38,982 | 30,016 | 35,130 | 50,365 | 69,397 | 83,161 |
| Other Current Assets | 13,943 | 7,161 | 7,896 | 11,270 | 16,093 | 20,259 |
| Total Current Assets | 138,736 | 140,863 | 170,548 | 267,446 | 433,249 | 648,416 |
| Fixed Assets | | | | | | |
| Vessels & Other Property, net | 1,645,151 | 1,603,642 | 1,525,358 | 1,451,775 | 1,383,141 | 1,323,407 |
| Asset Value | 1,645,151 | 1,603,642 | 1,525,358 | 1,451,775 | 1,383,141 | 1,323,407 |
| Other Assets | | | | | | |
| Non Current Accounts Receivable and Other | 2,323 | 450 | 527 | 755 | 1,041 | 1,247 |
| Restricted Cash | 3,338 | 3,338 | 3,338 | 3,338 | 3,338 | 3,338 |
| Deferred Charges, net | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| Total Other Assets | 6,861 | 4,988 | 5,065 | 5,293 | 5,579 | 5,785 |
| **Total Assets** | **1,790,748** | **1,749,493** | **1,700,971** | **1,724,515** | **1,821,969** | **1,977,608** |
| **LIABILITIES** | | | | | | |
| Current Liabilities | | | | | | |
| Accounts Payable | 9,600 | 6,588 | 8,507 | 10,403 | 13,775 | 16,700 |
| Other Accrued Liabilities | 12,929 | 4,429 | 6,429 | 8,429 | 10,429 | 12,429 |
| Accrued Interest | 37,227 | - | - | - | - | - |
| Income Taxes Payable | 390 | 390 | 390 | 390 | 390 | 390 |
| Current Maturities of Long-Term Debt | 131,675 | 2,918 | 6,982 | 8,402 | 8,524 | 315,127 |
| Total Current Liabilities | 191,821 | 14,325 | 22,307 | 27,624 | 33,118 | 344,646 |
| Long Term Debt | | | | | | |
| Long Term Debt | 1,099,063 | - | - | - | - | - |
| Unrestricted Sub Debt | 38,105 | 35,186 | 32,142 | 28,990 | 25,716 | 22,315 |
| New Term Loan | - | 350,000 | 322,226 | 316,976 | 311,726 | - |
| Deferred Financing Fees, net | (11,554) | (978) | (838) | (698) | (557) | (417) |
| Total Long Term Debt | 1,125,614 | 384,208 | 353,530 | 345,269 | 336,885 | 21,898 |
| Long Term Liabilities | | | | | | |
| Deferred Income Tax | 99,247 | 99,247 | 99,247 | 99,247 | 99,247 | 99,247 |
| Accrued Long Term Fees & Other | 3,054 | - | - | - | - | - |
| Total Long Term Liabilities | 102,301 | 99,247 | 99,247 | 99,247 | 99,247 | 99,247 |
| **EQUITY** | | | | | | |
| Equity Units | 310,350 | 310,350 | 310,350 | 310,350 | 310,350 | 310,350 |
| Retained Earnings | 60,662 | 941,363 | 915,536 | 942,025 | 1,042,369 | 1,201,467 |
| Total Equity | 371,012 | 1,251,713 | 1,225,886 | 1,252,375 | 1,352,719 | 1,511,817 |
| **Total Liabilities and Equity** | **1,790,748** | **1,749,493** | **1,700,971** | **1,724,515** | **1,821,969** | **1,977,608** |

| (in US$ in thousands) | 2017A | 2018F | 2019F | 2020F | 2021F | 2022F |
|---|---|---|---|---|---|---|
| **CASH FLOW** | | | | | | |
| Net Income | (20,502) | (73,997) | (25,827) | 26,489 | 100,344 | 159,098 |
| Depreciation & Amortization | 82,110 | 85,594 | 83,382 | 82,588 | 83,221 | 80,973 |
| Accrued Interest | 34,584 | 21,615 | - | - | - | - |
| (Increase) / Decrease in Working Capital | - | - | | | | |
| Accounts Receivable | 3,826 | 8,966 | (5,114) | (15,235) | (19,032) | (13,764) |
| Other Current Assets | 2,406 | 6,782 | (735) | (3,374) | (4,823) | (4,166) |
| Accounts Payable | (1) | (3,012) | 1,919 | 1,896 | 3,372 | 2,925 |
| Accrued Income Taxes | (1) | - | - | - | - | - |
| Accrued Liabilities & Other | 6,896 | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 |
| **Cash from Operations** | **109,318** | **47,449** | **55,624** | **94,364** | **165,082** | **227,065** |
| Change in PP&E | (59,523) | (27,246) | (4,957) | (8,865) | (14,447) | (21,098) |
| Changes in Restricted Cash | 560 | - | - | - | - | - |
| Change in Other Assets | (2,138) | 1,873 | (77) | (229) | (285) | (206) |
| **Cash from Investing Activities** | **(61,101)** | **(25,374)** | **(5,034)** | **(9,094)** | **(14,732)** | **(21,305)** |
| Net Borrowings (Repayments) | (28,024) | (4,200) | (26,754) | (6,982) | (8,402) | (8,524) |
| Borrowings on Revolver | 75,550 | - | - | - | - | - |
| Changes in Deferred Financing Fees | 5,412 | - | - | - | - | - |
| Change in Long Term Liabilities | (20,131) | - | - | - | - | - |
| Other Financing Activities | 3 | 0 | 0 | (0) | (0) | 0 |
| **Cash from Financing Activities** | **32,810** | **(4,200)** | **(26,754)** | **(6,982)** | **(8,402)** | **(8,524)** |
| **Net Cash Flow** | **81,027** | **17,875** | **23,836** | **78,289** | **141,948** | **197,237** |

## NOTES TO FINANCIAL PROJECTIONS

1.  **General Assumptions**

*Presentation.* The Projections are presented on a consolidated basis, including estimates of operating results for Debtor and non-Debtor entities, combined.

*Methodology*. In developing the projections, the management team considered expected customer activity levels based on current working rig count outlook and historical trends. Projected cash flows are based on the assumption that activity levels in offshore exploration and development will begin to recover in 2018 in response to improved oil and natural gas prices and increasing E&P capital expenditure budgets. These projections were developed on a vessel by vessel basis and the Debtors evaluated the likelihood of each of Harvey Gulf's vessels being utilized over the forecast period. While asset sales are contemplated, these are not included in the projections.

*Plan Consummation.* The Projections assume that the Prepackaged Plan will be consummated on or about April 30, 2018.

2.  **Assumptions With Respect to the Projected Income Statement**

*Revenues*. In the projections, revenues are forecasted by individual operating vessels. The management team developed activity and pricing assumptions based on historical levels and expected future commodity pricing. Vessel level revenue projections are based upon activity and pricing levels which are influenced by utilization of the "Active" vessel fleet and

expectations with respect to future contracts for each vessel. The management team has also included revenue from contract cancellations as well as other miscellaneous revenue items.

*Operating Costs*. The direct cost forecast is based on the management team's review of historical operating results, planned utilization levels and associated cost impact and an evaluation of opportunities to reduce costs. Direct costs consist primarily of labor costs, materials and supplies necessary to complete forecasted jobs, repairs and maintenance (inclusive of drydock and IWS expenses), and other direct costs incurred in the normal course of completing a job.

*General and Administrative*. General and administrative costs ("G&A") are comprised primarily of indirect labor costs and other expenses associated with corporate overhead. The amount of G&A is based on historical G&A cost trends, adjusted for cost reduction efforts. Expected annual inflation rates were then applied over the Projection Period.

*Depreciation and Amortization*. Depreciation and amortization reflects the anticipated depreciation and amortization of the Company's net property, plant & equipment and intangible assets based on book values.

*Interest Expense*. Interest expense is forecast based on the Debtors' proposed exit financing as more fully described in the Prepackaged Plan and the exhibits hereto.

*Income Tax (Expense) Benefit.* Income tax is based on the average jurisdictional mix of the Company's projected revenue and expenses. The Company is estimating there will be NOL carryforwards available after consummation of the Prepackaged Plan; however, the use of the NOL will be limited by section 382.

*Restructuring Expenses.* Restructuring Expenses include costs related to the recapitalization process., including but not limited to professional fees, claims administration and other items. Estimated amounts are based on the terms of contracts and historical precedent.

### 3.   Assumptions With Respect to the Projected Balance Sheet and Projected Statement of Cash Flows

*Working Capital*. Working capital assumptions are based on historical days' sales outstanding and historical days payable as well as historical levels of prepaid and other current assets and current liabilities.

*Capital Expenditures*. Capital expenditures primarily relate to maintenance-oriented capital necessary to maintain the service capability of the Company's existing assets in the normal course of business. In addition, the projections include capital associated with ongoing major refurbishment and overhaul work that may be needed based on historical precedent.

*Long Term Debt.* Reflects the terms of the financing transactions contemplated by the Prepackaged Plan.

**<u>EXHIBIT F</u>**

**Valuation Analysis**

## VALUATION ANALYSIS

### A.      Estimated Reorganization Valuation of the Debtor

THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTOR.

The Debtors have been advised by Blackhill Partners, LLC ("***Blackhill***") with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Prepackaged Plan, the range of a reorganization value of the Reorganized Debtors (the "***Enterprise Value***") was estimated to be approximately $730 million to $1,080 million (with a midpoint estimate of approximately $900 million) as of an assumed Effective Date of May 1, 2018. The valuation analysis herein is based on information as of the date of the Disclosure Statement and is based on the Projections for the Projection Period. For purposes of this valuation, it has been assumed that no material changes that would affect value occur between the date of the Disclosure Statement and the assumed Effective Date. Blackhill's estimate of a range of Enterprise Values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Prepackaged Plan or of the terms and provisions of the Prepackaged Plan.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MAY 1, 2018, REFLECTS WORK PERFORMED BY BLACKHILL ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO BLACKHILL AS OF FEBRUARY 8, 2018. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT BLACKHILL'S CONCLUSIONS, BLACKHILL DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

The estimated values set forth in this section: (i) do not purport to constitute an appraisal of the assets of the Reorganized Debtor; (ii) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan; (iii) do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan; and (iv) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtor.

Based upon the estimated range of the Enterprise Value of the Reorganized Debtors of between $730 million and $1,080 million and assumed adjusted net debt of $307 million (assuming a pro forma debt balance of $390 million less cash balance of $83 million), Blackhill has employed an imputed estimate of the range of equity value for the Reorganized Debtors (the "***Equity Value***") between approximately $423 million and $773 million, with a midpoint estimate of $598 million.

The estimated range of reorganization value was based on the Projections for the Projection Period, as set forth previously.

BLACKHILL DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH BLACKHILL'S ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE

VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY BLACKHILL REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PREPACKAGED PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PREPACKAGED PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, BLACKHILL, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Blackhill assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the Reorganized Debtors will achieve their Projections in all material respects, including revenue growth, EBITDA margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, Blackhill: (a) reviewed certain current and historical operations and financial performance of the Debtors; (b) reviewed certain financial projections, including various supporting schedules and other related financial information of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team and professionals; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Blackhill deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Blackhill assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

The estimated Enterprise Value and Equity Value do not constitute a recommendation to any holder of

Allowed Claims as to how such person should vote or otherwise act with respect to the Prepackaged Plan. Blackhill has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time. The estimated Enterprise Value and Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Prepackaged Plan or of the terms and provisions of the Prepackaged Plan.

Based on the Debtors' and their tax professionals' tax analysis, the Reorganized Debtors expect to have some limited tax attributes following the reorganization. Blackhill estimated the value of the tax attributes based on the Reorganized Debtors' projections and incorporated a net present value of approximately $32 million in the Total Enterprise Value. Any changes to the assumptions on the availability of tax attributes (including with respect to any net unrealized built-in gains) or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Blackhill's valuation analysis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY BLACKHILL REPRESENT ESTIMATED VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH BLACKHILL'S VALUATION ANALYSIS.

BLACKHILL IS ACTING AS INVESTMENT BANKER TO THE COMPANY, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE.